**<u>Exhibit 1</u>**

**Asset Purchase Agreement**

**EXECUTION VERSION**

**ASSET PURCHASE AGREEMENT**

by and among

Cider Leasing LLC and Ace Cider I LLC

as Purchaser

and

California Cider Company Inc., dba Ace Cider Company

and the other Sellers party hereto

Dated as of September 17, 2024

## TABLE OF CONTENTS

**Page**

I.    DEFINITIONS ................................................................................................ 1

    1.1    Certain Definitions ......................................................................... 1
    1.2    Terms Defined Elsewhere in this Agreement ................................ 5
    1.3    Other Definitional and Interpretive Matters. ............................... 6

II.    PURCHASE AND SALE OF ASSETS ........................................................ 8

    2.1    Purchase and Sale of Assets ......................................................... 8
    2.2    Excluded Assets ............................................................................ 9
    2.3    Assumption of Liabilities ............................................................. 9
    2.4    Excluded Liabilities ...................................................................... 9
    2.5    Cure Amounts .............................................................................. 10
    2.6    Non-Assignment of Assets. ......................................................... 10
    2.7    Further Conveyances and Assumptions ...................................... 11

III.    CONSIDERATION ..................................................................................... 11

    3.1    Consideration ............................................................................... 11
    3.2    Purchase Price Deposit ................................................................ 11
    3.3    Payment of Purchase Price ........................................................... 11

IV.    CLOSING AND TERMINATION .............................................................. 12

    4.1    Closing Date ................................................................................. 12
    4.2    Deliveries by Sellers .................................................................... 12
    4.3    Deliveries by Purchaser ............................................................... 12
    4.4    Termination of Agreement ........................................................... 12
    4.5    Procedure Upon Termination ....................................................... 14
    4.6    Effect of Termination ................................................................... 14

V.    REPRESENTATIONS AND WARRANTIES OF SELLERS ...................... 14

    5.1    Organization and Good Standing ................................................. 14
    5.2    Authorization of Agreement ........................................................ 14
    5.3    Governmental Consents ............................................................... 15
    5.4    Title to Purchased Assets ............................................................. 15
    5.5    Validity of Purchased Contracts .................................................. 15
    5.6    SEC Documents ........................................................................... 15
    5.7    Litigation ...................................................................................... 16
    5.8    Compliance with Laws ................................................................ 16
    5.9    Employee Compensation and Employee Benefit Plans; ERISA ........ 16
    5.10    Labor Matters .............................................................................. 17
    5.11    Intellectual Property .................................................................... 17
    5.12    Financial Advisors ....................................................................... 18
    5.13    Taxes ............................................................................................ 18

i

# TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| | 5.14 | No Other Representations or Warranties; Schedules | 18 |
| VI. | | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 19 |
| | 6.1 | Organization and Good Standing | 19 |
| | 6.2 | Authorization of Agreement | 19 |
| | 6.3 | Consents and Approvals; No Violations | 19 |
| | 6.4 | Financial Capability | 20 |
| | 6.5 | Condition of the Purchased Assets | 20 |
| | 6.6 | Exclusivity of Representations and Warranties | 20 |
| VII. | | BANKRUPTCY COURT MATTERS | 21 |
| | 7.1 | Submission for Bankruptcy Court Approval | 21 |
| | 7.2 | Bankruptcy Process | 21 |
| | 7.3 | Approval of Break-Up Fee and Expense Reimbursement | **Error! Bookmark not defined.** |
| | 7.4 | Back-Up Bidder | 23 |
| VIII. | | COVENANTS | 23 |
| | 8.1 | Access to Information | 23 |
| | 8.2 | Actions Pending the Closing | 23 |
| | 8.3 | Consents | 24 |
| | 8.4 | Reasonable Best Efforts; Consents to Assignment | 24 |
| | 8.5 | Publicity | 25 |
| | 8.6 | Confidentiality | 25 |
| | 8.7 | Transition and Access Agreements | 26 |
| | 8.8 | Employee Matters | 26 |
| | 8.9 | Releases | 27 |
| | 8.10 | Bulk Transfer Laws | 27 |
| IX. | | CONDITIONS TO CLOSING | 28 |
| | 9.1 | Conditions Precedent to Obligations of Purchaser | 28 |
| | 9.2 | Conditions Precedent to Obligations of Sellers | 28 |
| | 9.3 | Conditions Precedent to Obligations of Purchaser and Sellers | 29 |
| | 9.4 | Frustration of Closing Conditions | 29 |
| X. | | TAXES | 29 |
| | 10.1 | Transfer Taxes | 29 |
| | 10.2 | Purchase Price Allocation | 30 |
| | 10.3 | Cooperation and Audits | 30 |
| XI. | | GENERAL GOVERNING PROVISIONS | 31 |

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 11.1 | No Survival of Representations and Warranties | 31 |
| 11.2 | Expenses | 31 |
| 11.3 | Injunctive Relief | 31 |
| 11.4 | Submission to Jurisdiction; Consent to Service of Process. | 31 |
| 11.5 | Waiver of Right to Trial by Jury | 32 |
| 11.6 | Entire Agreement; Amendments and Waivers | 32 |
| 11.7 | Governing Law | 32 |
| 11.8 | Notices | 32 |
| 11.9 | Severability | 33 |
| 11.10 | Assignment | 33 |
| 11.11 | Non-Recourse | 34 |
| 11.12 | Counterparts | 34 |

**Exhibit**

| | |
|---|---|
| Exhibit A | Business Employees |
| Exhibit B | Sale Order |
| Exhibit C | Liabilities of Business Employees |
| Exhibit D | Form of Bill of Sale. |
| Exhibit E | Form of Assignment and Assumption Agreement. |
| Exhibit F | Form of IP Assignment Agreements |

**Schedules**

| | |
|---|---|
| Schedule 1.1(a) | Sellers' Knowledge |
| Schedule 1.1(b) | Leased Real Property |
| Schedule 2.1(b)(i) | Purchased Intellectual Property |
| Schedule 2.1(b)(v) | Purchased Contracts |
| Schedule 5.3 | Governmental Consents |
| Schedule 5.4 | Title to Purchased Assets |
| Schedule 5.6 | SEC Documents |
| Schedule 5.7 | Litigation |
| Schedule 5.8 | Compliance with Laws |
| Schedule 5.12 | Financial Advisors |

NAI-1541177416v2

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>"), dated as of September 17, 2024 (the "<u>Effective Date</u>"), is by and among Cider Leasing LLC, a Delaware limited liability company ("<u>Purchaser 1</u>") and Ace Cider I LLC, a Delaware limited liability company (together with Purchaser 1, "<u>Purchaser</u>"), California Cider Company Inc., dba Ace Cider Company a California corporation (the "<u>Company</u>" or "<u>Seller</u>"), and the Debtors (as defined below).  Certain capitalized terms used in this Agreement that are not otherwise defined are defined in <u>Article I</u>.

A.    Seller has filed a voluntary petition for relief under Chapter 11 of Title 11 (the "<u>Bankruptcy Case</u>") of the United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>").

B.    Seller engages in the business of producing and selling hard cider under wholly-owned brands (the "<u>Business</u>").

C.    Seller desires to sell to Purchaser the Purchased Assets and assign to Purchaser the Assumed Liabilities and Purchaser desires to purchase from Seller the Purchased Assets and assume the Assumed Liabilities, in each case, upon the terms and conditions set forth in this Agreement.

D.    On the terms and subject to the conditions set forth herein, in connection with Case No. 24-11575 (the "<u>Bankruptcy Case</u>"), Seller intends to request that the Bankruptcy Court authorize and approve the Transactions pursuant to Sections 105, 363 and 365 of the Bankruptcy Code  and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, which Sale Order will include the authorization for the assignment by the applicable Seller to, and the assumption by, Purchaser of the Purchased Contracts and the Assumed Liabilities thereunder in accordance with Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree:

## I.    DEFINITIONS

1.1    <u>Certain Definitions</u>.  For purposes of this Agreement, each of the following terms, when used herein with initial capital letters, has the meaning specified in this <u>Section 1.1</u> or in the other Sections of this Agreement identified in <u>Section 1.2</u>:

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Bankruptcy Estate" means all property of the Sellers' bankruptcy estates as provided by Section 541 of the Bankruptcy Code.

"Bidding Procedures Order" means an Order of the Bankruptcy Court (including any attachment thereto) approving, among other things, the (a) bidding procedures for conducting a sale and auction of the Purchased Assets and (b) procedures relating to the assumption and assignment of executory Contracts and unexpired leases.

"Business Day" means any day other than a Saturday, a Sunday or any other day on which commercial banks in New York, New York are authorized or required by Law to close.

"Business Employee" means those certain employees identified on Exhibit A.

"Code" means the Internal Revenue Code of 1986.

"Contract" means any written contract, agreement, commitment, promise or undertaking (including any indenture, note, bond or other evidence of indebtedness, lease, instrument, license, lease, purchase order or other legally binding agreement).

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions thereof or related or associated epidemics, pandemic or disease outbreaks.

"Cure Costs" means monetary amounts that must be paid and obligations that otherwise must be satisfied under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of any Purchased Contract, as agreed upon by the Parties or determined by the Bankruptcy Court pursuant to the procedures in the Bidding Procedures Order.

"Debtors" means the following eleven debtors as identified in the Bankruptcy Case: (1) Meier's Wine Cellars Acquisition, LLC; (2) California Cider Co., Inc.; (3) Girard Winery LLC; (4) Grove Acquisition, LLC; (5) Meier's Wine Cellars, Inc.; (6) Mildara Blass Inc.; (7) Sabotage Wine Company, LLC; (8) Thames America Trading Company Ltd.; (9) Vinesse, LLC; (10) Vintage Wine Estates, Inc. (CA); and (11) Vintage Wine Estates, Inc. (NV).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"Exchange Act" means the Securities Exchange Act of 1934.

"GAAP" means generally accepted accounting principles in the United States.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, or any agency, authority, department, commission, board, bureau, official or instrumentality of such body, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator thereof (public or private) of competent jurisdiction.

