## **Exhibit 1**

**Asset Purchase Agreement**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

by and between

VINO.COM, L.L.C.

as Purchaser

and

Vintage Wine Estates, Inc.

Dated as of August 29, 2024

# TABLE OF CONTENTS

**Page**

I.  DEFINITIONS ........................................................................................................ 1

   1.1  Certain Definitions ................................................................................. 1
   1.2  Terms Defined Elsewhere in this Agreement ........................................ 5
   1.3  Other Definitional and Interpretive Matters ......................................... 5

II.  PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES .................. 7

   2.1  Purchase and Sale of Assets ................................................................... 7
   2.2  Excluded Assets ...................................................................................... 8
   2.3  Assumption of Liabilities ....................................................................... 8
   2.4  Excluded Liabilities ................................................................................ 8
   2.5  Non-Assignment of Assets ..................................................................... 9
   2.6  Further Conveyances and Assumptions ................................................ 10
   2.7  Alcoholic Beverage Licenses ............................................................... 10

III.  CONSIDERATION ............................................................................................. 10

   3.1  Consideration ........................................................................................ 10
   3.2  Purchase Price Deposit ......................................................................... 10
   3.3  Payment of Closing Cash Amount ........................................................ 11
   3.4  Calculation of Pre-Closing Inventory Adjustment. .............................. 11
   3.5  Calculation of Post-Closing Purchased Product Inventory Adjustment. ............ 11

IV.  CLOSING AND TERMINATION ......................................................................... 13

   4.1  Closing Date .......................................................................................... 13
   4.2  Deliveries by Seller .............................................................................. 13
   4.3  Deliveries by Purchaser ........................................................................ 14
   4.4  Termination of Agreement .................................................................... 14
   4.5  Procedure Upon Termination ................................................................ 15
   4.6  Effect of Termination ............................................................................ 15

V.  REPRESENTATIONS AND WARRANTIES REGARDING SELLER ....................... 15

   5.1  Organization and Good Standing .......................................................... 16
   5.2  Authorization of Agreement ................................................................. 16
   5.3  Governmental Consents ........................................................................ 16
   5.4  Title to Purchased Assets ...................................................................... 16
   5.5  SEC Documents .................................................................................... 17
   5.6  Litigation ............................................................................................... 17
   5.7  Compliance with Laws ......................................................................... 17
   5.8  Intellectual Property ............................................................................. 17
   5.9  Financial Advisors ................................................................................ 18
   5.10  Taxes  18
   5.11  Inventory. ............................................................................................. 19

**TABLE OF CONTENTS**

(continued)

**Page**

5.12    Brand Registrations.............................................................................. 19
5.13    No Other Representations or Warranties; Company Disclosure Letter.............. 19

**VI.**    REPRESENTATIONS AND WARRANTIES OF PURCHASER................ 19

6.1    Organization and Good Standing........................................................ 20
6.2    Authorization of Agreement............................................................. 20
6.3    Consents and Approvals; No Violations............................................ 20
6.4    Financial Capability........................................................................ 20
6.5    Condition of the Purchased Assets .................................................. 21
6.6    Exclusivity of Representations and Warranties ................................ 21

**VII.**    BANKRUPTCY COURT MATTERS ................................................... 22

7.1    Submission for Bankruptcy Court Approval ..................................... 22
7.2    Bankruptcy Process........................................................................ 22
7.3    Approval of Break-Up Fee and Expense Reimbursement................... 23
7.4    Back-Up Bidder ............................................................................. 23

**VIII.**    COVENANTS ..................................................................................... 24

8.1    Access to Information ..................................................................... 24
8.2    Actions Pending the Closing............................................................ 24
8.3    Consents ........................................................................................ 25
8.4    Reasonable Best Efforts; Consents to Assignment............................ 25
8.5    Publicity ........................................................................................ 26
8.6    Confidentiality ............................................................................... 26
8.7    Bulk Transfer Laws........................................................................ 26
8.8    Use of Seller's Name ...................................................................... 26
8.9    Access; Purchased Inventory .......................................................... 26
8.10    Excluded Inventory......................................................................... 27
8.11    Post-Closing Actions. ..................................................................... 27

**IX.**    CONDITIONS TO CLOSING .............................................................. 27

9.1    Conditions Precedent to Obligations of Purchaser ........................... 27
9.2    Conditions Precedent to Obligations of Seller.................................. 28
9.3    Conditions Precedent to Obligations of Purchaser and Seller ............ 28
9.4    Frustration of Closing Conditions.................................................... 28

**X.**    TAXES ............................................................................................... 29

10.1    Transfer Taxes ............................................................................... 29
10.2    Purchase Price Allocation ............................................................... 29
10.3    Cooperation and Audits .................................................................. 30

**XI.**    GENERAL GOVERNING PROVISIONS............................................. 30

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 11.1 | No Survival of Representations and Warranties | 30 |
| 11.2 | Expenses | 30 |
| 11.3 | Injunctive Relief | 30 |
| 11.4 | Submission to Jurisdiction; Consent to Service of Process | 31 |
| 11.5 | Waiver of Right to Trial by Jury | 31 |
| 11.6 | Entire Agreement; Amendments and Waivers | 31 |
| 11.7 | Governing Law | 32 |
| 11.8 | Notices | 32 |
| 11.9 | Severability | 33 |
| 11.10 | Assignment | 33 |
| 11.11 | Non-Recourse | 33 |
| 11.12 | Counterparts | 34 |
| 11.13 | Restrictive Covenants. | 34 |

**Exhibit**

Exhibit A          Form of Sale Order
Exhibit B          Form of Bill of Sale and Assignment & Assumption Agreement
Exhibit C          Form of Trademark Assignment
Exhibit D          Form of IP Assignment

**Schedules**

Schedule 1.1(a)          Seller's Knowledge
Schedule 1.1(b)          Excluded Inventory
Schedule 1.1(c)          Target Purchased Product Inventory Value
Schedule 5.11             Inventory

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of August 29, 2024 (the "Effective Date"), is by and between VINO.COM, L.L.C., a Missouri limited liability company ("Purchaser") and Vintage Wine Estates, Inc., a Nevada corporation (on behalf of itself and its applicable Subsidiaries, the "Seller"). Certain capitalized terms used in this Agreement that are not otherwise defined are defined in Article I.

A.    Seller and its Subsidiary debtors filed voluntary petitions for relief under Chapter 11 of Title 11 (the "Bankruptcy Cases") of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

B.    Seller engages in the business of bottling and selling the Layer Cake, Cartlidge & Browne, and Tamarack brands, through the three-tier distribution network and directly to consumers (such brands, collectively, the "Brands" and such business, the "Business").

C.    Seller desires to sell (and cause to be sold) to Purchaser the Purchased Assets and Purchaser desires to purchase from Seller the Purchased Assets, in each case, upon the terms and conditions set forth in this Agreement.

D.    On the terms and subject to the conditions set forth herein, following the filing of the Bankruptcy Cases, Seller intends to request that the Bankruptcy Court authorize and approve the Transactions pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, which Sale Order will provide for the transfer of the Purchased Assets to Purchaser free and clear of all Liens (other than Permitted Exceptions), all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree:

## I.    DEFINITIONS

1.1    Certain Definitions.  For purposes of this Agreement, each of the following terms, when used herein with initial capital letters, has the meaning specified in this Section 1.1 or in the other Sections of this Agreement identified in Section 1.2:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Alternative Transaction" means the consummation of a sale transaction to any Person other than Purchaser in respect of any Qualified Bid with respect to any Purchased Assets as defined in the Bidding Procedures Order.

"Bidding Procedures Order" means an Order of the Bankruptcy Court (including any attachment thereto) approving, among other things, the (a) bidding procedures for conducting a sale and auction of the Purchased Assets and (b) procedures relating to the assumption and assignment of executory Contracts and unexpired leases.

"Business Day" means any day other than a Saturday, a Sunday or any other day on which commercial banks in New York, New York are authorized or required by Law to close.

"Code" means the Internal Revenue Code of 1986.

"Contract" means any oral or written contract, agreement, commitment, promise or undertaking (including any indenture, note, bond or other evidence of indebtedness, lease, instrument, license, lease, purchase order or other legally binding agreement).

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions thereof or related or associated epidemics, pandemic or disease outbreaks.

"Exchange Act" means the Securities Exchange Act of 1934.

"GAAP" means generally accepted accounting principles in the United States.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, or any agency, authority, department, commission, board, bureau, official or instrumentality of such body, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator thereof (public or private) of competent jurisdiction.

"Holdback Amount" means an amount equal to $302,831.

"Intellectual Property" means all intellectual property, whether registered or unregistered, including (a) patents and patent applications, continuations, divisionals, continuations-in-part, reissues and reexaminations, (b) trademarks, service marks, trade dress, logos, point of sale materials, corporate names, domain names, social media identifiers and other social media-related intellectual property, brand names, flavor names, slogans, logos, and trade names, together with the common law rights and goodwill associated with any of the foregoing, and all applications and registrations therefor, (c) copyrights, copyrightable works, rights in databases, data collections, copyright registrations and copyright applications and corresponding rights in works of authorship, including label designs, package designs, bottle designs, images, photographs, marketing, promotional and advertising materials, designs, works of art or authorship (d) trade secrets, (e) product composition, including the specific blends utilized for each item and technical analysis of all unique products, (f) Software in any form, including

internet websites, web content and links, source code, object code and mobile applications, and (f) rights of publicity and personality.

"IRS" means the Internal Revenue Service.

"Knowledge of Seller" or "Seller's Knowledge" means the actual knowledge, as of the applicable date and after reasonable inquiry, of those Persons identified on Schedule 1.1(a).

