## Exhibit 1

**Asset Purchase Agreement**

**EXECUTION VERSION**

**ASSET PURCHASE AGREEMENT**

by and among

Full - Glass Licensing LLC,
a Delaware limited liability company

as Purchaser

and

Vintage Wine Estates, Inc., a Nevada corporation and affiliated Debtors in the bankruptcy case
in the District of Delaware jointly administered under Case No. 24-1157

Dated as of September 5, 2024

# TABLE OF CONTENTS

**Page**

I.    DEFINITIONS .......................................................................................................... 1
    1.1    Certain Definitions ........................................................................................ 1
    1.2    Terms Defined Elsewhere in this Agreement ................................................ 5
    1.3    Other Definitional and Interpretive Matters ................................................. 5

II.    PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ................... 7
    2.1    Purchase and Sale of Assets .......................................................................... 7
    2.2    Excluded Assets ............................................................................................. 8
    2.3    Assumption of Liabilities .............................................................................. 8
    2.4    Excluded Liabilities ....................................................................................... 8
    2.5    Non-Assignment of Assets ............................................................................ 8
    2.6    Further Conveyances and Assumptions ......................................................... 9
    2.7    Alcoholic Beverage Licenses ........................................................................ 9

III.    CONSIDERATION ................................................................................................. 10
    3.1    Consideration ............................................................................................... 10
    3.2    Purchase Price Deposit; Escrow Holdback .................................................. 10
    3.3    Calculation of Pre-Closing Inventory Adjustment ...................................... 11
    3.4    Calculation of Post-Closing Inventory Adjustment ..................................... 11

IV.    CLOSING AND TERMINATION ........................................................................... 12
    4.1    Closing Date ................................................................................................. 12
    4.2    Deliveries by Seller ..................................................................................... 12
    4.3    Deliveries by Purchaser ............................................................................... 13
    4.4    Termination of Agreement ........................................................................... 13
    4.5    Procedure Upon Termination ....................................................................... 14
    4.6    Effect of Termination ................................................................................... 14

V.    REPRESENTATIONS AND WARRANTIES OF SELLER ........................................ 14
    5.1    Organization and Good Standing ................................................................. 15
    5.2    Authorization of Agreement ........................................................................ 15
    5.3    Governmental Consents ............................................................................... 15
    5.4    Title to Purchased Assets ............................................................................. 15
    5.5    SEC Documents ........................................................................................... 15
    5.6    Litigation ...................................................................................................... 16
    5.7    Financial Advisors, Finders, Brokers .......................................................... 16
    5.8    Inventory ...................................................................................................... 16
    5.9    Taxes ............................................................................................................ 16
    5.10    Intellectual Property .................................................................................... 17
    5.11    No Other Representations or Warranties; Schedules .................................... 17

VI.    REPRESENTATIONS AND WARRANTIES OF PURCHASER ............................... 18
    6.1    Organization and Good Standing ................................................................. 18

i

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 6.2 | Authorization of Agreement | 18 |
| 6.3 | Consents and Approvals; No Violations | 18 |
| 6.4 | Financial Capability | 19 |
| 6.5 | Condition of the Purchased Assets | 19 |
| 6.6 | Exclusivity of Representations and Warranties | 19 |
| **VII.** | **BANKRUPTCY COURT MATTERS** | 20 |
| 7.1 | Submission for Bankruptcy Court Approval | 20 |
| 7.2 | Bankruptcy Process | 20 |
| 7.3 | Approval of Break-Up Fee and Expense Reimbursement | 21 |
| 7.4 | Back-Up Bidder | 22 |
| **VIII.** | **COVENANTS** | 22 |
| 8.1 | Access to Information | 22 |
| 8.2 | Actions Pending the Closing | 22 |
| 8.3 | Consents | 23 |
| 8.4 | Reasonable Best Efforts; Consents to Assignment | 23 |
| 8.5 | Publicity | 23 |
| 8.6 | Confidentiality | 23 |
| 8.7 | Possession of Inventory | 24 |
| **IX.** | **CONDITIONS TO CLOSING** | 24 |
| 9.1 | Conditions Precedent to Obligations of Purchaser | 24 |
| 9.2 | Conditions Precedent to Obligations of Seller | 25 |
| 9.3 | Conditions Precedent to Obligations of Purchaser and Seller | 26 |
| 9.4 | Frustration of Closing Conditions | 26 |
| **X.** | **TAXES** | 26 |
| 10.1 | Transfer Taxes | 26 |
| 10.2 | Purchase Price Allocation | 26 |
| 10.3 | Cooperation and Audits | 27 |
| **XI.** | **GENERAL GOVERNING PROVISIONS** | 27 |
| 11.1 | No Survival of Representations and Warranties | 27 |
| 11.2 | Expenses | 27 |
| 11.3 | Injunctive Relief | 27 |
| 11.4 | Submission to Jurisdiction; Consent to Service of Process | 28 |
| 11.5 | Waiver of Right to Trial by Jury | 28 |
| 11.6 | Entire Agreement; Amendments and Waivers | 28 |
| 11.7 | Governing Law | 29 |
| 11.8 | Notices | 29 |
| 11.9 | Severability | 30 |
| 11.10 | Assignment | 30 |
| 11.11 | Non-Recourse | 30 |

BN 84197473v4
NAI-1540980169v9

# TABLE OF CONTENTS
(continued)

**Page**

11.12   Counterparts ............................................................................................. 31
11.13   Restrictive Covenants ........................................................................... 31

**Exhibits**

| | |
|---|---|
| Exhibit A | Form of Sale Order |
| Exhibit B | Form of Bill of Sale and Assignment and Assumption Agreement |
| Exhibit C | Form of Trademark Assignment |
| Exhibit D | Form of Other IP Assignment |

**Schedules**

| | |
|---|---|
| Schedule 1.1(a) | Knowledge |
| Schedule 3.3(a) | Wine Inventory |
| Scheduled 3.3(b) | Soft Goods |

iii

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of September 5, 2024 (the "Effective Date"), is by and among Full - Glass Licensing LLC, a Delaware limited liability company ("Purchaser"), and Vintage Wine Estates, Inc., a Nevada corporation and its affiliated debtors in the bankruptcy case in the District of Delaware jointly administered as Case No. 24-11575 on behalf of itself and its applicable affiliated debtors (collectively, "Seller"). Certain capitalized terms used in this Agreement that are not otherwise defined are defined in Article I.

## RECITALS

A.      Seller filed voluntary petitions for relief under Chapter 11 of Title 11 (the "Bankruptcy Cases") of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

B.      Seller is engaged in the business of bottling and selling the Cameron Hughes, Windsor and Vinesse brands (such brands, collectively, the "Brands").

C.      Seller desires to sell to Purchaser or one or more of its designees the Purchased Assets and Purchaser desires to purchase, or cause one or more of its designees to purchase, from Seller the Purchased Assets upon the terms and conditions set forth in this Agreement.

D.      On the terms and subject to the conditions set forth herein, Seller intends to request that the Bankruptcy Court authorize and approve the Transactions pursuant to Sections 105 and 363 of the Bankruptcy Code  and Rule 6004 of the Federal Rules of Bankruptcy Procedure, and the Sale Order all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree:

## I.      DEFINITIONS

1.1      Certain Definitions.  For purposes of this Agreement, each of the following terms, when used herein with initial capital letters, has the meaning specified in this Section 1.1 or in the other Sections of this Agreement identified in Section 1.2:

"Action" means any claim, counterclaim, action, cause of action, complaint, suit, hearing, charge, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Alternative Transaction</u>" means the consummation of a sale or Chapter 11 plan transaction to any Person other than Purchaser or its designee in respect of any Qualified Bid with respect to any Purchased Assets as defined in the Bidding Procedures Order.

"<u>Bankruptcy Estate</u>" means all property of the Seller's bankruptcy estates as provided by Section 541 of the Bankruptcy Code.

"<u>Bidding Procedures Order</u>" means an Order of the Bankruptcy Court (including any attachment thereto) approving, among other things, the (a) bidding procedures for conducting a sale and auction of the Purchased Assets and (b) procedures relating to the assumption and assignment of executory Contracts and unexpired leases, in form and substance acceptable to the Purchaser with respect to this Agreement, the Purchased Assets, and the Bid Protections.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday or any other day on which commercial banks in New York, New York are authorized or required by Law to close.

"<u>Change</u>" means any event, change, effect, condition, state of facts or occurrence.

"<u>Code</u>" means the Internal Revenue Code of 1986.

"<u>Contract</u>" means any written contract, agreement, commitment, promise or undertaking (including any indenture, note, bond or other evidence of indebtedness, lease, instrument, license, lease, purchase order or other legally binding agreement).

"<u>COVID-19</u>" means SARS-CoV-2 or COVID-19, and any evolutions thereof or related or associated epidemics, pandemic or disease outbreaks.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934.

"<u>GAAP</u>" means generally accepted accounting principles in the United States.

"<u>Governmental Body</u>" means any government or governmental or regulatory body thereof, or political subdivision thereof, or any agency, authority, department, commission, board, bureau, official or instrumentality of such body, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator thereof (public or private) of competent jurisdiction.

