**Exhibit 1**

**Birch Run APA**

**EXECUTION VERSION**

**ASSET PURCHASE AGREEMENT**

by and among

Adair Winery, Inc.,

Vintage Wine Estates, Inc., a Nevada corporation

and,

solely for purposes of Article XI herein,

Jay Adair

Dated as of September 17, 2024

# TABLE OF CONTENTS

**Page**

I.    DEFINITIONS..................................................................................................... 2

  1.1    Certain Definitions.................................................................. 2
  1.2    Terms Defined Elsewhere in this Agreement .................................. 10
  1.3    Other Definitional and Interpretive Matters. ................................. 10

II.    PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES................ 12

  2.1    Purchase and Sale of Assets...................................................... 12
  2.2    Excluded Assets ..................................................................... 13
  2.3    Assumption of Liabilities.......................................................... 14
  2.4    Excluded Liabilities ................................................................ 14
  2.5    Cure Amounts ....................................................................... 14
  2.6    Assumption and Assignment of Purchased Contracts. ...................... 14
  2.7    Non-Assignment of Assets. ....................................................... 16
  2.8    Further Conveyances and Assumptions......................................... 17
  2.9    Alcoholic Beverage Licenses ..................................................... 17

III.    CONSIDERATION ............................................................................................ 18

  3.1    Consideration ........................................................................ 18
  3.2    Purchase Price Deposit; Escrow Holdback.................................... 18
  3.3    Calculation of Pre-Closing Inventory Adjustment ........................... 19
  3.4    Calculation of Post-Closing Inventory Adjustment.......................... 19
  3.5    Withholding. ......................................................................... 20

IV.    CLOSING AND TERMINATION......................................................................... 20

  4.1    Closing Date.......................................................................... 20
  4.2    Deliveries by Seller................................................................. 21
  4.3    Deliveries by Purchaser ........................................................... 22
  4.4    Termination of Agreement......................................................... 22
  4.5    Procedure Upon Termination...................................................... 23
  4.6    Effect of Termination............................................................... 24

V.    REPRESENTATIONS AND WARRANTIES OF SELLER ....................................... 24

  5.1    Organization and Good Standing................................................. 24
  5.2    Authorization of Agreement ...................................................... 24
  5.3    Governmental Consents ............................................................ 25
  5.4    Title to Purchased Assets .......................................................... 25
  5.5    Validity of Purchased Contracts ................................................. 25
  5.6    SEC Documents ..................................................................... 25
  5.7    Litigation.............................................................................. 26

i

# TABLE OF CONTENTS
(continued)

**Page**

5.8     Compliance with Laws ....................................................... 26
5.9     Employee Compensation and Employee Benefit Plans; ERISA. ...... 26
5.10    Labor Matters ................................................................ 27
5.11    Intellectual Property ......................................................... 27
5.12    Customers and Mailing Lists ............................................. 28
5.13    Financial Advisors, Finders, Brokers .................................. 28
5.14    Real Property ................................................................. 28
5.15    Tangible Personal Property ................................................ 30
5.16    Inventory ...................................................................... 30
5.17    Permits and Licenses ....................................................... 30
5.18    Environmental Matters ..................................................... 30
5.19    No Notice ...................................................................... 31
5.20    Distributors and Suppliers ................................................ 31
5.21    Taxes ........................................................................... 31
5.22    Data Privacy .................................................................. 32
5.23    No Other Representations or Warranties; Schedules ............... 33

VI.     REPRESENTATIONS AND WARRANTIES OF PURCHASER ............... 33
6.1     Organization and Good Standing ....................................... 33
6.2     Authorization of Agreement .............................................. 33
6.3     Consents and Approvals; No Violations ............................... 34
6.4     Financial Capability ........................................................ 34
6.5     Condition of the Purchased Assets ..................................... 34
6.6     Exclusivity of Representations and Warranties ...................... 35

VII.    BANKRUPTCY COURT MATTERS ......................................... 35
7.1     Submission for Bankruptcy Court Approval .......................... 35
7.2     Bankruptcy Process ......................................................... 36
7.3     Approval of Break-Up Fee and Expense Reimbursement .......... 37
7.4     Back-Up Bidder .............................................................. 37

VIII.   COVENANTS .................................................................... 37
8.1     Access to Information ...................................................... 37
8.2     Actions Pending the Closing .............................................. 38
8.3     Consents ....................................................................... 39
8.4     Reasonable Best Efforts; Consents to Assignment .................. 39
8.5     Publicity ....................................................................... 39
8.6     Confidentiality ............................................................... 40
8.7     Transition Services Agreement .......................................... 40
8.8     Transfer of Intellectual Property ........................................ 40
8.9     Use of Name .................................................................. 40

ii

# TABLE OF CONTENTS
### (continued)

**Page**

|  |  |  |
|---|---|---|
| 8.10 | Bulk Transfer Laws | 41 |
| 8.11 | Inventory | 41 |
| 8.12 | Excluded Inventory | 41 |
| 8.13 | Privacy Policy. | 42 |
| **IX.** | **CONDITIONS TO CLOSING** | **42** |
| 9.1 | Conditions Precedent to Obligations of Purchaser | 42 |
| 9.2 | Conditions Precedent to Obligations of Seller | 43 |
| 9.3 | Conditions Precedent to Obligations of Purchaser and Seller | 43 |
| 9.4 | Frustration of Closing Conditions | 43 |
| **X.** | **TAXES** | **44** |
| 10.1 | Transfer Taxes | 44 |
| 10.2 | Purchase Price Allocation. | 44 |
| 10.3 | Cooperation and Audits | 45 |
| 10.4 | Prorations and other Costs. | 45 |
| **XI.** | **GENERAL GOVERNING PROVISIONS** | **45** |
| 11.1 | No Survival of Representations and Warranties | 45 |
| 11.2 | Expenses | 45 |
| 11.3 | Injunctive Relief | 46 |
| 11.4 | Submission to Jurisdiction; Consent to Service of Process. | 46 |
| 11.5 | Waiver of Right to Trial by Jury | 47 |
| 11.6 | Entire Agreement; Amendments and Waivers | 47 |
| 11.7 | Governing Law | 47 |
| 11.8 | Notices | 47 |
| 11.9 | Severability | 48 |
| 11.10 | Assignment | 49 |
| 11.11 | Non-Recourse | 49 |
| 11.12 | Damage or Destruction | 49 |
| 11.13 | Purchaser's Designee | 50 |
| 11.14 | Counterparts | 50 |
| 11.15 | Restrictive Covenants | 50 |
| 11.16 | Guaranty | 50 |

## Exhibit

| | |
|---|---|
| Exhibit A | Form of Sale Order |
| Exhibit B | Bill of Sale |
| Exhibit C | IP Assignment Agreements |
| Exhibit D | Grant Deeds |
| Exhibit E | TSA |

**TABLE OF CONTENTS**
(continued)

**Page**

Exhibit F            IRS Forms W-9

iv

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of September 17, 2024 (the "Effective Date"), is by and among Adair Winery, Inc., a Texas corporation ("Purchaser"), Vintage Wine Estates, Inc., a Nevada corporation ("Seller") and, solely for the purposes of Article XI, Jay Adair (the "Purchaser Guarantor").  Certain capitalized terms used in this Agreement that are not otherwise defined are defined in Article I.

## RECITALS

A.    Seller filed voluntary petitions for relief under Chapter 11 of Title 11 (the "Bankruptcy Cases") of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

B.    On July 24, 2024, Seller filed the *Motion of the Debtors and Debtors in Possession for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Purchase Agreements and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* (the "Bidding Procedures Motion") [Docket No. 14] with the Bankruptcy Court (as defined herein).

C.    On August 21, 2024, the Bankruptcy Court entered the Bidding Procedures Order (as defined herein) [Docket No. 181].

D.    On August 23, 2024, Seller filed the Assumption and Assignment Notice (as defined herein) [Docket No. 188].

E.    Seller engages in the business of (i) operating vineyards, wineries and/or tasting rooms where wine is produced and/or sold under wholly-owned brands, (ii) producing, bottling and selling wine and spirits under certain wholly-owned brands and (iii) hosting various functions at event spaces on its properties ((i), (ii), and (iii), as to the extent primarily related to the Girard, Clos Pegase, B.R. Cohn, Viansa and Kunde vineyards, wineries, and/or brands (each, an "Acquired Estate"), the "Business").

F.    Seller desires to sell, or cause its Affiliates to sell, as applicable, to Purchaser or one or more of its designees the Purchased Assets and assign, or cause its Affiliates to assign, as applicable, to Purchaser or one or more of its designees the Assumed Liabilities and Purchaser desires to purchase, or cause one or more of its designees to purchase, from Seller the Purchased Assets and assume, or cause one or more of its designees to assume, the Assumed Liabilities, in each case, upon the terms and conditions set forth in this Agreement.

G.     Pursuant to Recital F above, the Parties entered into an Asset Purchase Agreement dated September 6, 2024. For the avoidance of doubt, this Agreement supersedes such September 6 Asset Purchase Agreement in its entirety.

H.     Upon the terms and subject to the conditions set forth herein, and as authorized under sections 105, 363, and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure as relates to the Seller, the Seller proposes to sell, transfer and assign to Purchaser, and Purchaser proposes to purchase, acquire and assume from the Seller, the Purchased Assets and Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree:

## I.     DEFINITIONS

1.1     <u>Certain Definitions</u>.  For purposes of this Agreement, each of the following terms, when used herein with initial capital letters, has the meaning specified in this <u>Section 1.1</u> or in the other Sections of this Agreement identified in <u>Section 1.2</u>:

"<u>Action</u>" means any claim, counterclaim, action, cause of action, complaint, suit, hearing, charge, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity, by or before a Governmental Body, arbitrator or other tribunal.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"<u>Alternative Transaction</u>" means the consummation of a sale, chapter 11 plan, or similar transaction involving (i) any parcel of Real Property (or material improvements thereon), (ii) all or substantially all of the Purchased Assets of any Acquired Estate, (iii) all or substantially all of the Inventory of any Acquired Estate, or (iv) all or substantially all of the Purchased Intellectual Property of any Acquired Estate, in each case, with any other Person (other than Purchaser).

"<u>Ancillary Document</u>" means each agreement, document, instrument, writing and/or certificate contemplated by this Agreement or executed in connection with the Transactions, including the Bill of Sale, TSA, the Grant Deeds, the IP Assignment Agreements, and the Escrow Agreement.

"<u>Bankruptcy Estate</u>" means all property of the bankruptcy estate of Seller and its Subsidiaries as provided by Section 541 of the Bankruptcy Code.

NAI-1540950234v21

"Bidding Procedures Order" means the Order of the Bankruptcy Court (including any attachment thereto) approving, among other things, the (a) bidding procedures for conducting a sale and auction of the Purchased Assets (the "Bidding Procedures") and (b) procedures relating to the assumption and assignment of executory Contracts and unexpired leases, in form and substance acceptable to the Purchaser with respect to this Agreement, the Purchased Assets, and the Bid Protections, entered by the Bankruptcy Court on August 21, 2024 [Docket No. 181].

"Business Day" means any day other than a Saturday, a Sunday or any other day on which commercial banks in New York, New York are authorized or required by Law to close.

"Business Employee" means each employee of Seller relating to the Business as of immediately prior to the Closing; each such employee is listed on Schedule 1.1(a) of the Company Disclosure Letter.

"Change" means any event, change, effect, condition, state of facts or occurrence.

"Code" means the Internal Revenue Code of 1986.

"Contract" means any contract, agreement, commitment, promise or undertaking (including any indenture, note, bond or other evidence of indebtedness, lease, instrument, license, mortgage, purchase order or other legally binding agreement or obligation).

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions thereof or related or associated epidemics, pandemic or disease outbreaks.

"Cure Costs" means monetary amounts that must be paid and obligations that otherwise must be satisfied under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of any Purchased Contract, as agreed upon by the Parties or determined by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"Environmental and Safety Laws" shall mean any and all Laws of a Governmental Body, as each may be amended from time to time (including those under common law or otherwise, such as, without limitation, claims for nuisance, waste trespass, and strict liability), that are intended to assure the protection of the environment and natural resources; that classify, regulate the use, storage or disposal of, call for the investigation, mitigation, or remediation of, or require reporting with respect to, or list or define solid waste, hazardous or toxic substances, materials, wastes, pollutants or contaminants or Hazardous Materials; regulate the manufacture, handling, transport, use, treatment, storage or disposal of Hazardous Materials or materials containing Hazardous Materials; or which are intended to assure the safety and good health of employees, workers or other Persons, including the public with regard to Seller's use, release, storage, transport or disposal of Hazardous Materials, including the Clean Air Act, as amended, 42 U.S.C. Section 7401 et seq.; the Federal Water Pollution Control Act, as amended, 33 U.S.C. Section 1251 et seq.; the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. Section 6901 et seq.; the Comprehensive Environment Response, Compensation and Liability Act of 1980, as amended (including the Superfund Amendments and Reauthorization Act of 1986, "CERCLA"), 42 U.S.C. Section 9601 et seq.; the Toxic Substances Control Act, as amended, 15 U.S.C. Section 2601 et seq.; the Occupational Safety and Health Act, as amended, 29 U.S.C. Section 651, the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. Section 11001 et seq.; the Mine

Safety and Health Act of 1977, as amended, 30 U.S.C. Section 801 et seq.; the Safe Drinking Water Act, as amended, 42 U.S.C. Section 300f et seq.; and all comparable state and local laws, laws of other applicable jurisdictions or Orders and regulations (including California's Safe Drinking Water and Toxic Enforcement Act of 1986, ch. 6.6 of Cal. Health & Safety Code) relating to such matters.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Inventory" means any inventory owned by Seller or its Affiliates that is located on the Real Property but not owned by or primarily used in connection with the Business.

"Fraud" means (a) with respect to Seller, an actual and intentional misrepresentation of a material fact with respect to the making of any representation or warranty in Article V or in any other Ancillary Document made for the purpose of inducing Purchaser to act, and upon which Purchaser justifiably relies with resulting losses and (b) with respect to Purchaser, an actual and intentional misrepresentation of a material fact with respect to the making of any representation or warranty in Article VI or in any other Ancillary Document made for the purpose of inducing Seller to act, and upon which Seller justifiably relies with resulting losses. For the avoidance of doubt, "Fraud" does not include any claim for equitable fraud, constructive fraud or any tort based on negligence or recklessness.

"GAAP" means generally accepted accounting principles in the United States.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, or any agency, authority, Governmental Unit (as such term is defined in Section 101(27) of the Bankruptcy Code), department, commission, board, bureau, official or instrumentality of such body, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator thereof (public or private) of competent jurisdiction.

"Hazardous Materials" shall mean any chemical, compound, material, mixture, toxic or hazardous substance, material or waste or any pollutant or contaminant, or infectious or radioactive substance or material, in each case defined in or regulated under any Environmental and Safety Laws; petroleum and petroleum products including crude oil and any fractions thereof; natural gas, synthetic gas, and any mixtures thereof; radon; asbestos; pesticides, herbicides, fungicides and rodenticides; lead based paint; polychlorinated biphenyls (PCBs); and perfluoroalkyl and polyfluoroalkyl (PFAS) substances.

"Improvements" means all improvements existing as of the Effective Date including, without limitation, buildings (including, but not limited to, any tasting room and any outbuilding), storage facilities, roads, parking areas, structures, gates, wells, tanks, fixtures, landscaping, well pumps, water and wastewater disposal systems, filtration systems, electrical panels, transformers,

4

fuel and water tanks, tanks, pipelines, and other improvements and fixtures located, placed, constructed or installed on or affixed to the Real Property.

"Intellectual Property" means all intellectual property, including (a) patents and patent applications, continuations, divisionals, continuations-in-part, reissues and reexaminations, (b) trademarks, service marks, trade dress, logos, corporate names, domain names and trade names, together with the goodwill associated with any of the foregoing, and all applications and registrations therefor, (c) copyrights, copyrightable works, rights in databases, data collections, copyright registrations and copyright applications and corresponding rights in works of authorship, (d) trade secrets, (e) Software in any form, including internet websites, web content and links, source code, object code and mobile applications, and (f) rights of publicity and personality, including, but not limited to:

(i)      the registered and unregistered copyrights, services marks, logos, graphic representations, label designs, product packaging, and other similar indicia or source or origin, works of authorship, whether or not copyrightable, patents and patent applications (to the extent that such exist), proprietary Software, designs, URLs, websites (including all photographs, images, and content thereon), social media identifiers and other social media-related intellectual property, industrial designs, know-how, formulas, models, intellectual property relating to bottle molds, inventions (whether or not patentable), discoveries, improvements, technology, methods, processes, techniques, and other confidential and proprietary information and all rights therein; fictitious business names, and all intellectual property relating to patterns, drawings,  direct sales programs, advertising and promotional materials, designs for point of sale materials, all intellectual property relating to Uniform Product Codes (including prefixes); and

(ii)      any registered or unregistered trademarks, trade names, and trade dress used in connection with the Business, together with the goodwill associated therewith, including but not limited to, the Business, any and all vineyard designations related to the Business, all registrations, applications for and renewals and extensions of any of the foregoing (as applicable), all other intellectual or industrial property and proprietary rights, and all of the goodwill associated with the foregoing and the Business and other Purchased Assets; and

(iii)      intellectual property rights, including trade secrets, in customer lists, email lists, mailing lists, wine club lists and any other information or lists of customers or persons visiting Seller's tasting room or attending events relating to the Business.