2

"Intellectual Property" means all intellectual property, including (a) patents and patent applications, continuations, divisionals, continuations-in-part, reissues and reexaminations, (b) trademarks, service marks, trade dress, logos, corporate names, domain names and trade names, together with the goodwill associated with any of the foregoing, and all applications and registrations therefor, (c) copyrights, copyrightable works, rights in databases, data collections, copyright registrations and copyright applications and corresponding rights in works of authorship, (d) trade secrets, processes, formulas, recipes, (e) Software in any form, including internet websites, web content and links, source code, object code and mobile applications, and (f) rights of publicity and personality.

"IRS" means the Internal Revenue Service.

"Knowledge of Sellers" or "Sellers' Knowledge" means the actual knowledge, as of the applicable date, of those Persons identified on Schedule 1.1(a).

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule, regulation, Order, stipulation, award or common law requirement.

"Leased Real Property" means real property leased, subleased, or licensed by, or for which a right to use or occupy has been granted to, Seller set forth on Schedule 1.1(b).

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, loss, liability, claim (including "claim" as defined in the Bankruptcy Code), commitment, undertaking, damage, expense, fine, penalty, cost, royalty, deficiency or obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, disclosed or undisclosed, express or implied, primary or secondary, direct or indirect, matured or unmatured, fixed, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due, and whether in contract, tort or otherwise.

"Lien" as applied to any Person means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, sublease, charge, option, right of first offer or first refusal, right of use or possession, restriction, easement, servitude, restrictive covenant, encroachment or encumbrance or any other similar encumbrance or restriction in respect of an asset of such Person, whether imposed by Law, Contract or otherwise.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of, or entered, issued, made or rendered by, a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business consistent with past practice.

"Party" or "Parties" means Purchaser and each Seller, as the case may be.

"Permitted Exception" means any Lien that the Purchased Assets may not be sold free and clear of under Section 363(f) of the Bankruptcy Code.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Purchaser Material Adverse Effect" means any event, change, effect, condition, state of facts or occurrence (collectively, a "Change") which has had or would reasonably be expected to have, individually or when considered together with any other Change, a material adverse effect on the ability of Purchaser to consummate the Transactions prior to the Termination Date or to otherwise timely perform its obligations under this Agreement.

"Qualified Bid" means as set forth in the Order Approving Bid Procedures.

"Representative" means, with respect to any Person, any and all of its directors, officers, partners, managers, employees, consultants, financial advisors, counsel, accountants and other agents.

"Sale Order" means an Order entered by the Bankruptcy Court, pursuant to Sections 363 and 365 of the Bankruptcy Code, authorizing and approving, among other things, (a) the sale of the Purchased Assets, (b) the assumption of the Assumed Liabilities by Purchaser, and (c) the assumption and assignment of the Purchased Contracts, in accordance with the terms and conditions of this Agreement, substantially in the form attached hereto as Exhibit B.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933.

"Seller Material Adverse Effect" means any Change which has a material adverse effect on the Purchased Assets, except that none of the following, alone or in combination, will be deemed to constitute, nor will any of the following (including the effect of any of the following) be taken into account in determining whether there has been or will be, a "Seller Material Adverse Effect": (a) any Change in the United States or foreign economies or financial markets in general, (b) any Change that generally affects the industries in which the Business operates, (c) any Change arising in connection with pandemics (including COVID-19), earthquakes, hurricanes, tornadoes, fires, acts of God, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such matters, or any response of any Governmental Body to any of the foregoing, (d) any Change in applicable Laws or accounting rules, (e) any Change resulting from the public announcement of this Agreement or the Bankruptcy Cases, or (f) any effect resulting from (i) the commencement or filing of the Bankruptcy Cases, or (ii) any Seller's inability to pay certain prepetition obligations as a result of the commencement of the Bankruptcy Cases; provided, however, that with respect to clauses (a), (b), (c) and (d), such effects will only be excluded from consideration to the extent the applicable matter does not disproportionately materially adversely affect the Business as compared to similarly situated businesses operating in the same industry and geographic areas in which Sellers operate.

"Software" means all computer software and code, including assemblers, applets, compilers, source code, object code, development tools, design tools, user interfaces, databases and data, in any form or format, however fixed, including any related documentation.

"<u>Subsidiary</u>" means each corporation or other Person in which a Person owns or controls, directly or indirectly, capital stock or other equity interests representing more than 50% of the outstanding voting stock or other equity interests.

"<u>Tax Authority</u>" means any government, agency, or instrumentality thereof, charged with the administration of any Law or regulation relating to Taxes.

"<u>Tax Returns</u>" means any return, declaration, report, claim for refund or information return or statement relating to Taxes required to be filed with any Governmental Body, including any schedule or attachment thereto and any amendment thereof.

"<u>Taxes</u>" means (a) all federal, state, local, provincial, municipal, foreign or other taxes, charges or other assessments, including, without limitation, all income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, net worth, intangibles, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, intangibles, goods and services, customs duties, conveyance, mortgage, registration, documentary, recording, premium, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, unemployment insurance, severance, environmental (including taxes under Section 59A of the Code), disability, workers' compensation, health care natural resources, excise, severance, stamp, occupancy, rent, real property, personal property, estimated or other similar taxes, duties, levies or other governmental charges or assessments or deficiencies thereof, (b) any item described in clause (a) for which a taxpayer is liable as a transferee or successor, by reason of the regulations under Section 1502 of the Code (or similar provisions of state, local, foreign or other law), or by contract, indemnity or otherwise, and (c) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clauses (a) or (b).

"<u>Transactions</u>" means the transactions contemplated by this Agreement.

"<u>Transferred Exception</u>" means title of a lessor under a capital or operating lease if such lease is a Purchased Contract.

"<u>Trust Account</u>" means the trust account maintained by Epiq Corporate Restructuring, LLC.

1.2    <u>Terms Defined Elsewhere in this Agreement</u>.  For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
|---|---|
| Agreement | Preamble |
| Allocation Notice of Objection | 10.2(a) |
| Assumed Cure Costs | 2.5 |
| Assumed Liabilities | 2.3 |
| Auction | 7.2(b) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |

5

| Term | Section |
| --- | --- |
| Business | Recitals |
| Cash Amount | 3.1 |
| Closing | 4.1 |
| Closing Date | 4.1 |
| Company | Preamble |
| Company Disclosure Letter | Article V |
| Company Permits | 5.8 |
| Company Plan | 5.9(a) |
| Company SEC Documents | 5.6 |
| Competing Bid | 7.2 |
| Confidentiality Agreement | 8.6 |
| Deposit Amount | 3.2 |
| Effective Date | Preamble |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Final Allocation Statement | 10.2(a) |
| HSR Act | 8.4(a) |
| Necessary Consent | 2.6(a) |
| Prepayments | 2.1(b)(ix) |
| Proposed Allocation Statement | 10.2(a) |
| Purchase Price | 3.1 |
| Purchased Assets | 2.1(b) |
| Purchased Contracts | 2.1(b)(v) |
| Purchased Intellectual Property | 2.1(b)(i) |
| Purchaser | Preamble |
| Purchaser Disclosure Letter | Article VI |
| Seller or Sellers | Preamble |
| Termination Date | 4.4(a) |
| Termination Payment | 7.3 |
| Transfer Taxes | 10.1 |
| Transferred Employees | 8.8(a) |
| WARN Act | 5.10(b) |

1.3    <u>Other Definitional and Interpretive Matters</u>.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

(i)    <u>Calculation of Time Period</u>.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded, and the words "<u>to</u>" and "<u>until</u>" shall be deemed to exclude the date referred to. If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action will be extended to the next succeeding Business Day.

NAI-1541177416v2

(ii)    <u>Contracts</u>.  Reference to any Contract means such Contract as amended or modified and in effect from time to time in accordance with its terms.

(iii)   <u>Dollars</u>.  Any reference in this Agreement to Dollars or $ will mean U.S. dollars.

(iv)   <u>Exhibits/Schedules</u>.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Agreement.

(v)    <u>GAAP</u>.  Terms used herein which are defined in GAAP are, unless specifically defined herein, used herein as defined in GAAP.

(vi)   <u>Gender and Number</u>.  Any reference in this Agreement to gender will include all genders, and words imparting the singular number only will include the plural and vice versa.

(vii)  <u>Headings</u>.  The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any Article, Section, Recital, Exhibit or Schedule are to the corresponding Article, Section, Recital, Exhibit or Schedule of or to this Agreement unless otherwise specified.

(viii) <u>Herein</u>.  The words such as "<u>herein</u>," "<u>hereinafter</u>," "<u>hereof</u>" and "<u>hereunder</u>" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(ix)   <u>Including</u>.  The word "<u>including</u>" or any variation thereof means "<u>including, without limitation</u>" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x)    <u>Extent</u>. The word "<u>extent</u>" and the phrase "<u>to the extent</u>" mean the degree to which a subject or other thing extends, and do not simply mean "if".

(xi)   <u>Law</u>.  Reference to any Law means such Law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect from time to time, including any successor legislation thereto and any rules and regulations promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, replacement or re-enactment of such section or other provision.

(xii)  <u>Covenants</u>. Where <u>Article VIII</u> provides that a Party shall perform or comply with an obligation or agreement contained therein, such provision shall not be construed as such Party providing a guarantee or warranty with respect to such performance

NAI-1541177416v2

or compliance but shall be construed as requiring such Party to perform or comply to the extent within its control.

(b)     The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## II.     PURCHASE AND SALE OF ASSETS

2.1     <u>Purchase and Sale of Assets</u>.

(a)     On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser or one or more of its designees will purchase, acquire and accept from Seller, and Seller will sell, transfer, convey and deliver to Purchaser or one or more of its designees, all of such Seller's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than Liens created by Purchaser, Permitted Exceptions and Transferred Exceptions) and Excluded Liabilities. To the extent any of the Debtors is in possession of Purchased Assets exclusive to the Business, those certain assets will be transferred by the Debtor to Purchaser as a part of the Purchased Assets transferred to Purchaser as a part of this Agreement.