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule, regulation, Order, stipulation, award or common law requirement.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, loss, liability, claim (including "claim" as defined in the Bankruptcy Code), commitment, undertaking, damage, expense, fine, penalty, cost, royalty, deficiency or obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, disclosed or undisclosed, express or implied, primary or secondary, direct or indirect, matured or unmatured, fixed, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due, and whether in contract, tort or otherwise.

"Lien" as applied to any Person means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, sublease, charge, option, right of first offer or first refusal, right of use or possession, restriction, easement, servitude, restrictive covenant, encroachment or encumbrance or any other similar encumbrance or restriction in respect of an asset of such Person, whether imposed by Law, Contract or otherwise.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of, or entered, issued, made or rendered by, a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business consistent with past practice.

"Party" or "Parties" means Purchaser or Seller, as the case may be.

"Permitted Exception" means any Lien (a) for taxes and other governmental charges and assessments arising in the Ordinary Course of Business which are not yet due and payable or which are being contested in good faith, or (b) of carriers and warehousemen arising in the Ordinary Course of Business that (i) will not, and could not reasonably be expected to, individually or in the aggregate, materially impair the value or the continued use and operation of the Purchased Assets to which they relate, and (ii) are for sums not yet due and payable.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Purchased Inventory" means (a) all finished cased goods, wherever located, for wholesale or retail distribution within the United States of America that are packaged and labeled with Purchased Intellectual Property, excluding, in each case, QVC-specific SKUs set forth in Schedule 1.1(b) (the "Excluded Inventory") (the "Purchased Product Inventory"); (b) retail sales merchandise and supplies and point of sale and other in-store advertising material and equipment, in each case, exclusively related to the Brands; and (c) dunnage (including pallets, bags, snakewrap, chipboard, stretch film, separator sheets and strapping) reasonably required to transport the Purchased Product Inventory.

"Purchaser Material Adverse Effect" means any event, change, effect, condition, state of facts or occurrence (collectively, a "Change") which has had or would reasonably be expected to have, individually or when considered together with any other Change, a material adverse effect on the ability of Purchaser to consummate the Transactions prior to the Termination Date or to otherwise timely perform its obligations under this Agreement.

"Representative" means, with respect to any Person, any and all of its directors, officers, partners, managers, employees, consultants, financial advisors, counsel, accountants and other agents.

"Sale Order" means an Order entered by the Bankruptcy Court, pursuant to Sections 363 and 365 of the Bankruptcy Code, authorizing and approving, among other things, the sale of the Purchased Assets free and clear of all Liens (other than Permitted Exceptions), in accordance with the terms and conditions of this Agreement, substantially in the form attached hereto as Exhibit A, and otherwise reasonably acceptable to Purchaser and Seller.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933.

"Seller Material Adverse Effect" means any Change which has a material adverse effect on the Purchased Assets, considered as a whole, except that none of the following, alone or in combination, will be deemed to constitute, nor will any of the following (including the effect of any of the following) be taken into account in determining whether there has been or will be, a "Seller Material Adverse Effect": (a) any Change in the United States or foreign economies or financial markets in general, (b) any Change that generally affects the industries in which the Business operates, (c) any Change arising in connection with pandemics (including COVID-19), earthquakes, hurricanes, tornadoes, fires, acts of God, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such matters, or any response of any Governmental Body to any of the foregoing, (d) any Change in applicable Laws or accounting rules, (e) any actions taken by Purchaser or any of its Affiliates (other than those expressly permitted to be taken hereunder), (f) any Change resulting from the public announcement of this Agreement or the Bankruptcy Cases, or (g) any effect resulting from (i) the commencement or filing of the Bankruptcy Cases, or (ii) Seller's inability to pay certain prepetition obligations as a result of the commencement of the Bankruptcy Cases; provided, however, that with respect to clauses (a), (b), (c) and (d), such effects will only be excluded from consideration to the extent the applicable matter does not disproportionately materially adversely

affect the Business as compared to similarly situated businesses operating in the same industry and geographic areas in which Seller operates.

"Software" means all computer software and code, including assemblers, applets, compilers, source code, object code, development tools, design tools, user interfaces, databases and data, in any form or format, however fixed, including any related documentation.

"Subsidiary" means each corporation or other Person in which a Person owns or controls, directly or indirectly, capital stock or other equity interests representing more than 50% of the outstanding voting stock or other equity interests.

"Target Purchased Product Inventory Value" means $6,028,313, calculated based on the rate per case of each of the Brands set forth on Schedule 1.1(c).

"Tax Authority" means any government, agency, or instrumentality thereof, charged with the administration of any Law or regulation relating to Taxes.

"Tax Returns" means any return, declaration, report, claim for refund or information return or statement relating to Taxes required to be filed with any Governmental Body, including any schedule or attachment thereto and any amendment thereof.

"Taxes" means (a) all federal, state, local, provincial, municipal, foreign or other taxes, charges or other assessments, including, without limitation, all income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, net worth, intangibles, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, intangibles, goods and services, customs duties, conveyance, mortgage, registration, documentary, recording, premium, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, unemployment insurance, severance, environmental (including taxes under Section 59A of the Code), disability, workers' compensation, health care natural resources, excise, severance, stamp, occupancy, rent, real property, personal property, estimated or other similar taxes, duties, levies or other governmental charges or assessments or deficiencies thereof, (b) any item described in clause (a) for which a taxpayer is liable as a transferee or successor, by reason of the regulations under Section 1502 of the Code (or similar provisions of state, local, foreign or other law), or by contract, indemnity or otherwise, and (c) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clauses (a) or (b).

"Transactions" means the transactions contemplated by this Agreement.

1.2    Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, terms defined elsewhere in this Agreement have the meanings so given to them.

1.3    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

(i)        <u>Calculation of Time Period</u>.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded, and the words "<u>to</u>" and "<u>until</u>" shall be deemed to exclude the date referred to.  If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action will be extended to the next succeeding Business Day.

(ii)       <u>Contracts</u>.  Reference to any Contract means such Contract as amended or modified and in effect from time to time in accordance with its terms.

(iii)      <u>Dollars</u>.  Any reference in this Agreement to Dollars or $ will mean U.S. dollars.

(iv)      <u>Exhibits/Schedules</u>.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Agreement.

(v)       <u>GAAP</u>.  Terms used herein which are defined in GAAP are, unless specifically defined herein, used herein as defined in GAAP.

(vi)      <u>Gender and Number</u>.  Any reference in this Agreement to gender will include all genders, and words imparting the singular number only will include the plural and vice versa.

(vii)     <u>Headings</u>.  The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any Article, Section, Recital, Exhibit or Schedule are to the corresponding Article, Section, Recital, Exhibit or Schedule of or to this Agreement unless otherwise specified.

(viii)    <u>Herein</u>.  The words such as "<u>herein</u>," "<u>hereinafter</u>," "<u>hereof</u>" and "<u>hereunder</u>" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(ix)      <u>Including</u>.  The word "<u>including</u>" or any variation thereof means "<u>including, without limitation</u>" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x)       <u>Extent</u>.  The word "<u>extent</u>" and the phrase "<u>to the extent</u>" mean the degree to which a subject or other thing extends, and does not simply mean "if".

(xi)      <u>Law</u>.  Reference to any Law means such Law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect from time to time, including any successor legislation thereto and any rules and regulations

promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, replacement or re-enactment of such section or other provision.

(xii)    Subsidiaries.  Whenever this Agreement requires a Subsidiary of Seller to take (or not take) any action, such requirement will be deemed to include an undertaking on the part of Seller to cause such Subsidiary to take (or not take) such action.

(b)    The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## II.    PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    Purchase and Sale of Assets.

(a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser or one or more of its designees will purchase, acquire and accept from Seller, and Seller will sell, transfer, convey and deliver (or cause one or more of its Subsidiaries to sell, transfer, convey and deliver) to Purchaser or one or more of its designees, all of Seller's (or its applicable Subsidiaries') right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than Permitted Exceptions and Liens created by Purchaser) and Excluded Liabilities.

(b)    The term "Purchased Assets" means all of the following properties, assets, and rights and interests of Seller existing as of the Closing:

(i)    the Intellectual Property exclusively related to the Brands (the "Purchased Intellectual Property");

(ii)    the Purchased Inventory;

(iii)    all goodwill related to the Purchased Intellectual Property;

(iv)    all warranties, guarantees and similar rights exclusively related to the Purchased Inventory, including warranties and guarantees made by suppliers, manufacturers and contractors with respect to the Purchased Inventory, and claims against suppliers and other third parties in connection with the Purchased Intellectual Property and the Purchased Inventory;

(v)    all books, records (including any Tax Returns of Seller related to the Purchased Assets), files, invoices, inventory records, product specifications, cost and pricing information, business plans, brand and label registration data and quality control records and manuals, including all data and other information stored in any format or

media, including on hard drives, hard copy or other media, in each case, to the extent (A) solely related to the other Purchased Assets and (B) permitted by applicable Laws; and

(vi)     all rights, claims, causes of action and credits to the extent relating to any other Purchased Asset, including any such item arising under any guarantee, warranty, indemnity, right of recovery, right of setoff or similar right in favor of Seller or its Subsidiaries, in each case, in respect of any other Purchased Asset.

2.2     Excluded Assets.  Nothing herein contained will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller will retain all right, title and interest to, in and under the Excluded Assets.  The term "Excluded Assets" means all properties, assets and rights of Seller and its Subsidiaries existing as of the Closing that do not constitute Purchased Assets, including, but not limited to:

(i)     any real property;

(ii)     all fixtures, furniture, furnishings, equipment, leasehold improvements and other tangible personal property owned by Seller or its Subsidiaries or leased by Seller or its Subsidiaries;

(iii)     any Contracts;

(iv)     any equity interests;

(v)     all accounts receivable (whether billed or unbilled);

(vi)     any books, records, files, invoices, inventory records, product specifications, cost and pricing information, business plans and quality control records and manuals not relating to the Purchased Assets;

(vii)     any causes of action arising under the Bankruptcy Code;

(viii)     any refunds, overpayments, credits, or rebates of Taxes of Seller; and

(ix)     all claims, rights and causes of action arising from the Transactions.