"<u>Intellectual Property</u>" means all intellectual property, including (a) patents and patent applications, continuations, divisionals, continuations-in-part, reissues and reexaminations,

(b) trademarks, service marks, trade dress, logos, corporate names, domain names and trade names, together with the goodwill associated with any of the foregoing, and all applications and registrations therefor, (c) copyrights, copyrightable works, rights in databases, data collections, copyright registrations and copyright applications and corresponding rights in works of authorship, (d) trade secrets, (e) Software in any form, including internet websites, web content and links, source code, object code and mobile applications, and (f) rights of publicity and personality, including, but not limited to:

(i)       the registered and unregistered copyrights, services marks, logos, graphic representations, label designs, product packaging, and other similar indicia or source or origin, works of authorship, whether or not copyrightable, patents and patent applications (to the extent that such exist), proprietary Software, designs, URLs, websites (including all photographs, images, and content thereon), social media identifiers and other social media-related intellectual property, industrial designs, know-how, formulas, models, intellectual property relating to bottle molds, inventions (whether or not patentable), discoveries, improvements, technology, methods, processes, techniques, and other confidential and proprietary information and all rights therein; fictitious business names, and all intellectual property relating to patterns, drawings, direct sales programs, advertising and promotional materials, designs for point of sale materials, all intellectual property relating to Uniform Product Codes (including prefixes); and

(ii)      any registered or unregistered trademarks, trade names, and trade dress used in connection with the Brands, together with the goodwill associated therewith, including but not limited to, the Brands, any and all vineyard designations related to the Brands, all registrations, applications for and renewals and extensions of any of the foregoing (as applicable), all other intellectual or industrial property and proprietary rights, and all of the goodwill associated with the foregoing and the Brands and other Purchased Assets; and

(iii)     intellectual property rights, including trade secrets, in customer lists, email lists, mailing lists, wine club lists and any other information or lists of customers or persons visiting Seller's tasting room or attending events relating to the Brands.

"IRS" means the Internal Revenue Service.

"Knowledge of Seller" or "Seller's Knowledge" means the actual knowledge, upon reasonable inquiry, as of the applicable date, of those Persons identified on Schedule 1.1(a).

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule, regulation, Order, stipulation, award or common law requirement.

"Liability" means any debt, loss, liability, claim (including "claim" as defined in the Bankruptcy Code), commitment, undertaking, damage, expense, fine, penalty, cost, royalty, deficiency or obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, disclosed or undisclosed, express or implied, primary or secondary, direct or indirect, matured or unmatured, fixed, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due, and whether in contract, tort or otherwise.

NAI-1540980169v9

"Lien" as applied to any Person means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, sublease, charge, option, right of first offer or first refusal, right of use or possession, restriction, easement, servitude, restrictive covenant, encroachment or encumbrance or any other similar encumbrance or restriction in respect of an asset of such Person, whether imposed by Law, Contract or otherwise.

"Material Adverse Effect" means any Change that (i) is, or would reasonably be expected to be, materially adverse to the Purchased Assets, taken as a whole, or (ii) is, or would reasonably be expected to be, materially adverse to the ability of Seller to consummate the Transactions contemplated hereby, excluding in each case any such Change arising out of or in connection with or resulting from: (A) any Change in the United States or foreign economies or securities or financial markets in general; (B) adverse developments in economic, business or financial conditions generally affecting the wine industry; (C) hostilities, acts of war or terrorism or military actions or any escalation or worsening of any of the foregoing; (D) the effect of any action taken by Purchaser; (E) Changes in applicable Law; (F) any Change attributable to the execution or announcement of or compliance with this Agreement or the Bankruptcy Cases; (G) any Change arising in connection with pandemics (including COVID-19), earthquakes, hurricanes, tornadoes, fires, acts of God, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such matters, or any response of any Governmental Body to any of the foregoing; (H) any effect resulting from any failure by Seller to meet any internal or published projections, forecasts or revenue or earnings predictions, except in the case of the foregoing clauses (A), (B), (C) and (E) for such Change that materially and disproportionately affect the Purchased Assets, taken as a whole, relative to other participants in the wine industry as a whole.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of, or entered, issued, made or rendered by, a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the business related to the Purchased Assets as conducted by Seller and its Affiliates consistent with past practice.

"Party" or "Parties" means Purchaser and Seller, as the case may be.

"Permitted Exception" means any Lien (i) for real property taxes and assessment which are not yet due and payable, (ii) for personal property taxes, other taxes and other governmental charges and assessments arising in the Ordinary Course of Business which are not yet due and payable or which are being contested in good faith; (iii) of carriers and warehousemen arising in the Ordinary Course of Business that (A) will not, and could not reasonably be expected to, individually or in the aggregate, impair the value or the continued use and ability to sell the Purchased Assets to which they relate, and (B) are for sums not yet due and payable; (iv) other non-monetary liens or imperfections on property which are not material in amount or do not materially impair or interfere with the use of the property affected by such lien or imperfections.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Qualified Bid" has the meaning set forth in the Bidding Procedures Order.

"Representative" means, with respect to any Person, any and all of its directors, officers, partners, managers, employees, consultants, financial advisors, counsel, accountants and other agents.

"Sale Order" means an Order entered by the Bankruptcy Court, pursuant to Sections 363 and 365 of the Bankruptcy Code, authorizing and approving, among other things, (a) the sale of the Purchased Assets and (b) the assumption of the Assumed Liabilities by Purchaser, in accordance with the terms and conditions of this Agreement, substantially in the form attached hereto as Exhibit A, and otherwise acceptable to Purchaser and Seller, each in their reasonable discretion.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933.

"Tax Authority" means any government, agency, or instrumentality thereof, charged with the administration of any Law or regulation relating to Taxes.

"Tax Returns" means any return, declaration, report, claim for refund or information return or statement relating to Taxes required to be filed with any Governmental Body, including any schedule or attachment thereto and any amendment thereof.

"Taxes" means (a) all federal, state, local, provincial, municipal, foreign or other taxes, charges or other assessments, including, without limitation, all income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, net worth, intangibles, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, intangibles, goods and services, customs duties, conveyance, mortgage, registration, documentary, recording, premium, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, unemployment insurance, severance, environmental (including taxes under Section 59A of the Code), disability, workers' compensation, health care natural resources, excise, severance, stamp, occupancy, rent, real property, personal property, estimated or other similar taxes, duties, levies or other governmental charges or assessments or deficiencies thereof, (b) any item described in clause (a) for which a taxpayer is liable as a transferee or successor, by reason of the regulations under Section 1502 of the Code (or similar provisions of state, local, foreign or other law), or by contract, indemnity or otherwise, and (c) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clauses (a) or (b).

"Transactions" means the transactions contemplated by this Agreement.

1.2     Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, the terms defined elsewhere in this Agreement have meanings given to them herein.

1.3     Other Definitional and Interpretive Matters.

5

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

(i)     <u>Calculation of Time Period</u>.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded, and the words "<u>to</u>" and "<u>until</u>" shall be deemed to exclude the date referred to.  If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action will be extended to the next succeeding Business Day.

(ii)     <u>Contracts</u>.  Reference to any Contract means such Contract as amended or modified and in effect from time to time in accordance with its terms.

(iii)     <u>Dollars</u>.  Any reference in this Agreement to Dollars or $ will mean U.S. dollars.

(iv)     <u>Exhibits/Schedules</u>.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Agreement.

(v)     <u>GAAP</u>.  Terms used herein which are defined in GAAP are, unless specifically defined herein, used herein as defined in GAAP.

(vi)     <u>Gender and Number</u>.  Any reference in this Agreement to gender will include all genders, and words imparting the singular number only will include the plural and vice versa.

(vii)     <u>Headings</u>.  The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any Article, Section, Recital, Exhibit or Schedule are to the corresponding Article, Section, Recital, Exhibit or Schedule of or to this Agreement unless otherwise specified.

(viii)     <u>Herein</u>.  The words such as "<u>herein</u>," "<u>hereinafter</u>," "<u>hereof</u>" and "<u>hereunder</u>" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(ix)     <u>Including</u>.  The word "<u>including</u>" or any variation thereof means "<u>including, without limitation</u>" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x)     <u>Extent</u>.  The word "<u>extent</u>" and the phrase "<u>to the extent</u>" mean the degree to which a subject or other thing extends and does not simply mean "if."

(xi)     <u>Law</u>.  Reference to any Law means such Law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect from time to time, including any

6

successor legislation thereto and any rules and regulations promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, replacement or re-enactment of such section or other provision.

(xii)    Subsidiaries.  Whenever this Agreement requires a Subsidiary of Vintage Wine Estates, Inc., a Nevada corporation, to take (or not take) any action, such requirement will be deemed to include an undertaking on the part of Vintage Wine Estates, Inc., a Nevada corporation, to cause such Subsidiary to take (or not take) such action.

(b)    The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## II.    PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    Purchase and Sale of Assets.

(a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will, or will cause one or more of its designees to, purchase, acquire and accept from Seller and Seller will sell, transfer, convey and deliver (or cause one or more of its Subsidiaries to sell, transfer, convey and deliver) to Purchaser, all of Seller's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than Permitted Exceptions) and Excluded Liabilities.