"Inventory" means (a) all inventory of the Business, including (i) all Products, spare parts, packaging materials or other supplies, that are, in each case, exclusively related to the Business and exclusively owned, controlled by or used (or held for use) by or on behalf of the Business, whether in transit to or from the Seller, and whether in any leased Real Property, warehouse or distribution facility, held by third parties or otherwise and (ii) all inventory in all open purchase orders with suppliers, distributors, or sourcing agents for Products, but (b) excluding any products or other inventory (i) shipped to third parties prior to the Closing Date in the Ordinary Course of Business and for which title has passed to such third party or (ii) pursuant to an Order by the Bankruptcy Court but not yet delivered as of the Closing, in each case to the extent such information is available.

5

"IRS" means the Internal Revenue Service.

"IT Systems" means all information technology, computer systems and communications systems, computers, hardware, Software, databases, websites, and other equipment owned, operated, leased or licensed by Seller used to process, store, maintain, or operate data, information or functions used in connection with or in the operation of the Business.

"Knowledge of Seller" or "Seller's Knowledge" means the actual knowledge, upon reasonable inquiry, as of the applicable date, of those Persons identified on Schedule 1.1(b) of the Company Disclosure Letter.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule, regulation, Order, stipulation, award or common law requirement.

"Liability" means any debt, loss, liability, claim (including "claim" as defined in the Bankruptcy Code), commitment, undertaking, damage, expense, fine, penalty, cost, royalty, deficiency or obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, disclosed or undisclosed, express or implied, primary or secondary, direct or indirect, matured or unmatured, fixed, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due, and whether in contract, tort or otherwise.

"Lien" as applied to any Person means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, sublease, charge, option, right of first offer or first refusal, right of use or possession, restriction, easement, title defect, servitude, restrictive covenant, encroachment or encumbrance or any other similar encumbrance or restriction in respect of an asset of such Person, whether imposed by Law, Contract or otherwise.

"Material Adverse Effect" means any Change, individually or in the aggregate, that (i) is, or would reasonably be expected to be, materially adverse to the Purchased Assets or Assumed Liabilities, taken as a whole, or (ii) is, or would reasonably be expected to be, materially adverse to the ability of Seller to consummate the Transactions contemplated hereby, excluding in each case: (A) any change in the United States or foreign economies or securities or financial markets in general; (B) adverse developments in economic, business or financial conditions generally affecting the wine industry; (C) hostilities, acts of war or terrorism or military actions or any escalation or worsening of any of the foregoing; (D) the effect of any action taken by Purchaser; (E) Changes in applicable Law; (F) any Change attributable to the execution or announcement of or compliance with this Agreement or the Bankruptcy Cases; (G) any Change arising in connection with pandemics (including COVID-19), earthquakes, hurricanes, tornadoes, fires, acts of God, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such matters, or any response of any Governmental Body to any of the foregoing; (H) any effect resulting from any failure by Seller to meet any internal or published projections, forecasts or revenue or earnings predictions, except in the case of the foregoing clauses (A), (B), (C), (E) and (G) for such Change that has been disproportionately and materially adverse to the Purchased Assets or Assumed Liabilities, taken as a whole, relative to other participants in the wine industry as a whole (in which case only such material and disproportionate adverse effects will be considered in determining the existence of a Material Adverse Effect).

6

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of, or entered, issued, made or rendered by, a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business related to the Purchased Assets as conducted by Seller and its Affiliates consistent (in scope, manner, amount and otherwise) with past practice; provided, that, for purposes of Section 8.2, the sale of Inventory prior to Closing at a discount or in a manner that would otherwise reasonably be expected to materially adversely impact the brands of the Business shall be deemed an action outside the Ordinary Course of Business.

"Party" or "Parties" means Purchaser, Seller, and, solely for purposes of Article XI, Purchaser Guarantor.

"Permitted Exception" means any Lien (i) in the case of the Real Property, for real property Taxes and assessments which are not yet due and payable, (ii) for personal property Taxes, other Taxes and other governmental charges and assessments arising in the Ordinary Course of Business which are not yet due and payable or which are being contested in good faith by appropriate proceedings; (iii) of carriers and warehousemen arising in the Ordinary Course of Business that (A) will not, and could not reasonably be expected to, individually or in the aggregate, materially impair the value or the continued use and operation of the Purchased Assets to which they relate, and (B) are for sums not yet due and payable; (iv) which are immaterial and non-monetary which, individually or in the aggregate, do not materially detract from the value or interfere with the present or contemplated, use, occupancy or operation of the Real Property; (v) for any mechanics' or other Liens created by, consented to or approved in writing by Purchaser; (vi) for the requirements and restrictions of applicable zoning and governmental regulations and ordinances that do not interfere with the present or contemplated, use, occupancy or operation of the Real Property and (vii) from which the Purchased Assets may not be sold free and clear under Section 363(f) of the Bankruptcy Code.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personal Information" mean information relating an identified or identifiable person, device, or household including: (i) a natural person's name, street address or specific geolocation information, date of birth, telephone number, email address, online contact information, photograph, biometric data, Social Security number, driver's license number, passport number, tax identification number, any government-issued identification number, financial account number, credit card number, any information that would permit access to a financial account, a user name and password that would permit access to an online account, health information, insurance account information, any persistent identifier such as customer number held in a cookie, an Internet Protocol address, a processor or device serial number, or a unique device identifier; (ii) "personal data," "personal information," "protected health information," "nonpublic personal information," or other similar terms as defined by Privacy Requirements; or (iii) any other information that reasonably allows the identification of a natural person.

7

"Privacy Requirement" means: (i) all Laws concerning data privacy, breach notification, cybersecurity, or relating to Personal Information; (ii) all of Seller's policies regarding privacy and data security, including: (A) all privacy policies and similar disclosures published on Seller's web sites or otherwise communicated in writing to employees, users of Seller web site, service, or product, and other third parties or otherwise communicated to the public, and all public statements made by Seller about its privacy or data security practices; or (B) any notice to or consent from the provider or subject of Personal Information; (iii) all contractual obligations relating to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security, disposal, destruction, disclosure, or transfer (including the transfer by or on behalf of Seller of Personal Information); and (iv) each applicable rule, codes of conduct, or other requirement of self-regulatory bodies and applicable industry standards, including, to the extent applicable, the Payment Card Industry Data Security Standard industry guidelines.

"Products" means any and all products manufactured, marketed or sold by the Business, including harvested and unharvested grapes, wine, blended and unblended bulk wine, case goods and other finished goods including all bottled and bulk wine inventories, bottles, barrels, merchandise, dry goods, packaging and labels, and whether work in progress, bulk or in final form.

"Qualified Bid" has the meaning ascribed to such term in the Bidding Procedures Motion. For the avoidance of doubt, Purchaser's bid to purchase the Purchased Assets and assume the Assumed Liabilities pursuant to this Agreement constitutes a Qualified Bid under the Bidding Procedures Order.

"Real Property" means the real property set forth on Schedule 1.1(c) of the Company Disclosure Letter and shall include all of Seller's right, title, and interest in and to:

(i)      All Improvements existing as of the Effective Date located, placed, constructed or installed on or affixed to the Real Property;

(ii)      All easements, rights of way, privileges, oil, gas, natural gas, other mineral rights, air rights, all transferable licenses, permits, warranties, certifications, approvals, appurtenances, and other rights and benefits of Seller belonging to or in any way related to the Real Property, including without limitation all rights associated with the water supply and wastewater systems, in each case that are transferable or assignable to Purchaser and disclosed to Purchaser by Seller (collectively, "Appurtenances");

(iii)      All land use entitlements, development rights, air rights, permits, licenses, certifications, or other governmental approvals, including without limitation all certificate(s) of occupancy, use permits, use permit applications, building or equipment permits, consents, authorizations, variances, waivers, licenses, permits, certificates and approvals from any governmental or quasi-governmental authority (collectively, "Entitlements") that are transferable or assignable to Purchaser with respect to the Real Property;

(iv)      All Water Rights; and

(v)      To the extent available, all architectural, mechanical, engineering, as built and other plans, specifications and drawings and relating to the Real Property and the Improvements, all surveys (including any ALTA surveys) and all soil, viticultural, environmental, water, engineering,

8

archeological, historical, production or other reports or studies in the possession or control of Seller and relating to the Real Property or the Improvements.

"Representative" means, with respect to any Person, any and all of its directors, officers, partners, managers, employees, consultants, financial advisors, counsel, accountants and other agents.

"Sale Order" means an Order entered by the Bankruptcy Court, pursuant to Sections 363 and 365 of the Bankruptcy Code, authorizing and approving, among other things, (a) the sale of the Purchased Assets, (b) the assumption of the Assumed Liabilities by Purchaser, and (c) the assumption and assignment of the Purchased Contracts, in accordance with the terms and conditions of this Agreement, substantially in the form attached hereto as Exhibit A, or otherwise reasonably acceptable to Purchaser and Seller, each in its sole discretion.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933.

"Software" means all computer software and code, including assemblers, applets, compilers, source code, object code, development tools, design tools, user interfaces, databases and data, in any form or format, however fixed, including any related documentation.

"Straddle Period" means any Tax period that begins on or before and ends after the Closing Date.

"Tax Authority" means any government, agency, or instrumentality thereof, charged with the administration of any Law or regulation relating to Taxes.

"Tax Returns" means any return, declaration, report, claim for refund or information return or statement relating to Taxes required to be filed with any Governmental Body, including any schedule or attachment thereto and any amendment thereof.

"Taxes" means (a) all federal, state, local, provincial, municipal, foreign or other taxes, charges or other assessments, including, without limitation, all income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, net worth, intangibles, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, intangibles, goods and services, customs duties, conveyance, mortgage, registration, documentary, recording, premium, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, unemployment insurance, severance, environmental (including taxes under Section 59A of the Code), disability, workers' compensation, health care natural resources, excise, severance, stamp, occupancy, rent, real property, personal property, estimated or other similar taxes, duties, levies or other governmental charges or assessments or deficiencies thereof, (b) any item described in clause (a) for which a taxpayer is liable as a transferee or successor, by reason of the regulations under Section 1502 of the Code (or similar provisions of state, local, foreign or other law), or by contract, indemnity or otherwise, and (c) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clauses (a) or (b).

"<u>Title Company</u>" means Fidelity National Title Group, National Commercial Services (Attn:  Mary Pat Noeker), One Embarcadero Center, Suite 250, San Francisco, CA.

"<u>Title Policy</u>" means an ALTA owner's policy of title insurance insuring fee title to the Real Property vested in Purchaser in the form reasonably requested by Purchaser, subject only to the Permitted Exceptions, together with all endorsements thereto (to the extent available in the applicable jurisdiction without delivery of any title clearance items or other due diligence materials other than documents actually obtained by Purchaser prior to Closing or otherwise expressly required to be delivered under this Agreement by Seller as a condition to Closing) reasonably requested by Purchaser at Purchaser's sole cost and in the amount determined by Purchaser and acceptable to the Title Company.

"<u>Transactions</u>" means the transactions contemplated by this Agreement.

"<u>Transferred Exception</u>" means title of a lessor under a capital or operating lease if such lease is a Purchased Contract.

"<u>Water Rights</u>" means all water and water rights (including sub-surface water rights, riparian, appropriative, permitted, adjudicated or contractual water rights and any shares of water stock or mutual water company stock) and benefits relating to or appurtenant to the Real Property, including, without limitation, all rights of Seller in, to and under any and all water licenses and/or permits issued by the  California State Water Resources Control Board or any other Governmental Body having jurisdiction over such rights, in each case that are transferrable or assignable to Purchaser.

"<u>Wine Inventory</u>" means, as of a given measurement date, a listing of wine Inventory, (i) listed by brand and gallonage of bulk wine and number of cased goods on hand and (ii) which reflects the value at cost of such wine Inventory (as calculated through Seller's normal procedures consistent with past practice) including the wine Inventory as of June 30, 2024.

    1.2   <u>Terms Defined Elsewhere in this Agreement</u>.  For purposes of this Agreement, terms defined elsewhere in this Agreement have the meanings so ascribed to them.

    1.3   <u>Other Definitional and Interpretive Matters</u>.

    (a)   Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

    (i)   <u>Calculation of Time Period</u>.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded, and the words "<u>to</u>" and "<u>until</u>" shall be deemed to exclude the date referred to. If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action will be extended to the next succeeding Business Day.

    (ii)   <u>Contracts</u>.  Reference to any Contract means such Contract as amended or modified and in effect from time to time in accordance with its terms;

(iii)    <u>Dollars</u>.  Any reference in this Agreement to Dollars or $ will mean U.S. dollars.

(iv)    <u>Exhibits/Schedules</u>.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Agreement.

(v)    <u>GAAP</u>.  Terms used herein which are defined in GAAP are, unless specifically defined herein, used herein as defined in GAAP.

(vi)    <u>Gender and Number</u>.  Any reference in this Agreement to gender will include all genders, and words imparting the singular number only will include the plural and vice versa.

(vii)    <u>Headings</u>.  The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any Article, Section, Recital, Exhibit or Schedule are to the corresponding Article, Section, Recital, Exhibit or Schedule of or to this Agreement unless otherwise specified.

(viii)    <u>Herein</u>.  The words such as "<u>herein</u>," "<u>hereinafter</u>," "<u>hereof</u>" and "<u>hereunder</u>" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(ix)    <u>Including</u>.  The word "<u>including</u>" or any variation thereof means "<u>including, without limitation</u>" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x)    <u>Extent</u>. The word "<u>extent</u>" and the phrase "<u>to the extent</u>" mean the degree to which a subject or other thing extends and does not simply mean "if."

(xi)    <u>Law</u>.  Reference to any Law means such Law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect from time to time, including any successor legislation thereto and any rules and regulations promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, replacement or re-enactment of such section or other provision.

(xii)    Whenever this Agreement requires a subsidiary of Seller to take (or not take) any action, such requirement will be deemed to include an undertaking on the part of Seller to cause such subsidiary to take (or not take) such action.

(b)    The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

NAI-1540950234v21

## II.    PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    <u>Purchase and Sale of Assets</u>.

(a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will, or will cause one or more of its designees to, purchase, acquire and accept from Seller or Seller's Affiliates, and Seller will, or cause its Affiliates to, sell, transfer, convey and deliver to Purchaser, all of Seller's or Seller's Affiliate's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than Permitted Exceptions and Transferred Exceptions) and Excluded Liabilities.

(b)    The term "<u>Purchased Assets</u>" means all of the following properties, assets, and rights of Seller or its Affiliates existing as of the Closing:

(i)    all right, title and interest in and to the Real Property (together with all buildings and other structures, facilities or improvements currently or hereafter located on the Real Property, and all easements, licenses, rights (including Water Rights and natural resource rights) and appurtenances, rights-of-way, easements, tenements, appurtenant rights and privileges relating thereto with regard to the Real Property);

(ii)    all Inventory, as adjusted and provided herein and which shall set forth and list the count of all gallonage of bulk wine and case goods of Clos Pegase, Girard, B.R. Cohn, Viansa and Kunde on hand, to the extent such information is available;

(iii)    all fixtures, furniture, furnishings, machinery, tools, forklifts, vehicles, equipment (including any point of sale or other retail sales equipment), Improvements and other tangible personal property owned or (in the case of leases which constitute Purchased Contracts) leased by Seller, that are located on or at the Real Property or that are used exclusively by the Business as of the Effective Date, including such tangible personal property set forth on <u>Schedule 2.1(b)(iii)</u> of the Company Disclosure Letter ("<u>Tangible Personal Property</u>");

(iv)    all right, title and interest of Seller now or hereafter existing, in, to and under the Contracts that (A) are set forth on <u>Schedule 2.1(b)(iv)</u> of the Company Disclosure Letter, (B) are unexpired as of the Closing Date (including those Contracts that have been previously unrenewed), and (C) have not been rejected (or are the subject of a notice of rejection or a pending rejection motion) by Seller (the "<u>Purchased Contracts</u>");

(v)    all Intellectual Property exclusively related to the Business ("<u>Purchased Intellectual Property</u>");

(vi)    all goodwill related to the Purchased Assets;

(vii)    all warranties, guarantees and similar rights to the extent pertaining to the Purchased Assets, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets, and claims against suppliers and other third parties to the extent pertaining to the Purchased Contracts;

12

(viii)    all insurance proceeds in respect of any Purchased Assets (including, for the avoidance of doubt, any third party and casualty proceeds);

(ix)    all Company Permits exclusively related to the Business to the extent assignable (with or without consent);

(x)    in each case solely to the extent such relate to the other Purchased Assets, all papers, books, records, files, invoices, Tax Returns and copies thereof (including any records or working papers related thereto), Mailing Lists, inventory records, budgets, forecasts, product specifications, cost and pricing information, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, research, pamphlets, web pages, etc.), business plans and quality control records and other similar records, including all data and other information (including Personal Information) related to the Business, stored in any format or media, including on hard drives, hard copy or other media, in each case to the extent permitted by applicable Laws; and

(xi)    all rights, claims, causes of action (including causes of action under chapter 5 of the Bankruptcy Code) and credits to the extent exclusively relating to any Purchased Asset or Assumed Liability, including any such item arising under any guarantee, warranty, indemnity, right of recovery, right of setoff or similar right in favor of Seller in respect of any Purchased Asset or Assumed Liability.  Seller will, and will cause their respective Affiliates to, cooperate with Purchaser in good faith without further consideration in any arrangement reasonably acceptable to Purchaser and Seller intended to provide Purchaser with the benefit of such rights and claims.