(b)     The term "<u>Purchased Assets</u>" means all of the following assets, and rights of any Seller existing as of the Closing, and not including any Excluded Asset:

(i)     all intellectual property related exclusively to the Business and the Purchased Assets and associated goodwill, including without limitation the trademark ACE (the "<u>Brand</u>"), any trade names, fictitious business names, designs, recipes, formulas, processes, can and label approvals, copyrights, social media accounts, customer lists, mailing lists, websites, content, and domain names (the "<u>Purchased Intellectual Property</u>");

(ii)    all case goods and work in process inventory and any non-cider retail inventory associated exclusively with the Brand ("<u>Purchased Inventory</u>");

(iii)   all production related supplies and equipment, tasting room furniture and equipment, vehicles and forklifts and trailers, and all other personal property used exclusively in connection with the Business;

(iv)    all permits, licenses or other approvals issued to Seller by any governmental agency or authority which relate exclusively to the Business or the Purchased Assets that are currently in force and are transferable to Purchaser;

(v)     all right, title and interest of Seller now or hereafter existing, in, to and under the Contracts related exclusively to the operation of the Business, which are (A) are set forth on <u>Schedule 2.1(b)(v)</u>, (B) are unexpired as of the Closing Date (including those Contracts that have been previously unrenewed), and (C) have not been rejected (or are the subject of a notice of rejection or a pending rejection motion) by any Seller (the "<u>Purchased Contracts</u>");

8

(vi)    all warranties, guarantees and similar rights related to the Purchased Assets, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets, and claims against suppliers and other third parties in connection with the Purchased Contracts;

(vii)    all production records and data, price lists, distribution lists, supplier lists, quality control records and procedures, sales material and records, and marketing material and research used by Seller exclusively in connection with the Brand;

(viii)    all right, title and interest in and to the Leased Real Property;

(ix)    all amounts prepaid by Seller in respect of rent for the Leased Real Property (the "Prepayments"); and

(x)    all goodwill related to the Purchased Assets.

2.2    Excluded Assets.    Nothing herein contained will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers will retain all right, title and interest to, in and under the Excluded Assets.  The term "Excluded Assets" means all properties, assets, and rights of any Seller existing as of the Closing that are not a Purchased Asset, including (a) all causes of action arising under the Bankruptcy Code, (b) any refunds, overpayments, credits, or rebates of Taxes of any Seller, (c) all Tax Returns of the Sellers other than Tax Returns that relate solely to the Purchased Assets, and (d) all claims, rights and causes of action arising from the Transactions.

2.3    Assumption of Liabilities.    On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will assume or will cause one or more of its designees to assume, effective as of the Closing, and will timely perform and discharge in accordance with their respective terms, the following Liabilities existing as of the Closing Date and no other Liabilities of Sellers or any of their Affiliates (collectively, the "Assumed Liabilities"):

(a)    all Liabilities arising from the ownership or operation of the Purchased Assets or the Business after the Closing;

(b)    any Assumed Cure Costs that Purchaser is required to pay pursuant to Section 2.5;

(c)    all Liabilities of Sellers under the Purchased Contracts and the Leased Real Property arising after the Closing; and

(d)    the Liabilities of Business Employees for periods prior to the Closing Date, including in respect of wages and other compensation in the amount of $33,000.00 as set forth on Exhibit C ("Employee Liability").

2.4    Excluded Liabilities.    Notwithstanding anything to the contrary set forth herein, the Parties expressly acknowledge and agree that Purchaser will not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for Liabilities of any Seller, whether existing on the Closing Date or arising thereafter, including on the basis of any

9

Law imposing successor liability, other than the Assumed Liabilities (all such Liabilities that Purchaser is not assuming being referred to collectively as the "<u>Excluded Liabilities</u>").

2.5    <u>Cure Amounts</u>.  At the Closing and pursuant to Section 365 of the Bankruptcy Code, Sellers will assume the Purchased Contracts (to the extent not previously assumed) and, subject to the terms herein, assign the Purchased Contracts to Purchaser, and Purchaser, subject to the terms herein, will assume the Purchased Contracts.  All Cure Costs with respect to the Purchased Contracts (the "<u>Assumed Cure Costs</u>") will be paid by Purchaser, as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order, and not by Sellers, and Sellers will have no Liability for any Assumed Cure Costs.

2.6    <u>Non-Assignment of Assets</u>.

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not effect the assignment or transfer of any Purchased Asset (including any Purchased Contract) if (i) (A) prohibited by applicable Law, (B) an attempted assignment or transfer thereof would reasonably likely to subject Purchaser, its Affiliates or any of its or their respective Representatives to civil or criminal Liability or (C) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto, would constitute a breach, default or violation thereof or of any Law or Order (each such action, a "<u>Necessary Consent</u>"), or in any way adversely affect the rights of Purchaser thereunder or (ii) the Bankruptcy Court has not entered an Order (including, for the avoidance of doubt, the Sale Order) approving such assignment or transfer.  In such event, such assignment or transfer is subject to such Necessary Consent being obtained and Sellers and Purchaser will use their respective commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset (including any Purchased Contract) or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request; <u>provided</u>, <u>however</u>, that Sellers will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or Legal Proceedings to obtain any such consent or approval.  If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would give rise to any of the circumstances described in clauses (i) or (ii) of the first sentence of this <u>Section 2.6(a)</u>, be ineffective or would adversely affect the rights of Purchaser to such Purchased Asset following the Closing, (x) Sellers and Purchaser will, and will cause their respective Affiliates to, (1) use commercially reasonable efforts (including cooperating with one another to obtain such Necessary Consents, to the extent feasible) as may be necessary so that Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, (2) complete any such assignments or transfers as soon as reasonably practicable, and (3) upon receipt of any applicable Necessary Consents, to transfer or assign the applicable Purchased Asset to Purchaser, and (y) Sellers will, and will cause their respective Affiliates to, cooperate with Purchaser in good faith without further consideration in any arrangement reasonably acceptable to Purchaser and Sellers intended to provide Purchaser with the benefit of any such Purchased Assets.

(b)    Subject to <u>Section 2.6(a)</u>, if after the Closing (i) Purchaser or its designee holds any Excluded Assets or Excluded Liabilities or (ii) any Seller holds any Purchased Assets or Assumed Liabilities, Purchaser or the applicable Seller will promptly transfer (or cause to be

10

transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party.  Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for such other Party.

(c)      Notwithstanding anything herein to the contrary, at any time prior to the date that is the later of (but in no event later than five Business Days prior to the Closing) (i) five days after the resolution of any dispute with a non-debtor party to a Purchased Contract relating to the Cure Costs or adequate assurance of future performance required under Section 365 of the Bankruptcy Code and (ii) the conclusion of the cure objection hearing relating to any particular Purchased Contract as to which a cure objection has been timely filed, Purchaser will be entitled, in its sole and absolute discretion, to remove any Contract from Schedule 2.1(b)(v) by providing written notice thereof to Sellers and any Contract so removed will be deemed to be an "Excluded Asset" for all purposes hereunder.

2.7      Further Conveyances and Assumptions.  From time to time following the Closing, Sellers and Purchaser will, and will cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to each Seller and its Affiliates and their respective successors and assigns, and to otherwise make effective the Transactions; provided that nothing in this Section 2.7 will require Purchaser or any of its Affiliates to assume any Liabilities other than the Assumed Liabilities.

## III.    CONSIDERATION

3.1      Consideration.  The aggregate consideration for the Purchased Assets (the "Purchase Price") will be a total of $7,630,000.00 consisting of the following: (a) $7,237,000.00 in cash; plus (b) the amount of the Prepayments paid by Seller for periods occurring after the Closing in cash (the amounts set forth in (a) and (b), collectively, the "Cash Amount"); plus (c) the assumption of the Assumed Liabilities including the Employee Liability in the amount of $33,000.00; plus (d) the Assumed Cure Costs in an amount equal to $360,000.00.

3.2      Purchase Price Deposit.  Purchaser has deposited a sum of $500,000.00 (the "Deposit Amount") into the Trust Account, which will be held in the Trust Account and will be either delivered to Purchaser or paid to the Company as follows: (a) if the Closing occurs, the Deposit Amount will be applied towards the Cash Amount payable by Purchaser pursuant to Section 3.3, (b) if this Agreement is terminated by the Company pursuant to Section 4.4(d), then the Deposit Amount will promptly be released to the Company (and such Deposit Amount will be deemed fully earned by the Company as compensation and consideration for entering into this Agreement), or (c) if this Agreement is terminated for any reason other than by Sellers pursuant to Section 4.4(e), then the Deposit Amount will promptly be released to Purchaser.

3.3      Payment of Purchase Price.  At the Closing, (i) Purchaser will pay to Sellers, in immediately available funds to the account or accounts designated by the Company, the Cash Amount less the Deposit Amount and (ii) the Deposit Amount will be released to Sellers.

11

## IV.    CLOSING AND TERMINATION

4.1    <u>Closing Date</u>.  Subject to the satisfaction of the conditions set forth in <u>Sections 9.1</u>, <u>9.2</u> and <u>9.3</u> (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities as provided for in <u>Article II</u> (the "<u>Closing</u>") will take remotely by exchange of electronic documentation and signatures at 10:00 a.m. (Eastern time) on the date that is three Business Days following the satisfaction or waiver of the conditions set forth in <u>Sections 9.1</u>, <u>9.2</u> and <u>9.3</u> (other than conditions that by their nature are to be first satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place and time as the Parties may designate in writing.  The date on which the Closing is held is referred to in this Agreement as the "<u>Closing Date</u>."