2.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will assume or will cause one or more of its designees to assume, effective as of the Closing, and will timely perform and discharge all Liabilities arising from the ownership of the Purchased Assets by Purchaser solely to the extent such Liabilities arise out of, the ownership or operation of the Purchased Assets from and after the Closing Date, and no other Liabilities of Seller or any of its Affiliates (the "Assumed Liabilities").

2.4     Excluded Liabilities.  Notwithstanding anything to the contrary set forth herein, the Parties expressly acknowledge and agree that Purchaser will not assume, be obligated to pay,

perform or otherwise discharge or in any other manner be liable or responsible for Liabilities of Seller or its Subsidiaries, whether existing on the Closing Date or arising thereafter, including on the basis of any Law imposing successor liability, other than the Assumed Liabilities and the obligations of Purchaser under this Agreement (all such Liabilities that Purchaser is not assuming being referred to collectively as the "Excluded Liabilities").

2.5    Non-Assignment of Assets.

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not effect the assignment or transfer of any Purchased Asset if (i) (A) prohibited by applicable Law, (B) an attempted assignment or transfer thereof would reasonably likely to subject Purchaser, its Affiliates or any of its or their respective Representatives to civil or criminal Liability or (C) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto, would constitute a breach, default or violation thereof or of any Law or Order (each such action, a "Necessary Consent"), or in any way adversely affect the rights of Purchaser thereunder or (ii) the Bankruptcy Court has not entered an Order (including, for the avoidance of doubt, the Sale Order) approving such assignment or transfer.  In such event, such assignment or transfer is subject to such Necessary Consent being obtained and Seller and Purchaser will use their respective commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request; provided, however, that Seller will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or Legal Proceedings to obtain any such consent or approval.  If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would give rise to any of the circumstances described in clauses (i) or (ii) of the first sentence of this Section 2.5(a), be ineffective or would adversely affect the rights of Purchaser to such Purchased Asset following the Closing, (x) Seller and Purchaser will, and will cause their respective Affiliates to, (1) use commercially reasonable efforts (including cooperating with one another to obtain such Necessary Consents, to the extent feasible) as may be necessary so that Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, (2) complete any such assignments or transfers as soon as reasonably practicable, and (3) upon receipt of any applicable Necessary Consents, to transfer or assign the applicable Purchased Asset to Purchaser, and (y) Seller will, and will cause its respective Affiliates to, cooperate with Purchaser in good faith without further consideration in any arrangement reasonably acceptable to Purchaser and Seller intended to provide Purchaser with the benefit of any such Purchased Assets.

(b)    Subject to Section 2.5(a) if after the Closing (i) Purchaser or its designee holds any Excluded Assets or Excluded Liabilities or (ii) Seller or any of its Subsidiaries holds any Purchased Assets or Assumed Liabilities, Purchaser or Seller will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party.  Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for such other Party.

2.6     Further Conveyances and Assumptions.  From time to time following the Closing, Seller and Purchaser will, and will cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement, and to otherwise make effective the Transactions; provided that the foregoing does not require Purchaser or any of its Affiliates to assume any Liabilities other than the Assumed Liabilities and nothing in the foregoing will subject Seller or its Subsidiaries to additional obligations or liabilities.  Promptly following the Closing, Purchaser shall file, or cause to be filed, at Purchaser's cost, such trademark assignments as are reasonably necessary to record the transfer of the ownership of any trademark relating to the Brands that are held by a third-party, including One True Vine, LLC, to Purchaser, and Seller shall reasonably cooperate with Purchaser in making such filings.

2.7     Alcoholic Beverage Licenses.  To the extent permitted by applicable Law, Seller shall reasonably cooperate with Purchaser in making all filings and taking all steps reasonably necessary to obtain all approvals, consents and waivers required to be obtained by Purchaser under the terms of this Agreement in connection with the Transactions contemplated hereby in accordance with the terms hereof, and shall deliver to Purchaser copies of any non-confidential information in Seller's possession reasonably requested by Purchaser with respect to Purchaser's application for such approvals, consents and waivers; provided, however, that Seller shall have no obligation to obtain, and Purchaser shall be responsible to obtain all alcohol-related approvals, registrations, licenses, permits, authorizations and bonds (collectively, "Alcohol Licenses") from the California Department of Alcoholic Beverage Control ("ABC"), the Alcohol and Tobacco Tax and Trade Bureau ("TTB"), and other Governmental Bodies. Seller shall surrender licenses, permits and authorizations that relate exclusively to the Brands as may be reasonably required for Purchaser to obtain all approvals, consents and waivers required or desired to be obtained by Purchaser under the terms of this Agreement.  Purchaser will provide Seller with reasonable documentation to demonstrate that Purchaser has submitted its applications with respect to the TTB Alcohol License (all locations where required) and CA ABC Alcohol Licenses within five Business Days following the Effective Date (and, as applicable, the state commercial and direct-to-consumer shipper Alcohol Licenses within 10 Business Days following receipt of the TTB and ABC Alcohol Licenses).

### III.     CONSIDERATION

3.1     Consideration.  The aggregate cash consideration to be paid for the Purchased Assets will be: the Target Purchased Product Inventory Value (as finally adjusted pursuant to Section 3.5, the "Purchase Price").  The aggregate cash consideration to be paid by Purchaser to Seller at Closing will be: (i) the Target Purchased Product Inventory Value, minus (ii) the Purchased Product Inventory Deficit, minus (iii) the Deposit Amount (collectively, the "Closing Cash Amount").

3.2     Purchase Price Deposit; Holdback Amount.  Purchaser has deposited a sum of $602,831 (the "Deposit Amount") into an escrow account maintained by Epiq Corporate Restructuring, LLC ("Escrow Agent") pursuant to the addendum executed by Purchaser (the

"Escrow Agreement"), which will be held in the such escrow account and will be either delivered to Purchaser or paid to Seller as follows: (a) if the Closing occurs, $300,000 of the Deposit Amount will be released to Seller and the Holdback Amount will be held by the Escrow Agent to be used pursuant to Section 3.5, (b) if this Agreement is terminated by Seller pursuant to Section 4.4(d), then the Deposit Amount will promptly be released to Seller (and such Deposit Amount will be deemed fully earned by Seller as compensation and consideration for entering into this Agreement), or (c) if this Agreement is terminated for any reason other than by Seller pursuant to Section 4.4(d), then the Deposit Amount will promptly be released to Purchaser. Seller and Purchaser agree to execute joint written instructions and deliver them to the Escrow Agent to cause the Escrow Agent to release the Deposit Amount and the Holdback Amount, as applicable, in accordance with this Section 3.2 and Section 3.5.

3.3    Payment of Closing Cash Amount.  At the Closing, (i) Purchaser will pay to Seller, in immediately available funds to the account or accounts designated by Seller, the Closing Cash Amount and (ii) half of the Deposit Amount will be released to Seller in accordance with Section 3.2.

3.4    Calculation of Pre-Closing Inventory Adjustment.

(a)    Three (3) Business Days prior to the Closing Date or the most recent practicable Business Day prior to such date, Seller shall deliver to Purchaser a statement prepared by Seller setting forth Seller's Purchased Product Inventory expected as of the Closing Date, valued in accordance with Schedule 1.1(c); provided, that, no value will be ascribed any Purchased Product Inventory which, as of such time, has been sold to a third-party for which Seller or its Affiliates have been, or will be paid (the "Closing Purchased Product Inventory"). In the event the value of the Closing Purchased Product Inventory is less than the value of the Target Purchased Product Inventory Value, such difference will constitute the "Purchased Product Inventory Deficit" for purposes of calculating the Closing Cash Amount. Purchaser and Seller shall attempt, in good faith, to resolve any disputes which may arise with respect to the preparation of the Closing Purchased Product Inventory.  In the event that Purchaser and Seller are unable to resolve in good faith any disputes with respect to the calculation of the Closing Purchased Product Inventory, the calculation as determined by Seller will be used for purposes of calculating the Closing Cash Amount.

(b)    From and after the Inventory Effective Date until the Closing, Seller will not sell, transfer, convey, deliver or dispose of any of the Purchased Product Inventory in any way that would result in a change in the Closing Purchased Product Inventory other than upon advance written consent of the Purchaser (unless Seller communicates a corresponding reduction in the Closing Purchased Product Inventory for purposes of calculating the Closing Cash Amount at the Closing).

3.5    Calculation of Post-Closing Purchased Product Inventory Adjustment.

(a)    After the Closing, if Purchaser does not agree with the Closing Purchased Product Inventory provided by Seller, Purchaser shall deliver to Seller a notice of its disapproval (the "Disapproval Notice") within five (5) Business Days after the Closing Date along with a statement prepared by Purchaser calculating the difference between the value of the Closing

Purchased Product Inventory and the value of the actual Purchased Product Inventory on hand as of the Closing (the "Post-Closing Purchased Product Inventory Count"), in each case, valued in accordance with Schedule 1.1(c); provided, that, (i) any Purchased Product Inventory that has not been packaged and labelled in accordance with all applicable Laws such that, as a result, it is prohibited by applicable Law from being sold to consumers in its current form, shall be excluded for the purpose of calculating the Post-Closing Purchased Product Inventory Count (and Purchaser must indicate any such exclusions in its Disapproval Notice with sufficient detail to allow Seller to verify Purchaser's conclusion), and (ii) provided, that, no value will be ascribed any Purchased Product Inventory which, as of such time, has been sold to a third-party for which Seller or its Affiliates have been, or will be paid. In the event the Disapproval Notice is not delivered within the foregoing disapproval period, Purchaser shall have been deemed to have approved the Closing Purchased Product Inventory provided by Seller as set forth in Section 3.4, and the Holdback Amount will be released to Seller.