(b)    The term "Purchased Assets" means all of the following assets, and rights of Seller existing as of the Closing:

(i)    all of the wine inventory of Seller or its Affiliates listed on Schedule 3.3(a) which Schedule shall also indicate the address where such inventory is located as of July 31, 2024 (to the Knowledge of Seller and to the extent available), except to the extent sold by Seller or its Affiliates in the Ordinary Course of Business following July 31, 2024 ("Wine Inventory");

(ii)    all of the soft goods inventory of Seller or its Affiliates listed on Schedule 3.3(b) which Schedule shall also indicate the address where such inventory is located as of July 31, 2024 (to the Knowledge of Seller and to the extent available), except to the extent sold by Seller or its Affiliates in the Ordinary Course of Business following July 31, 2024 ("Soft Goods" together with the Wine Inventory, the "Inventory");

(iii)    the Intellectual Property exclusively related to the Brands (the "Purchased Intellectual Property");

(iv)    all of the tangible personal property set forth on Schedule 2.1(b)(iv);

(v)     in each case solely to the extent such relate to Purchased Assets, all books, records, files, invoices, inventory records, cost and pricing information, quality control records, including all data and other information stored in any format or media, including on hard drives, hard copy or other media, in each case to the extent permitted by applicable Laws; and

(vi)     all rights, claims, causes of action (including causes of action under chapter 5 of the Bankruptcy Code) and credits to the extent relating exclusively to any Purchased Asset or Assumed Liability, including any such item arising under any guarantee, warranty, indemnity, right of recovery, right of setoff or similar right in favor of Seller in respect of any Purchased Asset or Assumed Liability. Seller will, and will cause their respective Affiliates to, cooperate with Purchaser in good faith without further consideration in any arrangement reasonably acceptable to Purchaser and Seller intended to provide Purchaser with the benefit of such rights and claims.

2.2     Excluded Assets.  Nothing herein contained will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller will retain all right, title and interest to, in and under the Excluded Assets.  The term "Excluded Assets" means all properties, assets, and rights of Seller or its Affiliates existing as of the Closing that are not a Purchased Asset, including (a) all causes of action arising under the Bankruptcy Code, (b) any refunds, overpayments, credits, or rebates of Taxes of Seller, (c) all Tax Returns of the Seller other than Tax Returns that relate solely to the Purchased Assets, (d) all claims, rights and causes of action arising from the Transactions, and (e) the assets listed on Schedule 2.2 attached hereto.

2.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will assume, effective as of the Closing, and will timely perform and discharge in accordance with their respective terms, all Liabilities arising from the ownership or operation of the Purchased Assets by Purchaser to the extent such Liabilities arise after the Closing (collectively, the "Assumed Liabilities").

2.4     Excluded Liabilities.  Notwithstanding anything to the contrary set forth herein, the Parties expressly acknowledge and agree that Purchaser will not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for Liabilities of Seller or any of its Affiliates, whether existing prior to or on the Closing Date or arising thereafter, including on the basis of any Law imposing successor liability, other than the Assumed Liabilities and the obligations of Purchaser under this Agreement (all such Liabilities that Purchaser is not assuming being referred to collectively as the "Excluded Liabilities").

2.5     Non-Assignment of Assets.

(a)     Notwithstanding any other provision of this Agreement or any ancillary agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not effect the assignment or transfer of any Purchased Asset if (i) (A) prohibited by applicable Law, (B) an attempted assignment or transfer thereof would reasonably be likely to subject Purchaser, its Affiliates or any of its or their respective Representatives to civil or criminal Liability or (C) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto, would constitute a breach, default or violation thereof or of any Law or Order (each such action, a

8

"Necessary Consent"), or in any way adversely affect the rights of Purchaser thereunder.  In such event, such assignment or transfer is subject to such Necessary Consent being obtained and Seller and Purchaser will use their respective commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request; provided, however, that Seller will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or Action to obtain any such consent or approval.  If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would give rise to any of the circumstances described in clauses (i) of the first sentence of this Section 2.5(a), be ineffective or would adversely affect the rights of Purchaser to such Purchased Asset following the Closing, (x) Seller and Purchaser will, and will cause their respective Affiliates to, (1) use commercially reasonable efforts (including cooperating with one another to obtain such Necessary Consents, to the extent feasible) as may be necessary so that Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, (2) complete any such assignments or transfers as soon as reasonably practicable, and (3) upon receipt of any applicable Necessary Consents, to transfer or assign the applicable Purchased Asset to Purchaser, and (y) Seller will, and will cause their respective Affiliates to, cooperate with Purchaser in good faith without further consideration in any arrangement reasonably acceptable to Purchaser and Seller intended to provide Purchaser with the benefit of any such Purchased Assets.

(b)     Subject to Section 2.5(a), if after the Closing (i) Purchaser or its designee holds any Excluded Assets or Excluded Liabilities or (ii) Seller holds any Purchased Assets or Assumed Liabilities, Purchaser or Seller will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party.  Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for such other Party.

2.6     Further Conveyances and Assumptions.  From time to time following the Closing, Seller and Purchaser will, and will cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to Seller and its Affiliates and their respective successors and assigns, the assumption of the Liabilities intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Transactions; provided that nothing in this Section 2.6 will require Purchaser or any of its Affiliates to assume any Liabilities other than the Assumed Liabilities, and nothing in the foregoing will subject Seller or its Subsidiaries to additional obligations or liabilities.

2.7     Alcoholic Beverage Licenses.  To the extent permitted by applicable Law, Seller shall reasonably cooperate with Purchaser in making all filings and taking all steps reasonably necessary to obtain all approvals, consents and waivers required to be obtained by Purchaser under the terms of this Agreement in connection with the Transactions contemplated hereby in accordance with the terms hereof, and shall deliver to Purchaser copies of any non-confidential information in Seller's possession reasonably requested by Purchaser with respect to Purchaser's

application for such approvals, consents and waivers; provided, however, that Seller shall have no obligation to obtain, and Purchaser shall be responsible to obtain, all alcohol-related approvals, registrations, licenses, permits, authorizations and bonds (collectively, "Alcohol Licenses") from the California Department of Alcoholic Beverage Control ("ABC"), the Alcohol and Tobacco Tax and Trade Bureau ("TTB"), and other Governmental Bodies.  Seller shall surrender licenses, permits and authorizations that relate exclusively to the Brands as may be reasonably required for Purchaser to obtain all approvals, consents and waivers required or desired to be obtained by Purchaser under the terms of this Agreement.  Purchaser will provide Seller with reasonable documentation to demonstrate that Purchaser has submitted its applications with respect to the TTB Alcohol License (all locations where required) and CA ABC Alcohol Licenses within five Business Days following the Effective Date (and, as applicable, the state commercial and direct-to-consumer shipper Alcohol Licenses within 10 Business Days following receipt of the TTB and ABC Alcohol Licenses).

## III.    CONSIDERATION

3.1    <u>Consideration</u>.  The aggregate consideration for the Purchased Assets will be: (a) $3,200,000 in cash (the "<u>Bid Purchase Price</u>"), as adjusted pursuant to <u>Section 3.3</u> and <u>Section 3.4</u> below (as adjusted, the "<u>Purchase Price</u>").  At the Closing, Purchaser shall pay to Seller, in immediately available funds to the account or accounts designated by Seller, an amount equal to the Bid Purchase Price less the Deposit Amount less the Pre-Closing Inventory Adjustment, if any (the "<u>Cash Amount</u>").

3.2    <u>Purchase Price Deposit; Escrow Holdback</u>.

(a)    Purchaser has deposited a sum of $320,000 (the "<u>Deposit Amount</u>") into an escrow account maintained by Epiq Corporate Restructuring, LLC ("<u>Escrow Agent</u>") pursuant to the addendum executed by Purchaser (the "<u>Escrow Agreement</u>"), which will be held in such escrow account and will be either delivered to Purchaser or paid to Seller as follows: (a) if the Closing occurs (i) half of the Deposit Amount will be held by Escrow Agent as security for Seller's obligation to reimburse Purchaser for any Post-Closing Inventory Adjustment set forth in <u>Section 3.4</u> below (such remaining amount, the "<u>Escrow Holdback Amount</u>") and (ii) half of the Deposit Amount will be released to Seller, (b) if this Agreement is terminated by Seller pursuant to <u>Section 4.4(d)</u> or <u>Section 4.4(e)</u>, then the Deposit Amount will promptly be released to Seller (and such Deposit Amount will be deemed fully earned by Seller as compensation and consideration for entering into this Agreement), or (c) if this Agreement is terminated for any reason other than by Seller pursuant to <u>Section 4.4(d)</u> or <u>Section 4.4(e)</u>, then the Deposit Amount will promptly be released to Purchaser.

(b)    The Escrow Holdback Amount shall be held in escrow subject to the terms and conditions set forth in the Escrow Agreement.  Any amount of the Escrow Holdback Amount remaining following the determination of and payment to Purchaser of the Post-Closing Inventory Adjustment, if any shall be paid to Seller within five (5) Business Days following such determination and payment.  Seller and Purchaser agree to execute joint written instructions and deliver them to the Escrow Agent to cause the Escrow Agent to release the Deposit Amount or the Holdback Amount, as applicable, in accordance with this <u>Section 3.2</u> and the other provisions of this Agreement.