2.2    <u>Excluded Assets</u>.  Nothing herein contained will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller will retain all right, title and interest to, in and under the Excluded Assets.  The term "<u>Excluded Assets</u>" means all properties, assets, and rights of Seller or its Affiliates existing as of the Closing that are not a Purchased Asset, including the following assets:

(a)    all right, title and interest of Seller now or hereafter existing, in, to and under the Contracts other than the Purchased Contracts;

(b)    any refunds, overpayments, credits, rebates, or other assets or recoveries in relation to Taxes of the Seller that are Excluded Liabilities;

(c)    all Tax Returns of the Seller other than Tax Returns that relate solely to the Purchased Assets;

(d)    any Purchased Contract (including any lease) that cannot be assumed and assigned to Purchaser, as determined by the Bankruptcy Court pursuant to a final Order;

(e)    any Company Plan;

(f)     all offer letters or employment agreements between Seller or its Affiliates and any Business Employee;

(g)     all equity interests of Seller, including any options, warrants or other securities exchangeable or convertible into equity interests of Seller, and all related governance documents;

(h)     all causes of action arising under the Bankruptcy Code; and

(i)     all claims, rights and causes of action arising from the Transactions.

2.3     <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement, Purchaser will assume, effective as of the Closing, the following Liabilities and no Excluded Liabilities of Seller or any of its Affiliates from and after the Closing Date (collectively, the "<u>Assumed Liabilities</u>"):

(a)     all Liabilities of Seller arising from the ownership or operation of the Purchased Assets by Purchaser solely to the extent such Liabilities arise from facts, circumstances, events or obligations to be performed after the Closing;

(b)     any Assumed Cure Costs that Purchaser is required to pay pursuant to <u>Section 2.5</u>; and

(c)     all Liabilities of Seller or its Affiliates under the Purchased Contracts to the extent such Liabilities (i) arise from facts, circumstances, events or obligations to be performed after the Closing, (ii) do not arise from a breach, violation or default of such Purchased Contract by Seller or the Business prior to the Closing; and (iii) are not required to be performed prior to the Closing.

2.4     <u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary set forth herein, the Parties expressly acknowledge and agree that Purchaser will not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for Liabilities of Seller or any of its Affiliates, whether existing prior to or on the Closing Date or arising thereafter, including on the basis of any Law imposing successor liability, other than the Assumed Liabilities and the obligations of Purchaser under this Agreement (all such Liabilities that Purchaser is not assuming being referred to collectively as the "<u>Excluded Liabilities</u>").

2.5     <u>Cure Amounts</u>.  At the Closing and pursuant to Section 365 of the Bankruptcy Code, Seller will assume the Purchased Contracts (to the extent not previously assumed) (if any) and, subject to the terms herein, assign the Purchased Contracts to Purchaser, and Purchaser, subject to the terms herein, will assume the Purchased Contracts.  Notwithstanding anything to the contrary in this Agreement, any Cure Costs with respect to the Purchased Contracts (the "<u>Assumed Cure Costs</u>") will be paid by Purchaser, as and when finally determined by the Bankruptcy Court pursuant to the Bidding Procedures Order and as set forth in the Sale Order, and not by Seller, and Seller will have no Liability for any Assumed Cure Costs.

2.6     <u>Assumption and Assignment of Purchased Contracts</u>.

(a)     Seller has filed with the Bankruptcy Court a list of all available executory Contracts of Seller (as amended from time to time, the "Assumption and Assignment Notice"). The Assumption and Assignment Notice identifies all executory Contracts of Seller and sets forth a good faith estimate of the amount of the Cure Costs applicable to each such Contract. By the date on which Seller files the Notice of Primary Auction Results or, if there has not been an Auction with respect to the Purchased Assets, Seller announces the Successful Bidder with respect to the Purchased Assets (such date, the "Determination Date"), Purchaser shall designate in writing (each such writing, a "Designation Notice") which Contracts from the Assumption and Assignment Notice that are exclusively related to the Business (such Contracts, the "Available Contracts") Purchaser wishes for Seller to assume and assign to Purchaser at the Closing. All Contracts that Purchaser does not designate in writing for assumption shall not constitute Purchased Contracts or Purchased Assets and shall automatically be deemed Excluded Assets; provided, however, that if any Available Contract is subject to a cure dispute or other dispute as to the assumption or assignment of such Available Contract that has not been resolved to the mutual satisfaction of Purchaser and Seller prior to the Determination Date, then the Determination Date shall be extended (but only with respect to such Available Contract) to no later than the earlier of (A) the date on which such dispute has been resolved to the mutual satisfaction of Purchaser and Seller, (B) the date on which such Available Contract is deemed rejected by operation of section 365 of the Bankruptcy Code, and (C) five Business Days after the date upon which such dispute is finally determined by the Bankruptcy Court (the "Extended Contract Period"); provided, further, that the Purchaser may withdraw its Designation Notice with respect to such Available Contract at any time during the Extended Contract Period. If a Designation Notice with respect to such Available Contract is not delivered by Purchaser in writing by the date which is three Business Days following the expiration of such Extended Contract Period, such Available Contract shall be automatically deemed an Excluded Asset. For the avoidance of doubt, Purchaser shall not assume or otherwise have any Liability with respect to any Excluded Asset. At Purchaser's reasonable request, Seller shall make reasonably available to Purchaser the appropriate information of Seller necessary to  evaluate the outstanding Available Contracts, including making Seller's financial advisors reasonably available to Purchaser.

(b)     Seller shall use commercially reasonable efforts to take all actions required by the Bankruptcy Court to obtain an Order containing a finding that the proposed assumption and assignment of the Purchased Contracts to Purchaser satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(c)     At the Closing, subject to the Extended Contract Period, Seller shall, pursuant to the Sale Order and the Bill of Sale and Assignment and Assumption Agreements, assume and assign, or cause to be assigned, to Purchaser, each of the Purchased Contracts.

(d)     Purchaser shall be solely responsible for providing Seller with sufficient information to demonstrate that Purchaser has satisfied the requirement of adequate assurance of future performance contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the applicable Available Contracts. Purchaser will cooperate with Seller in communicating with third parties to Available Contracts as may be reasonably necessary to assist Seller in establishing that Purchaser has satisfied the requirement of adequate assurance of future performance contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the applicable Available Contracts.

(e)    Not later than one Business Day following the Closing Date, Seller shall file with the Bankruptcy Court an amended and restated Assumption and Assignment Notice, which notice shall set forth only the Purchased Contracts (and expressly state that all other Available Contracts are Excluded Assets).

(f)    On the Closing Date, with respect to Cure Costs not disputed as of the Closing Date, Purchaser or Seller, as applicable, shall pay, subject to Section 2.5, any Cure Costs. With respect to Cure Costs that are disputed as of the Closing Date, the Parties shall cooperate and diligently pursue resolution of such disputes. Upon the resolution of any disputed Cure Cost following the Closing, Purchaser or Seller, as applicable, shall pay such Cure Cost promptly, and in no event later than two Business Days following such resolution.

(g)    Notwithstanding anything in this Agreement to the contrary, from and after the date hereof through the Closing, Seller will not reject or take any action (or fail to take any action that would result in rejection by operation of Law) to reject, repudiate or disclaim any Contract listed in the Designation Notice without the prior written consent of Purchaser, such consent not to be unreasonably withheld. Notwithstanding anything in this Section 2.6(g), if Seller determines that the rejection of a Contract listed in the Designation Notice is necessary to satisfy its fiduciary obligations, then Seller may do so without the prior consent of Purchaser.

2.7    Non-Assignment of Assets.

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not effect the assignment or transfer of any Purchased Asset (including any Purchased Contract) if (i) (A) prohibited by applicable Law, (B) an attempted assignment or transfer thereof would reasonably be likely to subject Purchaser, its Affiliates or any of its or their respective Representatives to civil or criminal Liability or (C) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto, would constitute a breach, default or violation thereof or of any Law or Order (each such action, a "Necessary Consent"), or in any way adversely affect the rights of Purchaser thereunder or (ii) the Bankruptcy Court has not entered an Order (including, for the avoidance of doubt, the Sale Order) approving such assignment or transfer.  In such event, such assignment or transfer is subject to such Necessary Consent being obtained and Seller and Purchaser will use their respective commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset (including any Purchased Contract) or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request; provided, however, that Seller will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or Action to obtain any such consent or approval.  If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would give rise to any of the circumstances described in clauses (i) or (ii) of the first sentence of this Section 2.7(a), be ineffective or would adversely affect the rights of Purchaser to such Purchased Asset following the Closing, (x) Seller and Purchaser will, and will cause their respective Affiliates to, (1) use commercially reasonable efforts (including cooperating with one another to obtain such Necessary Consents, to the extent feasible) as may be necessary so that Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, (2) complete any such assignments or transfers as

16

soon as reasonably practicable, and (3) upon receipt of any applicable Necessary Consents, to transfer or assign the applicable Purchased Asset to Purchaser, and (y) Seller will, and will cause their respective Affiliates to, cooperate with Purchaser in good faith without further consideration in any arrangement reasonably acceptable to Purchaser and Seller intended to provide Purchaser with the benefit of any such Purchased Assets.

(b)    Subject to Section 2.7(a), if after the Closing (i) Purchaser or its designee holds any Excluded Assets or Excluded Liabilities or (ii) Seller holds any Purchased Assets or Assumed Liabilities, Purchaser or Seller will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party.  Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for such other Party.

2.8    Further Conveyances and Assumptions.  From time to time following the Closing, Seller and Purchaser will, and will cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, transfers, notices, assumptions, assignments, registrations or filings with Governmental Bodies, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to Seller and its Affiliates and their respective successors and assigns, the assumption of the Liabilities intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Transactions; provided that nothing in this Section 2.8 will require Purchaser or any of its Affiliates to assume any Liabilities other than the Assumed Liabilities.

2.9    Alcoholic Beverage Licenses.  To the extent permitted by applicable Law, Seller shall, and shall cause its Affiliates to, reasonably cooperate with Purchaser in making all filings and taking all steps reasonably necessary to obtain all approvals, consents and waivers required to be obtained by Purchaser under the terms of this Agreement in connection with the Transactions contemplated hereby in accordance with the terms hereof, and shall deliver to Purchaser copies of any non-confidential information in Seller's possession reasonably requested by Purchaser with respect to Purchaser's application for such approvals, consents and waivers; provided, however, that Seller shall have no obligation to obtain, and Purchaser shall be responsible to obtain, all alcohol-related approvals, registrations, licenses, permits, authorizations and bonds (collectively, "Alcohol Licenses") from the Alcohol and Tobacco Tax and Trade Bureau ("TTB"), the California Department of Alcoholic Beverage Control ("ABC"), and other governmental agencies required for operation of the Real Property.  Purchaser shall use commercially reasonable efforts to obtain such Alcohol Licenses.  Seller agrees to, and shall cause its Affiliates to, leave in place and shall not cancel its existing Alcohol Licenses during the duration of the TSA.  The TSA shall confirm the foregoing terms and indemnify Seller from liability in connection with the use of Seller's Alcohol Licenses after the Closing.  Subject to the terms and conditions of the TSA, Seller and its Affiliates shall surrender licenses, permits and authorizations that relate exclusively to the Business as may be reasonably required for Purchaser to obtain all approvals, consents and waivers required or desired to be obtained by Purchaser under the terms of this Agreement, including approvals for transfer or issuance of all Alcohol Licenses. If necessary, Seller shall, and shall cause its Affiliates to, at Purchaser's sole cost and expense, continue for the duration of the TSA to submit reports as required by 27 CFR Part 24 based on information and records provided by

17

Purchaser until Purchaser is able to obtain the necessary TTB Alcohol Licenses to operate the Purchased Assets for the duration of the TSA subject to the terms of this <u>Section 2.9</u> and the terms and conditions of the TSA. The post-Closing obligations of Seller under this Section shall survive the Closing. Purchaser will provide Seller with reasonable documentation to demonstrate that Purchaser has submitted applications with respect to TTB Alcohol License within ten Business Days following the Effective Date (and the ABC Alcohol Licenses within five Business Days following receipt of the TTTB Alcohol Licenses).

## III.    CONSIDERATION

3.1    <u>Consideration</u>.  The aggregate consideration for the Purchased Assets will be: (a) $85,000,000.00, in cash (the "<u>Bid Purchase Price</u>"); <u>plus</u> (b) the assumption of the Assumed Liabilities; <u>less</u> (ii) the aggregate amount of deposits received by Seller and/or its Affiliates for any hospitality event occurring on or after the Closing Date at any Real Property (such deposits, the "<u>Event Deposit Amount</u>"); <u>provided</u>, however, the Bid Purchase Price shall be adjusted pursuant to <u>Section 3.3</u> <u>Section 3.4</u>, and <u>Section 10.4</u> below (as adjusted, the "<u>Purchase Price</u>").  At the Closing, Purchaser shall pay, or cause to be paid, to Seller, in immediately available funds to the account or accounts designated by Seller, an amount equal to the Bid Purchase Price less the Deposit Amount less the Event Deposit Amount less the Pre-Closing Inventory Adjustment, if any (the "<u>Closing Payment</u>").

3.2    <u>Purchase Price Deposit; Escrow Holdback</u>.

(a)    Purchaser has deposited a sum of $7,000,000 (the "<u>Deposit Amount</u>") into an escrow account maintained by Epiq Corporate Restructuring, LLC ("<u>Escrow Agent</u>"), pursuant to the escrow agreement, dated August 13, 2024 between Seller and the Escrow Agent, as modified by the addendum (and any amendment thereto) executed by Purchaser (the "<u>Escrow Agreement</u>"),which will be held in such escrow account and will be either delivered to Purchaser or paid to Seller as follows: (a) if the Closing occurs, (i) $3,000,000 of the Deposit Amount less the Proration Amount will be released to Seller, (ii) the Proration Amount will be released to the Title Company for use in accordance with <u>Section 10.4</u>, and (iii) the remaining $4,000,000 will be held by Escrow Agent as security for Seller's obligation to reimburse Purchaser for any Post-Closing Inventory Adjustment set forth in <u>Section 3.4</u> below (such remaining amount, the "<u>Escrow Holdback Amount</u>"), (b) if this Agreement is terminated by Seller pursuant to <u>Section 4.4(d)</u>, then the Deposit Amount will promptly be released to Seller (and such Deposit Amount will be deemed fully earned by Seller as compensation and consideration for entering into this Agreement), or (c) if this Agreement is terminated for any reason other than by Seller pursuant to <u>Section 4.4(d)</u>, then the Deposit Amount will promptly be released to Purchaser. For the avoidance of doubt, any claim asserted by Purchaser under this <u>Section 3.2(a)</u> will be entitled to administrative expense priority under section 503(b) of the Bankruptcy Code.

(b)    The Escrow Holdback Amount shall be held in escrow subject to the terms and conditions set forth in this Agreement and the Escrow Agreement.  Any amount of the Escrow Holdback Amount remaining following the determination of and payment to Purchaser of the Post-Closing Inventory Adjustment, if any shall be paid to Seller within five Business Days following such determination and payment. Seller and Purchaser agree to execute joint written instructions

18

and deliver them to the Escrow Agent to cause the Escrow Agent to release the Deposit Amount in accordance with this <u>Section 3.2</u> and the other provisions of this Agreement.