4.2    <u>Deliveries by Sellers</u>.  At the Closing, Sellers will deliver to Purchaser:

(a)    one or more duly executed bills of sale in the form attached hereto as <u>Exhibit D</u>;

(b)    (i) one or more duly executed assignment and assumption agreements, in the form attached hereto as <u>Exhibit E</u> and (ii) duly executed assignments to Purchaser of the registered trademarks, copyrights and patents, and applications for each of the foregoing, included in the Purchased Intellectual Property, in each case, in a form suitable for recording in the U.S. Patent and Trademark Office (and equivalent offices in jurisdictions outside the United States) in the form attached hereto as <u>Exhibit F</u>;

(c)    the officer's certificate required to be delivered pursuant to <u>Sections 9.1(a)</u> and <u>9.1(b)</u>;

(d)    all other deeds, endorsements, assignments, company seals, instruments of transfer and other instruments of conveyance reasonably requested by Purchaser or required to convey and assign the Purchased Assets to Purchaser and vest title therein in Purchaser; and

(e)    a non-foreign affidavit from each Seller, sworn under penalty of perjury and as required under Treasury Regulations issued pursuant to Section 1445 of the Code stating that it is not a "foreign person" as defined in Section 1445 of the Code.

4.3    <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser will deliver to the Company:

(a)    the consideration specified in <u>Section 3.1</u>, as adjusted pursuant to <u>Section 3.3</u>; and

(b)    the officer's certificate required to be delivered pursuant to <u>Sections 9.2(a)</u> and <u>9.2(b)</u>;

4.4    <u>Termination of Agreement</u>.  This Agreement may be terminated prior to the Closing as follows:

12

(a)    by Purchaser or the Company, if the Closing has not occurred by 5:00 p.m. Eastern time on November 15, 2024 (the "Termination Date"), which date may be extended pursuant to Sections 4.4(c) and 4.4(d)(i); provided, however, that if the Closing has not occurred on or before the Termination Date due to a breach of any representations, warranties, covenants or agreements contained in this Agreement that has resulted in any of the conditions set forth in Sections 4.4(c) and 4.4(d)(i) not being satisfied by the Termination Date (i) by Purchaser, then Purchaser may not terminate this Agreement pursuant to this Section 4.4(a) or (ii) by any Seller, then the Company may not terminate this Agreement pursuant to this Section 4.4(a);

(b)    by mutual written consent of the Company and Purchaser;

(c)    by Purchaser, if Sellers breach any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a condition set forth in Sections 9.1 or 9.3 or breach of Section 4.1 and such breach has not been cured within 10 Business Days after the giving of written notice by Purchaser to the Company of such breach; provided that Purchaser is not then in breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in Article 9; provided, further, that in the event that Purchaser provides such written notice to the Company within 10 Business Days of the Termination Date, then the Termination Date will be extended until the end of the 10 Business Day cure period set forth in this Section 4.4(c);

(d)    by the Company; provided that no Seller is then in breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in Sections 9.1 or 9.3:

(i)    if Purchaser breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a condition set forth in Sections 9.2 or 9.3 or breach of Section 4.1 and such breach has not been cured within 10 Business Days after the giving of written notice by the Company to Purchaser of such breach; provided, that in the event that the Company provides such written notice to Purchaser within 10 Business Days of the Termination Date, then the Termination Date will be extended until the end of the 10 Business Day cure period set forth in this Section 4.4(d)(i); or

(ii)    if all of the conditions set forth in Sections 9.1 and 9.3 have been satisfied or waived by the applicable Party (in each case, other than those conditions that by their nature are first satisfied at the Closing), Sellers have given written notice to Purchaser that they are prepared to consummate the Closing and Purchaser fails to consummate the Closing within two Business Days after the date that the Closing should have occurred pursuant to Section 4.1.

(e)    by Sellers or Purchaser, if there is in effect a final non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions; it being agreed that the Parties will promptly appeal and use reasonable best efforts to seek to overturn any adverse determination which is not non-appealable and pursue such appeal with reasonable diligence unless and until this Agreement is terminated pursuant to this Section 4.4.

4.5     Procedure Upon Termination.  In the event of termination pursuant to Section 4.4, the terminating Party will give written notice thereof to the other Party or Parties, and this Agreement will terminate as described in Section 4.6, and the purchase of the Purchased Assets and assumption of the Assumed Liabilities hereunder will be abandoned, without further action by Purchaser or any Seller.

4.6     Effect of Termination.  In the event that this Agreement is terminated as provided herein, then each of the Parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination and there will be no Liability or obligation on Purchaser, any Seller or any of their respective Representatives, except as specifically set forth in this Section 4.6; provided, however, that the provisions of Section 3.2, this Section 4.6, and Article XI (other than Section 11.3) and, to the extent necessary to effectuate the foregoing enumerated provisions, Article I, will survive any such termination and will be enforceable hereunder; provided, further, that nothing in this Section 4.6 will be deemed to release any Party from Liability for any breach of this Agreement prior to termination and nothing in this Section 4.6 will be deemed to interfere with Sellers' rights to retain the Deposit Amount to the extent provided in Section 3.2.

## V.     REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the letter from the Company, dated the Effective Date, addressed to Purchaser (the "Company Disclosure Letter") or in the Company SEC Documents (other than any forward-looking disclosures set forth in any risk factor section, any disclosure in any section relating to forward-looking statements and any other similar disclosures included therein, in each case, to the extent such disclosures are primarily predictive or forward-looking in nature and do not consist of statements of present fact) filed prior to the date of this Agreement, Sellers hereby represent and warrant to Purchaser that:

5.1     Organization and Good Standing. Each Seller is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and, subject to any limitations that may be imposed on such Seller as a result of filing a petition for relief under the Bankruptcy Code, has the requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.  No Seller is in violation of its organizational or governing documents.

5.2     Authorization of Agreement.  Subject to entry of the Sale Order, as applicable, each Seller has all necessary power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder.  The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the Transactions have been duly authorized by all requisite corporate or similar action on the part of each Seller.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly and validly

executed and delivered, by the applicable Seller and (assuming the due authorization, execution and delivery by the other Parties and the entry of the Sale Order) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes legal, valid and binding obligations of each applicable Seller enforceable against such Seller in accordance with its respective terms, subject to equitable principles of general applicability (whether considered in a proceeding at law or in equity).

5.3     Governmental Consents.   Except as set forth on Schedule 5.3 and except to the extent not required if the Sale Order is entered, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of any Seller in connection with the execution and delivery of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which any Seller is a party, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of the Transactions or the taking by Sellers of any other action contemplated hereby or thereby (with or without notice or lapse of time, or both), except for (a) the entry of the Sale Order and (b) immaterial consents, waivers, approvals, Orders, authorizations, declarations, filings and notifications.

5.4     Title to Purchased Assets.   Except as set forth on Schedule 5.4, subject to (a) bankruptcy, insolvency, or other similar Laws affecting the enforcement of creditors' rights generally, and (b) equitable principles of general applicability (whether considered in a proceeding at law or in equity), Sellers have good and valid title to, or in the case of leased assets, have good and valid leasehold interests in, the Purchased Assets free and clear of all Liens (other than Permitted Exceptions and Transferred Exceptions) and, at the Closing, Purchaser will be vested with good and valid title to, or in the case of leased assets, good and valid leasehold interest in, such Purchased Assets, free and clear of all Liens (other than Permitted Exceptions and Transferred Exceptions) and Excluded Liabilities, to the fullest extent permissible under Law, including Section 363(f) of the Bankruptcy Code.

5.5     Validity of Purchased Contracts.   As of the date of this Agreement, each Purchased Contract is in full force and effect and is a valid and binding obligation of the Seller party thereto and, to the Knowledge of Sellers, the other parties thereto in accordance with its terms and conditions, except as such validity and enforceability may be limited by (a) bankruptcy, insolvency, or other similar Laws affecting the enforcement of creditors' rights generally, (b) equitable principles of general applicability (whether considered in a proceeding at law or in equity), and (c) the obligation to pay Cure Costs (if any) under Section 2.5.  As of the date of this Agreement, no Seller has Knowledge of the intention of any third party to terminate any Purchased Contract.  As of the date of this Agreement, to the Knowledge of Sellers, no event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default under or a violation of any such Purchased Contract or would cause the acceleration of any obligation of any Seller or the creation of a Lien upon any Purchased Asset, except for such events that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

5.6     SEC Documents.    Except as has not had, and would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect, (a) the Company has filed with or furnished to the SEC all forms, reports, schedules, statements and other documents

15

required to be filed or furnished by it since January 1, 2022, under the Exchange Act or the Securities Act (collectively, the "Company SEC Documents") and (b) as of its respective date of filing, or, if amended or superseded by a subsequent filing made prior to the date of this Agreement, as of the date of the last such amending or superseding filing, each Company SEC Document (i) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated in such Company SEC Document or necessary in order to make the statements in such Company SEC Document, in light of the circumstances under which they were made, not misleading and (ii) complied in all material respects with the applicable requirements of the Exchange Act and the Securities Act, as the case may be, and the applicable rules and regulations of the SEC under the Exchange Act and the Securities Act, as the case may be.

5.7    <u>Litigation</u>.    Except for Legal Proceedings that do not have, and would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect, as of the date of this Agreement, there are no Legal Proceedings or Orders pending or, to the Knowledge of Sellers, threatened against any Seller that involves or relates to the Business, any of the Transactions, or affects any of the Purchased Assets.

5.8    <u>Compliance with Laws</u>.    Sellers are and, since January 1, 2022, have been in compliance with all applicable Laws and Orders, except for failures to comply or violations that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.    Sellers hold all governmental licenses, authorizations, permits, consents and approvals necessary for the operation of the Business as presently conducted, taken as a whole (the "<u>Company Permits</u>"), except where such failure would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.    Sellers are in compliance with the terms of the Company Permits, except for failures to comply that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

5.9    <u>Employee Compensation and Employee Benefit Plans; ERISA</u>.

(a)    As used herein, the term "<u>Company Plan</u>" will mean each material "employee benefit plan" (within the meaning of Section 3(3) of ERISA) and each other material equity incentive, severance, employment, company stock plan, change-in-control, retention, fringe benefit, bonus, incentive, savings, retirement, deferred compensation or other benefit plan, agreement, program, policy or Contract, whether or not subject to ERISA, in each case other than a "multiemployer plan," as defined in Section 3(37) of ERISA, under which any current or former employee, officer, director, contractor (who is a natural Person) or consultant (who is a natural Person) of Sellers has any present or future right to benefits and which are entered into, contributed to, sponsored by or maintained by Sellers.