(b)     Following receipt of the Post-Closing Purchased Product Inventory Count, Seller shall be permitted to review the Post-Closing Purchased Product Inventory Count and the working papers relating to the Post-Closing Purchased Product Inventory Count and, within ten (10) Business Days after the date of such receipt (the "Notice Period"), may deliver to Purchaser a certificate setting forth any objections to the Post-Closing Purchased Product Inventory Count (a "Notice of Disagreement"). In the event Seller does not so object within the Notice Period, the Post-Closing Purchased Product Inventory Count shall become final and binding upon Purchaser and Seller for purposes of this Agreement upon expiration of the Notice Period.

(c)     In the event any objections raised in the Notice of Disagreement are not resolved by the Parties within five (5) Business Days after Purchaser's receipt of a Notice of Disagreement, then Purchaser and Seller shall submit in writing such unresolved objections to a mutually agreeable third-party accounting firm of national reputation and as to which neither party has a material relationship (the "Accounting Firm"), and the Accounting Firm shall make the final determination of the disputed items. The Post-Closing Purchased Product Inventory Count (as the same may be adjusted) shall become final and binding upon Purchaser and Seller on the date the disputed matters are finally resolved in writing by the Accounting Firm. The cost of the fees and expenses of the Accounting Firm shall be borne equally by Purchaser and Seller.

(d)     In the event the value of the Post-Closing Purchased Product Inventory Count is determined or deemed to be less than the value of the Closing Purchased Product Inventory, the amount of such difference shall be paid to Purchaser from the Holdback Amount; provided, Purchaser's recovery shall be limited to the Holdback Amount (and, to the extent such difference is less than the Holdback Amount, the remainder of the Holdback Amount will be released to Seller in accordance with Section 3.2).

(e)     Any term or provision hereof to the contrary notwithstanding, at all times following the Closing, a Party shall afford the other Party and such Party's accountants and representatives, and, if applicable, the Accounting Firm, reasonable access during normal business hours to such facilities where the Purchased Product Inventory is located, books, records and other information (including working papers) as any of the foregoing may reasonably request to prepare for or review the Closing Purchased Product Inventory, the Post-Closing Purchased Product Inventory Count or any matters submitted to the Accounting Firm.

The fees and expenses of Seller's accountants and other advisers of Seller shall be paid by Seller. The fees and expenses of Purchaser's accountants and other advisers of Purchaser shall be paid by Purchaser.

(f)    All payments made pursuant to Section 3.5(a), or following the resolution of a dispute pursuant to Section 3.5(b), shall be made by a wire transfer of immediately available funds to such accounts as designated by Seller, or the Purchaser, as applicable, within five days after the Post-Closing Purchased Product Inventory Count becomes final and binding.

## IV.    CLOSING AND TERMINATION

4.1    Closing Date.  Subject to the satisfaction of the conditions set forth in Sections 9.1, 9.2 and 9.3 (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets provided for in Article II (the "Closing") will take place remotely by exchange of electronic documentation and signatures at 10:00 a.m. (Eastern time) on the date that is three Business Days following the satisfaction or waiver of the conditions set forth in Sections 9.1, 9.2 and 9.3 (other than conditions that by their nature are to be first satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place and time as the Parties may designate in writing.  The date on which the Closing is held is referred to in this Agreement as the "Closing Date."

4.2    Deliveries by Seller.  At the Closing, Seller will deliver, or cause to be delivered, to Purchaser:

(a)    the Bill of Sale and Assignment & Assumption Agreement in substantially the form attached hereto as Exhibit B (the "Bill of Sale and Assignment & Assumption Agreement"), duly executed by Seller or its applicable Subsidiaries;

(b)    a Trademark Assignment in substantially the form attached hereto as Exhibit C (the "Trademark Assignment"), duly executed by Seller or its applicable Subsidiaries;

(c)    the officer's certificate required to be delivered pursuant to Sections 9.1(a) and 9.1(b);

(d)    an Assignment of Intellectual Property Agreement in substantially the form attached hereto as Exhibit D (the "IP Assignment") duly executed by Seller or its applicable Subsidiaries;

(e)    all other documents, instruments and certificates reasonably requested by Purchaser or required to convey and assign the Purchased Assets to Purchaser and vest title therein in Purchaser free and clear of all Liens (other than Permitted Exceptions) (it being understood that no such documents will require Seller or any of its Affiliates to make any additional representations, warranties or covenants, express or implied, not contained in this Agreement, or to otherwise assume any additional obligations or liability); and

(f)    an IRS Form W-9, duly executed by Seller.

4.3     <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser will deliver to Seller:

(a)     the Closing Cash Amount (in accordance with <u>Section 3.3</u>);

(b)     the officer's certificate required to be delivered pursuant to <u>Sections 9.2(a)</u> and <u>9.2(b)</u>; and

(c)     duly executed counterparts to the Bill of Sale and Assignment & Assumption Agreement, the Trademark Assignment and IP Assignment.

4.4     <u>Termination of Agreement</u>.  This Agreement may be terminated prior to the Closing as follows:

(a)     by Purchaser or Seller, if the Closing has not occurred by 5:00 p.m. Pacific time on November 25, 2024 (the "<u>Termination Date</u>"), which date may be extended pursuant to <u>Sections 4.4(c)</u> and <u>4.4(d)</u>; <u>provided</u>, <u>however</u>, that if the Closing has not occurred on or before the Termination Date due to a breach by (i) Purchaser of any representations, warranties, covenants or agreements contained in this Agreement that has resulted in any of the conditions set forth in <u>Section 9.2</u> or <u>Section 9.3</u> not being satisfied by the Termination Date, then Purchaser may not terminate this Agreement pursuant to this <u>Section 4.4(a)</u> or (ii) Seller of any representations, warranties, covenants or agreements contained in this Agreement that has resulted in any of the conditions set forth in <u>Section 9.1</u> or <u>Section 9.3</u> not being satisfied by the Termination Date, then Seller may not terminate this Agreement pursuant to this <u>Section 4.4(a)</u>;

(b)     by mutual written consent of Seller and Purchaser;

(c)     by Purchaser, if Seller breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a condition set forth in <u>Sections 9.1</u> or <u>9.3</u> and such breach has not been cured within 10 Business Days after the giving of written notice by Purchaser to Seller of such breach; <u>provided</u> that Purchaser is not then in breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in <u>Section 9.2 or Section 9.3</u>; <u>provided</u>, <u>further</u>, that in the event that Purchaser provides such written notice to Seller within 10 Business Days of the Termination Date, then the Termination Date will be extended until the end of the 10 Business Day cure period set forth in this <u>Section 4.4(c)</u>;

(d)     by Seller (<u>provided</u> that Seller is not then in breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in <u>Sections 9.1</u> or <u>9.3</u>):

(i)     if Purchaser breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a condition set forth in <u>Sections 9.2</u> or <u>9.3</u> and such breach has not been cured within 10 Business Days after the giving of written notice by Seller to Purchaser of such breach; <u>provided</u>, that in the event that Seller provides such written notice to Purchaser within 10 Business Days of the Termination Date, then the Termination Date will be extended until the end of the 10 Business Day cure period set forth in this <u>Section 4.4(d)(i)</u>;

(ii)    if all of the conditions set forth in <u>Sections 9.1</u> and <u>9.3</u> have been satisfied or waived by the applicable Party (in each case, other than those conditions that by their nature are first satisfied at the Closing), Seller has given written notice to Purchaser that they are prepared to consummate the Closing and Purchaser fails to consummate the Closing within two Business Days after the date that the Closing should have occurred pursuant to <u>Section 4.1</u>;

(e)    by Seller or Purchaser, if there is in effect a final non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions; it being agreed that the Parties will promptly appeal and use reasonable best efforts to seek to overturn any adverse determination which is not non-appealable and pursue such appeal with reasonable diligence unless and until this Agreement is terminated pursuant to this <u>Section 4.4;</u> provided, that the right to terminate this Agreement pursuant to this <u>Section 4.4(e)</u> will not be available to a Party whose breach of a representation, warranty or covenant in this Agreement has resulted in such non-appealable Order; and

(f)    automatically, upon the consummation of an Alternative Transaction.

4.5    <u>Procedure Upon Termination</u>.  In the event of termination pursuant to <u>Section 4.4</u> (other than (x) <u>Section 4.4(f)</u>, under which termination will take place automatically and (y) <u>Section 4.4(b)</u>, under which termination will take place upon the mutual written consent of the Parties), the terminating Party will give written notice thereof to the other Party or Parties, and this Agreement will terminate as described in <u>Section 4.6</u>, and the purchase and sale of the Purchased Assets hereunder will be abandoned, without further action by Purchaser or Seller.

4.6    <u>Effect of Termination</u>.  In the event that this Agreement is terminated as provided herein, then each of the Parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination and there will be no Liability or obligation on Purchaser, Seller or any of their respective Representatives, except as specifically set forth in this <u>Section 4.6</u>; provided, however, that the provisions of <u>Section 3.2</u>, this <u>Section 4.6</u>, <u>Section 7.3</u>, and <u>Article XI</u> (other than <u>Section 11.3</u> with respect to the ability to cause the Closing to occur) and, to the extent necessary to effectuate the foregoing enumerated provisions, <u>Article I</u> and any defined terms in the Agreement, will survive any such termination and will be enforceable hereunder; <u>provided, further</u>, that nothing in this <u>Section 4.6</u> will be deemed to release any Party from Liability for any breach of this Agreement prior to termination and nothing in this <u>Section 4.6</u> will be deemed to interfere with Seller's rights to retain the Deposit Amount to the extent provided in <u>Section 3.2</u>.