10

3.3 <u>Calculation of Pre-Closing Inventory Adjustment</u>. Purchaser and Seller agree that <u>Schedule 3.3(a)</u> is, as of July 31, 2024, a complete and accurate listing of Wine Inventory listed by category and number of cased goods on hand (the total number of cased goods included in this listing shall be referred to as the "<u>Submission Date Cased Goods Number</u>") and, <u>Schedule 3.3(b)</u> is, as of July 31, 2024, a complete and accurate listing of Soft Goods ("<u>Submission Date Wine Inventory</u>" and "<u>Submission Date Soft Goods Inventory</u>," respectively and, collectively, the "<u>Submission Date Inventory</u>"). Three (3) Business Days prior to the Closing Date or the most recent practicable Business Day prior to such date, Seller shall deliver to Purchaser a statement prepared by Seller setting forth Seller's Wine Inventory listed by category, location and number of cased goods on hand expected as of the Closing Date (the total number of Cased Goods included in this listing shall be referred to as the "<u>Closing Date Cased Goods Number</u>"). In the event that the Submission Date Cased Goods Number exceeds the Closing Date Cased Goods Number, that difference multiplied by $2.00 shall be deducted from the Bid Purchase Price (the "<u>Pre-Closing Inventory Adjustment</u>").

3.4 <u>Calculation of Post-Closing Inventory Adjustment</u>

(a) After the Closing, if Purchaser does not agree with the Closing Date Cased Goods Number provided by Seller, Purchaser shall deliver to Seller a notice of its disapproval (the "<u>Disapproval Notice</u>") within five (5) Business Days after the Closing Date along with a statement prepared by Purchaser calculating the difference between the Closing Dated Cased Goods Number and the actual Wine Inventory count on hand as of the Closing ("<u>Actual Cased Goods Number</u>"). In the event the Disapproval Notice is not delivered within the foregoing period, Purchaser shall deemed to have approved the Closing Date Cased Goods Number as applicable provided by Seller as set forth in <u>Section 3.3</u>.

(b) Following receipt of the Actual Cased Goods Number, Seller shall be permitted to review the Actual Cased Goods Number and the working papers relating to the Actual Cased Goods Number and, within ten (10) Business Days after the date of such receipt (the "<u>Notice Period</u>"), may deliver to Purchaser a certificate setting forth any objections to the Actual Cased Goods Number (a "<u>Notice of Disagreement</u>"). In the event Seller does not so object within the Notice Period, the Actual Cased Goods Number shall become final and binding upon Purchaser and Seller for purposes of this Agreement upon expiration of the Notice Period.

(c) In the event any objections raised in the Notice of Disagreement are not resolved by the Parties within five (5) Business Days after Purchaser's receipt of a Notice of Disagreement, then Purchaser and Seller shall submit in writing such unresolved objections to a mutually agreeable third-party accounting firm of national reputation and as to which neither party has a material relationship (the "<u>Accounting Firm</u>"), and the Accounting Firm shall make the final determination of the disputed items. The Actual Cased Goods Number (as the same may be adjusted) shall become final and binding upon Purchaser and Seller on the date the disputed matters are finally resolved in writing by the Accounting Firm. The cost of the fees and expenses of the Accounting Firm shall be borne equally by Purchaser and Seller.

(d) In the event the Actual Cased Goods Number is determined or deemed to be less than the Closing Date Cased Goods Number, that difference multiplied by $2.00 shall be paid to Purchaser from the Escrow Holdback Amount; <u>provided</u>, <u>that</u>, Purchaser's recovery of such

difference shall be limited to the Escrow Holdback Amount to the extent such difference is less than the Escrow Holdback Amount, the remainder of the Escrow Holdback Amount will be released to Seller in accordance with Section 3.2(b)).  To the extent the Actual Cased Goods Number is greater than or equal to the Closing Date Cased Goods Number, the entirety of the Escrow Holdback Amount will be released to Seller in accordance with Section 3.2(b).

(e)     Any term or provision hereof to the contrary notwithstanding, at all times following the Closing, each Party shall afford the other Party and such Party's accountants and representatives, and, if applicable, the Accounting Firm, reasonable access during normal business hours to such books, records and other information (including working papers) as any of the foregoing may reasonably request to prepare for or review the Closing Date Cased Goods Number, the Actual Cased Goods Number or any matters submitted to the Accounting Firm.  The fees and expenses of Seller's accountants and other advisers of Seller shall be paid by Seller.  The fees and expenses of Purchaser's accountants and other advisers of Purchaser shall be paid by Purchaser.

## IV.    CLOSING AND TERMINATION

4.1     Closing Date.  Subject to the satisfaction of the conditions set forth in Sections 9.1, 9.2 and 9.3 (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets provided for in Article II (the "Closing") will take place remotely by exchange of documentation and signatures at 10:00 a.m. (Pacific time) on the date that is three (3) Business Days following the satisfaction or waiver of the conditions set forth in Sections 9.1, 9.2 and 9.3 (other than conditions that by their nature are to be first satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place and time as the Parties may designate in writing.  The date on which the Closing is held is referred to in this Agreement as the "Closing Date."

4.2     Deliveries by Seller.

(a)     At the Closing, Seller shall deliver (subject to the physical delivery provisions of Section 8.10) the Purchased Assets to Purchaser.

(b)     At Closing, Seller shall deliver the Sale Order.

(c)     At the Closing, Seller shall also deliver or cause to be delivered to Purchaser any and all other such documents necessary to consummate this Agreement and the Transactions contemplated herein, including but not limited to the following:

(i)     a Bill of Sale and Assignment and Assumption Agreement in substantially the form attached hereto as Exhibit B (the "Bill of Sale"), duly executed by Seller or its applicable Affiliates;

(ii)     a Trademark Assignment in substantially the form attached hereto as Exhibit C (the "Trademark Assignment"), duly executed by Seller or its applicable Subsidiaries;

(a)     an Assignment of Intellectual Property Agreement in substantially the form attached hereto as Exhibit D (the "Other IP Assignment") duly executed by Seller or its applicable Subsidiaries; and

12

(b)      the officer's certificate required to be delivered pursuant to <u>Sections 9.1(a)</u> and <u>9.1(b)</u>.

4.3      <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser will deliver to Seller:

(a)      Cash Amount; and

(b)      the Bill of Sale, Trademark Assignment and Other IP Assignment, duly executed by Purchaser.

4.4      <u>Termination of Agreement</u>.  This Agreement may be terminated prior to the Closing as follows:

(a)      by Purchaser or Seller, if the Closing has not occurred by 5:00 p.m. Pacific time on November 25, 2024 (the "<u>Termination Date</u>"), which date may be extended pursuant to <u>Sections 4.4(c)</u> and <u>(d)</u>; <u>provided</u>, <u>however</u>, that if the Closing has not occurred on or before the Termination Date due to a breach by (i) Purchaser of any representations, warranties, covenants or agreements contained in this Agreement that has resulted in any of the conditions set forth in <u>Section 9.2</u> or <u>Section 9.3</u> not being satisfied by the Termination Date, then Purchaser may not terminate this Agreement pursuant to this <u>Section 4.4(a)</u> or (ii) Seller of any representations, warranties, covenants or agreements contained in this Agreement that has resulted in any of the conditions set forth in <u>Section 9.1</u> or <u>Section 9.3</u> not being satisfied by the Termination Date, then Seller may not terminate this Agreement pursuant to this <u>Section 4.4(a)</u>;

(b)      by mutual written consent of Seller and Purchaser;

(c)      by Purchaser, if Seller breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a condition set forth in <u>Sections 9.1</u> or <u>9.3</u> and such breach has not been cured within ten (10) Business Days after the giving of written notice by Purchaser to Seller of such breach; <u>provided</u> that Purchaser is not then in breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in <u>Section 9.2</u> or <u>Section 9.3</u> at such time; <u>provided</u>, <u>further</u>, that in the event that Purchaser provides such written notice to Seller within ten (10) Business Days of the Termination Date, then the Termination Date will be extended until the end of the ten (10) Business Day cure period set forth in this <u>Section 4.4(c)</u>;

(d)      by Seller, if Purchaser breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a condition set forth in <u>Section 9.2</u> or <u>Section 9.3</u> and such breach has not been cured within ten (10) Business Days after the giving of written notice by Seller to Purchaser of such breach; provided further that Seller is not then in breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in <u>Section 9.1</u> or <u>Section 9.3</u> at such time, provided further, that in the event that Seller provides such written notice to Purchaser within ten (10) Business Days of the Termination Date, then the Termination Date will be extended until the end of the ten (10) Business Day cure period set forth in <u>this Section 4.4(d)</u>;

13

(e)      by Seller, if all of the conditions set forth in <u>Section 9.1</u> and <u>Section 9.3</u> have been satisfied or waived by the applicable Party (in each case, other than those conditions that by their nature are first satisfied at the Closing, but subject to the ability of such conditions to be so satisfied or waived at such time), Seller has given written notice to Purchaser that they are prepared to consummate the Closing and Purchaser fails to consummate the Closing within two (2) Business Days after the date that the Closing should have occurred pursuant to <u>Section 4.1</u>; or

(f)      by Seller or Purchaser, if there is in effect a final non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions; it being agreed that the Parties will promptly appeal and use reasonable best efforts to seek to overturn any adverse determination which is not non-appealable and pursue such appeal with reasonable diligence unless and until this Agreement is terminated pursuant to this <u>Section 4.4</u>; <u>provided</u> that, no Party may terminate this Agreement pursuant to this Section 4.4(f) to the extent such Party's breach of a representation, warranty or covenant herein resulted in such final non-appealable Order.