3.3    <u>Calculation of Pre-Closing Inventory Adjustment</u>.  Purchaser and Seller agree that <u>Schedule 2.1(b)(ii)</u> of the Company Disclosure Letter will set forth the Wine Inventory accurate as of June 30, 2024 (the "<u>Submission Date</u>" and such Wine Inventory, "<u>Submission Date Wine Inventory</u>").  Three Business Days prior to the Closing Date or the most recent practicable Business Day prior thereto, Seller shall deliver to Purchaser a statement prepared by Seller setting forth the Wine Inventory expected as of the Closing Date; <u>provided</u>, that, no value will be ascribed any Wine Inventory which, as of such time, has been sold to a third party for which Seller or its Affiliates have been, or will be, paid (the "<u>Closing Wine Inventory</u>").  Seller's calculation of the Closing Wine Inventory shall be substantiated in all material respects by Seller's working papers and documentation in form and substance that is consistent with Seller's past practices with respect to such documentation and Purchaser shall have the right to discuss the Closing Wine Inventory statement with Seller and provide any comments prior to the Closing Date and Seller shall consider in good faith any such comments (provided, that, to the extent the Parties are unable to agree with respect to any such comments, the Closing Wine Inventory delivered by Seller will prevail for purposes of determining the Closing Wine Inventory). In the event the Closing Wine Inventory is less than the Submission Date Wine Inventory, the difference between the value of the Closing Wine Inventory and the value of Submission Date Wine Inventory shall be deducted dollar-for-dollar from the Bid Purchase Price (such amount, the "<u>Pre-Closing Inventory Adjustment</u>").

3.4    <u>Calculation of Post-Closing Inventory Adjustment</u>.

(a)    After the Closing, if Purchaser does not agree with the Closing Wine Inventory provided by Seller, Purchaser shall deliver to Seller a notice of its disapproval (the "<u>Disapproval Notice</u>") within thirty Business Days after the Closing Date along with a statement prepared by Purchaser calculating the difference between the Closing Wine Inventory and the actual Inventory count on hand as of the Closing; <u>provided</u>, that, no value will be ascribed any Wine Inventory which, as of such time, has been sold to a third party for which Seller or its Affiliates have been, or will be, paid ("<u>Actual Closing Date Inventory</u>").  In the event the Disapproval Notice is not delivered within the foregoing disapproval period, Purchaser shall have been deemed to have approved Closing Wine Inventory provided by Seller as set forth in <u>Section 3.2(b)</u> above.

(b)    Following receipt of the Actual Closing Date Inventory, Seller shall be permitted to review the Actual Closing Date Inventory and the working papers relating to the Actual Closing Date Inventory and, within 10 Business Days after the date of such receipt (the "<u>Notice Period</u>"), may deliver to Purchaser a certificate setting forth any objections to the Actual Closing Date Inventory (a "<u>Notice of Disagreement</u>").  In the event Seller does not so object within the Notice Period, the Actual Closing Date Inventory shall become final and binding upon Purchaser and Seller for purposes of this Agreement upon expiration of the Notice Period.

(c)    In the event any objections raised in the Notice of Disagreement are not resolved by the Parties within ten Business Days after Purchaser's receipt of a Notice of Disagreement, then Purchaser and Seller shall submit in writing such unresolved objections to a mutually agreeable third-party accounting firm of national reputation and as to which neither party

has a material relationship (the "Accounting Firm"), and the Accounting Firm shall make the final determination of the disputed items. The Actual Closing Date Inventory (as the same may be adjusted) shall become final and binding upon Purchaser and Seller on the date the disputed matters are finally resolved in writing by the Accounting Firm. The cost of the fees and expenses of the Accounting Firm shall be borne equally by Purchaser and Seller.

(d)    In the event the value of the Actual Closing Date Inventory is determined or deemed to be less than the value of the Closing Wine Inventory, the difference between the value of the Closing Wine Inventory and the Actual Closing Date Inventory (as calculated through Seller's normal procedures consistent with past practice) shall be paid to Purchaser from the Escrow Holdback Amount (such amount, the "Post-Closing Inventory Adjustment"); provided, Purchaser's recovery under this Section 3.4(d) shall be limited to the Escrow Holdback Amount (and, to the extent such difference is less than the Escrow Holdback Amount, the remainder of the Escrow Holdback Amount will be released to Seller).

(e)    Any term or provision hereof to the contrary notwithstanding, at all times following the Closing, a Party shall afford the other Party and such Party's accountants and representatives, and, if applicable, the Accounting Firm, reasonable access during normal business hours to such books, records and other information (including working papers) as any of the foregoing may reasonably request to prepare for or review the Closing Wine Inventory, the Actual Closing Date Inventory or any matters submitted to the Accounting Firm. The fees and expenses of Seller's accountants and other advisers of Seller shall be paid by Seller. The fees and expenses of Purchaser's accountants and other advisers of Purchaser shall be paid by Purchaser.

3.5    Withholding. Notwithstanding anything herein to the contrary, Purchaser and any other applicable withholding agent will be entitled to deduct and withhold (or cause to be deducted and withheld) from any amount otherwise payable pursuant to this Agreement to Seller or any other Person receiving a payment hereunder such amounts as are required to be deducted or withheld therefrom under applicable Law. Purchaser shall use commercially reasonable efforts to notify Seller of any required deduction or withholding at least five days prior to Closing and shall cooperate in good faith with Seller to mitigate any such requirement to deduct and withhold to the extent permitted by applicable Law. Any amounts deducted and withheld in accordance with this Section 3.5 shall be remitted by the Purchaser or other applicable withholding agent to the appropriate Governmental Body and treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

## IV.    CLOSING AND TERMINATION

4.1    Closing Date. Subject to the satisfaction of the conditions set forth in Sections 9.1, 9.2 and 9.3 (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II (the "Closing") will take place remotely by exchange of electronic documentation and signatures at 10:00 a.m. (Pacific time) on the date that is three Business Days following the satisfaction or waiver of the conditions set forth in Sections 9.1, 9.2 and 9.3 (other than conditions that by their nature are to be first satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place and time as the Parties may designate in writing. The date on which the Closing is held is referred to in this Agreement as the "Closing Date."

4.2    <u>Deliveries by Seller</u>.

(a)    At the Closing, Seller shall deliver (subject to the physical delivery provisions of <u>Section 8.8</u>), or cause to be delivered, the Purchased Assets to Purchaser.

(b)    At Closing, Seller shall deliver the Sale Order.

(c)    At the Closing, Seller shall also deliver or cause to be delivered to Purchaser any and all other such documents necessary to consummate this Agreement and the Transactions contemplated herein, including but not limited to the following:

(i)    a duly executed bill of sale and assignment and assumption agreement, in substantially the form attached hereto as <u>Exhibit B</u> (the "<u>Bill of Sale</u>");

(ii)    duly executed assignments to Purchaser of the registered trademarks, copyrights and patents, and applications for each of the foregoing, included in the Purchased Intellectual Property, in each case, in substantially the form attached hereto as <u>Exhibit C</u> (collectively, the "<u>IP Assignment Agreements</u>");

(iii)    the officer's certificate required to be delivered pursuant to <u>Sections 9.1(a)</u> and <u>9.1(b)</u>;

(iv)    Grant Deeds to the Real Property, each in substantially the form attached hereto as <u>Exhibit D</u>, duly executed by Seller, conveying fee simple in title in such Real Property to Purchaser;

(v)    a copy of Seller's Mailing Lists;

(vi)    a certified copy of the Sale Order;

(vii)    a TSA in substantially the form attached hereto as <u>Exhibit E</u>, duly executed by Seller or its applicable Affiliates;

(viii)    such ordinary and customary documents (including any factually accurate title affidavits) as may be reasonably required by the Title Company to enable Purchaser to acquire, at Purchaser's sole election and sole cost and expense, one or more owner policies of title insurance issued by such Title Company covering any or all of the Real Property;

(ix)    duly executed IRS Forms W-9 from Seller and any Affiliate thereof transferring assets or receiving a payment hereunder (or, if applicable, Seller's or such Affiliate's regarded owner for applicable Tax purposes), attached hereto as <u>Exhibit F</u>; and

(x)    all other endorsements, assignments, company seals, instruments of transfer, stock powers and other instruments of conveyance reasonably requested by Purchaser or required to convey and assign the Purchased Assets to Purchaser and vest in Purchaser all of Seller's rights, title and interests in the Purchased Assets, and evidence such transfer on the public records (it being understood that no such documents will require Seller or any of its Affiliates to make any additional representations, warranties or covenants, express or implied, not contained in

21

this Agreement or to otherwise assume any additional obligations or liability which are not contemplated by the terms of this Agreement).

       4.3    <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser will deliver to Seller:

       (a)    the Closing Payment;

       (b)    a duly executed signature page to the TSA;

       (c)    the officer's certificate required to be delivered pursuant to <u>Sections 9.2(a) and 9.2(b)</u>;

       (d)    counterparts to any documents delivered by Seller described in <u>Section 4.2</u>; and

       (e)    all such other documents, instruments and certificates, reasonably requested by Seller, to evidence the assumption by Purchaser of the Assumed Liabilities.

       4.4    <u>Termination of Agreement</u>.  This Agreement may be terminated prior to the Closing as follows:

       (a)    by mutual written consent of Seller and Purchaser;

       (b)    by Purchaser or Seller if the Closing has not occurred by 5:00 p.m. Pacific time on October 15, 2024 (the "<u>Termination Date</u>"), which date may be extended pursuant to <u>Section 4.4(c)(i)</u> and <u>Section 4.4(d)(i)</u>; provided, however, that if the Closing has not occurred on or before the Termination Date due to a breach by (i) Purchaser of any representations, warranties, covenants or agreements contained in this Agreement that has resulted in any of the conditions set forth in <u>Section 9.2</u> or <u>Section 9.3</u> not being satisfied by the Termination Date, then Purchaser may not terminate this Agreement pursuant to this <u>Section 4.4(b)</u> or (ii) Seller of any representations, warranties, covenants or agreements contained in this Agreement that has resulted in any of the conditions set forth in <u>Section 9.1</u> or <u>Section 9.3</u> not being satisfied by the Termination Date, then Seller may not terminate this Agreement pursuant to this <u>Section 4.4(b)</u>;

       (c)    by Purchaser, if:

       (i)    Seller breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a condition set forth in <u>Sections 9.1</u> or <u>9.3</u> and such breach has not been cured within 10 Business Days after the giving of written notice by Purchaser to Seller of such breach; <u>provided</u> that Purchaser is not then in breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in <u>Section 9.2</u> or <u>Section 9.3</u>; <u>provided</u>, <u>further</u>, that in the event that Purchaser provides such written notice to Seller on or after October 12, then the Termination Date will be extended to October 17;

(ii)     prior to the Closing (A) the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code or (B) a trustee is appointed under Section 1104 of the Bankruptcy Code;

(iii)     a party other than Purchaser is named the Successful Bidder (as defined the Bidding Procedures Order) for any of the Purchased Assets in the Notice of Primary Auction Results (as defined the Bidding Procedures Order); or

(iv)     any material portion of any Real Property is damaged or destroyed prior to Closing Date and such the aggregate value of such loss exceeds $500,000;

(d)     by Seller, if:

(i)     Purchaser breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a condition set forth in Sections 9.2 or 9.3 and such breach has not been cured within 10 Business Days after the giving of written notice by Seller to Purchaser of such breach; provided further that Seller is not then in breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in Section 9.1 or Section 9.3, provided further, that in the event that Seller provides such written notice to Purchaser on or after October 12, then the Termination Date will be extended to October 17; or

(ii)     all of the conditions set forth in Sections 9.1 and 9.3 have been satisfied or waived by the applicable Party (in each case, other than those conditions that by their nature are first satisfied at the Closing), Seller has given written notice to Purchaser that they are prepared to consummate the Closing and Purchaser fails to consummate the Closing within two Business Days after the date that the Closing should have occurred pursuant to Section 4.1.

(e)     by Seller or Purchaser, if there is in effect a final non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions; it being agreed that the Parties will promptly appeal and use reasonable best efforts to seek to overturn any adverse determination which is not non-appealable and pursue such appeal with reasonable diligence unless and until this Agreement is terminated pursuant to this Section 4.4; provided, that a Party may not terminate this Agreement pursuant to this Section 4.4(e) if such Party is in material breach of any of its representations, warranties, covenants or agreements contained herein and such material breach is the primary cause or grounds for such Order.

(f)     automatically, upon the consummation of an Alternative Transaction.

4.5     Procedure Upon Termination.  In the event of termination pursuant to Section 4.4 (other than Section 4.4(f), under which termination will take place automatically), the terminating Party will give written notice thereof to the other Party or Parties, and this Agreement will terminate as described in Section 4.6, and the purchase of the Purchased Assets and assumption of the Assumed Liabilities hereunder will be abandoned, without further action by Purchaser or Seller.

23

4.6     Effect of Termination.  In the event that this Agreement is terminated as provided herein, then each of the Parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination and there will be no Liability or obligation on Purchaser, Seller or any of their respective Representatives, except as specifically set forth in this Section 4.6; provided, however, that the provisions of Section 3.2, this Section 4.6, Section 7.3, Article XI and, to the extent necessary to effectuate the foregoing enumerated provisions, Article I, will survive any such termination and will be enforceable hereunder; provided, further, that nothing in this Section 4.6 will be deemed to release any Party from Liability for any breach of this Agreement prior to termination and nothing in this Section 4.6 will be deemed to interfere with (i) Purchaser's rights to the Termination Payment provided in Section 7.3 or (ii) Purchaser's or  Seller's rights to the Deposit Amount to the extent provided in Section 3.2.

## V.     REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the letter from Seller, dated the Effective Date, addressed to Purchaser (the "Company Disclosure Letter") (regardless of whether or not the corresponding Section of this Article V contains a specific reference to the Company Disclosure Letter), or, to the extent its applicability is reasonably apparent, in the Company SEC Documents (other than any forward-looking disclosures set forth in any risk factor section, any disclosure in any section relating to forward-looking statements and any other similar disclosures included therein, in each case, to the extent such disclosures are primarily predictive or forward-looking in nature and do not consist of statements of present fact) filed prior to the date of this Agreement, Seller hereby represents and warrants to Purchaser that:

5.1     Organization and Good Standing.  Seller is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and, subject to any limitations that may be imposed on Seller as a result of filing a petition for relief under the Bankruptcy Code, has the requisite power and authority to own, lease and operate its properties and to carry on the Business as now being conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Purchased Assets.  Seller is duly qualified to conduct the Business as currently conducted in each jurisdiction in which the character or location of the property owned, leased or operated by it or the nature of its business makes such qualification necessary and each other jurisdiction in which the conduct of the Business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Purchased Assets.  Seller is not in violation of its organizational or governing documents.

5.2     Authorization of Agreement.  Subject to entry of the Sale Order, as applicable, Seller has all necessary power and authority to execute and deliver this Agreement and the Ancillary Documents to which it is a party and to perform its respective obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Ancillary Documents to which it is a party and the consummation of the Transactions have been duly authorized by all requisite corporate or similar action on the part of Seller.  This Agreement and the Ancillary Documents to which it is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly

and validly executed and delivered, by Seller and (assuming the due authorization, execution and delivery by the other Parties and the entry of the Sale Order) this Agreement and the Ancillary Documents to which it is a party constitutes legal, valid and binding obligations of Seller enforceable against Seller in accordance with its respective terms, subject to equitable principles of general applicability (whether considered in a proceeding at law or in equity). The execution, delivery and performance by Seller of this Agreement and the Ancillary Documents will not violate any Law or Order to which a Seller is subject or by which its properties or assets are bound.

5.3    <u>Governmental Consents</u>. Except to the extent not required if the Sale Order is entered, assuming Purchaser obtains the Alcohol Licenses, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Seller in connection with the execution and delivery of this Agreement or the Ancillary Documents to which Seller is a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the Transactions or the taking by Seller of any other action contemplated hereby or thereby (with or without notice or lapse of time, or both), except for (a) the entry of the Sale Order and (b) immaterial consents, waivers, approvals, Orders, authorizations, declarations, filings and notifications.

5.4    <u>Title to Purchased Assets</u>. Subject to <u>Section 2.7</u> and (a) bankruptcy, insolvency, or other similar Laws affecting the enforcement of creditors' rights generally, and (b) equitable principles of general applicability (whether considered in a proceeding at law or in equity), Seller has good and valid title to, or in the case of leased assets, have good and valid leasehold interests in, the Purchased Assets free and clear of all Liens (other than Permitted Exceptions and Transferred Exceptions) and, at the Closing, Purchaser will be vested with good and marketable title to the Purchased Assets, or in the case of leased assets, good and marketable leasehold interest in, such Purchased Assets, free and clear of all Liens (other than Permitted Exceptions and Transferred Exceptions) and Excluded Liabilities, to the fullest extent permissible under Law, including Section 363(f) of the Bankruptcy Code.