(b)    Except as would not, individually or in the aggregate, have a Seller Material Adverse Effect:

(i)    Each Company Plan is in material compliance with all applicable Laws, including ERISA and the Code.

(ii)    Each Company Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination or opinion letter to that

NAI-1541177416v2

effect from the IRS and, to the Knowledge of Sellers, no event has occurred since the date of such determination or opinion that would reasonably be expected to adversely affect such determination or opinion.

(iii)    To the Knowledge of Sellers, no condition exists that is reasonably likely to subject Sellers to any direct or indirect liability under Title IV of ERISA.

(iv)    No Legal Proceeding (other than routine claims for benefits in the Ordinary Course of Business) are pending or, to the Knowledge of Sellers, threatened with respect to any Company Plan.

5.10    <u>Labor Matters</u>.  Except as would not have, individually or in the aggregate, a Seller Material Adverse Effect:

(a)    None of Sellers are party to, or bound by, any labor agreement, collective bargaining agreement, or any other labor-related Contract with any labor union, trade union, works council or labor organization covering Business Employees' terms and conditions of employment. No labor union, trade union, labor organization or group of Business Employees has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of Sellers, threatened in writing to be brought or filed with the National Labor Relations Board or any other Governmental Body.  To the Knowledge of Sellers, there are no organizing activities with respect to any Business Employees.  There has been no actual or, to the Knowledge of Sellers, threatened material labor disputes, strikes, slowdowns or work stoppages against or affecting Sellers.

(b)    Since January 1, 2022, none of Sellers have effectuated (i) a "plant closing" (as defined in the Worker Adjustment and Retraining Notification Act or any similar state or local plant closing or layoff Law (the "<u>WARN Act</u>")) in connection with the Business; or (ii) a "mass layoff" (as defined in the WARN Act) of individuals employed at or who primarily provided service to the Business, without first complying with the requirements of the WARN Act.

5.11    <u>Intellectual Property</u>.  Except as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect, (a) Sellers own all right, title and interest in, or has the right to use, pursuant to a license or otherwise, all Intellectual Property required to operate the Business as presently conducted, in each case, (i) free and clear of all Liens except Permitted Exceptions, and (ii) other than non-exclusive licenses of, or covenants with respect to, Intellectual Property granted in the Ordinary Course of Business, and (b) as of the date of this Agreement, (i) there are no pending, and Sellers have not received, since January 1, 2022, any written notice of any actual or threatened Legal Proceedings alleging a violation, misappropriation or infringement of the Intellectual Property of any other Person by Sellers except for any of the foregoing that have since been resolved, (ii) to the Knowledge of Sellers, the operation of the Business as currently conducted does not violate, misappropriate or infringe the Intellectual Property of any other Person, and (iii) to the Knowledge of Sellers, no other Person has violated, misappropriated or infringed any Purchased Intellectual Property.

17

5.12    _Financial Advisors_.  Except with respect to GLC Advisors & Co., LLC, Sellers have not incurred any Liability for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement or Transactions for which Purchaser is or will become liable.

5.13    _Taxes_.

(a)    Each Seller has filed  (or had filed on its behalf) all material Tax Returns that it was required to file in respect of the Purchased Assets or the Business and all such Tax Returns were correct and complete in all material respects. Other than as excused or prohibited from being paid as a result of the Bankruptcy Code or the Bankruptcy Court, with respect to the Purchased Assets and the Business, each Seller has paid (or had paid on its behalf) (i) all material Taxes that are shown to be due by such Seller on any such Tax Returns or pursuant to any written assessment received by such Seller from any Tax Authority for any period preceding the Closing Date, and (ii) all other material Taxes due on or before the Closing Date (whether or not shown on a Tax Return).

(b)    There are no pending, proposed in writing or threatened in writing Legal Proceedings with respect to any material Taxes payable by or asserted against any Seller related to the Purchased Assets or the Business.

(c)    There are no Liens with respect to Taxes (other than Permitted Exceptions, Liens that will be released by the Sale Order, and Liens for Taxes not yet due and payable or Taxes that are being diligently contested and for which adequate reserves have been set aside in accordance with GAAP) upon the Purchased Assets or the Business.

(d)    No Seller is a party to any Tax indemnity, Tax allocation or Tax sharing agreement, other than any such agreement entered into in the Ordinary Course of Business the principal purpose of which is not related to Tax, that could result in a Lien upon the Purchased Assets or the Business.

(e)    There are no requests for rulings pending between any Seller and any Tax Authority in respect of any Tax that could result in a Lien upon the Purchased Assets or the Business.

5.14    _No Other Representations or Warranties; Schedules_.  Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), none of Sellers nor any other Person makes any other express or implied representation or warranty with respect to Sellers, the Purchased Assets, the Assumed Liabilities or the Transactions, and each Seller disclaims any other representations or warranties, whether made by Sellers, any Affiliate of Sellers, or any of Sellers' or their Affiliates' respective Representatives.   Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), each Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information

18

made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any Representative of Sellers or any of its Affiliates). Sellers make no representations or warranties to Purchaser regarding the probable success or profitability of the Business, the Purchased Assets or the use thereof. The disclosure of any matter or item in any Schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter could result in a Seller Material Adverse Effect.

## VI.    REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as set forth in the letter from Purchaser, dated as of the Effective Date, addressed to Sellers (the "Purchaser Disclosure Letter"), Purchaser hereby represents and warrants to Sellers that:

6.1    Organization and Good Standing. Purchaser has all requisite power and authority to own, lease and operate his properties and to carry on his business as now being conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect. Purchaser is not in violation of its organizational or governing documents.

6.2    Authorization of Agreement. Purchaser has all necessary power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party and the consummation of the Transactions have been duly authorized by all requisite company or similar action on the part of Purchaser. This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly and validly executed and delivered, by Purchaser and (assuming the due authorization, execution and delivery by the other Parties and the entry of the Sale Order) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party constitutes legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its respective terms, subject to equitable principles of general applicability (whether considered in a proceeding at law or in equity).

6.3    Consents and Approvals; No Violations.

(a)    The execution, delivery and performance of this Agreement by Purchaser and the consummation Purchaser of the Transactions do not and will not (i) conflict with or violate the certificate of incorporation or bylaws (or similar organizational documents) Purchaser, (ii) assuming that all consents, approvals and authorizations contemplated by clauses (i) through (iii) of subsection (b) of this Section have been obtained, and all filings described in such clauses have been made, conflict with or violate any Law or Order applicable Purchaser or by which Purchaser or any of its respective properties are bound, or (iii) result in any breach or violation of

or constitute a default (or an event which with notice or lapse of time or both would become a default) or result in the loss of a benefit under, or give rise to any right of termination, cancellation, amendment or acceleration of, any Contracts to which Purchaser is a party or by which Purchaser or any of its respective properties are bound, except, in the case of clauses (ii) and (iii), for any such conflict, violation, breach, default, acceleration, loss, right or other occurrence which would not have or reasonably be expected to have a Purchaser Material Adverse Effect.

(b)    The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the Transactions do not and will not require any consent, approval, authorization or permit of, action by, filing with or notification to, any Governmental Body, except for (i) the applicable requirements, if any, of the Exchange Act and state securities, takeover and "blue sky" Laws, (ii) the applicable requirements of the HSR Act, and (iii)  any such consent, approval, authorization, permit, action, filing or notification the failure of which to make or obtain would not have or reasonably be expected to have a Purchaser Material Adverse Effect.

6.4    <u>Financial Capability</u>.  Purchaser has sufficient funds available to him in cash to pay or cause to be paid the Purchase Price and the fees and expenses required to be paid by Purchaser in connection with the Transactions, and to effect the Transactions.  Upon the consummation of the Transactions, (a) Purchaser will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) Purchaser will not be left with unreasonably small capital, (c) Purchaser will not have incurred debts beyond his ability to pay such debts as they mature, and (d) the capital of Purchaser will not be impaired.

6.5    <u>Condition of the Purchased Assets</u>.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Sellers are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers in <u>Article V</u> (as modified by the Schedules hereto), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis, including with respect to any environmental conditions at, on, in, under, migrating to or from or relating to the Purchased Assets. Purchaser acknowledges that he has conducted to his satisfaction his own independent investigation of the Purchased Assets and, in making the determination to proceed with the Transactions, Purchaser has relied on the results of his own independent investigation.

6.6    <u>Exclusivity of Representations and Warranties</u>.  Purchaser acknowledges that except for the representations and warranties made by Sellers in <u>Article V</u>, none of Sellers, any of their respective Affiliates, nor any Representatives of any of the foregoing, make (and neither Purchaser or any other Person has relied upon) any representations or warranties on behalf of Sellers.  Purchaser further agrees that neither Sellers nor any other Person will have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser in certain "data rooms" or management presentations in expectation of the Transactions.  For the avoidance of doubt, Purchaser acknowledges that none of Sellers, any of their respective Affiliates, nor any Representatives of any of the foregoing, make any express or implied representation or warranty with respect to "Confidential Information" as defined in the Confidentiality Agreement, other than to the extent the representations and warranties made by Sellers in this Agreement expressly speak to matters

20

that constitute "Confidential Information".  Purchaser acknowledges and agrees that Purchaser (a) has had an opportunity to discuss the business of Sellers with the management of Sellers, (b) has had sufficient access to (i) the books and records of Sellers and (ii) the electronic data room maintained by Sellers for purposes of the Transactions, (c) has been afforded the opportunity to ask questions of and receive answers from officers and other Business Employees of Sellers and (d) has conducted Purchaser's own independent investigation of Sellers, their respective businesses and the Transactions, and has not relied on any representation, warranty or other statement by any Person on behalf of Sellers, other than the representations and warranties of Sellers expressly contained in <u>Article V</u>, and that all other representations and warranties are specifically disclaimed. In connection with any investigation by Purchaser of Sellers, Purchaser has received or may receive from Sellers or its other Representatives on behalf of Sellers certain projections, forward-looking statements and other forecasts and certain business plan information in written or verbal communications.  Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Purchaser is familiar with such uncertainties, that Purchaser is taking full responsibility for making Purchaser's own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to Purchaser (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that Purchaser will have no claim against Sellers or any other Person with respect thereto.  Accordingly, Purchaser acknowledges that neither Sellers nor any other Person on behalf of the Sellers make (and neither Purchaser or any other Person has relied upon) any representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

## VII.    BANKRUPTCY COURT MATTERS

7.1    <u>Submission for Bankruptcy Court Approval</u>.  As promptly as practicable after the execution of this Agreement, Sellers will file with the Bankruptcy Court a motion seeking (a) entry of the Bidding Procedures Order and authorizing the observance and performance of the Bidding Procedures Order by Sellers and Purchaser and (b) the Sale Order, including the approval of this Agreement and the sale of the Purchased Assets to Purchaser on the terms and conditions hereof if determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order.  Such motion must be reasonably acceptable to Purchaser.