## V.    REPRESENTATIONS AND WARRANTIES REGARDING SELLER

Except as set forth in the letter from Seller, dated the Effective Date, addressed to Purchaser (the "<u>Company Disclosure Letter</u>") (regardless of whether or not the corresponding Section of this <u>Article V</u> contains a specific reference to the Company Disclosure Letter; <u>provided</u> that, such disclosures will be deemed made against the Section of this <u>Article V</u> which corresponds to the relevant Schedule of the Company Disclosure Letter and each other Section of this <u>Article V</u> to which its applicability is reasonably apparent on its face) or, to the extent its applicability to the Purchased Assets is reasonably apparent, in the Company SEC Documents (other than any

forward-looking disclosures set forth in any risk factor section, any disclosure in any section relating to forward-looking statements and any other similar disclosures included therein, in each case, to the extent such disclosures are primarily predictive or forward-looking in nature and do not consist of statements of present fact) filed prior to the date of this Agreement, Seller hereby represents and warrants to Purchaser that:

5.1    <u>Organization and Good Standing</u>.  Seller is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and, subject to any limitations that may be imposed on Seller as a result of filing a petition for relief under the Bankruptcy Code, has the requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchased Assets.  Seller is not in violation of its organizational or governing documents.

5.2    <u>Authorization of Agreement</u>.  Subject to entry of the Sale Order, as applicable, Seller has all necessary power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder.  The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the Transactions have been duly authorized by all requisite corporate or similar action on the part of Seller.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly and validly executed and delivered, by Seller and (assuming the due authorization, execution and delivery by the other Parties and the entry of the Sale Order) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes legal, valid and binding obligations of Seller enforceable against Seller in accordance with its respective terms, subject to equitable principles of general applicability (whether considered in a proceeding at law or in equity).

5.3    <u>Governmental Consents</u>.  Except to the extent not required if the Sale Order is entered, and subject to Purchaser obtaining the Alcohol Licenses, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Seller in connection with the execution and delivery of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which Seller is a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the Transactions or the taking by Seller of any other action contemplated hereby or thereby (with or without notice or lapse of time, or both), except for the entry of the Sale Order.  Neither the execution nor delivery of this Agreement or any other agreement, document or instrument contemplated hereby to which Seller is a party shall violate any provision of the organizational or governing documents of Seller.

5.4    <u>Title to Purchased Assets</u>.  Subject to <u>Section 2.5</u> and (a) bankruptcy, insolvency, or other similar Laws affecting the enforcement of creditors' rights generally, and (b) equitable principles of general applicability (whether considered in a proceeding at law or in equity), Seller

has good and valid title to the Purchased Assets free and clear of all Liens (other than Permitted Exceptions), at the Closing, Purchaser will be vested with good and valid title to such Purchased Assets, free and clear of all Liens (other than Permitted Exceptions) and Excluded Liabilities, to the fullest extent permissible under Law, including Section 363(f) of the Bankruptcy Code.

5.5    SEC Documents.  Except as would not reasonably be expected to be, individually or in the aggregate, material to the Purchased Assets, taken as a whole, (a) Seller has filed with or furnished to the SEC all forms, reports, schedules, statements and other documents required to be filed or furnished by it since January 1, 2022, under the Exchange Act or the Securities Act (collectively, the "Company SEC Documents") and (b) as of its respective date of filing, or, if amended or superseded by a subsequent filing made prior to the date of this Agreement, as of the date of the last such amending or superseding filing, each Company SEC Document (i) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated in such Company SEC Document or necessary in order to make the statements in such Company SEC Document, in light of the circumstances under which they were made, not misleading and (ii) complied in all material respects with the applicable requirements of the Exchange Act and the Securities Act, as the case may be, and the applicable rules and regulations of the SEC under the Exchange Act and the Securities Act, as the case may be.

5.6    Litigation.  There are no Legal Proceedings or Orders pending or, to the Knowledge of Seller, threatened against Seller that involves or relates to the Business, any of the Transactions, or affects any of the Purchased Assets.

5.7    Compliance with Laws.  Seller is and, since January 1, 2022, has been in compliance with all applicable Laws.  Seller holds all governmental licenses, authorizations, permits, consents and approvals necessary for the operation of the Business as presently conducted, taken as a whole (the "Company Permits").  Seller is in compliance with the terms of the Company Permits, except for failures to comply that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

5.8    Intellectual Property.

(a)    Section 5.8 of the Company Disclosure Letter contains a list of all domestic and foreign patents, patent applications, registered trademarks, trademark applications, service marks, service mark applications, registered copyrights, copyright applications and domain names and social media identifiers included in the Purchased Intellectual Property.  All of the Purchased Intellectual Property is owned solely by Seller and free and clear of all Liens except Permitted Exceptions.  Each registration listed on Section 5.8 of the Company Disclosure Letter (excluding applications that have not been issued or granted by the relevant Governmental Body) is valid, in full force and effect and enforceable.  Except as otherwise set forth in Section 5.8 of the Company Disclosure Letter, no item listed on Section 5.8 of the Company Disclosure Letter has expired, been canceled or abandoned.

(b)    The Purchased Intellectual Property constitutes all of the Intellectual Property owned by Seller that is necessary for the conduct of the Business relating to the Brands as presently conducted.  The conduct of the Business as currently conducted or conducted since January 1, 2020 does not infringe or violate any patent, trademark, trade name, copyright, or

other Intellectual Property rights of any Person, or constitute a misappropriation of any confidential information or any other Intellectual Property right of any Person.  There are no pending or to the Knowledge of Seller, threatened claims, and Seller has not received, since January 1, 2020, any written notice of any actual or threatened Legal Proceedings alleging any of the foregoing except for those that have since been resolved.  To the Knowledge of Seller, there is no infringement, misappropriation or violation being made by any other Person of any Purchased Intellectual Property.

(c)      To Seller's Knowledge there has been no disclosures of any material trade secrets, confidential information, or other proprietary information included in the Purchased Intellectual Property to any third party that has not been authorized by Seller.

5.9      Financial Advisors.  Except with respect to GLC Advisors & Co., LLC, Seller has not incurred any Liability for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement or Transactions.  Purchaser is not and shall not become obligated to pay any finder's fee or commission or any similar to any broker, finder or financial advisor as a result of the consummation of the Transactions based upon any arrangement made by Seller.

5.10     Taxes.

(a)      Seller has filed (or had filed on its behalf) all material Tax Returns that it was required to file in respect of the Purchased Assets or the Business and all such Tax Returns were correct and complete in all material respects.  Other than as excused or prohibited from being paid as a result of the Bankruptcy Code or the Bankruptcy Court, with respect to the Purchased Assets and the Business, Seller has paid (or had paid on its behalf) (i) all material Taxes that are shown to be due by Seller on any such Tax Returns or pursuant to any written assessment received by Seller from any Tax Authority for any period preceding the Closing Date, and (ii) all other material Taxes due on or before the Closing Date (whether or not shown on a Tax Return).

(b)      There are no pending, proposed in writing or threatened in writing Legal Proceedings with respect to any material Taxes payable by or asserted against Seller related to the Purchased Assets or the Business.

(c)      There are no Liens with respect to Taxes (other than Permitted Exceptions, Liens that will be released by the Sale Order, and Liens for Taxes not yet due and payable or Taxes that are being diligently contested and for which adequate reserves have been set aside in accordance with GAAP) upon the Purchased Assets or the Business.

(d)      Seller is not a party to any Tax indemnity, Tax allocation or Tax sharing agreement, other than any such agreement entered into in the Ordinary Course of Business the principal purpose of which is not related to Tax, that could result in a Lien upon the Purchased Assets or the Business.

(e)      There are no requests for rulings pending between Seller and any Tax Authority in respect of any Tax that could result in a Lien upon the Purchased Assets or the Business.

5.11    Inventory.  Schedule 5.11 contains a true, correct and complete list of all the Purchased Product Inventory as of July 31, 2024, including information, in each case to the extent such information is available, regarding such Purchased Product Inventory's vintage, vineyard block, varietal and the name and address of the warehouse and tank in which such Purchased Product Inventory is located.  Seller is the true, lawful and exclusive owner of the Purchased Product Inventory and has all necessary power and authority to transfer title of the Purchased Product Inventory to Purchaser, free and clear of all Liens other than Permitted Liens and Liens that will be removed on or before the Closing Date. The Purchased Product Inventory has been produced, packaged and labeled, including as to vintage, appellation, and varietal, in accordance with all Laws in all material respects.  The Purchased Product Inventory consists only of items of quality commercially usable and salable in the Ordinary Course of Business, is within its shelf life, is not materially obsolete or damaged, and, to the extent applicable, consists of packaging and product that is merchantable and free of material defects.  None of such Purchased Inventory has been consigned from or to others.

5.12    Brand Registrations. Schedule 5.12 contains a complete list of all Brand and Label Registrations filed by Seller or a Subsidiary of Seller with a Governmental Body in relation to the Purchased Assets (the "Brand Registrations"). Except as set forth on Schedule 5.12(a), each Brand Registration is in the name of, was made by, and is maintained by Seller or a Subsidiary of Seller.

5.13    No Other Representations or Warranties; Company Disclosure Letter.  Except for the representations and warranties contained in this Article V (as modified by the Company Disclosure Letter), Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller, the Purchased Assets, the Assumed Liabilities or the Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller, or any of Seller's or its Affiliate's respective Representatives. Except for the representations and warranties contained in this Article V (as modified by the Company Disclosure Letter), Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any Representative of Seller or any of its Affiliates).  Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business, the Purchased Assets or the use thereof.  The disclosure of any matter or item in any Schedule hereto or in the Company Disclosure Letter will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter could result in a Seller Material Adverse Effect.

## VI.    REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

6.1     <u>Organization and Good Standing</u>.  Purchaser is a limited liability company organized, validly existing and in good standing under Missouri and has all requisite limited liability company power and authority to own, lease and operate its properties and to carry on its business as now being conducted.  Purchaser is not in violation of its organizational or governing documents.