(g)      automatically, upon the consummation of an Alternative Transaction.

4.5    <u>Procedure Upon Termination</u>.  In the event of termination pursuant to <u>Section 4.4</u> (other than <u>Section 4.4(g)</u>, under which termination will take place automatically), the terminating Party will give written notice thereof to the other Party or Parties, and this Agreement will terminate as described in <u>Section 4.6</u>, and the purchase of the Purchased Assets hereunder will be abandoned, without further action by Purchaser or Seller.

4.6    <u>Effect of Termination</u>.  In the event that this Agreement is terminated as provided herein, then each of the Parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination and there will be no Liability or obligation on Purchaser, Seller or any of their respective Representatives, except as specifically set forth in this <u>Section 4.6</u>; <u>provided</u>, <u>however</u>, that the provisions of <u>Section 3.2</u>, this <u>Article IV</u>, <u>Section 7.3</u>, <u>Article XI</u> and, to the extent necessary to effectuate the foregoing enumerated provisions, <u>Article I</u>, will survive any such termination and will be enforceable hereunder; <u>provided</u>, <u>further</u>, that nothing in this <u>Section 4.6</u> will be deemed to release any Party from Liability for any breach of this Agreement prior to termination and nothing in this <u>Section 4.6</u> will be deemed to interfere with Seller's rights to retain the Deposit Amount to the extent provided in <u>Section 3.2</u>.

## V.    REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the letter from Seller, dated as of the Effective Date, addressed to Purchaser (the "<u>Company Disclosure Letter</u>") (regardless of whether or not the corresponding Section of this Article V contains a specific reference to the Company Disclosure Letter; provided that, such disclosures will be deemed made against the Section of this Article V which corresponds to the relevant Schedule of the Company Disclosure Letter and each other Section of this Article V to which its applicability is reasonably apparent on its face) or, to the extent its applicability is reasonably apparent, in the Company SEC Documents (other than any forward-looking disclosures set forth in any risk factor section, any disclosure in any section relating to forward-looking statements and any other similar disclosures included therein, in each case, to the extent such disclosures are primarily predictive or forward-looking in nature and do not consist of statements

14

of present fact) filed prior to the date of this Agreement, Seller hereby represents and warrants to Purchaser that:

5.1     Organization and Good Standing.  Seller is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and, subject to any limitations that may be imposed on Seller as a result of filing a petition for relief under the Bankruptcy Code, has the requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchased Assets.  Seller is not in violation of its organizational or governing documents.

5.2     Authorization of Agreement.  Subject to entry of the Sale Order, as applicable, Seller has all necessary power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder.  The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the Transactions have been duly authorized by all requisite corporate or similar action on the part of Seller.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly and validly executed and delivered, by Seller and (assuming the due authorization, execution and delivery by the other Parties and the entry of the Sale Order) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes legal, valid and binding obligations of Seller enforceable against Seller in accordance with its respective terms, subject to equitable principles of general applicability (whether considered in a proceeding at law or in equity).

5.3     Governmental Consents.  Except to the extent not required if the Sale Order is entered, and assuming Purchaser has obtained any necessary Alcohol Licenses, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Seller in connection with the execution and delivery of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which Seller is a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the Transactions or the taking by Seller of any other action contemplated hereby or thereby (with or without notice or lapse of time, or both), except for the entry of the Sale Order.

5.4     Title to Purchased Assets.  At the Closing, Purchaser will be vested with good and marketable title to the Purchased Assets, free and clear of all Liens (other than Permitted Exceptions) and Excluded Liabilities, to the fullest extent permissible under Law, including Section 363(f) of the Bankruptcy Code.

5.5     SEC Documents.  Except that which would not reasonably be expected to have or has not had, individually or in the aggregate, a Material Adverse Effect, (a) Seller has filed with or furnished to the SEC all forms, reports, schedules, statements and other documents required to

be filed or furnished by it since January 1, 2022, under the Exchange Act or the Securities Act (collectively, the "Company SEC Documents") and (b) as of its respective date of filing, or, if amended or superseded by a subsequent filing made prior to the date of this Agreement, as of the date of the last such amending or superseding filing, each Company SEC Document (i) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated in such Company SEC Document or necessary in order to make the statements in such Company SEC Document, in light of the circumstances under which they were made, not misleading and (ii) complied in all material respects with the applicable requirements of the Exchange Act and the Securities Act, as the case may be, and the applicable rules and regulations of the SEC under the Exchange Act and the Securities Act, as the case may be.

5.6    Litigation.  There are no Actions or Orders pending or, to the Knowledge of Seller, threatened against Seller that involves or relates to the Purchased Assets.  No Seller has any material liability (and there is no pending or threatened Action that alleges any material liability) for replacement of any grapes or wine inventory or other damages in connection with any grapes or wine inventory, other than ordinary course product warranty claims consistent with the Seller's historical experience, as adjusted for the passage of time based on any changes in the volume and mix of products shipped to customers.

5.7    Financial Advisors, Finders, Brokers.  Except with respect to GLC Advisors & Co., LLC, Seller has not incurred any Liability for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement or Transactions, and in no event will Purchaser be liable for such fees.

5.8    Inventory.  Seller is the true, lawful and exclusive owner of the Inventory and has all necessary power and authority to transfer title of the Inventory to Purchaser, free and clear of all Liens other than Permitted Liens and Liens that will be removed on or before the Closing Date.  The Inventory has been produced, packaged and labeled, including as to vintage, appellation, and varietal, in accordance with all Laws in all material respects. None of such Inventory has been consigned from or to others.

5.9    Taxes.  Except as would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchased Assets:

(a)    Seller has filed  (or had filed on its behalf) all material Tax Returns that it was required to file in respect of the Purchased Assets and all such Tax Returns were correct and complete in all material respects.  Other than as excused or prohibited from being paid as a result of the Bankruptcy Code or the Bankruptcy Court, with respect to the Purchased Assets, Seller has paid (or had paid on its behalf) (i) all material Taxes that are shown to be due by Seller on any such Tax Returns or pursuant to any written assessment received by Seller from any Tax Authority for any period preceding the Closing Date, and (ii) all other material Taxes due on or before the Closing Date (whether or not shown on a Tax Return).

(b)    There are no pending, proposed in writing or threatened in writing Actions with respect to any material Taxes payable by or asserted against Seller related to the Purchased Assets.

16

5.10    <u>Intellectual Property</u>.

(c)    <u>Section 5.10</u> of the Company Disclosure Letter contains a list of all domestic and foreign patents, patent applications, registered trademarks, trademark applications, service marks, service mark applications, registered copyrights, copyright applications and domain names and social media identifiers included in the Purchased Intellectual Property.  All of the Purchased Intellectual Property is owned solely by Seller and free and clear of all Liens except Permitted Exceptions.  Each registration listed on <u>Section 5.10</u> of the Company Disclosure Letter (excluding applications that have not been issued or granted by the relevant Governmental Body) is valid, in full force and effect and enforceable.  Except as otherwise set forth in <u>Section 5.10</u> of the Company Disclosure Letter, no item listed on <u>Section 5.10</u> of the Company Disclosure Letter has expired, been canceled or abandoned.

(d)    The conduct of the Brands' business as currently conducted or conducted since January 1, 2021 does not infringe or violate any patent, trademark, trade name, copyright, or other Intellectual Property rights of any Person, or constitute a misappropriation of any confidential information or any other Intellectual Property right of any Person.  There are no pending or to the Knowledge of Seller, threatened claims, and Seller has not received, since January 1, 2021, any written notice of any actual or threatened Legal Proceedings alleging any of the foregoing except for those that have since been resolved.  To the Knowledge of Seller, there is no infringement, misappropriation or violation being made by any other Person of any Purchased Intellectual Property.

(e)    To Seller's Knowledge there has been no disclosures of any material trade secrets, confidential information, or other proprietary information included in the Purchased Intellectual Property to any third party that has not been authorized by Seller.

5.11    <u>No Other Representations or Warranties; Schedules</u>.  Except for the representations and warranties contained in this <u>Article V</u>, Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller, the Purchased Assets, the Assumed Liabilities or the Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller, or any of Seller's or their Affiliates' respective Representatives.  Except for the representations and warranties contained in this Article V (as modified by the Company Disclosure Letter), Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any Representative of Seller or any of its Affiliates).  Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Purchased Assets or the use thereof.  The disclosure of any matter or item in any Schedule hereto or in the Company Disclosure Letter will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter could result in a Material Adverse Effect.

## VI.    REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

6.1    <u>Organization and Good Standing</u>.  Purchaser is a corporation organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Purchaser to consummate the Transactions or to otherwise timely perform its obligations under this Agreement. Purchaser is not in violation of its organizational or governing documents.

6.2    <u>Authorization of Agreement</u>.  Purchaser has all necessary corporate power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party and the consummation of the Transactions have been duly authorized by all requisite corporate or similar action on the part of Purchaser.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly and validly executed and delivered, by Purchaser and (assuming the due authorization, execution and delivery by the other Parties and the entry of the Sale Order) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party constitutes legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its respective terms, subject to equitable principles of general applicability (whether considered in a proceeding at law or in equity).