5.5    <u>Validity of Purchased Contracts</u>. Each Purchased Contract is in full force and effect and is a valid and binding obligation of Seller and, to the Knowledge of Seller, the other parties thereto in accordance with its terms and conditions, except as such validity and enforceability may be limited by (a) bankruptcy, insolvency, or other similar Laws affecting the enforcement of creditors' rights generally, (b) equitable principles of general applicability (whether considered in a proceeding at law or in equity), and (c) the obligation to pay Cure Costs (if any) under <u>Section 2.5</u>. Seller has no Knowledge of the intention of any third party to terminate, breach, adversely modify or fail to renew any Purchased Contract. To Seller's Knowledge, Seller has in all material respects performed all obligations required to be performed by it to date under each Purchased Contract. As of the date of this Agreement, to the Knowledge of Seller, no event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default under or a violation of any such Purchased Contract or would cause the acceleration of any obligation of any Seller or the creation of a Lien upon any Purchased Asset, except for such events that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

5.6    <u>SEC Documents</u>. Except that which would not reasonably be expected to have or has not had, individually or in the aggregate, a Material Adverse Effect, (a) Seller has filed with

or furnished to the SEC all forms, reports, schedules, statements and other documents required to be filed or furnished by it since January 1, 2022, under the Exchange Act or the Securities Act (collectively, the "Company SEC Documents") and (b) as of its respective date of filing, or, if amended or superseded by a subsequent filing made prior to the date of this Agreement, as of the date of the last such amending or superseding filing, each Company SEC Document (i) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated in such Company SEC Document or necessary in order to make the statements in such Company SEC Document, in light of the circumstances under which they were made, not misleading and (ii) complied in all material respects with the applicable requirements of the Exchange Act and the Securities Act, as the case may be, and the applicable rules and regulations of the SEC under the Exchange Act and the Securities Act, as the case may be.

5.7    Litigation.  Except for any Actions or Orders that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Business, there are no Actions or Orders pending or, to the Knowledge of Seller, threatened against Seller that involves or relates to the Business, any of the Transactions, or affects any of the Purchased Assets.

5.8    Compliance with Laws.  Seller is and, since January 1, 2020, has been, in all material respects, in compliance with all Laws and Orders applicable to the Business.  Seller holds all material governmental licenses, authorizations, permits, consents and approvals necessary for the operation of the Business as presently conducted (the "Company Permits").  Seller is in material compliance with the terms of the Company Permits, and to the Knowledge of Seller all Company Permits are in full force and effect.

5.9    Employee Compensation and Employee Benefit Plans; ERISA.

(a)    As used herein, the term "Company Plan" will mean each material "employee benefit plan" (within the meaning of Section 3(3) of ERISA) and each other material equity incentive, severance, employment, company stock plan, change-in-control, retention, fringe benefit, bonus, incentive, savings, retirement, deferred compensation or other benefit plan, agreement, program, policy or Contract, whether or not subject to ERISA, in each case other than a "multiemployer plan," as defined in Section 3(37) of ERISA, under which any current or former employee, officer, director, contractor (who is a natural Person) or consultant (who is a natural Person) of Seller has any present or future right to benefits and which are entered into, contributed to, sponsored by or maintained by Seller.

(b)    Except as would not, individually or in the aggregate, have a Material Adverse Effect:

(i)    Each Company Plan is in material compliance with all applicable Laws, including ERISA and the Code.

(ii)    Each Company Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination or opinion letter to that effect from the IRS and, to the Knowledge of Seller, no event has occurred since the date of such determination or opinion that would reasonably be expected to adversely affect such determination or opinion.

(iii)   To the Knowledge of Seller, no condition exists that is reasonably likely to subject Seller to any direct or indirect liability under Title IV of ERISA.

(iv)   No Actions (other than routine claims for benefits in the Ordinary Course of Business) are pending or, to the Knowledge of Seller, threatened with respect to any Company Plan.

5.10   <u>Labor Matters</u>.  Except as would not have, individually or in the aggregate, a Material Adverse Effect:

(a)   Seller is not party to, or bound by, any labor agreement, collective bargaining agreement, or any other labor-related Contract with any labor union, trade union, works council or labor organization covering Business Employees' terms and conditions of employment. No labor union, trade union, labor organization or group of Business Employees has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of Seller, threatened in writing to be brought or filed with the National Labor Relations Board or any other Governmental Body.  To the Knowledge of Seller, there are no organizing activities with respect to any Business Employees.  There has been no actual or, to the Knowledge of Seller, threatened material labor disputes, strikes, slowdowns or work stoppages against or affecting Seller. Since January 1, 2022, none of Seller have effectuated (i) a "plant closing" (as defined in the Worker Adjustment and Retraining Notification Act or any similar state or local plant closing or layoff Law (the "<u>WARN Act</u>")) in connection with the Business; or (ii) a "mass layoff" (as defined in the WARN Act) of individuals employed at or who primarily provided service to the Business, without first complying with the requirements of the WARN Act.

(b)   <u>Schedule 1.1(a)</u> of the Company Disclosure Letter contains a complete and correct list, as of August 27, 2024 of all current Business Employees and all former employees of Seller whose employment terminated in the past ninety days, their respective titles as of the date hereof (or as of the date of their termination), the compensation paid or payable to each such employee (as of the Closing Date or the date of their termination). Except as set forth on <u>Schedule 1.1(a)</u> of the Company Disclosure Letter, each of the Business Employees is employed "at will." There are no agreements between any Business Employee and any Person (including any Seller) which would restrict, in any manner, such Business Employee's ability to perform services for the Business or Purchaser or the right of such Business Employee to compete with any Person or sell to or purchase from any Person.

5.11   <u>Intellectual Property</u>.

(a)   <u>Schedule 5.11</u> of the Company Disclosure Letter contains a list of all domestic and foreign patents, patent applications, registered trademarks, trademark applications, service marks, service mark applications, registered copyrights, copyright applications and domain names included in the Purchased Intellectual Property. All of the Purchased Intellectual Property is owned solely by Seller and free and clear of all Liens except Permitted Exceptions. Each registration listed on <u>Schedule 5.11</u> of the Company Disclosure Letter (excluding applications that have not been issued or granted by the relevant Governmental Body) is valid, in full force and effect and enforceable.  Except as otherwise set forth in <u>Schedule 5.11</u> of the Company Disclosure

27

Letter, no item listed on <u>Schedule 5.11</u> of the Company Disclosure Letter has expired, been canceled or abandoned.

(b)     The Purchased Intellectual Property constitutes all of the Intellectual Property owned by Seller that is necessary for the conduct of the Business as presently conducted. The conduct of the Business as currently conducted or conducted since January 1, 2020 does not infringe or violate any patent, trademark, trade name, copyright, or other Intellectual Property rights of any Person, or constitute a misappropriation of any confidential information or any other Intellectual Property right of any Person.  There are no pending or, to the Knowledge of Seller, threatened claims, and Seller has not received, since January 1, 2020, any written notice of any actual or threatened Actions alleging any of the foregoing except for those that have since been resolved. To the Knowledge of Seller, there is no infringement, misappropriation or violation being made by any other Person of any Purchased Intellectual Property.

(c)     To Seller's Knowledge, Seller has taken adequate measures to protect the confidentiality and value of all material trade secrets included in the Purchased Intellectual Property. To Seller's Knowledge there have been no disclosures of any material trade secrets, confidential information, or other proprietary information included in the Purchased Intellectual Property to any third party that have not been authorized by Seller.

(d)     To Seller's Knowledge, Seller takes and has taken reasonable measures to maintain and protect the performance, confidentiality, integrity and security of the IT Systems (and all Software and confidential data, including Personal Information stored therein). To Seller's Knowledge, the IT Systems (i) are adequate and sufficient for the operation of the Business as currently conducted, and (ii) do not contain any defect, viruses, worms, Trojan horses, bugs, faults or other devices, errors, contaminants or effects. To Seller's Knowledge, there have been no material (a) security breaches or unauthorized use, access or intrusions of any IT Systems or (ii) failures, breakdowns, continued substandard performance, outages or unscheduled downtime or other adverse events affecting any of the IT Systems

5.12   <u>Customers and Mailing Lists</u>.  All customer lists, email lists, mailing lists, wine club lists and any other information or lists of customers or persons relating to the Business, in any format that is exclusively related to the Business, in the possession of Seller relating to the Business (collectively, "<u>Mailing Lists</u>"), which shall be delivered to Purchaser at the Closing, are true, complete and accurate copies of all of such lists owned, held or used by Seller or its Affiliates in connection with the Business. Purchaser shall have exclusive ownership and the exclusive right to use the Mailing Lists.

5.13   <u>Financial Advisors, Finders, Brokers</u>.  Except with respect to GLC Advisors & Co., LLC, Seller has not incurred any Liability for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the Ancillary Documents or Transactions.

5.14   <u>Real Property</u>.

(a)     <u>Water</u>. The quality and quantity of water available to the Real Property is sufficient for the operation of the Business as it is currently conducted as of the date of this

Agreement and as of the Closing.  Seller has not released or modified any of the Water Rights or supplies for any of the Real Property, and such Water Rights and supplies are sufficient for the operation of the Business as it is currently conducted as of date of this Agreement and as of the Closing.  To Seller's Knowledge, there are no water sharing agreements or water disputes affecting the Real Property. To Seller's Knowledge, Seller has made available to Purchaser all material environmental, health and safety audits, assessments, reports and other material environmental, health and safety documents relating to any water sources on the Real Property and used by the Business.

(b)     Utilities. The Real Property is supplied with utilities and other services in such amounts as have been reasonably necessary for their present use in the operation of the Real Property and the Business in all material respects, including gas, electricity, irrigation, drainage facilities, telephone, sanitary and storm sewer service.

(c)     Improvements. The Improvements are in good operating condition and repair (subject to normal wear and tear consistent with the age and assets of the Improvements) for the operation of the Business as currently conducted by the Company, and no condition exists requiring repairs (other than routine maintenance) or alterations thereof. There are no structural or other material physical defects or deficiencies in the condition of any of the Improvements, including all heating, ventilation, air conditioning, plumbing, electrical, and mechanical equipment. The Improvements are in compliance with all applicable Laws. No work has been done at the Real Property, and no materials have been supplied to the Real Property, which have not been paid for, and there are no materialman's liens or mechanic's liens affecting the Real Property.

(d)     Entitlements. The Real Property is licensed, permitted and authorized to carry on the operation of the Business as it is presently conducted in each Real Property under all applicable Laws, and no portion of the Real Property or the current use thereof constitutes a non-conforming use (except for Permitted Exceptions or as disclosed on any building and zoning report provided to Purchaser by Seller). Except for Permitted Exceptions, Seller has not received any written notice regarding the Real Property's failure to comply with or violation of any applicable Law, rule, regulation, ordinance, fire safety law, building or health code or government directive from any administrative or governmental authority or any restrictive easements or covenants affecting the Real Property. Except for Permitted Exceptions, Seller has not received any written notice, nor to Seller's Knowledge, has there been any condemnation action, litigation or environmental, zoning, moratorium, or other land use proceedings, either instituted or planned to be instituted, nor has Seller received written notice of any special assessment proceedings affecting the Real Property.

(e)     No Tenancies, Occupations or Encroachments. Seller is in possession of the Real Property and has not leased, licensed, subleased or otherwise granted the right to use, operate or occupy any parcel or any portion of any parcel of any Real Property to any other Person. No portion of the Improvements has been built or installed on any real property neighboring the Real Property and no portion of any Improvements on any real property neighboring the Real Property has been built or installed on the Real Property.

(f)    No Agreements. Except for any Purchased Contracts, there are no contracts, leases, storage, service, supply, maintenance, management agreements or other Contracts affecting the Real Property that will not be terminated at or prior to the Closing.

5.15    Tangible Personal Property.  Each item of the Tangible Personal Property is in a condition suitable for the uses for which they are intended in all material respects, normal wear and tear excepted and there are no, to Seller's Knowledge, material defects to any of the Tangible Personal Property. Seller owns, free and clear of any Lien, all fermenters and all barrels used in the production and storage processes exclusively related to the Business.

5.16    Inventory.  Schedule 2.1(b)(ii) of the Company Disclosure Letter contains a true, correct and complete list of all Inventory as of June 30, 2024, including information, in each case to the extent such information is available, regarding such Inventory's vintage, vineyard block, varietal and the name and address of the warehouse and tank in which such Inventory is located. Seller is the true, lawful and exclusive owner of the Inventory and has all necessary power and authority to transfer title of the Inventory to Purchaser, free and clear of all Liens other than Permitted Liens and Liens that will be removed on or before the Closing Date.  The Inventory has been produced, packaged and labeled, including as to vintage, appellation, and varietal, in accordance with all Laws in all material respects.  The Inventory consists only of items of quality commercially usable and salable in the Ordinary Course of Business, is within its shelf life, is not materially obsolete or damaged, and, to the extent applicable, consists of packaging and product that is merchantable and free of material defects.  None of such Inventory has been consigned from or to others.

5.17    Permits and Licenses.  The Company Permits are valid and existing under Law and in full force in all material respects.  To Seller's Knowledge, Seller has all Company Permits required for the current use and operation of the Real Property and received no written notice of any pending proceeding, and there is no pending or, threatened action by any governmental authority that may reasonably be expected to result in the revocation, cancellation, suspension, termination, or adverse modification of any of said Company Permits. Seller has, since January 1, 2020, complied with all Company Permits and is not in conflict with, or in default or violation of, any Company Permits, in each case, in all material respects.

5.18    Environmental Matters.  Seller is in compliance in all material respects with all applicable Environmental and Safety Laws, except where a failure to be in compliance would not cause a Material Adverse Effect. Seller has not used, stored, generated, manufactured, transported, treated, recycled, disposed of, released, discharged, dumped or otherwise handled Hazardous Materials on the Real Property or any other location, and to Seller's Knowledge, no other party has used, stored, generated, manufactured, transported, treated, recycled, disposed of, released, discharged, dumped or otherwise handled Hazardous Materials on the Real Property, in each case in a condition that requires remediation under applicable Environmental and Safety Laws.  Seller has not received any unresolved written notice of any alleged or actual noncompliance of the Real Property by it or of its past or present operations with Environmental and Safety Law.  No written notice regarding any pending administrative Action has been received or, to Seller's Knowledge, is anticipated or threatened relating to Seller's use of Hazardous Materials or a violation of any Environmental and Safety Laws by Seller on the Real Property owned or leased by it.  To Seller's Knowledge, there has not been in the past during the period Seller has owned such property, and

30

there is not now, any contamination, disposal, spilling, dumping, incineration, release, discharge, storage, treatment or handling of Hazardous Materials on, under or migrating to or from the Real Property (including soils, soil vapors and surface and ground waters) caused by Seller or any other Person that could result in any material Liability of or affecting Seller or any Purchased Asset under Environmental and Safety Laws. Seller has not installed or operated any underground storage tank for the storage of Hazardous Materials under the Real Property and to Seller's Knowledge, there is no underground storage tank used for the storage of Hazardous Materials under the Real Property, in each case in a condition that violates applicable Environmental and Safety Laws.

5.19    <u>No Notice</u>.  Seller has not received any written notice of any matter that directly relates to (a) any change contemplated in any regulations of any Governmental Body applicable specifically to the Real Property or Purchased Assets, which change is not part of the public record, (b) any judicial or administrative action with respect to a violation of Law by Seller pertaining to the Real Property or Purchased Assets, (c) any action or claim by adjacent landowners against Seller with respect to the Real Property or Purchased Assets, or (d) any conditions upon the Real Property or Purchased Assets which would prevent, impede, limit, or impair the use of the Real Property, Purchased Assets or operation of the Business as of the date of this Agreement and as of the Closing.

5.20    <u>Distributors and Suppliers</u>.  Seller has not participated in any activities of the type commercially referred to as "trade loading" or "channel stuffing" or any other activity that reasonably could be expected to result in a material increase, temporary or otherwise, in the demand for Products within 12 months prior to the Closing, including sales of such products: (a) with payment terms materially longer than terms customarily offered by Seller for such products in the Ordinary Course of Business; (b) at a greater discount from listed prices than customarily offered by Seller for such products in the Ordinary Course of Business, other than pursuant to a promotion of a nature previously used in Seller's Ordinary Course of Business for such products; or (c) in a quantity greater than the reasonable resale requirement of any particular customer or distributor.

5.21    <u>Taxes</u>.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Purchased Assets or the Business:

(a)    Seller has timely filed (or had timely filed on its behalf) all material Tax Returns that it was required to file in respect of the Purchased Assets and all such Tax Returns were correct and complete in all material respects. Other than as prohibited from being paid as a result of the Bankruptcy Code or the Bankruptcy Court, with respect to the Purchased Assets, Seller has paid (or had paid on its behalf) (i) all material amounts of Taxes that are shown to be due by Seller on any such Tax Returns or pursuant to any written assessment received by Seller from any Tax Authority for any period preceding the Closing Date, and (ii) all other material amounts of Taxes due on or before the Closing Date (whether or not shown on a Tax Return).