7.2    <u>Bankruptcy Process</u>.

(a)    Sellers and Purchaser acknowledge and agree that this Agreement, the sale of the Purchased Assets and the Transactions are subject to higher or otherwise better bids (in accordance with the Bidding Procedures Order) and Bankruptcy Court approval (each, a "<u>Competing Bid</u>"), as determined in Sellers' sole and exclusive discretion.  Purchaser and Sellers acknowledge that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best offer for the Purchased Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about Sellers' business to prospective bidders, entertaining higher or otherwise better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an auction (the "<u>Auction</u>"). Purchaser agrees and acknowledges that Sellers and their Affiliates will be permitted, and will be permitted to cause their Representatives, to

initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Purchaser and its Affiliates, agents and Representatives). In addition, the Sellers shall have the responsibility and obligation to respond to any inquiries or offers for a Competing Bid and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, including supplying information relating to the Sellers or the Purchased Assets to prospective purchasers.

(b)     The bidding procedures to be employed with respect to this Agreement and any Auction will be those reflected in the Bidding Procedures Order. Purchaser agrees to be bound by and accept the terms and conditions of the Bidding Procedures Order as entered by the Bankruptcy Court to the extent such Order is substantially in a form reasonably acceptable to Purchaser.

(c)     Purchaser will provide adequate evidence and assurance under the Bankruptcy Code of the future performance by Purchaser of each Purchased Contract. Purchaser will, and will cause its Affiliates to, reasonably promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Purchased Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Representatives available to testify before the Bankruptcy Court. Subject to the other terms and conditions of this Agreement, Purchaser will, from and after the Closing Date, (i) assume all Liabilities of Sellers under the Purchased Contracts and (ii) satisfy and perform all of the Liabilities related to each of the Purchased Contracts when the same are due thereunder.

(d)     If this Agreement and the sale of the Purchased Assets to Purchaser on the terms and conditions hereof are determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order, Purchaser and Sellers agree to use commercially reasonable efforts to cause the Bankruptcy Court to enter the Sale Order in substantially in the form attached hereto as Exhibit B with such changes or modifications as may be requested by Purchaser or Sellers that are consented to in writing by the other party, with such consent not to be unreasonably withheld, conditioned or delayed.

(e)     Sellers covenant and agree that if the Sale Order is entered, the terms of any plan submitted by Sellers to the Bankruptcy Court for confirmation will not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of Purchaser hereunder, or in any way prevent or interfere with the consummation or performance of the Transactions including any transaction that is contemplated by or approved pursuant to the Sale Order.

(f)     If the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement are appealed or petition for certiorari or motion for rehearing or reargument is filed with respect thereto, Sellers agree to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion and Purchaser agrees to cooperate in such efforts and each Party agrees to use its commercially reasonable efforts to obtain an expedited

resolution of such appeal; <u>provided</u>, that the absence of an appeal of the Sale Order will not be a condition to any Party's obligation to consummate the Transactions at the Closing.

(g)    For the avoidance of doubt, nothing in this Agreement will restrict Sellers or their Affiliates from selling, disposing of or otherwise transferring any Excluded Assets or from settling, delegating or otherwise transferring any Excluded Liabilities, or from entering into discussions or agreements with respect to the foregoing.

7.3    Back-Up Bidder.  Seller and Purchaser agree that, in the event that Purchaser is not the winning bidder at the Auction and in accordance with the Bidding Procedures Order, if and only if (a) Purchaser submits the second highest or second best bid at the Auction and is named the "Back-Up Bidder" at the Auction, in each case, as determined by the Company, and (b) the Company gives notice to Purchaser that the Company (i) failed to consummate the sale with the winning bidder, and (ii) has terminated the definitive agreement with the winning bidder, Purchaser shall promptly consummate the Transactions upon the terms and conditions as set forth herein, including payment of the Purchase Price, as applicable, in accordance with Article III, as the same may be increased by Purchaser at the Auction.

## VIII.  COVENANTS

8.1    Access to Information.  From the Effective Date through the Closing Date, Purchaser will be entitled, through its Representatives, to make such investigation of the Purchased Assets and the Assumed Liabilities as it reasonably requests for purposes of furthering the consummation of the Transactions; except that, without the Company's prior written consent (which consent may be granted or denied in the Company's sole discretion), (a) Purchaser and its Representatives will not have the right to perform any investigative procedures that involve physical disturbance or damage to the properties of the Company or its Affiliates, and (b) any such investigation will not include any sampling of environmental media, including soil, land, soil gas, surface water, groundwater, stream sediments, indoor air, ambient air or building materials.  Any such investigation and examination will be conducted upon reasonable advance notice and under reasonable circumstances, will occur only during normal business hours and will be subject to restrictions under applicable Law.  Sellers will direct their respective Representatives to cooperate with Purchaser and Purchaser's Representatives in connection with such investigation and examination, and Purchaser and its Representatives will cooperate with Sellers and their Representatives.  Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would require Sellers to disclose information that would cause material competitive harm to a Seller or would violate attorney-client privilege or other confidentiality obligations of Sellers.  No investigation by Purchaser will affect or be deemed to modify any of the representations, warranties, covenants or agreements of Sellers contained in this Agreement.

8.2    Actions Pending the Closing.  Except (a) as required by applicable Law or by Order of the Bankruptcy Court, (b) as otherwise expressly contemplated by this Agreement, or (c) with the prior written consent of Purchaser, during the period from the Effective Date to and through the Closing Date, Sellers will (taking into account the commencement of the Bankruptcy Cases, the anticipated liquidation and shut-down of operations of Sellers other than the Purchased Assets and the Business and other changes, facts and circumstances that customarily result from the events

leading up to and following the commencement of bankruptcy proceedings, and the Company's and its Subsidiaries' commercially reasonable responses to and actions in light of Changes related to the COVID-19 pandemic): (i) maintain the Purchased Assets in their current condition, ordinary wear and tear excepted (and excluding sales of inventory in the Ordinary Course of Business); (ii) not materially amend, modify, terminate, let lapse (other than the expiration of a contract pursuant to its terms) or waive any rights under, or create any Lien with respect to, any of the Purchased Contracts; (iii) use commercially reasonable efforts to defend and protect the Purchased Assets from deterioration; (iv) comply with applicable Laws with respect to the Purchased Assets, other than with respect to the failure of such compliance as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect; and (v) not enter into any agreement or commitment to take any action prohibited by this <u>Section 8.2</u>.

8.3     <u>Consents</u>.  Sellers and Purchaser will use their commercially reasonable efforts to obtain at the earliest practicable date all consents and approvals contemplated by this Agreement, including the consents and approvals referred to in <u>Section 5.3</u> and the Necessary Consents; <u>provided</u>, <u>however</u>, that none of Sellers or Purchaser (other than with respect to Assumed Cure Costs) will be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any Legal Proceedings to obtain any such consent or approval.  For the avoidance of doubt, the Parties acknowledge and agree that obtaining any such authorizations, consents and approvals, giving such notices and making such filings will not be a condition to Closing.

8.4     <u>Reasonable Best Efforts; Consents to Assignment</u>.

(a)     Upon the terms and subject to the conditions of this Agreement, and without limiting the generality of <u>Section 7.2(a)</u> or <u>Section 8.4(d)</u>, each of the Parties will use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the Transactions as promptly as practicable, including the prompt preparation and filing of all forms, registrations and notices required to be filed to consummate the Transactions and the taking of such commercially reasonable actions as are necessary to obtain any requisite approvals, consents, Orders, exemptions or waivers by any Governmental Body or any other Person, including filings pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "<u>HSR Act</u>") and any actions necessary to cause the expiration of the notice periods under the HSR Act.  Each Party will promptly consult with the others with respect to, provide any necessary information with respect to, and provide the other Parties (or their counsel) copies of, all filings made by such party with any Governmental Body or any other Person or any other information supplied by such Party to a Governmental Body or any other Person in connection with this Agreement and the Transactions.  Purchaser and Sellers will make all filings under the HSR Act as promptly as practicable, and no later than 10 Business Days, following the Effective Date.  Purchaser will be responsible for all filing fees under the HSR Act or any other competition Laws applicable to Purchaser as well as all fees and expenses of Sellers in responding to any requests for additional information.

(b)     Each Party will promptly inform the others of any communication from any Governmental Body (other than the Bankruptcy Court or the Office of the United States Trustee) regarding any of the Transactions and promptly provide the others with copies of all related

correspondence or filings. If any Party or Affiliate thereof receives a request for additional information or documentary material from any such Governmental Body (other than the Bankruptcy Court or the Office of the United States Trustee) with respect to the Transactions, then such Party will endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request. Each Party will provide any necessary information and reasonable assistance as the others may request in connection with its preparation of any additional necessary filings or submissions to any Governmental Body, including any additional filings necessary under the HSR Act.