6.2     <u>Authorization of Agreement</u>.  Purchaser has all necessary limited liability company power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party and the consummation of the Transactions have been duly authorized by all requisite limited liability company or similar action on the part of Purchaser.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly and validly executed and delivered, by Purchaser and (assuming the due authorization, execution and delivery by the other Parties and the entry of the Sale Order) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party constitutes legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its respective terms, subject to equitable principles of general applicability (whether considered in a proceeding at law or in equity).

6.3     <u>Consents and Approvals; No Violations</u>.

(a)     The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the Transactions do not and will not (i) conflict with or violate the articles of organization or operating agreement (or similar organizational documents) of Purchaser, (ii) conflict with or violate any Law or Order applicable Purchaser or by which Purchaser or any of its respective properties are bound, or (iii) result in any breach or violation of or constitute a default (or an event which with notice or lapse of time or both would become a default) or result in the loss of a benefit under, or give rise to any right of termination, cancellation, amendment or acceleration of, any Contracts to which Purchaser is a party or by which Purchaser or any of its respective properties are bound, except, in the case of <u>clauses (ii)</u> and <u>(iii)</u>, for any such conflict, violation, breach, default, acceleration, loss, right or other occurrence which would not have or reasonably be expected to have a Purchaser Material Adverse Effect.

(b)     The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the Transactions do not and will not require any consent, approval, authorization or permit of, action by, filing with or notification to, any Governmental Body, except for any such consent, approval, authorization, permit, action, filing or notification the failure of which to make or obtain would not have or reasonably be expected to have a Purchaser Material Adverse Effect.

6.4     <u>Financial Capability</u>.  Purchaser has sufficient funds available to it in cash or readily available liquidity to pay or cause to be paid the Purchase Price and the fees and expenses

required to be paid by Purchaser in connection with the Transactions in cash, and to effect the Transactions. Upon the consummation of the Transactions, (a) Purchaser will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) Purchaser will not be left with unreasonably small capital, (c) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature, and (d) the capital of Purchaser will not be impaired.

6.5     Condition of the Purchased Assets.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Article V (as modified by the Company Disclosure Letter), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis. Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Purchased Assets and, in making the determination to proceed with the Transactions, Purchaser has relied on the results of its own independent investigation.

6.6     Exclusivity of Representations and Warranties.  Purchaser acknowledges that except for the representations and warranties made by Seller in Article V, none of Seller, any of its Affiliates, nor any Representatives of any of the foregoing, make (and neither Purchaser or any other Person has relied upon) any representations or warranties on behalf of Seller. Purchaser further agrees that neither Seller nor any other Person will have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser in certain "data rooms" or management presentations in expectation of the Transactions.  For the avoidance of doubt, Purchaser acknowledges that none of Seller, nor its Affiliates, nor any Representatives of any of the foregoing, make any express or implied representation or warranty with respect to "Confidential Information" as defined in the Confidentiality Agreement, other than to the extent the representations and warranties made by Seller in this Agreement expressly speak to matters that constitute "Confidential Information".  Purchaser acknowledges and agrees that it (a) has had an opportunity to discuss the business of Seller with the management of Seller, (b) has had sufficient access to (i) the books and records of Seller and (ii) the electronic data room maintained by Seller for purposes of the Transactions, (c) has been afforded the opportunity to ask questions of and receive answers from officers and other key employees of Seller and (d) has conducted its own independent investigation of Seller, their respective businesses and the Transactions, and has not relied on any representation, warranty or other statement by any Person on behalf of Seller, other than the representations and warranties of Seller expressly contained in Article V, and that all other representations and warranties are specifically disclaimed.  In connection with any investigation by Purchaser of Seller, Purchaser has received or may receive from Seller or its other Representatives on behalf of Seller certain projections, forward-looking statements and other forecasts and certain business plan information in written or verbal communications.  Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Purchaser is familiar with such uncertainties, that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to Purchaser (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that Purchaser will have no claim against Seller or

any other Person with respect thereto.  Accordingly, Purchaser acknowledges that neither Seller nor any other Person on behalf of Seller makes (and neither Purchaser or any other Person has relied upon) any representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

## VII.   BANKRUPTCY COURT MATTERS

7.1    <u>Submission for Bankruptcy Court Approval</u>.  As promptly as practicable after the execution of this Agreement, Seller will file with the Bankruptcy Court a motion seeking entry of the Sale Order, including the approval of this Agreement and the sale of the Purchased Assets to Purchaser on the terms and conditions hereof if determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order.

7.2    <u>Bankruptcy Process</u>.

(a)    As promptly as practicable following the Effective Date, Seller shall file with the Bankruptcy Court a motion seeking approval of the Bid Protections.

(b)    Seller and Purchaser acknowledge and agree that this Agreement, the sale of the Purchased Assets and the Transactions are subject to higher or otherwise better bids (in accordance with the Bidding Procedures Order) and Bankruptcy Court approval (each, a "<u>Competing Bid</u>"), as determined in Seller's sole and exclusive discretion.  Purchaser and Seller acknowledge that Seller must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best offer for the Purchased Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about Seller's business to prospective bidders, entertaining higher or otherwise better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an auction (the "<u>Auction</u>").  Purchaser agrees and acknowledges that Seller and its Affiliates will be permitted, and will be permitted to cause their Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Purchaser and its Affiliates, agents and Representatives).  In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers for a Competing Bid and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, including supplying information relating to Seller or the Purchased Assets to prospective purchasers.

(c)    Purchaser agrees that it is bound by and accepts the terms and conditions of the Bidding Procedures Order as entered by the Bankruptcy Court.

(d)    If this Agreement and the sale of the Purchased Assets to Purchaser on the terms and conditions hereof are determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order, Purchaser and Seller agree to use commercially reasonable efforts to cause the Bankruptcy Court to enter the Sale Order in substantially in the form attached hereto as <u>Exhibit A</u> with such changes or modifications as may be requested by

Purchaser or Seller that are consented to in writing by the other party, with such consent not to be unreasonably withheld, conditioned or delayed.

(e)  Seller covenants and agrees that if the Sale Order is entered, the terms of any plan submitted by Seller to the Bankruptcy Court for confirmation will not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of Purchaser hereunder, or in any way prevent or interfere with the consummation or performance of the Transactions including any transaction that is contemplated by or approved pursuant to the Sale Order.

(f)  If the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement are appealed or petition for certiorari or motion for rehearing or reargument is filed with respect thereto, Seller agrees to take all actions as may be commercially reasonable and appropriate to defend against such appeal, petition or motion and Purchaser agrees to cooperate in such efforts and each Party agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal; provided, that the absence of an appeal of the Sale Order will not be a condition to any Party's obligation to consummate the Transactions at the Closing.

(g)  For the avoidance of doubt, nothing in this Agreement will restrict Seller or its Affiliates from selling, disposing of or otherwise transferring any Excluded Assets or from settling, delegating or otherwise transferring any Excluded Liabilities, or from entering into discussions or agreements with respect to the foregoing.

7.3  Approval of Break-Up Fee and Expense Reimbursement.  In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation hereof and the identification and quantification of assets of Seller, Seller shall pay Purchaser, in accordance with the terms hereof and the Bidding Procedures Order, a break-up fee in an amount equal to (a) $180,000 (the "Break-Up Fee") plus (b) the amount of the reasonable, out-of-pocket and documented expenses of Purchaser incurred in connection with the negotiation hereof up to an aggregate amount of $120,000 (such expense reimbursement, together with the Break-Up Fee, the "Termination Payment" or the "Bid Protections").  Subject to the entry of the Bidding Procedures Order, the Termination Payment shall be paid on the fifth Business Day following the date of consummation of a Competing Bid if no material breach by Purchaser of this Agreement has occurred prior to such consummation.  In accordance with Section 7.2, Seller shall file with and seek the entry by the Bankruptcy Court of an Order approving the payment of the Termination Payment, pursuant to, and subject to the limitations set forth in, this Agreement.

7.4  Back-Up Bidder.  Seller and Purchaser agree that, in the event that Purchaser is not the winning bidder at the Auction and in accordance with the Bidding Procedures Order, if and only if (a) Purchaser submits the second highest or second best bid at the Auction and is named the "Back-Up Bidder" at the Auction, in each case, as determined by Seller, and (b) Seller gives notice to Purchaser that Seller (i) failed to consummate the sale with the winning bidder, and (ii) has terminated the definitive agreement with the winning bidder, Purchaser shall promptly consummate the Transactions upon the terms and conditions as set forth herein,

including payment of the Purchase Price, as applicable, in accordance with <u>Article III</u>, as the same may be increased by Purchaser at the Auction.

## VIII.   COVENANTS

8.1     <u>Access to Information</u>.  From the Effective Date through the Closing Date, Purchaser will be entitled, through its Representatives, to make such investigation of the Purchased Assets as it reasonably requests for purposes of furthering the consummation of the Transactions; except that, without Seller's prior written consent (which consent may not be unreasonably withheld, delayed or conditioned), (a) Purchaser and its Representatives will not have the right to perform any investigative procedures that involve physical disturbance or damage to the properties of Seller or its Affiliates, and (b) any such investigation will not include any sampling of environmental media, including soil, land, soil gas, surface water, groundwater, stream sediments, indoor air, ambient air or building materials.  Any such investigation and examination will be conducted upon reasonable advance notice and under reasonable circumstances, will occur only during normal business hours and will be subject to restrictions under applicable Law.  Seller will direct its Representatives to cooperate with Purchaser and Purchaser's Representatives in connection with such investigation and examination, and Purchaser and its Representatives will cooperate with Seller and Seller's Representatives. Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would require Seller to disclose information that would cause material competitive harm to a Seller or would violate attorney-client privilege or other confidentiality obligations of Seller.  No investigation by Purchaser will affect or be deemed to modify any of the representations, warranties, covenants or agreements of Seller contained in this Agreement.