6.3    <u>Consents and Approvals; No Violations</u>.

(a)    The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the Transactions do not and will not (i) conflict with or violate the certificate of incorporation or bylaws (or similar organizational documents) Purchaser, (ii) assuming that all consents, approvals and authorizations contemplated by <u>clauses (i)</u> and (ii) of <u>subsection (b)</u> of this Section have been obtained, and all filings described in such clauses have been made, conflict with or violate any Law or Order applicable Purchaser or by which Purchaser or any of its respective properties are bound, or (iii) result in any breach or violation of or constitute a default (or an event which with notice or lapse of time or both would become a default) or result in the loss of a benefit under, or give rise to any right of termination, cancellation, amendment or acceleration of, any Contracts to which Purchaser is a party or by which Purchaser or any of its respective properties are bound, except, in the case of <u>clauses (ii)</u> and <u>(iii)</u>, for any such conflict, violation, breach, default, acceleration, loss, right or other occurrence which would not have or reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Transactions or to otherwise timely perform its obligations under this Agreement.

(b)     The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the Transactions do not and will not require any consent, approval, authorization or permit of, action by, filing with or notification to, any Governmental Body, except for (i) the applicable requirements, if any, of the Exchange Act and state securities, takeover and "blue sky" Laws, and, (ii)  any such consent, approval, authorization, permit, action, filing or notification the failure of which to make or obtain would not have or reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Transactions or to otherwise timely perform its obligations under this Agreement.

6.4     <u>Financial Capability</u>.  Purchaser has sufficient funds available to it in cash to pay or cause to be paid the Purchase Price and the fees and expenses required to be paid by Purchaser in connection with the Transactions, and to effect the Transactions.  Upon the consummation of the Transactions, (a) Purchaser will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) Purchaser will not be left with unreasonably small capital, (c) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature, and (d) the capital of Purchaser will not be impaired.

6.5     <u>Condition of the Purchased Assets</u>.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in <u>Article V</u> (as modified by the Company Disclosure Letter or any Company SEC Documents), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis.  Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Purchased Assets and, in making the determination to proceed with the Transactions, Purchaser has relied on the results of its own independent investigation and the representations and warranties of Seller in Article V.

6.6     <u>Exclusivity of Representations and Warranties</u>.  Purchaser acknowledges that except for the representations and warranties made by Seller in <u>Article V</u>, neither Seller, any of their respective Affiliates, nor any Representatives of any of the foregoing, make (and neither Purchaser or any other Person has relied upon) any representations or warranties on behalf of Seller.  Purchaser further agrees that neither Seller nor any other Person will have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser in certain "data rooms" or management presentations in expectation of the Transactions.   For the avoidance of doubt, Purchaser acknowledges that none of Seller, any of their respective Affiliates, nor any Representatives of any of the foregoing, make any express or implied representation or warranty with respect to "Confidential Information" as defined in the Confidentiality Agreement, other than to the extent the representations and warranties made by Seller in this Agreement expressly speak to matters that constitute "Confidential Information."  Purchaser acknowledges and agrees that it (a) has had an opportunity to discuss the business of Seller with the management of Seller, (b) has had sufficient access to (i) the books and records of Seller and (ii) the electronic data room maintained by Seller for purposes of the Transactions, (c) has been afforded the opportunity to ask questions of and receive answers from officers and other key employees of Seller and (d) has conducted its own independent investigation of Seller, its respective businesses and the Transactions, and has

19

not relied on any representation, warranty or other statement by any Person on behalf of Seller, other than the representations and warranties of Seller expressly contained in <u>Article V</u>, and that all other representations and warranties are specifically disclaimed.  In connection with any investigation by Purchaser of Seller, Purchaser has received or may receive from Seller or its other Representatives on behalf of Seller certain projections, forward-looking statements and other forecasts and certain business plan information in written or verbal communications.  Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Purchaser is familiar with such uncertainties, that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to Purchaser (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that Purchaser will have no claim against Seller or any other Person with respect thereto.  Accordingly, Purchaser acknowledges that neither Seller nor any other Person on behalf of the Seller make (and neither Purchaser or any other Person has relied upon) any representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

## VII.    BANKRUPTCY COURT MATTERS

7.1    <u>Submission for Bankruptcy Court Approval</u>.  As promptly as practicable after the determination that this Agreement is "highest or otherwise best offer" in accordance with the Bidding Procedures Order, Seller will file with the Bankruptcy Court a supplemental motion seeking entry of the Sale Order, including the approval of this Agreement and the sale of the Purchased Assets to Purchaser on the terms and conditions hereof if determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order.

7.2    <u>Bankruptcy Process</u>.

(a)    Seller and Purchaser acknowledge and agree that this Agreement, the sale of the Purchased Assets and the Transactions are subject to higher or otherwise better bids (in accordance with the Bidding Procedures Order) and Bankruptcy Court approval (each, a "<u>Competing Bid</u>"), as determined in Seller's sole and exclusive discretion.  Purchaser and Seller acknowledge that Seller must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best offer for the Purchased Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about Seller's business to prospective bidders, entertaining higher or otherwise better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an auction (the "<u>Auction</u>").  Purchaser agrees and acknowledges that Seller and their Affiliates will be permitted, and will be permitted to cause their Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Purchaser and its Affiliates, agents and Representatives).  In addition, the Seller shall have the responsibility and obligation to respond to any inquiries or offers for a Competing Bid and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, including supplying information relating to the Seller or the Purchased Assets to prospective purchasers.

(b)     Purchaser agrees to be bound by and accept the terms and conditions of the Bidding Procedures Order as entered by the Bankruptcy Court.

(c)     Purchaser and Seller agree to use commercially reasonable efforts to cause the Bankruptcy Court to enter the Sale Order in substantially the form attached hereto as <u>Exhibit A</u> with such changes or modifications as may be requested by Purchaser or Seller that are consented to in writing by the other Party, with such consent not to be unreasonably withheld, conditioned or delayed, if either (i) no other Qualified Bid is timely submitted in accordance with the Bidding Procedures Order or (ii) one or more Qualified Bids is timely submitted and the sale of the Purchased Assets to Purchaser on the terms and conditions hereof (as may be modified at the Auction) are determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order.

(d)     Seller covenants and agrees that if the Sale Order is entered, the terms of any plan submitted by Seller to the Bankruptcy Court for confirmation will not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of Purchaser hereunder, or in any way prevent or interfere with the consummation or performance of the Transactions including any transaction that is contemplated by or approved pursuant to the Sale Order.

(e)     If the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement are appealed or petition for certiorari or motion for rehearing or reargument is filed with respect thereto, Seller agrees to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion and Purchaser agrees to cooperate in such efforts and each Party agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal; <u>provided</u>, that the absence of an appeal of the Sale Order will not be a condition to any Party's obligation to consummate the Transactions at the Closing.

(f)     For the avoidance of doubt, nothing in this Agreement will restrict Seller or its Affiliates from selling, disposing of or otherwise transferring any Excluded Assets or from settling, delegating or otherwise transferring any Excluded Liabilities, or from entering into discussions or agreements with respect to the foregoing.

7.3     <u>Approval of Break-Up Fee and Expense Reimbursement</u>.  In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation hereof and the identification and quantification of assets of Seller, Seller shall pay Purchaser, in accordance with the terms hereof and the Bidding Procedures Order, a break-up fee in an amount equal to (a) $96,000 (the "<u>Break-Up Fee</u>") plus (b) the amount of the reasonable, out-of-pocket and documented expenses of Purchaser incurred in connection with the negotiation hereof up to an aggregate amount of $64,000 (such expense reimbursement, together with the Break-Up Fee, the "<u>Termination Payment</u>" or the "<u>Bid Protections</u>").  Subject to the entry of the Bidding Procedures Order, the Termination Payment shall be paid on the third (3rd)  Business Day following the date of consummation of an Alternative Transaction if no material breach by Purchaser of this Agreement has occurred; <u>provided</u>, that, for the avoidance of doubt, the Parties acknowledge and agree that the Termination Payment will be paid to Purchaser in the event that the Alternative Transaction is consummated after this Agreement is terminated pursuant to <u>Section 4.4(a)</u> to the extent that Purchaser has not materially breached the terms of this Agreement.  In

accordance with <u>Section 7.1</u>, Seller shall file with and seek the entry by the Bankruptcy Court of an Order approving the payment of the Termination Payment, pursuant to, and subject to the limitations set forth in, this Agreement.  This provision shall survive the termination of this Agreement.

7.4     <u>Back-Up Bidder</u>.  Subject to <u>Section 4.4</u>, Seller and Purchaser agree that, in the event that Purchaser is not the winning bidder at the Auction and in accordance with the Bidding Procedures Order, if and only if (a) Purchaser submits the second highest or second best bid at the Auction and is named the "Back-Up Bidder" at the Auction, in each case, as determined by Seller, (b) Purchaser has not terminated this Agreement, including, pursuant to <u>Section 4.4(a)</u>, and (c) Seller gives notice to Purchaser that Seller (i) failed to consummate the sale with the winning bidder, and (ii) has terminated the definitive agreement with the winning bidder, Purchaser shall promptly consummate the Transactions upon the terms and conditions as set forth herein, including payment of the Purchase Price, as applicable, in accordance with <u>Article III</u>, as the same may be increased by Purchaser at the Auction.