(b)    There are no pending, proposed in writing or threatened in writing Actions with respect to any material amounts of Taxes payable by or asserted against Seller related to the Purchased Assets.

NAI-1540950234v21

(c)     There are no Liens with respect to Taxes (other than Permitted Exceptions, Liens that will be released by the Sale Order, and Liens for Taxes not yet due and payable or Taxes that are being diligently contested in good faith by appropriate proceedings and for which adequate reserves have been set aside in accordance with GAAP) upon the Purchased Assets.

(d)     Seller is not a party to any Tax indemnity, Tax allocation or Tax sharing agreement, other than any such agreement entered into in the Ordinary Course of Business the principal purpose of which is not related to Tax and that could not result in a Lien upon the Purchased Assets or be binding on Purchaser.

(e)     There are no requests for rulings pending between Seller and any Tax Authority in respect of any Tax that could result in a Lien upon the Purchased Assets or be binding on Purchaser. Seller has not executed or entered into any agreement with, or obtained any consents or clearances from, any Tax Authority, or been subject to any ruling or guidance specific to Seller, that would be binding on Purchaser for any taxable period (or portion thereof) ending after the Closing Date.

5.22    Data Privacy.

(a)     To Seller's Knowledge, Seller has complied with all Privacy Requirements and all internal or publicly posted policies, notices, and statements concerning the collection, use, processing, storage, transfer, and security of Personal Information in the conduct of the Business. Without limiting the generality of the foregoing, Seller, and to Seller's Knowledge, any Person acting for or on behalf of Seller is, and has at all times complied with all Privacy Requirements in all jurisdictions where Seller sells and markets its wine (including through its online allocation, order and sale process for its yearly wine releases).

(b)     Seller has not: received any written notice of any Action by any Governmental Body or other Person concerning Seller's collection, use, processing, storage, transfer, or protection of Personal Information or actual, alleged, or suspected violation of any Privacy Requirement, in each case in connection with the conduct of the Business, and there are no facts or circumstances that could reasonably be expected to give rise to any such Action.

(c)     To Seller's Knowledge, there have been no material security breaches, unauthorized access to, use or disclosure of or other adverse events or incidents related to any Personal Information processed by or on behalf of Seller with respect to the Business. To Seller's Knowledge, Seller has not provided or been legally required to provide any notice to any Person in connection with an unauthorized disclosure of Personal Information with respect to the Business.

(d)     To Seller's Knowledge, Seller is not subject to any contractual requirement or other legal obligation that, following the Closing, would materially prohibit the Buyer or the Business from processing any Personal Information in the manner in which Seller processed such Personal Information prior to the Closing. To Seller's Knowledge, the transfer of Personal Information in connection with the transactions contemplated by this Agreement will not materially violate any Privacy Requirements as they currently exist or as they existed at any time during which any of the Personal Information was collected or obtained.

32

5.23    No Other Representations or Warranties; Schedules. Except for the representations and warranties contained in this Article V and the Ancillary Documents, Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller, the Purchased Assets, the Assumed Liabilities or the Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller, or any of Seller's or its Affiliates' respective Representatives. Except for the representations and warranties contained in this Article V and each Ancillary Document, Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any Representative of Seller or any of its Affiliates). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business, the Purchased Assets or the use thereof. The disclosure of any matter or item in any Schedule of the Company Disclosure Letter will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter could result in a Material Adverse Effect.

## VI.    REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

6.1    Organization and Good Standing. Purchaser is a corporation organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Purchaser to consummate the Transactions or to otherwise timely perform its obligations under this Agreement. Purchaser is not in violation of its organizational or governing documents.

6.2    Authorization of Agreement. Purchaser has all necessary corporate power and authority to execute and deliver this Agreement and the Ancillary Documents to which Purchaser is a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Ancillary Documents to which Purchaser is a party and the consummation of the Transactions have been duly authorized by all requisite corporate or similar action on the part of Purchaser. This Agreement and the Ancillary Documents to which Purchaser is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly and validly executed and delivered, by Purchaser and (assuming the due authorization, execution and delivery by the other Parties and the entry of the Sale Order) this Agreement and the Ancillary Documents to which Purchaser is a party constitutes legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its respective terms, subject to equitable principles of general applicability (whether considered in a proceeding at law or in equity).

6.3     <u>Consents and Approvals; No Violations</u>.

(a)     The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the Transactions do not and will not (i) conflict with or violate the certificate of incorporation or bylaws (or similar organizational documents) of Purchaser, (ii) assuming that all consents, approvals and authorizations contemplated by <u>clauses (i)</u> and (ii) of <u>subsection (b)</u> of this Section have been obtained, and all filings described in such clauses have been made, conflict with or violate any Law or Order applicable Purchaser or by which Purchaser or any of its respective properties are bound, or (iii) result in any breach or violation of or constitute a default (or an event which with notice or lapse of time or both would become a default) or result in the loss of a benefit under, or give rise to any right of termination, cancellation, amendment or acceleration of, any Contracts to which Purchaser is a party or by which Purchaser or any of its respective properties are bound, except, in the case of <u>clauses (ii)</u> and <u>(iii)</u>, for any such conflict, violation, breach, default, acceleration, loss, right or other occurrence which would not have or reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Transactions or to otherwise timely perform its obligations under this Agreement.

(b)     The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the Transactions do not and will not require any consent, approval, authorization or permit of, action by, filing with or notification to, any Governmental Body, except for (i) the applicable requirements, if any, of the Exchange Act and state securities, takeover and "blue sky" Laws, and, (ii) any such consent, approval, authorization, permit, action, filing or notification the failure of which to make or obtain would not have or reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Transactions or to otherwise timely perform its obligations under this Agreement.

6.4     <u>Financial Capability</u>.  Purchaser has sufficient funds available to it in cash to pay or cause to be paid the Purchase Price and the fees and expenses required to be paid by Purchaser in connection with the Transactions, and to effect the Transactions.  Upon the consummation of the Transactions, (a) Purchaser will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) Purchaser will not be left with unreasonably small capital, (c) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature, and (d) the capital of Purchaser will not be impaired.

6.5     <u>Condition of the Purchased Assets</u>.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in <u>Article V</u> (as modified by the Company Disclosure Letter), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis.  Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Purchased Assets and, in making the determination to proceed with the Transactions, Purchaser has relied on the results of its own independent investigation and the representations and warranties of Seller in <u>Article V</u> and the Ancillary Documents.

NAI-1540950234v21

6.6     Exclusivity of Representations and Warranties.   Purchaser acknowledges that except for the representations and warranties made by Seller in Article V and the Ancillary Documents, neither Seller, any of their respective Affiliates, nor any Representatives of any of the foregoing, make (and neither Purchaser or any other Person has relied upon) any representations or warranties on behalf of Seller.  Purchaser further agrees that neither Seller nor any other Person will have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser in certain "data rooms" or management presentations in expectation of the Transactions.  For the avoidance of doubt, Purchaser acknowledges that none of Seller, any of its Affiliates, nor any Representatives of any of the foregoing, make any express or implied representation or warranty with respect to "Confidential Information" as defined in the Confidentiality Agreement, other than to the extent the representations and warranties made by Seller in this Agreement and the Ancillary Documents expressly speak to matters that constitute "Confidential Information."  Purchaser acknowledges and agrees that it (a) has had an opportunity to discuss the business of Seller with the management of Seller, (b) has had sufficient access to (i) the books and records of Seller and (ii) the electronic data room maintained by Seller for purposes of the Transactions, (c) has been afforded the opportunity to ask questions of and receive answers from officers and other key employees of Seller and (d) has conducted its own independent investigation of Seller, its respective businesses and the Transactions, and has not relied on any representation, warranty or other statement by any Person on behalf of Seller, other than the representations and warranties of Seller expressly contained in Article V and the Ancillary Documents, and that all other representations and warranties are specifically disclaimed. In connection with any investigation by Purchaser of Seller, Purchaser has received or may receive from Seller or its other Representatives on behalf of Seller certain projections, forward-looking statements and other forecasts and certain business plan information in written or verbal communications.  Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Purchaser is familiar with such uncertainties, that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to Purchaser (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that Purchaser will have no claim against Seller or any other Person with respect thereto.  Accordingly, Purchaser acknowledges that neither Seller nor any other Person on behalf of the Seller make (and neither Purchaser or any other Person has relied upon) any representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

## VII.    BANKRUPTCY COURT MATTERS

7.1     Submission for Bankruptcy Court Approval.  As promptly as practicable following execution of this Agreement, Seller shall file with the Bankruptcy Court a supplemental motion seeking  (a) approval of the Bid Protections; and (b) entry of the Sale Order, including the approval of this Agreement and the sale of the Purchased Assets to Purchaser on the terms and conditions hereof if determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order, each of which shall be in form and substance acceptable to Purchaser.

NAI-1540950234v21

7.2     Bankruptcy Process.

(a)     Seller and Purchaser acknowledge and agree that this Agreement, the sale of the Purchased Assets and the Transactions are subject to higher or otherwise better bids (in accordance with the Bidding Procedures Order) and Bankruptcy Court approval (each, a "Competing Bid"), as determined in Seller's sole and exclusive discretion.  Purchaser and Seller acknowledge that Seller must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best offer for the Purchased Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about Seller's business to prospective bidders, entertaining higher or otherwise better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an auction (the "Auction").  Purchaser agrees and acknowledges that Seller and their Affiliates will be permitted, and will be permitted to cause their Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Purchaser and its Affiliates, agents and Representatives).  In addition, the Seller shall have the responsibility and obligation to respond to any inquiries or offers for a Competing Bid and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, including supplying information relating to the Seller or the Purchased Assets to prospective purchasers.

(b)     The bidding procedures to be employed with respect to this Agreement and any Auction will be those reflected in the Bidding Procedures Order.  Purchaser agrees to be bound by and accept the terms and conditions of the Bidding Procedures Order as entered by the Bankruptcy Court to the extent such Order is substantially in a form reasonably acceptable to Purchaser.

(c)     Purchaser will provide adequate evidence and assurance under the Bankruptcy Code of the future performance by Purchaser of each Purchased Contract.  Purchaser will, and will cause its Affiliates to, reasonably promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Purchased Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Representatives available to testify before the Bankruptcy Court.  Subject to the other terms and conditions of this Agreement, Purchaser will, from and after the Closing Date, (i) assume all Liabilities of Seller under the Purchased Contracts, subject to the terms hereof, and (ii) satisfy and perform all of the Liabilities related to each of the Purchased Contracts when the same are due thereunder.

(d)     If either (i) no other Qualified Bid is timely submitted in accordance with the Bidding Procedures Order or (ii) this Agreement and the sale of the Purchased Assets to Purchaser on the terms and conditions hereof are determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order, Purchaser and Seller agree to use commercially reasonable efforts to cause the Bankruptcy Court to enter the Sale Order in substantially in the form attached hereto as Exhibit A or as may be amended, modified, or supplemented in the sole discretion of Purchaser.

NAI-1540950234v21

(e)     Seller covenants and agrees that if the Sale Order is entered, the terms of any plan submitted by Seller to the Bankruptcy Court for confirmation will not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of Purchaser hereunder, or in any way prevent or interfere with the consummation or performance of the Transactions including any transaction that is contemplated by or approved pursuant to the Sale Order.

(f)     If the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement are appealed or petition for certiorari or motion for rehearing or reargument is filed with respect thereto, Seller agrees to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion and Purchaser agrees to cooperate in such efforts and each Party agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal.

(g)     For the avoidance of doubt, nothing in this Agreement will restrict Seller or its Affiliates from selling, disposing of or otherwise transferring any Excluded Assets or from settling, delegating or otherwise transferring any Excluded Liabilities, or from entering into discussions or agreements with respect to the foregoing.

7.3     <u>Approval of Break-Up Fee and Expense Reimbursement</u>.  Seller acknowledges and agrees that Purchaser has expended considerable time and expense in connection with this Agreement and the negotiation hereof and the identification and quantification of assets of Seller. In consideration therefor, Seller shall, in accordance with the terms hereof and the Bidding Procedures Order, file with and seek approval of the Bankruptcy Court to pay Purchaser a break-up fee in an amount equal to (a) $2,100,000 (the "<u>Break-Up Fee</u>") plus (b) the amount of the reasonable, out-of-pocket and documented expenses of Purchaser incurred in connection with the negotiation hereof up to an aggregate amount of $1,400,000 (such expense reimbursement, together with the Break-Up Fee, the "<u>Termination Payment</u>" or the "<u>Bid Protections</u>"), in each case as administrative priority expenses under section 503(b) of the Bankruptcy Code.  Subject to the entry of the Bidding Procedures Order, the Termination Payment shall be paid on the third Business Day following the date of consummation of an Alternative Transaction if no material breach by Purchaser of this Agreement has occurred.  In accordance with <u>Section 7.1</u>, Seller shall file with and seek the entry by the Bankruptcy Court of the Bidding Protections Order approving the payment of the Termination Payment, pursuant to, and subject to the limitations set forth in, this Agreement.  This provision shall survive the termination of this Agreement.

7.4     <u>Back-Up Bidder</u>.  Seller and Purchaser agree that, in the event that Purchaser is not the winning bidder at the Auction, Purchaser shall be under no obligation whatsoever to be (i) the "Back-Up Bidder" or (ii) consummate the Transactions.

### VIII.   COVENANTS

8.1     <u>Access to Information</u>.   From the Effective Date through the Closing Date, Purchaser will be entitled, through its Representatives, to make such investigation of the Purchased Assets and the Assumed Liabilities as it reasonably requests for purposes of furthering the consummation of the Transactions; except that, without Seller's prior written consent (which consent may be withheld at Seller's sole discretion), (a) Purchaser and its Representatives will not

have the right to perform any investigative procedures that involve physical disturbance or damage to the properties of Seller or its Affiliates, and (b) any such investigation will not include any sampling of environmental media, including soil, land, soil gas, surface water, groundwater, stream sediments, indoor air, ambient air or building materials.  Any such investigation and examination will be conducted upon reasonable advance notice and under reasonable circumstances, will occur only during normal business hours and will be subject to restrictions under applicable Law.  Seller will direct its respective Representatives to cooperate with Purchaser and Purchaser's Representatives in connection with such investigation and examination, and Purchaser and its Representatives will cooperate with Seller and its Representatives. Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would require Seller to disclose information that would cause material competitive harm to Seller or would violate attorney-client privilege or other confidentiality obligations of Seller; provided, however, if such investigation or examination is denied, Seller shall promptly notify Purchaser, shall describe in writing the reasons for such denial and shall cooperate with Purchaser to implement any commercially reasonable procedures requested by Purchaser to provide access or disclosure without resulting in the violations set forth in the foregoing clause.  No investigation by Purchaser will affect or be deemed to modify any of the representations, warranties, covenants or agreements of Seller contained in this Agreement.

8.2    Actions Pending the Closing.  Except (a) as required by applicable Law or by Order of the Bankruptcy Court, (b) as otherwise expressly contemplated by this Agreement, or (c) with the prior written consent of Purchaser, during the period from the Effective Date to and through the Closing Date, Seller will (taking into account the commencement of the Bankruptcy Cases, the anticipated liquidation and shut-down of operations of Seller other than the Purchased Assets and other Changes, fact an circumstances that customarily result from the events leading up to and following the commencement of bankruptcy proceedings, and Seller's commercially reasonable responses to and actions in light of Changes related to the COVID-19 pandemic) and will:

(i)    maintain (and not sell, lease, sublet, transfer, abandon, license, sublicense, or assign) the Purchased Assets in their current condition, ordinary wear and tear excepted (and excluding sales of Inventory in the Ordinary Course of Business or other pursuant to an Order of the Bankruptcy Court);

(ii)    not materially amend, modify, terminate, let lapse (other than the expiration of a Contract pursuant to its terms) or waive any rights under, or create any Lien with respect to, any of the Purchased Contracts;

(iii)    use commercially reasonable efforts to defend and protect the Purchased Assets from deterioration;

(iv)    (iv) comply in all material respects with applicable Laws with respect to the Purchased Assets and maintain and comply with any material Company Permits;

(v)    not sell bulk wine that constitutes Wine Inventory to any third party (which shall not prohibit the bottling of bulk wine and the sale of such finished or cased goods);

NAI-1540950234v21

(vi)    move any Purchased Assets from their location as of the date hereof (other than sales of Inventory in the Ordinary Course of Business);

(vii)    sell any Inventory other than in the Ordinary Course of Business; or

(viii)    not enter into any agreement or commitment to take any action prohibited by this Section 8.2.