(c)     Neither Sellers nor Purchaser will independently participate in any meeting with any Governmental Body (other than the Bankruptcy Court or the Office of the United States Trustee) in respect of any findings or inquiry in connection with the Transactions without giving, in the case of Sellers, Purchaser, and in the case of Purchaser, Sellers, prior notice of the meeting and, to the extent reasonably practicable and not prohibited by the applicable Governmental Body, the opportunity to attend and/or participate in such meeting.

(d)     Purchaser will resolve all objections, if any, as may be asserted by any Governmental Body with respect to the Transactions under the HSR Act or any equivalent foreign competition Law, such that the Transactions may be consummated prior to the Termination Date. To the extent any Legal Proceeding is instituted (or threatened to be instituted) challenging any Transaction as violative of the HSR Act or any equivalent foreign competition Law, each of the Parties will cooperate and use its reasonable best efforts to contest and resist any such Legal Proceeding and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other Order, whether temporary, preliminary or permanent that is in effect and that prohibits, prevents, or restricts consummation of the Transactions, unless Sellers and Purchaser agree in writing that litigation is not in their respective best interests.

(e)     Nothing in this Section 8.4 will be construed to limit the generality of Section 7.2(a).

8.5     Publicity. With the exception of press releases issued by Sellers and Purchaser on the Effective Date and the Closing Date in forms mutually agreeable to the Company and Purchaser, Purchaser and Sellers will not issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Parties, which approval may not be unreasonably withheld, conditioned or delayed, except that such consent will not be required if disclosure is otherwise required by applicable Law or by the Bankruptcy Court; provided, however, that Purchaser or Sellers, as applicable, will use its or their commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Parties with respect to the text of any such required disclosure.

8.6     Confidentiality. Purchaser acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under Section 8.1, and is subject to the terms of the confidentiality agreement dated August 23, 2024 between the Company and Purchaser (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference. Purchaser acknowledges

and understands that this Agreement and related documents may be publicly filed in the Bankruptcy Court and further made available by Sellers to prospective bidders or contract counterparties and that, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.

8.7    <u>Transition and Access Agreements</u>.  Prior to the Closing Date, Sellers and Purchaser will negotiate mutually acceptable terms of agreements to:

(a)    provide transition services following the Closing Date including allowing Purchaser to legally operate the Business as of the Closing pending issuance of Purchaser's alcohol licenses, permits and bonds pursuant to an agreement mutually acceptable to the Parties; <u>provided</u>, that, pursuant to such agreement, Purchaser will agree to indemnify and hold harmless Seller and its Affiliates from any losses or damages suffered by them in connection with providing such transition services; and

(b)    provide Sellers with access, for a period of at least 4 months following the Closing Date, to Purchaser's personnel, including the Transferred Employees, information technology systems, including email, third party service providers and books and records, and use of office space and office support for employees of Sellers, as is reasonably necessary or appropriate in connection with the administration of the Bankruptcy Case and to permit Sellers to wind-down and liquidate the Sellers' Bankruptcy Estates following the Closing.

8.8    <u>Employee Matters</u>.

(a)    Prior to the Closing Date, Purchaser will, or will cause one of its Affiliates to, offer employment to substantially all the Business Employees, such employment to commence immediately following the Closing upon the Business Employees execution of new employment agreements with non-solicitation and non-competition provisions.  Sellers and their Affiliates will cooperate with and use their commercially reasonable efforts to assist Purchaser and its Affiliates in their efforts to secure the transition of Business Employees to Purchaser.  Without limiting the generality of the foregoing, Sellers and their Affiliates will provide all relevant information in their possession necessary to the hiring and transfer of the Transferred Employees, including all relevant payroll, compensation, benefits participation and withholding tax information with respect to the Transferred Employees; provided, that Purchaser will not have access to personnel records of any Seller the disclosure of which is prohibited by applicable Law.  Business Employees who accept offers of employment from Purchaser or an Affiliate of Purchaser are referred to as "Transferred Employees".

(b)    Purchaser's employment of the Transferred Employees will be "at will" and may be terminated by Purchaser and/or any of its Affiliates at any time for any reason.  Nothing in this Agreement will create any third-party rights in any Transferred Employees or any current or former employees or other service providers of any Seller or any Seller Affiliate (or any beneficiaries or dependents of the foregoing) or in any other Person.  Nothing contained herein will constitute an amendment to any Company Plan or in any other benefit plan of Seller, Purchaser or their Affiliates.

(c)     Sellers shall be responsible for any notices required to be given under the WARN Act relating to any acts or omissions on or prior to the Closing Date.  Purchaser shall be responsible for any notices required to be given under and shall otherwise comply with all Liabilities arising under the WARN Act relating to any acts or omissions after the Closing Date.

8.9     <u>Releases</u>.  Notwithstanding anything to the contrary contained herein, effective upon the Closing, (a) Purchaser (individually and on behalf of its Affiliates) hereby releases and forever discharges each Seller and each of its Affiliates and their respective successors and assigns and all of their respective Representatives from any and all actual or potential claims, causes of action, Legal Proceedings and/or Liabilities, of whatever kind or nature (including attorneys' fees and costs), in law (including the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Sections 9601 et seq., or other Laws relating to the environment or health and safety) or equity, known or unknown, suspected or unsuspected, now existing or hereafter arising, whether contractual, in tort or otherwise, which Purchaser or any of its Affiliates had, have, or may have in the future relating in any way to the Purchased Assets or the Assumed Liabilities and (b) each Seller (individually and on behalf of its Affiliates) hereby releases and forever discharges Purchaser and each of its Affiliates and their respective successors and assigns and all of their respective Representatives from any and all actual or potential claims, causes of action, Legal Proceedings and/or Liabilities of whatever kind or nature (including attorneys' fees and costs), in law (including the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Sections 9601 et seq., or other Laws relating to the environment or health and safety) or equity, known or unknown, suspected or unsuspected, now existing or hereafter arising, whether contractual, in tort or otherwise, which such Seller or Affiliate thereof had, have, or may have in the future relating in any way to the Excluded Assets or the Excluded Liabilities; <u>provided</u> that (i) nothing in this <u>Section 8.9</u> will constitute a release of any Person arising from conduct of such Person that is determined by a final Order of a court of competent jurisdiction to have constituted an actual fraud, willful breach, knowing and intentional misrepresentation or criminal act by such Person and (ii) nothing in this Agreement will be construed to release any Person from any of its contractual obligations under this Agreement and the other agreements contemplated by the Transactions, including its obligations in respect of the Purchased Assets, Assumed Liabilities, Excluded Assets and Excluded Liabilities, as the case may be, each of which will remain fully effective and enforceable from and after the Closing Date.

8.10     <u>Bulk Transfer Laws</u>.  Purchaser acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the Transactions, and hereby waives all claims related to the non-compliance therewith.

8.11     <u>Inventory</u>.  The Parties acknowledge and agree that Purchaser will be responsible for acquiring possession of the Purchased Inventory and that Purchaser will use its reasonable best efforts to acquire such possession of the Purchased Inventory as soon as reasonably practicable after the Closing and in no event later than four weeks after the Closing Date.  Purchaser will be responsible for all fees and expenses incurred in connection with acquiring and maintaining possession of the Purchased Inventory, including labor, transportation and storage after acquisition.  Seller and its Affiliates will, or will cause the applicable purchaser of the applicable location (each, an "<u>Other Purchaser</u>"), if applicable, to, maintain storage of the Purchased Inventory for a period of up to four weeks after the Closing Date at no cost to Purchaser and shall reasonably cooperate with Purchaser or its Representatives in acquiring

27

possession of the Purchased Inventory.  After such four-week period, Purchaser will pay Seller or the applicable Other Purchaser a storage fee equal to market rates (as determined by Seller in its sole discretion) (provided, that, neither Seller nor any Other Purchaser will have any obligation to maintain storage of such Purchased Inventory after the date that is four weeks following the Closing Date).  Purchaser agrees to indemnify and hold harmless Seller or the applicable Other Purchaser, as applicable, and their respective Affiliates and Representatives for any losses suffered by them to the extent arising out of damage to the real property or other assets of Seller or the applicable Other Purchaser, as applicable, as a direct result of the storing of, or the removal of, the Purchased Inventory following the Closing in accordance with this Section 8.11 and, absent willful misconduct, gross negligence or bad faith of Seller or the applicable Other Purchaser, any risk of damage or loss to such Purchased Inventory following the Closing will be for the account of Purchaser.  Each applicable Other Purchaser and each of its applicable Affiliates and Representatives, and each of Seller's applicable Affiliates and Representatives, is an express third-party beneficiary for purposes of this Section 8.11.

## IX.    CONDITIONS TO CLOSING

9.1    Conditions Precedent to Obligations of Purchaser.  The obligation of Purchaser to consummate the Transactions is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    each of the representations and warranties of Sellers contained in this Agreement (disregarding all "materiality" or "Seller Material Adverse Effect" qualifications set forth therein) shall be true and correct as of the Closing, as if made on the Closing Date (except for any such representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such specific date), except where the failure of the representations and warranties to be true and correct, individually or in the aggregate, has not had and would not reasonably be expected to have a Seller Material Adverse Effect, and Purchaser shall have received a certificate signed by an authorized officer of each Seller on behalf of such Seller, dated the Closing Date, to the foregoing effect;

(b)    Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to or on the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of each Seller on behalf of such Seller, dated the Closing Date, to the forgoing effect;

(c)    Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2.

9.2    Conditions Precedent to Obligations of Sellers.  The obligations of Sellers to consummate the Transactions are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)      each of the representations and warranties of Purchaser contained in this Agreement (disregarding all "materiality" or "Purchaser Material Adverse Effect" qualifications set forth therein) shall be true and correct as of the Closing, as if made on the Closing Date (except for any such representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such specific date), except where the failure of the representations and warranties to be true and correct, individually or in the aggregate, has not had and would not reasonably be expected to have a Purchaser Material Adverse Effect, and Sellers shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect;

(b)      Purchaser shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by Purchaser prior to or on the Closing Date, and Sellers shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect; and

(c)      Purchaser shall have delivered to Sellers all of the items set forth in Section 4.3.