8.2     <u>Actions Pending the Closing</u>.  Except (a) as required by applicable Law or by Order of the Bankruptcy Court, (b) as otherwise expressly contemplated by this Agreement, or (c) with the prior written consent of Purchaser, during the period from the Effective Date to and through the Closing Date, Seller will (taking into account the commencement of the Bankruptcy Cases, the anticipated liquidation and shut-down of operations of Seller other than the Purchased Assets and the Business and other changes, facts and circumstances that customarily result from the events leading up to and following the commencement of bankruptcy proceedings, and the Seller's and its Subsidiaries' commercially reasonable responses to and actions in light of Changes related to the COVID-19 pandemic): (i) maintain the Purchased Assets in their current condition, ordinary wear and tear excepted (and excluding sales of Purchased Product Inventory in the Ordinary Course of Business and in accordance with <u>Section 3.4(b)</u>); (ii) not materially amend, modify, terminate, let lapse (other than the expiration of a contract pursuant to its terms) or waive any rights under, or create any Lien with respect to, any Contracts that may have an adverse effect on the Purchased Assets; (iii) use commercially reasonable efforts to defend and protect the Purchased Assets from deterioration; (iv) comply with applicable Laws with respect to the Purchased Assets; (v) move any Purchased Product Inventory from their location as of the Effective Date (other than sales of Purchased Product Inventory in the Ordinary Course of Business and in accordance with <u>Section 3.4(b)</u>), and (vi) not enter into any agreement or commitment to take any action prohibited by this <u>Section 8.2</u>.

8.3     Consents.  Seller and Purchaser will use their commercially reasonable efforts to obtain at the earliest practicable date all consents and approvals contemplated by this Agreement, including the consents and approvals referred to herein and the Necessary Consents; provided, however, that none of Seller or Purchaser will be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any Legal Proceedings to obtain any such consent or approval.  For the avoidance of doubt, the Parties acknowledge and agree that obtaining any such authorizations, consents and approvals, giving such notices and making such filings will not be a condition to Closing.

8.4     Reasonable Best Efforts; Consents to Assignment.

(a)     Upon the terms and subject to the conditions of this Agreement, and without limiting Section 7.2, each of the Parties will use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the Transactions as promptly as practicable, including the prompt preparation and filing of all forms, registrations and notices required to be filed to consummate the Transactions and the taking of such commercially reasonable actions as are necessary to obtain any requisite approvals, consents, Orders, exemptions or waivers by any Governmental Body or any other Person.  Each Party will promptly consult with the others with respect to, provide any necessary information with respect to, and provide the other Parties (or their counsel) copies of, all filings made by such party with any Governmental Body or any other Person or any other information supplied by such Party to a Governmental Body or any other Person in connection with this Agreement and the Transactions (provided that such information may be redacted in order to preserve attorney-client privilege or to remove sensitive information).

(b)     Each Party will promptly inform the others of any communication from any Governmental Body (other than the Bankruptcy Court or the Office of the United States Trustee) regarding any of the Transactions and promptly provide the others with copies of all related correspondence or filings.  If any Party or Affiliate thereof receives a request for additional information or documentary material from any such Governmental Body (other than the Bankruptcy Court or the Office of the United States Trustee) with respect to the Transactions, then such Party will endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request.  Each Party will provide any necessary information and reasonable assistance as the others may reasonably request in connection with its preparation of any additional necessary filings or submissions to any Governmental Body.

(c)     Neither Seller nor Purchaser will independently participate in any meeting with any Governmental Body (other than the Bankruptcy Court or the Office of the United States Trustee) in respect of any findings or inquiry in connection with the Transactions without giving, in the case of Seller, Purchaser, and in the case of Purchaser, Seller, prior notice of the meeting and, to the extent reasonably practicable and not prohibited by the applicable Governmental Body, the opportunity to attend and/or participate in such meeting.

(d)     Nothing in this Section 8.4 will be construed to limit Section 7.2.

8.5    Publicity.  Prior to the Closing, with the exception of press releases issued by Seller and Purchaser on the Effective Date and the Closing Date in forms mutually agreeable to Seller and Purchaser, Purchaser and Seller will not issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Parties, which approval may not be unreasonably withheld, conditioned or delayed, except that such consent will not be required if disclosure is otherwise required by applicable Law or by the Bankruptcy Court; provided, however, that Purchaser or Seller, as applicable, will use its or their commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Parties with respect to the text of any such required disclosure.  Following the Closing, Seller will not issue any press release or public announcement concerning this Agreement or the Transactions without the prior written approval of the Purchaser, except that such consent will not be required if disclosure is otherwise required by applicable Law or by the Bankruptcy Court.

8.6    Confidentiality.  Purchaser acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under Section 8.1, and is subject to the terms of the confidentiality agreement dated March 5, 2024, between Seller and Purchaser (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference. Purchaser acknowledges and understands that this Agreement and related documents may be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders or contract counterparties and that, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.

8.7    Bulk Transfer Laws.  Purchaser acknowledges that Seller will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the Transactions, and hereby waives all claims related to the non-compliance therewith.  The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of all Liens (except for Permitted Exceptions) and Excluded Liabilities in the Purchased Assets, including any Liens or Liabilities arising out of the bulk transfer Laws.

8.8    Use of Seller's Name.  From and after the Closing, the Purchaser may sell the Purchased Product Inventory (including labels bearing Seller's name and address), so long as such Purchased Product Inventory is not modified or altered from and after the Closing.

8.9    Access; Purchased Inventory. The Parties acknowledge and agree that Purchaser will be responsible for acquiring possession of the Purchased Inventory and that Purchaser will use its reasonable best efforts to acquire such possession of the Purchased Inventory as soon as reasonably practicable after the Closing.  Purchaser will be responsible for all fees and expenses incurred in connection with acquiring and maintaining possession of the Purchased Inventory, including labor, transportation and storage after acquisition.  Seller and its Affiliates will, or will cause the applicable purchaser of the applicable location (each, an "Other Purchaser"), if applicable, to, maintain storage of the Purchased Inventory for a period of up to four weeks after the Closing Date at no cost to Purchaser (provided, that, if Purchaser's inability to take possession of all Purchased Inventory during such four-week period is a result of the failure of Seller or an Other Purchaser to permit Purchaser with sufficient access for such purpose, such

free storage period will be extended by an additional two weeks (such period, the "Free Storage Period")). Seller shall use its reasonable best efforts to cooperate with Purchaser or its Representatives in acquiring timely possession of the Purchased Inventory.  After the Free Storage Period, Purchaser will pay Seller or the applicable Other Purchaser a storage fee equal to market rates (as determined by Seller in its sole discretion) (provided, that, neither Seller nor any Other Purchaser will have any obligation to maintain storage of such Purchased Inventory after the date that is eight weeks following the Closing Date).  Seller shall store, or cause to be stored, the Purchased Product Inventory in the same manner maintained by Seller prior to the Effective Date. Purchaser agrees to indemnify and hold harmless Seller or the applicable Other Purchaser, as applicable, and their respective Affiliates and Representatives for any losses or damages incurred by them in connection with storing of, or the removal of, the Purchased Inventory following the Closing other than to the extent any loss or damage is caused by gross negligence or the willful misconduct of the Seller or Other Purchaser.  Each applicable Other Purchaser and each of its applicable Affiliates and Representatives, and each of Seller's applicable Affiliates and Representatives, is an express third-party beneficiary for purposes of this Section 8.9.

8.10    Excluded Inventory.  For the avoidance of doubt, and notwithstanding anything in this Agreement to the contrary, Seller and its Affiliates will not be restricted with respect to their treatment of the Excluded Inventory, and will be permitted to retain or dispose of the Excluded Inventory as Seller chooses in its sole discretion.

8.11    Post-Closing Actions. Within five Business Days after the Closing Date, Seller shall (a) request a brand authorization letter or bottling letter, as applicable, from each bottler or other entity listed on the Certificate of Label Approval (each a "COLA") for the Purchased Product Inventory assigning the right to use the COLA to Purchaser; and (b) authorize Vermont Information Processing to transfer all data exclusively relating to the Brands to Purchaser, including all SKUs, distributor level sales and historical inventory to the extent exclusively related to the Brands. The foregoing requests by Seller shall be in a form satisfactory to Purchaser.

## IX.    CONDITIONS TO CLOSING

9.1    Conditions Precedent to Obligations of Purchaser.  The obligation of Purchaser to consummate the Transactions is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    each of the representations and warranties of Seller contained in this Agreement (disregarding all "materiality" or "Seller Material Adverse Effect" qualifications set forth therein) shall be true and correct as of the Closing, as if made on the Closing Date (except for any such representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such specific date), except where the failure of the representations and warranties to be true and correct, individually or in the aggregate, has not had and would not reasonably be expected to have a Seller Material Adverse Effect and Purchaser shall have received a certificate signed by an authorized officer of Seller on behalf of Seller, dated the Closing Date, to the foregoing effect;

(b)      Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to or on the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller on behalf of Seller, dated the Closing Date, to the forgoing effect; and

(c)      Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2.

9.2      Conditions Precedent to Obligations of Seller. The obligations of Seller to consummate the Transactions are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)      each of the representations and warranties of Purchaser contained in this Agreement (disregarding all "materiality" or "Purchaser Material Adverse Effect" qualifications set forth therein) shall be true and correct as of the Closing, as if made on the Closing Date (except for any such representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such specific date) and Seller shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect;

(b)      Purchaser shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by Purchaser prior to or on the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect; and

(c)      Purchaser shall have delivered to Seller all of the items set forth in Section 4.3.