## VIII.   COVENANTS

8.1     <u>Access to Information</u>.  From the Effective Date through the Closing Date, Purchaser will be entitled, through its Representatives, to make such investigation of the Purchased Assets and the Assumed Liabilities as it reasonably requests for purposes of furthering the consummation of the Transactions; except that, without Seller's prior written consent (which consent may not be unreasonably withheld, conditioned or delayed), Purchaser and its Representatives will not have the right to perform any investigative procedures that involve physical disturbance or damage to the properties of Seller or its Affiliates.  Seller will direct its respective Representatives to cooperate with Purchaser and Purchaser's Representatives in connection with such investigation and examination, and Purchaser and its Representatives will cooperate with Seller and its Representatives.  Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would require Seller to disclose information that would cause material competitive harm to Seller or would violate attorney-client privilege or other confidentiality obligations of Seller.  No investigation by Purchaser will affect or be deemed to modify any of the representations, warranties, covenants or agreements of Seller contained in this Agreement.

8.2     <u>Actions Pending the Closing</u>.  Except (a) as required by applicable Law or by Order of the Bankruptcy Court, (b) as otherwise expressly contemplated by this Agreement, or (c) with the prior written consent of Purchaser, during the period from the Effective Date to and through the Closing Date, Seller will (taking into account the commencement of the Bankruptcy Cases, the anticipated liquidation and shut-down of operations of Seller other than the Purchased Assets and other changes, facts and circumstances that customarily result from the events leading up to and following the commencement of bankruptcy proceedings, and Seller's commercially reasonable responses to and actions in light of Changes related to the COVID-19 pandemic): (i) maintain the Purchased Assets in their current condition, ordinary wear and tear excepted (and excluding sales of inventory in the Ordinary Course of Business); (ii) use commercially reasonable efforts to defend and protect the Purchased Assets from deterioration; (iii) materially comply with applicable Laws with respect to the Purchased Assets; (iv) move any Inventory from their location as of the

date hereof (other than sales of Inventory in the Ordinary Course of Business), or (v) not enter into any agreement or commitment to take any action prohibited by this Section 8.2.

8.3    Consents.  Seller and Purchaser will use their commercially reasonable efforts to obtain at the earliest practicable date all consents and approvals contemplated by this Agreement, including the consents and approvals referred to in Section 5.3 and the Necessary Consents; provided, however, that none of Seller or Purchaser will be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any Actions to obtain any such consent or approval.  For the avoidance of doubt, the Parties acknowledge and agree that obtaining any such authorizations, consents and approvals, giving such notices and making such filings will not be a condition to Closing.

8.4    Reasonable Best Efforts; Consents to Assignment.

(a)    Upon the terms and subject to the conditions of this Agreement, each of the Parties will use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the Transactions as promptly as practicable, including the prompt preparation and filing of all forms, registrations and notices required to be filed to consummate the Transactions and the taking of such commercially reasonable actions as are necessary to obtain any requisite approvals, consents, Orders, exemptions or waivers by any Governmental Body or any other Person.

(b)    Each Party will promptly inform the others of any communication from any Governmental Body (other than the Bankruptcy Court or the Office of the United States Trustee) regarding any of the Transactions and promptly provide the others with copies of all related correspondence or filings.

8.5    Publicity.  With the exception of press releases issued by Seller and Purchaser on the Effective Date and the Closing Date in forms mutually agreeable to Seller and Purchaser, Purchaser and Seller will not issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Parties, which approval may not be unreasonably withheld, conditioned or delayed, except that such consent will not be required if disclosure is otherwise required by applicable Law or by the Bankruptcy Court; provided, however, that Purchaser or Seller, as applicable, will use its or their commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Parties with respect to the text of any such required disclosure.

8.6    Confidentiality.  Purchaser acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under Section 8.1, and is subject to the terms of the confidentiality agreement dated January 4, 2024, between Seller and Purchaser (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference.  Purchaser acknowledges and understands that this Agreement and related documents may be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders or contract counterparties and that, such disclosure will not be deemed to violate any confidentiality

obligations owing to Purchaser, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.

8.7    <u>Possession of Inventory</u>.  The Parties acknowledge and agree that Purchaser will be responsible for acquiring possession of the Inventory and that Purchaser will use its reasonable best efforts to acquire such possession of the Inventory as soon as reasonably practicable after the Closing and in no event later than four weeks after the Closing Date (the "<u>Inventory Relocation Period</u>").  Purchaser will be responsible for all fees and expenses incurred in connection with acquiring and maintaining possession of the Inventory, including labor, transportation and storage after acquisition.  Seller and its Affiliates will, or will cause the applicable purchaser of the applicable location (each, an "<u>Other Purchaser</u>"), if applicable, to, maintain storage of the Inventory for a period of up to four weeks after the Closing Date at no cost to Purchaser and Seller and shall reasonably cooperate with Purchaser or its Representatives in acquiring possession of the Inventory.  After the Inventory Relocation Period, Purchaser will pay Seller or the applicable Other Purchaser a storage fee equal to market rates (as determined by Seller in its sole discretion) (provided, neither Seller nor any Other Purchaser will have any obligation to maintain storage of such Inventory after the Inventory Relocation Period.  Purchaser agrees to indemnify and hold harmless Seller or the applicable Other Purchaser, as applicable, and their respective Affiliates and Representatives for any losses or damages incurred by them in connection with storing of, or the removal of, the Inventory following the Closing.  Each applicable Other Purchaser and each of its applicable Affiliates and Representatives, and each of Seller's applicable Affiliates and Representatives, is an express third-party beneficiary for purposes of this <u>Section 8.7</u>.  To the extent the acquisition by Purchaser of the Purchased Assets requires any alcohol-related approvals, registrations, licenses, permits, authorizations and bonds (collectively, "<u>Alcohol Licenses</u>"), Purchaser will obtain any necessary Alcohol Licenses at Purchaser's sole cost and expense, and Purchaser will provide Seller with reasonable documentation to demonstrate that Purchaser has submitted applications with respect thereto within five Business Days following the Effective Date.  For the avoidance of doubt, the Parties agree that (a) in no event will the Alcohol Licenses constitute conditions to Purchaser's obligation to consummate the Closing and (b) Purchaser is solely responsible for obtaining the Alcohol Licenses (including any fees or other expenses with respect thereto) and will indemnify and hold harmless Seller and its Affiliates in connection with any failure to obtain such Alcohol Licenses.

8.8    <u>Bulk Transfer Laws</u>.  Purchaser acknowledges that Seller will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the Transactions, and hereby waives all claims related to the non-compliance therewith.  The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of all Liens (except for Permitted Exceptions) and Excluded Liabilities in the Purchased Assets, including any Liens or Liabilities arising out of the bulk transfer Laws.

## IX.    CONDITIONS TO CLOSING

9.1    <u>Conditions Precedent to Obligations of Purchaser</u>.  The obligation of Purchaser to consummate the Transactions is subject to the fulfillment, on or prior to the Closing Date, of each

of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    each of the representations and warranties of Seller contained in this Agreement (disregarding all "materiality" or "Material Adverse Effect" qualifications set forth therein) shall be true and correct as of the Closing, as if made on the Closing Date (except for any such representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such specific date), except where the failure of the representations and warranties to be true and correct, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect, and Purchaser shall have received a certificate signed by an authorized officer of Seller on behalf of Seller, dated as of the Closing Date, to the foregoing effect;

(b)    Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to or on the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller on behalf of Seller, dated as of the Closing Date, to the forgoing effect;

(c)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 4.2</u>; and

(d)    The Sale Order shall have been entered and it shall expressly provide that the transfer of the Purchased Asset to the Purchaser at Closing shall be free and clear of all Liens (other than Permitted Exceptions).

9.2    <u>Conditions Precedent to Obligations of Seller</u>.  The obligations of Seller to consummate the Transactions are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)    each of the representations and warranties of Purchaser contained in this Agreement (disregarding all "materiality" or "material adverse effect" qualifications set forth therein) shall be true and correct as of the Closing, as if made on the Closing Date (except for any such representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such specific date), except where the failure of the representations and warranties to be true and correct, individually or in the aggregate, has not had and would not reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Transactions or to otherwise timely perform its obligations under this Agreement, and Seller shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated as of the Closing Date, to the foregoing effect;

(b)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by Purchaser prior to or on the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated as of the Closing Date, to the foregoing effect; and

NAI-1540980169v9

(c)     Purchaser shall have delivered to Seller all of the items set forth in Section 4.3.

9.3     <u>Conditions Precedent to Obligations of Purchaser and Seller</u>.  The respective obligations of Purchaser and Seller to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Seller and Purchaser, jointly, in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body restraining, enjoining or otherwise prohibiting the consummation of the Transactions; and

(b)     the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be subject to a stay or have been vacated or revoked.

9.4     <u>Frustration of Closing Conditions</u>.  No Party may rely on the failure of any condition set forth in Sections 9.1, 9.2 or 9.3, as the case may be, if such failure was caused by such Party's breach of any provision of this Agreement.