8.3    Consents.  Seller and Purchaser will use their commercially reasonable efforts to obtain at the earliest practicable date all consents and approvals contemplated by this Agreement, including the consents and approvals referred to in Section 5.3 and the Necessary Consents; provided, however, that none of Seller or Purchaser (other than with respect to Assumed Cure Costs) will be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any Actions to obtain any such consent or approval.  For the avoidance of doubt, the Parties acknowledge and agree that obtaining any such authorizations, consents and approvals, giving such notices and making such filings will not be a condition to Closing.

8.4    Reasonable Best Efforts; Consents to Assignment.

(a)    Upon the terms and subject to the conditions of this Agreement, and without limiting the generality of Section 7.1(a), each of the Parties will, and will cause their respective Affiliates to, use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the Transactions as promptly as practicable, including the prompt preparation and filing of all forms, registrations and notices required to be filed to consummate the Transactions and the taking of such commercially reasonable actions as are necessary to obtain any requisite approvals, consents, Orders, exemptions or waivers by any Governmental Body or any other Person. Seller will provide ordinary and customary assistance to Purchaser to enable Purchaser to acquire one or more owner policies of title insurance covering the Real Property.

(b)    Each Party will promptly inform the others of any communication from any Governmental Body (other than the Bankruptcy Court or the Office of the United States Trustee) regarding any of the Transactions and promptly provide the others with copies of all related correspondence or filings.

8.5    Publicity.  With the exception of press releases issued by Seller and Purchaser on the Effective Date and the Closing Date in forms mutually agreeable to Seller and Purchaser, Purchaser and Seller will not issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Parties, which approval may not be unreasonably withheld, conditioned or delayed, except that such consent will not be required if disclosure is otherwise required by applicable Law or by the Bankruptcy Court; provided, however, that Purchaser or Seller, as applicable, will use its or their commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Parties with respect to the text of any such required disclosure.

39

8.6     <u>Confidentiality</u>.  Purchaser acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under <u>Section 8.1</u>, and is subject to the terms of that certain Mutual Confidentiality Agreement, dated August 5, 2024 between Seller and Birch Run Capital Advisors, LP (the "<u>Confidentiality Agreement</u>"), the terms of which are incorporated herein by reference. Purchaser acknowledges and understands that this Agreement and related documents may be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders or contract counterparties and that, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.

8.7     <u>Transition Services Agreement</u>.  Prior to entry by the Bankruptcy Court of the Bid Protections Order, Seller and Purchaser will negotiate mutually acceptable terms of a transition services agreement (a "<u>TSA</u>") pursuant to the terms set forth in <u>Section 2.8</u>, for a period of no longer than six months following the Closing Date.

8.8     <u>Transfer of Intellectual Property</u>.  If at any time after the Closing Date, Seller or Purchaser, or any of their respective Affiliates, discovers that any Purchased Intellectual Property has not been transferred by Seller as contemplated herein, Seller will promptly transfer or cause to be transferred, such Purchased Intellectual Property to Purchaser or its designee in accordance with the terms of this Agreement (including by executing and delivering to Purchaser or its designee, or causing to be executed and delivered, any instruments and documents necessary to effect such transfer of such Purchased Intellectual Property, it being understood that no such documents will require Seller or any of its Affiliates to make any additional representations, warranties or covenants, express or implied, not contained in this Agreement or to otherwise assume any additional obligations or liability which are not contemplated by the terms of this Agreement); provided, that (a) the costs of such transfers shall be at Purchaser's sole expense but (b) Purchaser shall not be required to pay Seller any additional compensation for such Purchased Intellectual Property. Prior to any such transfer, Seller will hold such Purchased Intellectual Property in trust for Purchaser and pay over to Purchaser promptly any amounts or benefits received with respect to such Purchased Intellectual Property following the Closing Date.

8.9     <u>Use of Name</u>.  Seller hereby agrees that upon the consummation of the transactions contemplated hereby, Purchaser shall have the sole right to the use of the names "Girard", "Clos Pegase", "Kunde", "Viansa", "B.R. Cohn" and any trademark listed on <u>Schedule 5.11</u> of the Company Disclosure Letter or any trademarks containing or comprising the foregoing, including any name or mark confusingly similar thereto that is owned, controlled or used exclusively in connection with the Business by Seller or its Affiliates (collectively, the "<u>Seller Marks</u>"), and Seller shall not, and shall not permit any of its Affiliates to, use such names or any variation or simulation thereof. In furtherance thereof, as promptly as practicable but in no event later than ninety days following the Closing Date, Seller shall, and shall cause its Affiliates to, remove, strike over or otherwise obliterate all Seller Marks from all materials owned by, or in the possession or control of, Seller or its Affiliates as of such time which such material are used or displayed publicly including, without limitation, any sales and marketing materials, websites, displays, signs, promotional materials and other materials. However, nothing in this <u>Section 8.9</u> shall require Seller the change the name of Girard Winery LLC prior to its liquidation.

8.10    <u>Bulk Transfer Laws</u>.  Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens, claims, and interests, including any Liens, claims, and interests arising out of any bulk transfer or similar Laws, and the Parties shall use their respective reasonable best efforts to so provide in the Sale Order.

8.11    <u>Inventory</u>. The Parties acknowledge and agree that Purchaser will be responsible for acquiring possession of the Inventory and that Purchaser will use its reasonable best efforts to acquire such possession of the Inventory as soon as reasonably practicable after the Closing and in no event later than four weeks after the Closing Date.  Purchaser will be responsible for all fees and expenses incurred in connection with acquiring and maintaining possession of the Inventory, including labor, transportation and storage after acquisition.  Seller and its Affiliates will, or will cause the applicable purchaser of the applicable location (each, an "<u>Other Purchaser</u>"), if applicable, to, maintain storage of the Inventory for a period of up to four weeks after the Closing Date at no cost to Purchaser and shall reasonably cooperate with Purchaser or its Representatives in acquiring possession of the Inventory.  After such four-week period, Purchaser will pay Seller or the applicable Other Purchaser a storage fee equal to market rates (as determined by Seller in its sole discretion) (provided, that, neither Seller nor any Other Purchaser will have any obligation to maintain storage of such Inventory after the date that is four weeks following the Closing Date).  Purchaser agrees to indemnify and hold harmless Seller or the applicable Other Purchaser, as applicable, and their respective Affiliates and Representatives for any losses suffered by them to the extent arising out of damage to the real property or other assets of Seller or the applicable Other Purchaser, as applicable, as a direct result of the storing of, or the removal of, the Inventory following the Closing in accordance with this <u>Section 8.11 and, absent willful misconduct, gross negligence or bad faith of Seller or the applicable Other Purchaser, any risk of damage or loss to such Inventory following the Closing will be for the account of Purchaser</u>.  Each applicable Other Purchaser and each of its applicable Affiliates and Representatives, and each of Seller's applicable Affiliates and Representatives, is an express third-party beneficiary for purposes of this <u>Section 8.11</u>.

8.12    <u>Excluded Inventory</u>.  To the extent reasonably necessary in order to allow Seller and the purchasers of Excluded Inventory (each, an "<u>Excluded Inventory Purchaser</u>" and collectively, the "<u>Access Persons</u>") to remove Excluded Inventory from the Real Property, Purchaser will provide such Access Persons with access, upon reasonable notice and in a manner that does not unreasonably disrupt the business of Purchaser, to the Real Property for such purpose. All removal costs will be at the sole cost and expense of the applicable Excluded Inventory Purchaser or Seller, as applicable.  Any such removal will be conducted in compliance with applicable Laws and in a manner so as to cause minimal disruption to Purchaser's operations and not cause any damage to the Real Property or other assets of Purchaser. Seller agrees to, or to cause the applicable Excluded Inventory Purchaser to, indemnify and hold harmless Purchaser and its Affiliates and Representatives for any losses suffered by them to the extent arising out of damage to the Real Property or the other Purchased Assets as a direct result of the storing of, or the removal of, the Excluded Inventory following the Closing in accordance with this <u>Section 8.12</u>. Each applicable Excluded Inventory Purchaser and each of its applicable Affiliates and Representatives, and each of Seller's applicable Affiliates and Representatives, is an express third-party beneficiary for purposes of this <u>Section 8.12</u>. The access contemplated by this <u>Section 8.12</u> will be available to each Excluded Inventory Purchaser for a period of eight weeks following the closing of such Excluded Inventory Purchaser's acquisition; <u>provided</u>, that after such eight-week period, Seller

will pay, or will cause such Excluded Inventory Purchaser to pay, as applicable, to Purchaser a storage fee equal to market rates (as determined by Seller in its reasonable discretion); provided, further, that, Purchaser will not have any obligation to maintain storage of such Excluded Inventory for (a) any Excluded Inventory Purchaser after the date that is eight weeks after the applicable acquisition closing date, and (b) Seller after the date that is eight weeks after the Closing.

8.13    Privacy Policy. Prior to the Closing, the Seller shall, for each website that relates exclusively to the Business, use commercially reasonable efforts to update the privacy policy posted to such website to include language constituting notice that Seller may transfer Personal Information to a buyer or other successor in the event of a corporate transaction such as a merger, divestiture, restructuring, reorganization, dissolution, bankruptcy or other sale or transfer of Seller's assets or liabilities, in compliance with applicable Privacy Requirements.

## IX.    CONDITIONS TO CLOSING

9.1    Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the Transactions is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    each of the representations and warranties of Seller contained in this Agreement (disregarding all "materiality" or "Material Adverse Effect" qualification set forth therein) shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date (other than any such representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such specific date), except where the failure of the representations and warranties to be true and correct, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect, and Purchaser shall have received a certificate signed by an authorized officer of Seller on behalf of Seller, dated as of the Closing Date, to the foregoing effect;

(b)    Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to or on the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller on behalf of Seller, dated as of the Closing Date, to the forgoing effect;

(c)    there shall not have been or occurred any Change that has had a Material Adverse Effect on the Purchased Assets since the date of this Agreement;

(d)    the Sale Order shall include a finding that Purchaser is a "good faith purchaser" pursuant to Section 363(m) of the Bankruptcy Code;

(e)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2; and

(f)    the Bankruptcy Court shall have entered the Sale Order in form and substance acceptable to Purchaser, and such Sale Order shall not be subject to a stay or have been vacated or revoked.

NAI-1540950234v21

9.2     <u>Conditions Precedent to Obligations of Seller</u>.   The obligations of Seller to consummate the Transactions are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)     each of the representations and warranties of Purchaser contained in this Agreement (disregarding all "materiality" or "material adverse effect" qualifications set forth therein) shall be true and correct as of the Closing, as if made on the Closing Date (except for any such representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such specific date), except where the failure of the representations and warranties to be true and correct, individually or in the aggregate, has not had and would not reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Transactions or to otherwise timely perform its obligations under this Agreement, and Seller shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by Purchaser prior to or on the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect; and

(c)     Purchaser shall have delivered to Seller all of the items set forth in <u>Section 4.3</u>.

9.3     <u>Conditions Precedent to Obligations of Purchaser and Seller</u>.   The respective obligations of Purchaser and Seller to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Seller and Purchaser, jointly, in whole or in part to the extent permitted by applicable Law):

(a)     the Bankruptcy Court shall have entered an Order approving the payment of the Termination Payment (the "Bid Protections Order"), each in form and substance satisfactory to the Purchaser, and the Bidding Procedures Order and the Bid Protections Order shall not be subject to a stay or have been vacated or revoked;

(b)     there shall not be in effect any Order by a Governmental Body restraining, enjoining or otherwise prohibiting the consummation of the Transactions; and

(c)     the Bankruptcy Court shall have entered the Sale Order, in form and substance acceptable to Purchaser, and the Sale Order shall not be subject to a stay or have been vacated or revoked.

9.4     <u>Frustration of Closing Conditions</u>.   No Party may rely on the failure of any condition set forth in <u>Sections 9.1</u>, <u>9.2</u> or <u>9.3</u>, as the case may be, if such failure was caused by such Party's breach of any provision of this Agreement.

## X.   TAXES

10.1   <u>Transfer Taxes</u>.  All documentary, stamp, transfer, motor vehicle registration, sales, use, value added, excise and other similar non-income Taxes and all filing and recording fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the Transactions (collectively, "<u>Transfer Taxes</u>") will be borne by Purchaser, regardless of the Party on whom Liability is imposed under the provisions of the Laws relating to such Transfer Taxes.  Seller and Purchaser will consult and cooperate in timely preparing and making all filings, Tax Returns, reports and forms as may be required to comply with the provisions of the Laws relating to such Transfer Taxes and will cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for or exemptions from such Transfer Taxes, including preparing exemption certificates and other instruments as are applicable to claim available exemptions from the payment of Transfer Taxes under applicable Law and executing and delivering such affidavits and forms as are reasonably requested by the other Party.

10.2   <u>Purchase Price Allocation</u>.

(a)   As promptly as practicable after the Closing Date, but no later than 60 days thereafter, Purchaser will prepare and deliver to Seller, an allocation schedule setting forth the amounts to be allocated among the Purchased Assets of Seller, pursuant to (and to the extent necessary to comply with) Section 1060 of the Code and the applicable regulations promulgated thereunder (or, if applicable, any similar provision under state, local or foreign Law or regulation) (the "<u>Proposed Allocation Statement</u>").  Seller will have 20 Business Days following delivery of the Proposed Allocation Statement during which to notify Purchaser in writing (an "<u>Allocation Notice of Objection</u>") of any objections to the Proposed Allocation Statement, setting forth in reasonable detail the basis of their objections.  If Seller fails to deliver an Allocation Notice of Objection in accordance with this <u>Section 10.2(a)</u>, the Proposed Allocation Statement will be conclusive and binding on all Parties and will become the "<u>Final Allocation Statement</u>."  If Seller submits an Allocation Notice of Objection, then for 10 Business Days after the date Purchaser receives the Allocation Notice of Objection, Purchaser and Seller will use their commercially reasonable efforts to agree on the allocations.  Failing such agreement within ten (10) Business Days of such notice, the unresolved allocations will be submitted to an independent, internationally-recognized accounting firm mutually agreeable to Purchaser and Seller, which firm will be instructed to determine its best estimate of the allocation schedule based on its determination of the unresolved allocations and provide a written description of the basis for its determination within 45 Business Days after submission, such written determination to be final, binding and conclusive.  The fees and expenses of such accounting firm will be apportioned among Seller and Purchaser equally.  For the avoidance of doubt, in administering any Action, the Bankruptcy Court will not be required to apply the Final Allocation Statement in determining the manner in which the Purchase Price should be allocated as between Seller and its estate.

(b)   Seller and Purchaser and their respective Affiliates will report, act, and file Tax Returns (including, but not limited to IRS Form 8594) in all respects and for all purposes consistent with the Final Allocation Statement (and, as applicable, the allocations as finally determined by the accounting firm pursuant to <u>Section 10.2(a))</u>, and will not take any position (whether in audits, Tax Returns, or otherwise) that is inconsistent therewith, in each case, except

44

to the extent otherwise required by a "determination" within the meaning of Section 1313 of the Code or a good-faith settlement with a Governmental Body with respect to Taxes.

10.3    <u>Cooperation and Audits</u>.  Purchaser and Seller will cooperate fully with each other regarding Tax matters to the extent commercially reasonable and will make available to the other as reasonably requested all information, records and documents relating to Taxes in relation to the Purchased Assets until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes.

10.4    <u>Prorations and other Costs</u>.

(a)    Purchaser shall pay the premium for an owner's Title Policy, if any, and 100% of all escrow fees, costs and expenses.

(b)    Title Company shall prorate (on the basis of a 365-day year) real and personal property Taxes and other similar and appropriate on-going expenses related to the Purchased Assets, as of the Closing Date, and such prorations shall be set forth on a Closing Statement and agreed to prior to the Closing.  Seller shall be liable for the proportionate amount of such taxes and expenses attributable to the period through and including the Closing Date, and Purchaser shall be liable for the proportionate amount of such Taxes and expenses attributable to the period after the Closing Date.

(c)    Any monthly or recurring expenses that accrue with respect to the Purchased Assets, including utility expenses, shall be prorated between Purchaser and Seller as of the Closing Date on the basis of a 365-day year and shall be treated as an adjustment to the Purchase Price (Seller's portion thereof, together with Seller's portion of the taxes and expenses calculated in accordance with <u>Section 10.4(b)</u>, the "<u>Proration Amount</u>").  Electricity, water, sewer, gas, electric, telephone and other utility charges shall be prorated to the Closing Date and, if prepaid by Seller, shall be paid by Purchaser to the extent of Purchaser's pro-rated amount, or if payable subsequent to the Closing Date, shall be charged to Seller to the extent of Seller's pro-rated amount.

(d)    The Title Company will use the funds disbursed to it pursuant to <u>Section 3.2(a)</u> to satisfy Seller's obligations under this <u>Section 10.4</u>.