9.3      Conditions Precedent to Obligations of Purchaser and Sellers.  The respective obligations of Purchaser and Sellers to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers and Purchaser, jointly, in whole or in part to the extent permitted by applicable Law):

(a)      the notice period under the HSR Act shall have expired or been terminated;

(b)      there shall not be in effect any Order by a Governmental Body restraining, enjoining or otherwise prohibiting the consummation of the Transactions; and

(c)      the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be subject to a stay or have been vacated or revoked.

9.4      Frustration of Closing Conditions.  No Party may rely on the failure of any condition set forth in Sections 9.1, 9.2 or 9.3, as the case may be, if such failure was caused by such Party's breach of any provision of this Agreement.

## X.      TAXES

10.1      Transfer Taxes.  All documentary, stamp, transfer, motor vehicle registration, sales, use, value added, excise and other similar non-income Taxes and all filing and recording fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the Transactions (collectively, "Transfer Taxes") will be borne by Purchaser, regardless of the Party on whom Liability is imposed under the provisions of the Laws relating to such Transfer Taxes.  Sellers and Purchaser will consult and cooperate in timely preparing and making all filings, Tax Returns, reports and forms as may be required to comply with the provisions of the Laws relating to such Transfer Taxes and will cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for or exemptions from such

29

Transfer Taxes, including preparing exemption certificates and other instruments as are applicable to claim available exemptions from the payment of Transfer Taxes under applicable Law and executing and delivering such affidavits and forms as are reasonably requested by the other Party.

10.2    Purchase Price Allocation.

(a)    As promptly as practicable after the Closing Date, but no later than 30 days thereafter, Purchaser will prepare and deliver to Sellers, an allocation schedule setting forth the amounts to be allocated among Sellers and among the Purchased Assets of each Seller, pursuant to (and to the extent necessary to comply with) Section 1060 of the Code and the applicable regulations promulgated thereunder (or, if applicable, any similar provision under state, local or foreign Law or regulation) (the "Proposed Allocation Statement").  Sellers will have 20 Business Days following delivery of the Proposed Allocation Statement during which to notify Purchaser in writing (an "Allocation Notice of Objection") of any objections to the Proposed Allocation Statement, setting forth in reasonable detail the basis of their objections.  If Sellers fail to deliver an Allocation Notice of Objection in accordance with this Section 10.2(a), the Proposed Allocation Statement will be conclusive and binding on all Parties and will become the "Final Allocation Statement."  If Sellers submit an Allocation Notice of Objection, then for 10 Business Days after the date Purchaser receives the Allocation Notice of Objection, Purchaser and Sellers will use their commercially reasonable efforts to agree on the allocations.  Failing such agreement within 10 Business Days of such notice, the unresolved allocations will be submitted to an independent, internationally-recognized accounting firm mutually agreeable to Purchaser and Sellers, which firm will be instructed to determine its best estimate of the allocation schedule based on its determination of the unresolved allocations and provide a written description of the basis for its determination within 45 Business Days after submission, such written determination to be final, binding and conclusive.  The fees and expenses of such accounting firm will be apportioned among Sellers and Purchaser equally.  For the avoidance of doubt, in administering any Legal Proceeding, the Bankruptcy Court will not be required to apply the Final Allocation Statement in determining the manner in which the Purchase Price should be allocated as between Sellers and their respective estates.

(b)    Sellers and Purchaser and their respective Affiliates will report, act, and file Tax Returns (including, but not limited to IRS Form 8594) in all respects and for all purposes consistent with the Final Allocation Statement, and will not take any position (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Final Allocation Statement, in each case, except to the extent otherwise required by a "determination" within the meaning of Section 1313 of the Code.

10.3    Cooperation and Audits.  Purchaser and Sellers will cooperate fully with each other regarding Tax matters to the extent commercially reasonable and will make available to the other as reasonably requested all information, records and documents relating to Taxes governed by this Agreement until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes.

## XI.    GENERAL GOVERNING PROVISIONS

11.1    <u>No Survival of Representations and Warranties</u>.    The Parties agree that the representations and warranties contained in this Agreement will not survive the Closing hereunder, and none of the Parties will have any Liability to each other after the Closing for any breach thereof.  The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing will survive the Closing hereunder until the expiration of the applicable statute of limitations or for such shorter period explicitly specified therein, and each Party will be liable to the other after the Closing for any breach thereof.

11.2    <u>Expenses</u>.  Except as otherwise expressly provided in this Agreement, whether or not the Transactions are consummated, each of Sellers, on the one hand, and Purchaser, on the other hand, will bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Transactions and all Legal Proceedings incident thereto.

11.3    <u>Injunctive Relief</u>.

(a)    The Parties agree that irreparable damages would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce specifically the terms and provisions of this Agreement, including without limitation specific performance of such covenants, promises or agreements or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this <u>Section 11.3</u> will be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(b)    The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Purchaser or Sellers, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of Purchaser or Sellers, as applicable, under this Agreement all in accordance with the terms of this <u>Section 11.3</u>.

11.4    <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(a)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Legal Proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in <u>Section 11.8</u>; provided, <u>however</u>, that if the Bankruptcy Cases have been closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive

jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action in the United States District Court for the District of Delaware) and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the Parties hereby consents to process being served by any other Party in any Legal Proceeding by delivery of a copy thereof in accordance with the provisions of Section 11.8; provided, however, that such service will not be effective until the actual receipt thereof by the Party being served.

11.5     Waiver of Right to Trial by Jury.  Each Party to this Agreement waives any right to trial by jury in any Legal Proceeding regarding this Agreement or any provision hereof.

11.6     Entire Agreement; Amendments and Waivers.  This Agreement represents the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, will be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

11.7     Governing Law.  This Agreement will be governed by and construed in accordance with federal bankruptcy Law, to the extent applicable, other federal law, where applicable, and, where state Law is implicated, the Laws of the State of Delaware applicable to contracts made and performed in such State.

11.8     Notices.  All notices and other communications under this Agreement will be in writing and will be deemed given (a) when delivered personally by hand, (b) when sent by email (with written confirmation of transmission), or (c) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and email addresses (or to such other address or email address as a Party may have specified by notice given to the other Party pursuant to this provision):

If to Seller, to:

California Cider Co., Inc.
Attention: Amir Sadr
Email: asadr@vintagewineestates.com
Attention: Kristina Johnston
Email: kjohnston@vintagewineestates.com

With copies (which will not constitute notice) to:

Jones Day
901 Lakeside Avenue
Cleveland, Ohio 44114
Attention: Heather Lennox
Email: hlennox@jonesday.com
Attention: George Hunter
Email: ghunter@jonesday.com

If to Purchaser, to:
Mordechai Lipton
4431 University Parkway
University Heights, Ohio  44118
Email:  mlipton@rllipton.com

With copies (which will not constitute notice) to:

Gellert Seitz Busenkell & Brown, LLC
1201 North Orange Street, Suite 300
Wilmington, Delaware 19801
Telephone: (302) 425-5812
Facsimile: (302) 425-5814
Attn:  Michael Busenkell
Email: mbusenkell@gsbblaw.com

11.9    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

11.10    Assignment.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement.  No assignment of this Agreement or of any rights or obligations hereunder

may be made by either Sellers or Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents will be void; provided, however, that (a) Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more Affiliates and (b) Sellers may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities (including any liquidating trust) pursuant to a Chapter 11 plan confirmed by the Bankruptcy Court, in the case of each clause (a) and (b) without any other Party's consent.  No assignment of any obligations hereunder will relieve the Parties of any such obligations.  Upon any such permitted assignment, the references in this Agreement to Sellers or Purchaser will also apply to any such assignee unless the context otherwise requires.

11.11    Non-Recourse.  No past, present or future director, officer, employee, incorporator, member, partner, equity holder, manager, agent, attorney, Representative or Affiliate of the Parties or any of their Affiliates will have any Liability for any obligations or Liabilities of Sellers or Purchaser, as applicable, under this Agreement or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.  Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as Parties or thereto, and then only with respect to the specific obligations set forth herein or therein.  Other than the Parties, no other party will have any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or Liabilities of any Party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any Legal Proceeding based on, in respect of, or by reason of, Transactions (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Laws or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a Party or another Person or otherwise.  In no event will any Person be liable to another Person for any remote, speculative or punitive damages with respect to the Transactions.

11.12    Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

*[Signature page follows]*

NAI-1541177416v2

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the Effective Date.

PURCHASER:

Cider Leasing LLC

By: _____

Name: _____

Title: _____

Ace Cider I LLC

By: _____

Name: _Avraham Lipton_____

Title: _VP_____

[*Signature Page to Asset Purchase Agreement*]

<u>COMPANY</u>:

California Cider Co., Inc.

By: _____
Name: Kristina Johnston
Title: Authorized Person

<u>DEBTORS</u>:

Meier's Wine Cellars Acquisition, LLC

By: _____
Name: Kristina Johnston
Title: Authorized Person

California Cider Co., Inc.

By: _____
Name: Kristina Johnston
Title: Authorized Person

Girard Winery LLC

By: _____
Name: Kristina Johnston
Title: Authorized Person

Grove Acquisition, LLC

By: _____
Name: Kristina Johnston
Title: Authorized Person

Meier's Wine Cellars, Inc.

By: _____
Name: Kristina Johnston
Title: Authorized Person

[*Signature page to Asset Purchase Agreement*]

Mildara Blass Inc.

By: _____

Name: Kristina Johnston
Title: Authorized Person

Thames America Trading Company Ltd.

By: _____

Name: Kristina Johnston
Title: Authorized Person

Vinesse, LLC

By: _____

Name: Kristina Johnston
Title: Authorized Person

Vintage Wine Estates, Inc.

By: _____

Name: Kristina Johnston
Title: Authorized Person

Vintage Wine Estates, Inc.

By: _____

Name: Kristina Johnston
Title: Authorized Person

[*Signature page to Asset Purchase Agreement*]