9.3      Conditions Precedent to Obligations of Purchaser and Seller. The respective obligations of Purchaser and Seller to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Seller and Purchaser, jointly, in whole or in part to the extent permitted by applicable Law):

(a)      there shall not be in effect any Order by a Governmental Body restraining, enjoining or otherwise prohibiting the consummation of the Transactions; and

(b)      the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be subject to a stay or have been vacated, modified or revoked.

9.4      Frustration of Closing Conditions. No Party may rely on the failure of any condition set forth in Sections 9.1, 9.2 or 9.3, as the case may be, if such failure was caused by such Party's breach of any provision of this Agreement.

# X.   TAXES

10.1   <u>Transfer Taxes</u>.  All documentary, stamp, transfer, motor vehicle registration, sales, use, value added, excise and other similar non-income Taxes and all filing and recording fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the Transactions (collectively, "<u>Transfer Taxes</u>") will be borne by Purchaser, regardless of the Party on whom Liability is imposed under the provisions of the Laws relating to such Transfer Taxes.  Seller and Purchaser will consult and cooperate in timely preparing and making all filings, Tax Returns, reports and forms as may be required to comply with the provisions of the Laws relating to such Transfer Taxes and will cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for or exemptions from such Transfer Taxes, including preparing exemption certificates and other instruments as are applicable to claim available exemptions from the payment of Transfer Taxes under applicable Law and executing and delivering such affidavits and forms as are reasonably requested by the other Party.

10.2   <u>Purchase Price Allocation</u>.

(a)   As promptly as practicable after the Closing Date, but no later than 45 days thereafter, Purchaser will prepare and deliver to Seller, an allocation schedule setting forth the amounts to be allocated among the Purchased Assets of Seller, pursuant to (and to the extent necessary to comply with) Section 1060 of the Code and the applicable regulations promulgated thereunder (or, if applicable, any similar provision under state, local or foreign Law or regulation) (the "<u>Proposed Allocation Statement</u>").  Seller will have 20 Business Days following delivery of the Proposed Allocation Statement during which to notify Purchaser in writing (an "<u>Allocation Notice of Objection</u>") of any objections to the Proposed Allocation Statement, setting forth in reasonable detail the basis of their objections.  If Seller fails to deliver an Allocation Notice of Objection in accordance with this <u>Section 10.2(a)</u>, the Proposed Allocation Statement will be conclusive and binding on all Parties and will become the "<u>Final Allocation Statement</u>."  If Seller submits an Allocation Notice of Objection, then for 10 Business Days after the date Purchaser receives the Allocation Notice of Objection, Purchaser and Seller will use their commercially reasonable efforts to agree on the allocations.  Failing such agreement within 10 Business Days of such notice, the unresolved allocations will be submitted to PriceWaterhouseCoopers, or if PriceWaterhousecoopers is determined not be independent of any of the Parties or is otherwise unwilling to so serve, an independent, internationally recognized accounting firm mutually agreeable to Purchaser and Seller (the "<u>PPA Accountant</u>"), which will be instructed to determine its best estimate of the allocation schedule based on its determination of the unresolved allocations and provide a written description of the basis for its determination within 45 Business Days after submission, such written determination to be final, binding and conclusive.  The fees and expenses of the PPA Accountant will be apportioned among Seller and Purchaser equally.

(b)   Seller and Purchaser and their respective Affiliates will report, act, and file Tax Returns (including, but not limited to IRS Form 8594) in all respects and for all purposes consistent with the Final Allocation Statement, and will not take any position (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Final Allocation Statement, in each case,

except to the extent otherwise required by a "determination" within the meaning of Section 1313 of the Code.

10.3    <u>Cooperation and Audits</u>.  Purchaser and Seller will cooperate fully with each other regarding Tax matters to the extent commercially reasonable and will make available to the other as reasonably requested all information, records and documents relating to Taxes governed by this Agreement until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes.

## XI.    GENERAL GOVERNING PROVISIONS

11.1    <u>No Survival of Representations and Warranties</u>.  The Parties agree that the representations and warranties contained in this Agreement, and the covenants contained in this Agreement to be performed prior to the Closing, will not survive the Closing, and none of the Parties will have any Liability to each other after the Closing for any breach thereof.  The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing will survive the Closing until fully performed in accordance with the terms of this Agreement, and each Party will be liable to the other after the Closing for any breach thereof.

11.2    <u>Expenses</u>.  Except as otherwise expressly provided in this Agreement, whether or not the Transactions are consummated, Seller, on the one hand, and Purchaser, on the other hand, will bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Transactions and all Legal Proceedings incident thereto.

11.3    <u>Injunctive Relief</u>.

(a)    The Parties agree that irreparable damages would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce specifically the terms and provisions of this Agreement, including without limitation specific performance of such covenants, promises or agreements or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this <u>Section 11.3</u> will be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(b)    The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Purchaser or Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of Purchaser or Seller, as applicable, under this Agreement all in accordance with the terms of this <u>Section 11.3</u>.

11.4    <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(a)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Legal Proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in <u>Section 11.8</u>; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases have been closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action in the United States District Court for the District of Delaware) and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the Parties hereby consents to process being served by any other Party in any Legal Proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 11.8</u>; <u>provided</u>, <u>however</u>, that such service will not be effective until the actual receipt thereof by the Party being served.

11.5    <u>Waiver of Right to Trial by Jury</u>.  Each Party to this Agreement waives any right to trial by jury in any Legal Proceeding regarding this Agreement or any provision hereof.

11.6    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement, together with the Bill of Sale and Assignment & Assumption Agreement, the Trademark Assignment, the Escrow Agreement, and the other agreements contemplated hereby represents the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, will be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

11.7    <u>Governing Law</u>.  This Agreement will be governed by and construed in accordance with federal bankruptcy Law, to the extent applicable, other federal law, where applicable, and, where state Law is implicated, the Laws of the State of Delaware applicable to contracts made and performed in such State.

11.8    <u>Notices</u>.  All notices and other communications under this Agreement will be in writing and will be deemed given (a) when delivered personally by hand, (b) when sent by email (with written confirmation of transmission), or (c) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and email addresses (or to such other address or email address as a Party may have specified by notice given to the other Party pursuant to this provision):

> If to Seller, to:
>
> Vintage Wine Estates, Inc.
> 205 Concourse Blvd.
> Santa Rosa, California 95403
> Attention: Amir Sadr
> Email: <u>asadr@vintagewineestates.com</u>
> Attention: Kristina Johnston
> Email: <u>kjohnston@vintagewineestates.com</u>
>
> With copies (which will not constitute notice) to:
>
> Jones Day
> 901 Lakeside Avenue
> Cleveland, Ohio 44114
> Attention: Heather Lennox
> Email: hlennox@jonesday.com
> Attention: George Hunter
> Email: ghunter@jonesday.com
>
> If to Purchaser, to:
> 421 Wando Park Blvd
> Suite 200
> Mount Pleasant, SC 29464
> Attention: David J Pardus; Brian Fox
> Email:  dpardus@tbsbrands.com; bfox@tbsbrands.com
>
> With copies (which will not constitute notice) to:
>
> Kilpatrick Townsend & Stockton LLP
> 1100 Peachtree Street NE
> Suite 2800
> Atlanta, GA 30309-4528
> Attention: Paul Rosenblatt
> Email:  PRosenblatt@ktslaw.com

11.9    <u>Severability</u>. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

11.10    <u>Assignment</u>. This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement (other than as set forth in <u>Section 8.9</u> and provided that any Person that is not a Party will be a third-party beneficiary for purposes of <u>Section 11.11</u>). No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents will be void; <u>provided</u>, <u>however</u>, that (a) Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more Affiliates and (b) Seller may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities (including any liquidating trust) pursuant to a Chapter 11 plan confirmed by the Bankruptcy Court, in the case of each clause (a) and (b) without any other Party's consent. No assignment of any obligations hereunder will relieve the Parties of any such obligations. Upon any such permitted assignment, the references in this Agreement to Seller or Purchaser will also apply to any such assignee unless the context otherwise requires.

11.11    <u>Non-Recourse</u>. No past, present or future director, officer, employee, incorporator, member, partner, equityholder, manager, agent, attorney, Representative or Affiliate of the Parties or any of their Affiliates will have any Liability for any obligations or Liabilities of Seller or Purchaser, as applicable, under this Agreement or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as Parties or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the Parties, no other Person will have any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or Liabilities of any Party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any Legal Proceeding based on, in respect of, or by reason of, Transactions (including the breach, termination or failure to consummate such Transactions), in each case whether based on contract, tort, fraud, strict liability, other Laws or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a Party or another Person or otherwise. In no event will any Person be liable to another Person for any remote, speculative or punitive damages with respect to the Transactions.

11.12   <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

11.13   <u>Restrictive Covenants</u>.  Upon and after the Closing Date until the earlier of (i) the effective date of a plan of reorganization with respect to the Bankruptcy Cases, (ii) the dismissal of the Bankruptcy Cases, and (iii) six months after the Closing Date, Seller shall not, and shall cause its Affiliates not to:

(a)     conduct business under, or otherwise use, directly or indirectly, any name that consists of any word included in the name of any Brand or any synonyms therefor, or any word or words in combination therewith;

(b)     refer to themselves as the makers, creators, founders or originators of any of the Brands in any commercial context, except for existing references to any Brand;

(c)     publicly disparage, criticize, defame or slander the Brands, Purchaser or Purchaser's current or future Affiliates; or

(d)     cause or attempt to cause any client, customer, distributor or supplier of the Brands to terminate or materially reduce its business with Purchaser or any current or future Affiliate thereof regarding the Brands.

*[Signature page follows]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the Effective Date.

PURCHASER:

VINO.COM, LLC.

By: _____

Name:      David J. Pardus

Title:      President

[Signature Page to Asset Purchase Agreement]

SELLER:

VINTAGE WINE ESTATES, INC.

By: _____
Name:  Kristina Johnston
Title:   Authorized Person

[*Signature Page to Asset Purchase Agreement*]