## X.     TAXES

10.1     <u>Transfer Taxes</u>.  All documentary, stamp, transfer, motor vehicle registration, sales, use, value added, excise and other similar non-income Taxes and all filing and recording fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the Transactions (collectively, "<u>Transfer Taxes</u>") will be borne by Purchaser, regardless of the Party on whom Liability is imposed under the provisions of the Laws relating to such Transfer Taxes.  Seller and Purchaser will consult and cooperate in timely preparing and making all filings, Tax Returns, reports and forms as may be required to comply with the provisions of the Laws relating to such Transfer Taxes and will cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for or exemptions from such Transfer Taxes, including preparing exemption certificates and other instruments as are applicable to claim available exemptions from the payment of Transfer Taxes under applicable Law and executing and delivering such affidavits and forms as are reasonably requested by the other Party.

10.2     <u>Purchase Price Allocation</u>.

(a)     As promptly as practicable after the Closing Date, but no later than 30 days thereafter, Purchaser will prepare and deliver to Seller, an allocation schedule setting forth the amounts to be allocated among the Purchased Assets of Seller, pursuant to (and to the extent necessary to comply with) Section 1060 of the Code and the applicable regulations promulgated thereunder (or, if applicable, any similar provision under state, local or foreign Law or regulation) (the "<u>Proposed Allocation Statement</u>").  Seller will have Twenty (20) Business Days following delivery of the Proposed Allocation Statement during which to notify Purchaser in writing (an "<u>Allocation Notice of Objection</u>") of any objections to the Proposed Allocation Statement, setting forth in reasonable detail the basis of their objections.  If Seller fails to deliver an Allocation Notice of Objection in accordance with this Section 10.3(a), the Proposed Allocation Statement will be conclusive and binding on all Parties and will become the "<u>Final Allocation Statement</u>."  If Seller submits an Allocation Notice of Objection, then for ten (10) Business Days after the date Purchaser

26

receives the Allocation Notice of Objection, Purchaser and Seller will use their commercially reasonable efforts to agree on the allocations. Failing such agreement within ten (10) Business Days of such notice, the unresolved allocations will be submitted to an independent, internationally-recognized accounting firm mutually agreeable to Purchaser and Seller, which firm will be instructed to determine its best estimate of the allocation schedule based on its determination of the unresolved allocations and provide a written description of the basis for its determination within forty-five (45) Business Days after submission, such written determination to be final, binding and conclusive. The fees and expenses of such accounting firm will be apportioned among Seller and Purchaser equally. For the avoidance of doubt, in administering any Action, the Bankruptcy Court will not be required to apply the Final Allocation Statement in determining the manner in which the Purchase Price should be allocated as between Seller and its Subsidiaries and their respective estates.

(b)    Seller and Purchaser and their respective Affiliates will report, act, and file Tax Returns (including, but not limited to IRS Form 8594) in all respects and for all purposes consistent with the Final Allocation Statement, and will not take any position (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Final Allocation Statement, in each case, except to the extent otherwise required by a "determination" within the meaning of Section 1313 of the Code.

10.3    <u>Cooperation and Audits</u>.  Purchaser and Seller will cooperate fully with each other regarding Tax matters to the extent commercially reasonable and will make available to the other as reasonably requested all information, records and documents relating to Taxes governed by this Agreement until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes.

## XI.    GENERAL GOVERNING PROVISIONS

11.1    <u>No Survival of Representations and Warranties</u>.  The Parties agree that the representations and warranties contained in this Agreement, and the covenants contained in this Agreement to be performed prior to the Closing, will not survive the Closing, and none of the Parties will have any Liability to each other after the Closing for any breach thereof.  The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing will survive the Closing until fully performed in accordance with the terms of this Agreement, and each Party will be liable to the other after the Closing for any breach thereof.

11.2    <u>Expenses</u>.  Except as otherwise expressly provided in this Agreement, whether or not the Transactions are consummated, each of Seller, on the one hand, and Purchaser, on the other hand, will bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Transactions and all Actions incident thereto.

11.3    <u>Injunctive Relief</u>.

(a)    The Parties agree that irreparable damages would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at Law may be an inadequate remedy for the breach

of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce specifically the terms and provisions of this Agreement, including without limitation specific performance of such covenants, promises or agreements or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this Section 11.3 will be in addition to any other rights which a Party may have at Law or in equity pursuant to this Agreement.

(b)    The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Purchaser or Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of Purchaser or Seller, as applicable, under this Agreement all in accordance with the terms of this Section 11.3.

11.4    Submission to Jurisdiction; Consent to Service of Process.

(a)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Actions related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in Section 11.8; provided, however, that if the Bankruptcy Cases have been closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action in the United States District Court for the District of Delaware) and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the Parties hereby consents to process being served by any other Party in any Action by delivery of a copy thereof in accordance with the provisions of Section 11.8; provided, however, that such service will not be effective until the actual receipt thereof by the Party being served.

11.5    Waiver of Right to Trial by Jury.  Each Party to this Agreement waives any right to trial by jury in any Action regarding this Agreement or any provision hereof.

11.6    Entire Agreement; Amendments and Waivers.  This Agreement, the Bill of Sale, the Trademark Assignment, the Other IP Assignment and the other agreements contemplated to be delivered in connection herewith represent the entire understanding and agreement between the

28

Parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, will be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law. In the event of a conflict between any agreement delivered in connection herewith and this Agreement, this Agreement shall control.

11.7    <u>Governing Law</u>. This Agreement will be governed by and construed in accordance with federal bankruptcy Law, to the extent applicable, other federal law, where applicable, and, where state Law is implicated, the Laws of the State of Delaware applicable to contracts made and performed in such State.

11.8    <u>Notices</u>. All notices and other communications under this Agreement will be in writing and will be deemed given (a) when delivered personally by hand, (b) when sent by email (with written confirmation of transmission), or (c) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and email addresses (or to such other address or email address as a Party may have specified by notice given to the other Party pursuant to this provision):

> If to Seller, to:
>
> Vintage Wine Estates, Inc.
> 205 Concourse Blvd.
> Santa Rosa, California 95403
> Attention: Amir Sadr
> Email: asadr@vintagewineestates.com
> Attention: Kristina Johnston
> Email: kjohnston@vintagewineestates.com
>
> With copies (which will not constitute notice) to:
>
> Jones Day
> 901 Lakeside Avenue
> Cleveland, Ohio 44114
> Attention: Heather Lennox
> Email: hlennox@jonesday.com
> Attention: George Hunter

29

Email: ghunter@jonesday.com

If to Purchaser, to:

Full - Glass Licensing, LLC
1100 Emmons Court
Lake Forest, IL 60045
Attn: Louis Amoroso; Neha Kumar
Email: louis@fullglass wine; neha@fullglass.wine


With copies (which will not constitute notice) to:

Buchalter
1000 Wilshire Blvd., Suite 1500
Los Angeles, CA 90017
Attention:  Jeremy Weitz
Jweitz@buchalter.com
Attention: Tanya Viner
Tviner@buchalter.com

11.9    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

11.10    <u>Assignment</u>.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement (other than as set forth in <u>Section 8.7</u> and provided that any Person that is not a Party will be a third-party beneficiary for purposes of <u>Section 11.11</u>).  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of Law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents will be void; <u>provided</u>, <u>however</u>, that (a) Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more Affiliates and (b) Seller may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities (including any liquidating trust) pursuant to a Chapter 11 plan confirmed by the Bankruptcy Court, in the case of each clause (a) and (b) without any other Party's consent.  No assignment of any obligations hereunder will relieve the Parties of any such obligations.  Upon any such permitted assignment, the references in this Agreement to Seller or Purchaser will also apply to any such assignee unless the context otherwise requires.

11.11    <u>Non-Recourse</u>.  No past, present or future director, officer, employee, incorporator, member, partner, equityholder, manager, agent, attorney, Representative or Affiliate of the Parties

or any of their Affiliates will have any Liability for any obligations or Liabilities of Seller or Purchaser, as applicable, under this Agreement or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the Transactions contemplated hereby and thereby.  Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as Parties or thereto, and then only with respect to the specific obligations set forth herein or therein.  Other than the Parties, no other Person will have any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or Liabilities of any Party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any Action based on, in respect of, or by reason of, Transactions (including the breach, termination or failure to consummate such Transactions), in each case whether based on contract, tort, fraud, strict liability, other Laws or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a Party or another Person or otherwise.  In no event will any Person be liable to another Person for any remote, speculative or punitive damages with respect to the Transactions.

11.12    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

11.13    <u>Restrictive Covenants</u>.  Upon and after the Closing Date until the earlier of (i) the effective date of a plan of reorganization with respect to the Bankruptcy Cases, (ii) the dismissal of the Bankruptcy Cases, and (iii) six months after the Closing Date, Seller shall not, and shall cause its Affiliates not to publicly disparage, criticize, defame or slander the Brands, Purchaser or Purchaser's current or future Affiliates.

*[Signature page follows]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the Effective Date.

PURCHASER:

Full - Glass Licensing, LLC

By: _____

Name: Louis Amoroso

Title: CFO

SELLER:

VINTAGE WINE ESTATES, INC., on behalf of itself and its affiliated Debtors in the bankruptcy case in the District of Delaware jointly administered under Case No. 24-1157

By: _____
Name:  Kristina Johnston
Title:   Authorized Person