## XI.    GENERAL GOVERNING PROVISIONS

11.1    <u>No Survival of Representations and Warranties</u>.  Except in the case of Fraud, the Parties agree that the representations and warranties contained in this Agreement, and the covenants contained in this Agreement to be performed prior to the Closing, will not survive the Closing hereunder, and none of the Parties will have any Liability to each other after the Closing for any breach thereof.  The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing will survive the Closing until fully performed in accordance with the terms of this Agreement, and each Party will be liable to the other after the Closing for any breach thereof.

11.2    <u>Expenses</u>.  Except as otherwise expressly provided in this Agreement, whether or not the Transactions are consummated, each of Seller, on the one hand, and Purchaser, on the other

hand, will bear its own expenses incurred in connection with the negotiation and execution of this Agreement and the Ancillary Documents and the consummation of the Transactions and all Actions incident thereto.

11.3    <u>Injunctive Relief</u>.

(a)    The Parties agree that irreparable damages would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce specifically the terms and provisions of this Agreement, including without limitation specific performance of such covenants, promises or agreements or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this <u>Section 11.3</u> will be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(b)    The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Purchaser or Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of Purchaser or Seller, as applicable, under this Agreement all in accordance with the terms of this <u>Section 11.3</u>.

11.4    <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(a)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Actions related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in <u>Section 11.8</u>; <u>provided, however</u>, that if the Bankruptcy Cases have been closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action in the United States District Court for the District of Delaware) and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the Parties hereby consents to process being served by any other Party in any Action by delivery of a copy thereof in accordance with the provisions of <u>Section 11.8</u>;

provided, however, that such service will not be effective until the actual receipt thereof by the Party being served.

11.5     Waiver of Right to Trial by Jury.  Each Party to this Agreement waives any right to trial by jury in any Action (whether in contract, tort or otherwise) arising out of, regarding, or relating to this Agreement, any provision hereof or the actions of any Party or such Party's Representatives in the negotiation and performance hereof.

11.6     Entire Agreement; Amendments and Waivers.  This Agreement represents the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, will be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

11.7     Governing Law.  This Agreement will be governed by and construed in accordance with federal bankruptcy Law and other federal law, where required; provided that except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement will be governed by, and construed in accordance with, the Laws of the State of Delaware applicable to contracts made and performed in such State without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

11.8     Notices.  All notices and other communications under this Agreement will be in writing and will be deemed given (a) when delivered personally by hand, (b) when sent by email (with written confirmation of transmission), or (c) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and email addresses (or to such other address or email address as a Party may have specified by notice given to the other Party pursuant to this provision):

If to Seller, to:

Vintage Wine Estates, Inc.
205 Concourse Blvd.
Santa Rosa, California 95403
Attention: Amir Sadr
Email: asadr@vintagewineestates.com

Attention: Kristina Johnston
Email: kjohnston@vintagewineestates.com

With copies (which will not constitute notice) to:

Jones Day
901 Lakeside Avenue
Cleveland, Ohio 44114
Attention: Heather Lennox
Email: hlennox@jonesday.com
Attention: George Hunter
Email: ghunter@jonesday.com

If to Purchaser or Purchaser Guarantor, to:

Adair Winery, Inc.
4722 Shadywood Lane
Dallas, TX 75209
Attention: Jay Adair
Email: Jay.Adair@Copart.Com

With copies (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Ave
New York, NY 10153
Attention:
Ray Schrock
Gabriel Morgan
Richard Frye

Email:
ray.schrock@weil.com
gabriel.morgan@weil.com
richard.frye@weil.com

11.9    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, such term or provision is hereby modified so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

48

11.10   Assignment.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any Person not a party to this Agreement  (other than as set forth in Sections 8.11 and 8.12 and  provided that any Person that is not a Party will be a third-party beneficiary for purposes of Section 11.11).  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of Law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents will be void; provided, however, that (a) Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more Affiliates and (b) Seller may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities (including any liquidating trust) pursuant to a Chapter 11 plan confirmed by the Bankruptcy Court, in the case of each clause (a) and (b) without any other Party's consent.  No assignment of any obligations hereunder will relieve the Parties of any such obligations.  Upon any such permitted assignment, the references in this Agreement to Seller or Purchaser will also apply to any such assignee unless the context otherwise requires.

11.11   Non-Recourse.  No past, present or future director, officer, employee, incorporator, member, partner, equityholder, manager, agent, attorney, Representative or Affiliate of the Parties or any of their Affiliates or any other Person (other than the Parties and any express party to any Ancillary Document) will have any Liability for any obligations or Liabilities of Seller or Purchaser, as applicable, or rights of recovery or recourse under this Agreement or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the Transactions contemplated hereby and by any Ancillary Document.  Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as Parties or thereto, and then only with respect to the specific obligations set forth herein or therein.  Other than the Parties, no other Person will have any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or Liabilities of any Party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any Action based on, in respect of, or by reason of, Transactions (including the breach, termination or failure to consummate such Transactions), in each case whether based on contract, tort, fraud, strict liability, other Laws or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a Party or another Person or otherwise.  In no event will any Person be liable to another Person for any remote, speculative or punitive damages with respect to the Transactions.

11.12   Damage or Destruction.  In the event that any material portion of any Real Property is damaged or destroyed prior to Closing Date and such damage or destruction shall cost in excess of $500,000 to repair or replace, then, with respect to such Real Property, Purchaser has the right, exercisable by giving written notice to Seller within 10 Business Days after receiving written notice of such damage or destruction (but in any event no later than one Business Day prior to the Closing), either to (a) proceed to close notwithstanding the damage or destruction of such Real Property, (b) terminate this Agreement pursuant to Section 4.4(c)(v) or (c) exclude such Real Property, in which event Purchaser shall not have any obligation to close if as a consequence of the exclusion of such Real Property any condition to Closing in Article IX would not be satisfied. If Purchaser closes notwithstanding an unrepaired or unrestored loss to any Real Property, Seller will deliver or assign to Purchaser any insurance proceeds with respect to such damage or destruction, and all claims against third parties relating thereto, and the adjustment to the Purchase

Price shall be limited to the amount of any deductible or self-insured retention under the applicable policies of insurance.

11.13    Purchaser's Designee.   Prior to the Closing, Purchaser shall have the right to designate, in writing, one or more Affiliates of Purchaser (each, a "Designee") to receive and assume, on behalf of Purchaser, any or all of the Purchased Assets or Assumed Liabilities delivered by Seller at the Closing pursuant to Article II, and Seller shall, upon receipt of such a designation by Purchaser, cooperate with Purchaser in assigning and delivering such Purchased Assets or Assumed Liabilities to the Designee at the Closing provided that the foregoing will not relieve Purchaser of its obligations pursuant to this Agreement.

11.14    Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

11.15    Restrictive Covenants.  Upon and after the Closing Date until the earlier of (i) the effective date of a plan of reorganization with respect to the Bankruptcy Cases, (ii) the dismissal of the Bankruptcy Cases, and (iii) six months after the Closing Date, Seller shall not, and shall cause its Affiliates not to:

(a)    conduct business under, or otherwise use, directly or indirectly, any name that consists of any word included in the name of any brand constituting a Purchased Asset or any synonyms therefor, or any word or words in combination therewith;

(b)    refer to themselves as the makers, creators, founders or originators of any of brand constituting a Purchased Asset in any commercial context;

(c)    cause, induce or encourage any material client, customer, supplier, or licensor of Purchaser with respect to the Business (including any existing or former customer of Seller and any Person that becomes a client or customer of Purchaser with respect to the Business after the Closing) or any other Person who has a material business relationship with Seller or Purchaser with respect to the Business, to terminate or modify any such actual or prospective relationship; or

(d)    make, or cause to be made, any statement (whether oral or written) that disparages the reputation or business of the Purchaser or any of its Affiliates; provided, however, that nothing in this Section 11.15(d) shall restrict any Person enforcing its rights hereunder or from testifying truthfully in any Action.

11.16    Guaranty.  Purchaser Guarantor hereby unconditionally and irrevocably guarantees to the Seller, until the earlier of (x) the valid termination of this Agreement in accordance with its terms and (y) the occurrence of the Closing and the complete consummation of the transactions contemplated hereby to occur at or substantially contemporaneously with the Closing (including the assumption of the Assumed Liabilities and the payment of the Closing Payment), the due and punctual payment and performance by Purchaser of Purchaser's obligations and liabilities under this Agreement, including the payment of the Closing Payment (the "Guaranteed Obligations"). The foregoing sentence is an absolute, unconditional and irrevocable guaranty of the full and punctual discharge and performance of the Guaranteed Obligations. Should Purchaser default in

50

the discharge or performance of all or any portion of the Guaranteed Obligations, the obligations of Purchaser Guarantor hereunder shall, upon Seller's demand, become immediately due and, if applicable, payable; provided, that notwithstanding anything to the contrary in this Agreement, Purchaser Guarantor shall retain all defenses under this Agreement available to Purchaser. Purchaser Guarantor represents and warrants to the Seller as follows: (a) this Agreement constitutes a valid and binding obligation of Purchaser Guarantor, and is enforceable against Purchaser Guarantor in accordance with its terms, subject to equitable principles of general applicability (whether considered in a proceeding at law or in equity); (b) none of the execution, delivery or performance by Purchaser Guarantor of this Agreement will result in a violation of any Laws to which Purchaser Guarantor is subject or bound, and there is no action, suit, proceeding pending or, to its knowledge, threatened against it or affecting it with respect to any of the transactions contemplated by this Section 11.16; (c) it will have at the Closing sufficient funds immediately available to pay and perform all of its obligations under this Section 11.16; and (d) it makes the representation set forth in Section 6.6 (replacing references to "Purchaser" with references to "Purchaser Guarantor").

*[Signature page follows]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the Effective Date.

PURCHASER:

ADAIR WINERY, INC.

By: _Jay Adair_
D9A32850A2A2402...
Name: Jay Adair
Title: Chairman of the Board

Solely for purposes of Article XI,

PURCHASER GUARANTOR:

_Jay Adair_
D9A32850A2A2402...
Jay Adair

SELLER:

VINTAGE WINE ESTATES, INC.

By: _Kristina Johnston_____

Name:  Kristina Johnston
Title:  Authorized Person

[Signature Page to Asset Purchase Agreement]

**AMENDMENT NO. 1 TO ASSET PURCHASE AGREEMENT**

This Amendment No. 1 to Asset Purchase Agreement (this "Amendment"), dated as of September 23, 2024, is made by and among Adair Winery, Inc., a Texas corporation ("Purchaser"), Vintage Wine Estates, Inc., a Nevada corporation ("Seller") and Jay Adair (the "Purchaser Guarantor").  Reference is made to that certain Asset Purchase Agreement, dated as of September 17, 2024 (the "Purchase Agreement"), by and among Purchaser, Seller, and the Purchaser Guarantor.  Capitalized terms used in this Amendment, but not otherwise defined herein, shall have the meanings ascribed to such terms in the Purchase Agreement.

WHEREAS, in accordance with Section 11.6 of the Purchase Agreement, the parties hereto wish to amend the Purchase Agreement as specified herein.

NOW, THEREFORE, the parties hereto agree as follows:

1. Amendment to Section 3.2(a).  Section 3.2(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Purchaser has deposited a sum of $8,500,000 (the "Deposit Amount") into an escrow account maintained by Epiq Corporate Restructuring, LLC ("Escrow Agent"), pursuant to the escrow agreement, dated August 13, 2024 between Seller and the Escrow Agent, as modified by the addendum (and any amendment thereto) executed by Purchaser (the "Escrow Agreement"),which will be held in such escrow account and will be either delivered to Purchaser or paid to Seller as follows: (a) if the Closing occurs, (i) $4,000,000 of the Deposit Amount less the Proration Amount will be released to Seller, (ii) the Proration Amount will be released to the Title Company for use in accordance with Section 10.4, and (iii) the remaining $4,500,000 will be held by Escrow Agent as security for Seller's obligation to reimburse Purchaser for any Post-Closing Inventory Adjustment set forth in Section 3.4 below (such remaining amount, the "Escrow Holdback Amount"), (b) if this Agreement is terminated by Seller pursuant to Section 4.4(d), then the Deposit Amount will promptly be released to Seller (and such Deposit Amount will be deemed fully earned by Seller as compensation and consideration for entering into this Agreement), or (c) if this Agreement is terminated for any reason other than by Seller pursuant to Section 4.4(d), then the Deposit Amount will promptly be released to Purchaser. For the avoidance of doubt, any claim asserted by Purchaser under this Section 3.2(a) will be entitled to administrative expense priority under section 503(b) of the Bankruptcy Code."

2. Effectiveness.  All of the provisions of this Amendment shall be effective as of the date first set forth above.  Except as specifically provided for in this Amendment, all of the terms of the Purchase Agreement shall remain unchanged and are hereby confirmed and remain in full force and effect, and, to the extent applicable, such terms shall apply to this Amendment as if it formed part of the Purchase Agreement.

3. Effect of Amendment.  Whenever the Purchase Agreement is referred to in the Purchase Agreement or in any other agreements, documents or instruments, such reference shall be deemed to be to the Purchase Agreement as amended by this Amendment.

4.    <u>Counterparts</u>.    This Amendment may be executed in two (2) or more counterparts (including by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument.

5.    <u>Governing Law; Incorporation by Reference</u>.    This Amendment will be governed by and construed in accordance with federal bankruptcy Law and other federal law, where required; provided that except to the extent the mandatory provisions of the Bankruptcy Code apply, this Amendment will be governed by, and construed in accordance with, the Laws of the State of Delaware applicable to contracts made and performed in such State without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.    The applicable provisions of Article 11 of the Purchase Agreement are incorporated herein by reference and shall apply *mutatis mutandis* as if fully set forth herein.

[Remainder of Page Intentionally Left Blank]

2

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed as of the date first written above.

**PURCHASER**:

ADAIR WINERY, INC.

By: _Jay Adair_
Name: Jay Adair
Title: Chairman of the Board

**PURCHASER GUARANTOR**:

_Jay Adair_
Jay Adair

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized officers, as of the date first written above.

**SELLER**:

VINTAGE WINE ESTATES, INC.

By: _____
Name: Kristina Johnston
Title: CFO

**Exhibit 2**

**Approvals**

| Corporate Name + Trade Name | Brand Names (associated with Winery and this Transaction) | Property Address of Winery (Incl. County) | CA ABC Winegrower's Type 02 License Number (incl. Expiration Date) | TTB Bonded Winery Registration + Winery Basic Permit Numbers |
|---|---|---|---|---|
| Girard Winery, LLC, dba Girard Winery | Girard | 1077 Dunaweal Ln. Calistoga, CA 94515-9799 (Napa County) | 592431 (30-JUN-2025) | BWN-CA-22715 CA-W-22961 |
| Vintage Wine Estates, Inc. [CA], dba Clos Pegase Winery | Clos Pegase | 1060 Dunaweal Ln. Calistoga, CA 94515-9798 (Napa County) | 537344 (30-JUN-2025) | BW-CA-5343 CA-W-21472 |
| Vintage Wine Estates, Inc. [CA], dba B.R. Cohn Winery | B.R. Cohn | 15000 Hwy. 12[1] Glenn Ellen, CA 95442-9454 (Sonoma County) | 560342[2] (30-JUN-2025) | BW-CA-5359 CA-W-22099 |
| Vintage Wine Estates, Inc. [CA], dba Viansa Winery | Viansa | 25200 Arnold Way Sonoma, CA 95476-9222 (Sonoma County) | 539418 (30-JUN-2025) | BW-CA-5374 CA-W-21502 |
| Vintage Wine Estates, Inc. [CA], dba Kunde Family Winery | Kunde | 9825 Sonoma Hwy[3] Kenwood, CA 95452 (Sonoma County) | 640097 (30-JUN-2025) | BW-CA-202 CA-W-1759 DSP-CA-222 CA-S-20401 |

In addition, all state licenses and permits held by the Seller or its subsidiaries related to the Purchased Assets or operation of the Business.

---

[1] Address recorded as 15000 Sonoma Hwy., Glen Ellen, CA 95442 on CA ABC's License Lookup and TTB.gov FOIL Search pages.

[2] Also holds a Type 81 Wine Sales Event Permit, expiring on same date.

[3] Address recorded as 9825 HWY 12 , Kenwood, CA, 95452 on CA ABC's License Lookup page.

**Exhibit 3**

**Contracts Assumed by Mutual Consent**

| Counterparty | Debtor Party to Contract | Description | Date of Agreement | Cure Amount |
|---|---|---|---|---|
| Bernstein and Bockstanz Wedding | Vintage Wine Estates, Inc. (CA) | Event #182 (Kunde) | 10/12/2023 | $0 |
| Post Wedding Celebration | Vintage Wine Estates, Inc. (CA) | Event #183 (Kunde) | 4/24/2024 | $0 |
| Picnic Tour | Vintage Wine Estates, Inc. (CA) | Event #185 (Kunde) | 2/2/2024 | $0 |