## **Exhibit 1**

## **Asset Purchase Agreement**

**EXECUTION VERSION**

**ASSET PURCHASE AGREEMENT**

by and among

Foley Family Wines, Inc.,
a Delaware corporation

as Purchaser

and

Vintage Wine Estates, Inc., a Nevada corporation

Dated as of August 20, 2024

# TABLE OF CONTENTS

**Page**

I.      DEFINITIONS ................................................................................................... 1
    1.1    Certain Definitions ................................................................... 1
    1.2    Terms Defined Elsewhere in this Agreement ....................... 9
    1.3    Other Definitional and Interpretive Matters. ...................... 10

II.     PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ............... 11
    2.1    Purchase and Sale of Assets ................................................ 11
    2.2    Excluded Assets .................................................................... 12
    2.3    Assumption of Liabilities ..................................................... 13
    2.4    Excluded Liabilities .............................................................. 13
    2.5    Cure Amounts ....................................................................... 13
    2.6    Non-Assignment of Assets. ................................................. 13
    2.7    Further Conveyances and Assumptions ............................... 15
    2.8    Alcoholic Beverage Licenses. .............................................. 15

III.    CONSIDERATION .......................................................................................... 15
    3.1    Consideration ........................................................................ 15
    3.2    Purchase Price Deposit; Escrow Holdback ......................... 16
    3.3    Calculation of Pre-Closing Inventory Adjustment. ............ 16
    3.4    Calculation of Post-Closing Inventory Adjustment. ........... 17

IV.     CLOSING AND TERMINATION ..................................................................... 18
    4.1    Closing Date .......................................................................... 18
    4.2    Deliveries by Seller .............................................................. 18
    4.3    Deliveries by Purchaser ........................................................ 19
    4.4    Termination of Agreement .................................................... 19
    4.5    Procedure Upon Termination ............................................... 20
    4.6    Effect of Termination ........................................................... 20

V.      REPRESENTATIONS AND WARRANTIES OF SELLERS ................................. 21
    5.1    Organization and Good Standing .......................................... 21
    5.2    Authorization of Agreement ................................................. 21
    5.3    Governmental Consents ........................................................ 21
    5.4    Title to Purchased Assets ..................................................... 22
    5.5    SEC Documents .................................................................... 22
    5.6    Litigation ............................................................................... 22
    5.7    Compliance with Laws ......................................................... 22
    5.8    Intellectual Property ............................................................. 22
    5.9    Customers and Mailing Lists ................................................ 23
    5.10   Financial Advisors, Finders, Brokers .................................. 23
    5.11   Real Property. ....................................................................... 23

# TABLE OF CONTENTS
(continued)

**Page**

5.12    Tangible Personal Property..................................................................... 24
5.13    Inventory. ............................................................................................ 24
5.14    Permits and Licenses............................................................................ 25
5.15    Environmental Matters.......................................................................... 25
5.16    No Notice. ............................................................................................ 25
5.17    Distributors and Suppliers..................................................................... 26
5.18    Taxes .................................................................................................... 26
5.19    Data Privacy. ........................................................................................ 26
5.20    No Other Representations or Warranties; Schedules............................. 27

VI.    REPRESENTATIONS AND WARRANTIES OF PURCHASER ................. 27

6.1    Organization and Good Standing .......................................................... 27
6.2    Authorization of Agreement ................................................................. 27
6.3    Consents and Approvals; No Violations................................................ 28
6.4    Financial Capability.............................................................................. 28
6.5    Condition of the Purchased Assets ....................................................... 29
6.6    Exclusivity of Representations and Warranties .................................... 29

VII.    BANKRUPTCY COURT MATTERS ......................................................... 30

7.1    Submission for Bankruptcy Court Approval ......................................... 30
7.2    Bankruptcy Process. ............................................................................. 30
7.3    Approval of Break-Up Fee and Expense Reimbursement...................... 31
7.4    Back-Up Bidder. ................................................................................... 32

VIII.    COVENANTS ............................................................................................ 32

8.1    Access to Information ........................................................................... 32
8.2    Actions Pending the Closing................................................................. 32
8.3    Consents ............................................................................................... 33
8.4    Reasonable Best Efforts; Consents to Assignment................................ 33
8.5    Publicity ............................................................................................... 33
8.6    Confidentiality ..................................................................................... 34
8.7    Access Agreements ............................................................................... 34
8.8    Employee Matters. ................................................................................ 34
8.9    Inventory. ............................................................................................. 35
8.10    Diagram of Premises ............................................................................ 35

IX.    CONDITIONS TO CLOSING ..................................................................... 35

9.1    Conditions Precedent to Obligations of Purchaser ............................... 35
9.2    Conditions Precedent to Obligations of Seller...................................... 36
9.3    Conditions Precedent to Obligations of Purchaser and Seller .............. 36
9.4    Frustration of Closing Conditions......................................................... 37

ii

## TABLE OF CONTENTS
(continued)

Page

X.  TAXES AND PRORATIONS .................................................................................... 37

  10.1  Transfer Taxes ........................................................................................... 37
  10.2  Prorations and other Costs. ....................................................................... 37
  10.3  Purchase Price Allocation. ........................................................................ 38
  10.4  Cooperation and Audits ............................................................................ 38

XI.  GENERAL GOVERNING PROVISIONS ............................................................... 38

  11.1  No Survival of Representations and Warranties ........................................ 38
  11.2  Damage or Destruction; Taking. ............................................................... 39
  11.3  Expenses. .................................................................................................. 40
  11.4  Injunctive Relief. ...................................................................................... 40
  11.5  Submission to Jurisdiction; Consent to Service of Process. ..................... 40
  11.6  Waiver of Right to Trial by Jury ............................................................... 41
  11.7  Entire Agreement; Amendments and Waivers .......................................... 41
  11.8  Governing Law .......................................................................................... 41
  11.9  Notices ...................................................................................................... 41
  11.10  Severability .............................................................................................. 42
  11.11  Assignment .............................................................................................. 42
  11.12  Non-Recourse .......................................................................................... 43
  11.13  Counterparts ............................................................................................ 43
  11.14  Restrictive Covenants. ............................................................................ 43

**Exhibit**

| | |
|---|---|
| Exhibit A | Form of Sale Order |
| Exhibit B | Form of Grant Deed |
| Exhibit C | Form of Bill of Sale |
| Exhibit D | Form of General Assignment |
| Exhibit E | Form of Assignment of IP |
| Exhibit F | Form of Trademark Assignment |
| Exhibit G | Form of FIRPTA |
| Exhibit H | Form of TSA |

**Schedules**

| | |
|---|---|
| Schedule 1.1(a) | Business Employees |
| Schedule 1.1(b) | Seller's Knowledge |
| Schedule 1.1(c) | Real Property |
| Schedule 2.1(b)(ii) | Inventory |
| Schedule 2.1(b)(iv) | Purchased Contracts |
| Schedule 5.3 | Governmental Consents |
| Schedule 5.8 | Intellectual Property |
| Schedule 5.14 | Permits and Licenses |

iii

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of August 20, 2024 (the "Effective Date"), is by and among Foley Family Wines, Inc., a Delaware corporation ("Purchaser"), and Vintage Wine Estates, Inc., a Nevada corporation ("Seller"). Certain capitalized terms used in this Agreement that are not otherwise defined are defined in Article I.

## RECITALS

A.    Seller filed voluntary petitions for relief under Chapter 11 of Title 11 (the "Bankruptcy Cases") of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

B.    Seller engages in the business of (i) operating a tasting room where wine is produced and sold under the name of Sonoma Coast Vineyard ("SCV"), and (ii) selling wine under certain wholly-owned brands, Bar Dog, Cherry Pie, Swanson, Cosentino and SCV, through the three-tier distribution network and directly to consumers (such brands, collectively, the "Brands" and such business, the "Business").

C.    Seller desires to sell, or cause its Affiliates to sell, as applicable, to Purchaser or one or more of its designees the Purchased Assets and assign, or cause its Affiliates to assign, as applicable, to Purchaser or one or more of its designees the Assumed Liabilities and Purchaser desires to purchase, or cause one or more of its designees to purchase, from Seller the Purchased Assets and assume, or cause one or more of its designees to assume, the Assumed Liabilities, in each case, upon the terms and conditions set forth in this Agreement.

D.    On the terms and subject to the conditions set forth herein, Seller intends to request that the Bankruptcy Court authorize and approve the Transactions pursuant to Sections 105, 363 and 365 of the Bankruptcy Code  and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, and the Sale Order, which Sale Order will include the authorization for the assignment by the applicable Seller to, and the assumption by, Purchaser of the Purchased Contracts and the Assumed Liabilities thereunder in accordance with Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree:

## I.    DEFINITIONS

1.1    Certain Definitions.  For purposes of this Agreement, each of the following terms, when used herein with initial capital letters, has the meaning specified in this Section 1.1 or in the other Sections of this Agreement identified in Section 1.2:

"Action" means any claim, counterclaim, action, cause of action, complaint, suit, hearing, charge, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Alternative Transaction" means the consummation of a sale or Chapter 11 plan transaction in respect of any Qualified Bid with respect to any Purchased Assets as defined in the Bidding Procedures Order.

"Bankruptcy Estate" means all property of the Seller's bankruptcy estates as provided by Section 541 of the Bankruptcy Code.

"Bidding Procedures Order" means an Order of the Bankruptcy Court (including any attachment thereto) approving, among other things, the (a) bidding procedures for conducting a sale and auction of the Purchased Assets and (b) procedures relating to the assumption and assignment of executory Contracts and unexpired leases, in form and substance acceptable to the Purchaser with respect to this Agreement, the Purchased Assets, and the Bid Protections.

"Business Day" means any day other than a Saturday, a Sunday or any other day on which commercial banks in New York, New York are authorized or required by Law to close.

"Business Employee" means each employee of a Seller relating to the Business as of immediately prior to the Closing; each such employee is listed on Schedule 1.1(a).

"Change" means any event, change, effect, condition, state of facts or occurrence.

"Code" means the Internal Revenue Code of 1986.

"Contract" means any written contract, agreement, commitment, promise or undertaking (including any indenture, note, bond or other evidence of indebtedness, lease, instrument, license, lease, purchase order or other legally binding agreement).

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions thereof or related or associated epidemics, pandemic or disease outbreaks.

"Cure Costs" means monetary amounts that must be paid and obligations that otherwise must be satisfied under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code as established under the Sale Order in connection with the assumption and/or assignment of any Purchased Contract, as agreed upon by the Parties or determined by the Bankruptcy Court pursuant to the procedures in the Bidding Procedures Order.

2

"<u>Environmental and Safety Laws</u>" shall mean any and all Laws of a Governmental Body, as each may be amended from time to time (including those under common law or otherwise, such as, without limitation, claims for nuisance, waste trespass, and strict liability), that are intended to assure the protection of the environment and natural resources; that classify, regulate the use, storage or disposal of, call for the investigation, mitigation, or remediation of, or require reporting with respect to, or list or define solid waste, hazardous or toxic substances, materials, wastes, pollutants or contaminants or Hazardous Materials;  regulate the manufacture, handling, transport, use, treatment, storage or disposal of Hazardous Materials or materials containing Hazardous Materials; or which are intended to assure the safety and good health of employees, workers or other Persons, including the public with regard to Seller's use, release, storage, transport or disposal of Hazardous Materials, including the Clean Air Act, as amended, 42 U.S.C. Section 7401 et seq.; the Federal Water Pollution Control Act, as amended, 33 U.S.C. Section 1251 et seq.; the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. Section 6901 et seq.; the Comprehensive Environment Response, Compensation and Liability Act of 1980, as amended (including the Superfund Amendments and Reauthorization Act of 1986, "CERCLA"), 42 U.S.C. Section 9601 et seq.; the Toxic Substances Control Act, as amended, 15 U.S.C. Section 2601 et seq.; the Occupational Safety and Health Act, as amended, 29 U.S.C. Section 651, the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. Section 11001 et seq.; the Mine Safety and Health Act of 1977, as amended, 30 U.S.C. Section 801 et seq.; the Safe Drinking Water Act, as amended, 42 U.S.C. Section 300f et seq.; and all comparable state and local laws, laws of other applicable jurisdictions or Orders and regulations (including California's Safe Drinking Water and Toxic Enforcement Act of 1986, ch. 6.6 of Cal.  Health & Safety Code) relating to such matters.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934.

"<u>GAAP</u>" means generally accepted accounting principles in the United States.

"<u>Governmental Body</u>" means any government or governmental or regulatory body thereof, or political subdivision thereof, or any agency, authority, department, commission, board, bureau, official or instrumentality of such body, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator thereof (public or private) of competent jurisdiction.

"<u>Hazardous Materials</u>" shall mean any chemical, compound, material, mixture, toxic or hazardous substance, material or waste or any pollutant or contaminant, or infectious or radioactive substance or material, in each case defined in or regulated under any Environmental and Safety Laws; petroleum and petroleum products including crude oil and any fractions thereof; natural gas, synthetic gas, and any mixtures thereof; radon; asbestos; pesticides, herbicides, fungicides and rodenticides; lead based paint; polychlorinated biphenyls (PCBs); and perfluoroalkyl and polyfluoroalkyl (PFAS) substances.

3

"Improvements" means all improvements existing as of the Effective Date including, without limitation, buildings (including, but not limited to, any tasting room and any outbuilding), storage facilities, roads, parking areas, structures, gates, wells, tanks, fixtures, landscaping, well pumps, water and wastewater disposal systems, filtration systems, electrical panels, transformers, fuel and water tanks, tanks, pipelines, and other improvements and fixtures located, placed, constructed or installed on or affixed to the Real Property.

"Intellectual Property" means all intellectual property, including (a) patents and patent applications, continuations, divisionals, continuations-in-part, reissues and reexaminations, (b) trademarks, service marks, trade dress, logos, corporate names, domain names and trade names, together with the goodwill associated with any of the foregoing, and all applications and registrations therefor, (c) copyrights, copyrightable works, rights in databases, data collections, copyright registrations and copyright applications and corresponding rights in works of authorship, (d) trade secrets, (e) Software in any form, including internet websites, web content and links, source code, object code and mobile applications, and (f) rights of publicity and personality, including, but not limited to:

(i)      the registered and unregistered copyrights, services marks, logos, graphic representations, label designs, product packaging, and other similar indicia or source or origin, works of authorship, whether or not copyrightable, patents and patent applications (to the extent that such exist), proprietary Software, designs, URLs, websites (including all photographs, images, and content thereon), social media identifiers and other social media-related intellectual property, industrial designs, know-how, formulas, models, intellectual property relating to bottle molds, inventions (whether or not patentable), discoveries, improvements, technology, methods, processes, techniques, and other confidential and proprietary information and all rights therein; fictitious business names, and all intellectual property relating to patterns, drawings, direct sales programs, advertising and promotional materials, designs for point of sale materials, all intellectual property relating to Uniform Product Codes (including prefixes); and

(ii)      any registered or unregistered trademarks, trade names, and trade dress used in connection with the Brands, together with the goodwill associated therewith, including but not limited to, the Brands, any and all vineyard designations related to the Brands, all registrations, applications for and renewals and extensions of any of the foregoing (as applicable), all other intellectual or industrial property and proprietary rights, and all of the goodwill associated with the foregoing and the Brands and other Purchased Assets; and

(iii)      intellectual property rights, including trade secrets, in customer lists, email lists, mailing lists, wine club lists and any other information or lists of customers or persons visiting Seller's tasting room or attending events relating to the Brands.

"Inventory" all of the items of Seller and its Affiliates of inventory of the Brands, including but not limited to finished Brand-labeled goods being warehoused on behalf of Seller at bailment warehouses in control states within the United States, blended and unblended bulk wine, case goods and other finished goods including all bottled and bulk wine inventories (including library wines), unlabeled case goods, raw materials (whether expensed or not), work in process, must and grape juice, packaging supplies including corks, capsules, labels, bottles and foils and similar items, and retail sales merchandise and supplies and point of sale materials.

4

"IRS" means the Internal Revenue Service.

"Knowledge of Seller" or "Seller's Knowledge" means the actual knowledge, upon reasonable inquiry, as of the applicable date, of those Persons identified on Schedule 1.1(b).

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule, regulation, Order, stipulation, award or common law requirement.

"Liability" means any debt, loss, liability, claim (including "claim" as defined in the Bankruptcy Code), commitment, undertaking, damage, expense, fine, penalty, cost, royalty, deficiency or obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, disclosed or undisclosed, express or implied, primary or secondary, direct or indirect, matured or unmatured, fixed, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due, and whether in contract, tort or otherwise.

"Lien" as applied to any Person means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, sublease, charge, option, right of first offer or first refusal, right of use or possession, restriction, easement, servitude, restrictive covenant, encroachment or encumbrance or any other similar encumbrance or restriction in respect of an asset of such Person, whether imposed by Law, Contract or otherwise.

"Material Adverse Effect" means any Change that (i) is, or would reasonably be expected to be, materially adverse to the Purchased Assets, taken as a whole, or (ii) is, or would reasonably be expected to be, materially adverse to the ability of Seller to consummate the Transactions contemplated hereby, excluding in each case any such Change arising out of or in connection with or resulting from: (A) any Change in the United States or foreign economies or securities or financial markets in general; (B) adverse developments in economic, business or financial conditions generally affecting the wine industry; (C) hostilities, acts of war or terrorism or military actions or any escalation or worsening of any of the foregoing; (D) the effect of any action taken by Purchaser; (E) Changes in applicable Law; (F) any Change attributable to the execution or announcement of or compliance with this Agreement or the Bankruptcy Cases; (G) any Change arising in connection with pandemics (including COVID-19), earthquakes, hurricanes, tornadoes, fires, acts of God, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such matters, or any response of any Governmental Body to any of the foregoing; (H) any effect resulting from any failure by Seller to meet any internal or published projections, forecasts or revenue or earnings predictions, except in the case of the foregoing clauses (A), (B), (C) and (E) for such Change that materially and disproportionately affect the Purchased Assets, taken as a whole, relative to other participants in the wine industry as a whole.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of, or entered, issued, made or rendered by, a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business related to the Purchased Assets as conducted by Seller and its Affiliates consistent with past practice.

5

"Party" or "Parties" means Purchaser and Seller, as the case may be.

"Permitted Exception" means any Lien (i) for real property taxes and assessment which are not yet due and payable, (ii) for personal property taxes, other taxes and other governmental charges and assessments arising in the Ordinary Course of Business which are not yet due and payable or which are being contested in good faith; (iii) of carriers and warehousemen arising in the Ordinary Course of Business that (A) will not, and could not reasonably be expected to, individually or in the aggregate, materially impair the value or the continued use and operation of the Purchased Assets to which they relate, and (B) are for sums not yet due and payable; (iv) other non-monetary liens or imperfections on property which are not material in amount or do not materially impair or interfere with the use of the property affected by such lien or imperfections; (v) any and all restrictions, covenants, conditions, reservations, easements, rights-of-way and other matters or conditions that are either of record, apparent upon an inspection, or that would be disclosed by an accurate and complete land survey of the Real Property; (vi) any mechanics' or other liens or other matters created by, consent to, Purchaser or approved in writing by Purchaser, or arising out of or in any way connected with Purchaser's possession of the Property; (vii) applicable zoning and governmental regulations and ordinances; and (viii) title exceptions approved by Purchaser during the due diligence period and through the Closing.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personal Information" mean information relating an identified or identifiable person, device, or household including: (i) a natural person's name, street address or specific geolocation information, date of birth, telephone number, email address, online contact information, photograph, biometric data, Social Security number, driver's license number, passport number, tax identification number, any government-issued identification number, financial account number, credit card number, any information that would permit access to a financial account, a user name and password that would permit access to an online account, health information, insurance account information, any persistent identifier such as customer number held in a cookie, an Internet Protocol address, a processor or device serial number, or a unique device identifier; (ii) "personal data," "personal information," "protected health information," "nonpublic personal information," or other similar terms as defined by Privacy Requirements; or (iii) any other information that reasonably allows the identification of a natural person.

"Privacy Requirement" means: (i) all Laws concerning data privacy, breach notification, cybersecurity, or relating to Personal Information; (ii) all of Seller's policies regarding privacy and data security, including: (A) all privacy policies and similar disclosures published on Seller's web sites or otherwise communicated in writing to employees, users of Seller web site, service, or product, and other third parties or otherwise communicated to the public, and all public statements made by Seller about its privacy or data security practices; or (B) any notice to or consent from the provider or subject of Personal Information; (iii) all contractual obligations relating to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security, disposal, destruction, disclosure, or transfer (including the transfer by or on behalf of Seller of Personal Information); and (iv) each applicable rule, codes of

conduct, or other requirement of self-regulatory bodies and applicable industry standards, including, to the extent applicable, the Payment Card Industry Data Security Standard industry guidelines.

"Qualified Bid" has the meaning set forth in the Bidding Procedures Order.

"Real Property" means the real property set forth on Schedule 1.1(c) and shall include all of Seller's right, title, and interest in and to:

(i)     All Improvements existing as of the Effective Date located, placed, constructed or installed on or affixed to the Real Property;

(ii)    All easements, rights of way, privileges, oil, gas, natural gas, other mineral rights, air rights, all transferable licenses, permits, warranties, certifications, approvals, appurtenances, and other rights and benefits of Seller belonging to or in any way related to the Real Property, including without limitation all rights associated with the water supply and wastewater systems, in each case that are transferable or assignable to Purchaser and disclosed to Purchaser by Seller (collectively, "Appurtenances");

(iii)   All land use entitlements, development rights, air rights, permits, licenses, certifications, or other governmental approvals, including without limitation all certificate(s) of occupancy, use permits, use permit applications, building or equipment permits, consents, authorizations, variances, waivers, licenses, permits, certificates and approvals from any governmental or quasi-governmental authority (collectively, "Entitlements") that are transferable or assignable to Purchaser with respect to the Real Property; and

(iv)    All Water Rights.

"Representative" means, with respect to any Person, any and all of its directors, officers, partners, managers, employees, consultants, financial advisors, counsel, accountants and other agents.

"Sale Order" means an Order entered by the Bankruptcy Court, pursuant to Sections 363 and 365 of the Bankruptcy Code, authorizing and approving, among other things, (a) the sale of the Purchased Assets, (b) the assumption of the Assumed Liabilities by Purchaser, and (c) the assumption and assignment of the Purchased Contracts, in accordance with the terms and conditions of this Agreement, substantially in the form attached hereto as Exhibit A, and otherwise acceptable to Purchaser and Seller, each in their reasonable discretion.

"SCV Tasting Room" means that certain tasting room located at 555 CA-1, Bodega Bay, CA 94923.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933.

7

"<u>Software</u>" means all computer software and code, including assemblers, applets, compilers, source code, object code, development tools, design tools, user interfaces, databases and data, in any form or format, however fixed, including any related documentation.

"<u>Tax Authority</u>" means any government, agency, or instrumentality thereof, charged with the administration of any Law or regulation relating to Taxes.

"<u>Tax Returns</u>" means any return, declaration, report, claim for refund or information return or statement relating to Taxes required to be filed with any Governmental Body, including any schedule or attachment thereto and any amendment thereof.

"<u>Taxes</u>" means (a) all federal, state, local, provincial, municipal, foreign or other taxes, charges or other assessments, including, without limitation, all income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, net worth, intangibles, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, intangibles, goods and services, customs duties, conveyance, mortgage, registration, documentary, recording, premium, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, unemployment insurance, severance, environmental (including taxes under Section 59A of the Code), disability, workers' compensation, health care natural resources, excise, severance, stamp, occupancy, rent, real property, personal property, estimated or other similar taxes, duties, levies or other governmental charges or assessments or deficiencies thereof, (b) any item described in clause (a) for which a taxpayer is liable as a transferee or successor, by reason of the regulations under Section 1502 of the Code (or similar provisions of state, local, foreign or other law), or by contract, indemnity or otherwise, and (c) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clauses (a) or (b).

"<u>Title Company</u>" means Fidelity National Title Group, National Commercial Services (Attn:  Mary Pat Noeker), One Embarcadero Center, Suite 250, San Francisco, CA.

"<u>Title Policy</u>" means an ALTA owner's policy of title insurance insuring fee title to the Real Property vested in Purchaser in the form reasonably requested by Purchaser, subject only to the Permitted Exceptions, together with all endorsements thereto (to the extent available in the applicable jurisdiction without delivery of any title clearance items or other due diligence materials other than documents actually obtained by Purchaser prior to Closing or otherwise expressly required to be delivered under this Agreement by Seller as a condition to Closing) reasonably requested by Purchaser at Purchaser's sole cost and in the amount determined by Purchaser and acceptable to the Title Company.

"<u>Transactions</u>" means the transactions contemplated by this Agreement.

"<u>Transferred Exception</u>" means title of a lessor under a capital or operating lease if such lease is a Purchased Contract.

"<u>Water Rights</u>" means all water and water rights (including sub-surface water rights, riparian, appropriative, permitted, adjudicated or contractual water rights and any shares of water stock or mutual water company stock) and benefits relating to or appurtenant to the Land, including, without limitation, all rights of Seller in, to and under any and all water licenses

8

and/or permits issued by the California State Water Resources Control Board or any other governmental or quasi-governmental agency or board having jurisdiction over such rights, in each case that are transferable or assignable to Purchaser.

      1.2    <u>Terms Defined Elsewhere in this Agreement</u>.  For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| <u>Term</u> | <u>Section</u> |
|---|---|
| ABC | 2.8 |
| Accounting Firm | 3.4(c) |
| Actual Closing Date Inventory | 3.4(a) |
| Agreement | Preamble |
| Alcohol Licenses | 2.8 |
| Allocation Notice of Objection | 10.3(a) |
| Assignment of Contracts | 4.2(c)(iv) |
| Assignment of Intellectual Property | 4.2(c)(v) |
| Assumed Cure Costs | 2.5 |
| Assumed Liabilities | 2.3 |
| Auction | 7.2(a) |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bid Protections | 7.3 |
| Bid Purchase Price | 3.1 |
| Brands | Recitals |
| Break-Up Fee | 7.3 |
| Cash Amount | 3.1 |
| Closing | 4.1 |
| Closing Date | 4.1 |
| Closing Wine Inventory | 3.3 |
| Company Disclosure Letter | Article V |
| Company Permits | 5.7 |
| Company SEC Documents | 5.5 |
| Competing Bid | 7.2(a) |
| Confidentiality Agreement | 8.6 |
| Disapproval Notice | 3.4(a) |
| Effective Date | Preamble |
| Escrow Agent | 3.2(a) |
| Escrow Agreement | 4.2(c)(ix) |
| Escrow Holdback Amount | 3.2(a) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Final Allocation Statement | 10.3(a) |
| General Assignment | 4.2(c)(iii) |
| Mailing Lists | 5.9 |
| Necessary Consent | 2.6(a) |
| Notice of Disagreement | 3.4(b) |

9

| Term | Section |
|------|---------|
| Notice Period | 3.4(b) |
| Permits | 5.14 |
| Proposed Allocation Statement | 10.3(a) |
| Purchase Price | 3.1 |
| Purchased Assets | 2.1(b) |
| Purchased Contracts | 2.1(b)(iv) |
| Purchased Intellectual Property | 2.1(b)(v) |
| Purchaser | Preamble |
| Purchaser Disclosure Letter | Article VI |
| Sales Proceeds | 3.3 |
| Seller | Preamble |
| Submission Date Wine Inventory | 3.3 |
| Substandard Wine Inventory | 3.3 |
| Tangible Personal Property | 2.1(b)(iii) |
| Termination Date | 4.4(a) |
| Termination Payment | 7.3 |
| Trademark Assignment | 4.2(c)(v) |
| Transfer Taxes | 10.1 |
| TSA | 2.8 |
| TTB | 2.8 |
| Wine Inventory | 3.3 |

1.3     Other Definitional and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

(i)     Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded, and the words "to" and "until" shall be deemed to exclude the date referred to.  If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action will be extended to the next succeeding Business Day.

(ii)     Contracts.  Reference to any Contract means such Contract as amended or modified and in effect from time to time in accordance with its terms.

(iii)     Dollars.  Any reference in this Agreement to Dollars or $ will mean U.S. dollars.

(iv)     Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Agreement.

10

(v) <u>GAAP</u>.  Terms used herein which are defined in GAAP are, unless specifically defined herein, used herein as defined in GAAP.

(vi) <u>Gender and Number</u>.  Any reference in this Agreement to gender will include all genders, and words imparting the singular number only will include the plural and vice versa.

(vii) <u>Headings</u>.  The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any Article, Section, Recital, Exhibit or Schedule are to the corresponding Article, Section, Recital, Exhibit or Schedule of or to this Agreement unless otherwise specified.

(viii) <u>Herein</u>.  The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(ix) <u>Including</u>.  The word "<u>including</u>" or any variation thereof means "<u>including, without limitation</u>" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x) <u>Extent</u>.  The word "<u>extent</u>" and the phrase "<u>to the extent</u>" mean the degree to which a subject or other thing extends and does not simply mean "if."

(xi) <u>Law</u>.  Reference to any Law means such Law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect from time to time, including any successor legislation thereto and any rules and regulations promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, replacement or re-enactment of such section or other provision.

(b) The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## II.    PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1 <u>Purchase and Sale of Assets</u>.

(a) On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will, or will cause one or more of its designees to, purchase, acquire and accept from Seller or Seller's Affiliates, and Seller will, or cause its Affiliates to, sell, transfer, convey and deliver to Purchaser, all of Seller's or Seller's Affiliate's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than Permitted Exceptions and Transferred Exceptions) and Excluded Liabilities.

11

(b)     The term "Purchased Assets" means all of the following properties, assets, and rights of Seller or its Affiliates existing as of the Closing, and not including any Excluded Asset:

(i)     all right, title and interest in and to the Real Property, including, to the extent available and transferable to Purchaser, all architectural, mechanical, engineering, as built and other plans, specifications and drawings relating to the Real Property and the Improvements, all surveys (including any ALTA surveys) and all soil, viticultural, environmental, water, engineering, archeological, historical, production or other reports or studies in the possession or control of Seller and relating to the Real Property or the Improvements;

(ii)    the Inventory;

(iii)   all fixtures, furniture, furnishings, equipment, Improvements and other tangible personal property owned by Seller, that are located on or at the Real Property ("Tangible Personal Property");

(iv)    all right, title and interest of Seller now or hereafter existing, in, to and under the Contracts that (A) are set forth on Schedule 2.1(b)(iv), (B) are unexpired as of the Closing Date (including those Contracts that have been previously unrenewed), and (C) have not been rejected (or are the subject of a notice of rejection or a pending rejection motion) by Seller (the "Purchased Contracts");

(v)     all Intellectual Property related exclusively to the Business (the "Purchased Intellectual Property");

(vi)    all goodwill related to the Purchased Assets;

(vii)   in each case solely to the extent such relate to other Purchased Assets, all books, records, files, invoices, inventory records, product specifications, cost and pricing information, business plans and quality control records and manuals, including all data and other information stored in any format or media, including on hard drives, hard copy or other media, in each case to the extent permitted by applicable Laws; and

(viii)  all rights, claims, causes of action (including causes of action under chapter 5 of the Bankruptcy Code) and credits to the extent relating exclusively to any Purchased Asset or Assumed Liability, including any such item arising under any guarantee, warranty, indemnity, right of recovery, right of setoff or similar right in favor of Seller in respect of any Purchased Asset or Assumed Liability.  Seller will, and will cause their respective Affiliates to, cooperate with Purchaser in good faith without further consideration in any arrangement reasonably acceptable to Purchaser and Seller intended to provide Purchaser with the benefit of such rights and claims.

2.2     Excluded Assets.  Nothing herein contained will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller will retain all right, title and interest to, in and under the Excluded Assets.  The term "Excluded Assets" means all properties, assets, and rights of Seller or its Affiliates existing as of the

12

Closing that are not a Purchased Asset, including (a) all causes of action arising under the Bankruptcy Code, (b) any refunds, overpayments, credits, or rebates of Taxes of Seller, (c) all Tax Returns of the Seller other than Tax Returns that relate solely to the Purchased Assets, and (d) all claims, rights and causes of action arising from the Transactions.

2.3    <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will assume, effective as of the Closing, and will timely perform and discharge in accordance with their respective terms, the following Liabilities existing as of the Closing Date and no Excluded Liabilities of Seller or any of its Affiliates from and after the Closing Date (collectively, the "<u>Assumed Liabilities</u>"):

(a)    all Liabilities arising from the ownership or operation of the Purchased Assets by Purchaser to the extent such Liabilities arise after the Closing;

(b)    any Assumed Cure Costs that Purchaser is required to pay pursuant to <u>Section 2.5</u>;

(c)    all Liabilities of Seller or its Affiliates under the Purchased Contracts arising after the Closing; and

(d)    final wages and accrued paid time off of any Business Employee who accepts an offer of employment with Purchaser payable by Seller as of the termination date of the employment of such Business Employee.  For avoidance of doubt Purchaser shall not assume any other Liabilities of such Business Employee, including any severance or other termination payment by Seller or any Liability related to Seller's employment practices or otherwise related to any such Business Employee.

2.4    <u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary set forth herein, the Parties expressly acknowledge and agree that Purchaser will not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for Liabilities or any Action of Seller or any of its Affiliates, including but not limited to those Actions more particularly described on Schedule 5.6, whether existing prior to or on the Closing Date or arising thereafter, including on the basis of any Law imposing successor liability, other than the Assumed Liabilities and the obligations of Purchaser under this Agreement (all such Liabilities that Purchaser is not assuming being referred to collectively as the "<u>Excluded Liabilities</u>").

2.5    <u>Cure Amounts</u>.  At the Closing and pursuant to Section 365 of the Bankruptcy Code, Seller will assume the Purchased Contracts (to the extent not previously assumed) (if any) and, subject to the terms herein, assign the Purchased Contracts to Purchaser, and Purchaser, subject to the terms herein, will assume the Purchased Contracts.  All Cure Costs with respect to the Purchased Contracts (the "<u>Assumed Cure Costs</u>") will be paid by Purchaser, as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order, and not by Seller, and Seller will have no Liability for any Assumed Cure Costs.

2.6    <u>Non-Assignment of Assets</u>.

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not effect the

assignment or transfer of any Purchased Asset (including any Purchased Contract) if (i) (A) prohibited by applicable Law, (B) an attempted assignment or transfer thereof would reasonably be likely to subject Purchaser, its Affiliates or any of its or their respective Representatives to civil or criminal Liability or (C) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto, would constitute a breach, default or violation thereof or of any Law or Order (each such action, a "Necessary Consent"), or in any way adversely affect the rights of Purchaser thereunder or (ii) the Bankruptcy Court has not entered an Order (including, for the avoidance of doubt, the Sale Order) approving such assignment or transfer.  In such event, such assignment or transfer is subject to such Necessary Consent being obtained and Seller and Purchaser will use their respective commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset (including any Purchased Contract) or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request; provided, however, that Seller will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or Action to obtain any such consent or approval.  If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would give rise to any of the circumstances described in clauses (i) or (ii) of the first sentence of this Section 2.6(a), be ineffective or would adversely affect the rights of Purchaser to such Purchased Asset following the Closing, (x) Seller and Purchaser will, and will cause their respective Affiliates to, (1) use commercially reasonable efforts (including cooperating with one another to obtain such Necessary Consents, to the extent feasible) as may be necessary so that Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, (2) complete any such assignments or transfers as soon as reasonably practicable, and (3) upon receipt of any applicable Necessary Consents, to transfer or assign the applicable Purchased Asset to Purchaser, and (y) Seller will, and will cause their respective Affiliates to, cooperate with Purchaser in good faith without further consideration in any arrangement reasonably acceptable to Purchaser and Seller intended to provide Purchaser with the benefit of any such Purchased Assets.

(b)     Subject to Section 2.6(a), if after the Closing (i) Purchaser or its designee holds any Excluded Assets or Excluded Liabilities or (ii) Seller holds any Purchased Assets or Assumed Liabilities, Purchaser or Seller will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party.  Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for such other Party.

(c)     Notwithstanding anything herein to the contrary, at any time prior to the date that is five (5) days after the later of (i) resolution of any dispute with a non-debtor party to a Purchased Contract relating to the Cure Costs or adequate assurance of future performance required under Section 365 of the Bankruptcy Code and (ii) the conclusion of the cure objection hearing relating to any particular Purchased Contract as to which a cure objection has been timely filed, Purchaser will be entitled, in its sole and absolute discretion, to remove any Purchased Contract from Schedule 2.1(b)(iv) by providing written notice thereof to Seller and any Purchased Contract so removed will be deemed to be an "Excluded Asset" for all purposes hereunder.

14

2.7     Further Conveyances and Assumptions.  From time to time following the Closing, Seller and Purchaser will, and will cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to Seller and its Affiliates and their respective successors and assigns, the assumption of the Liabilities intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Transactions; provided that nothing in this Section 2.7 will require Purchaser or any of its Affiliates to assume any Liabilities other than the Assumed Liabilities.

2.8     Alcoholic Beverage Licenses.  To the extent permitted by applicable Law, Seller shall reasonably cooperate with Purchaser in making all filings and taking all steps reasonably necessary to obtain all approvals, consents and waivers required to be obtained by Purchaser under the terms of this Agreement in connection with the Transactions contemplated hereby in accordance with the terms hereof, and shall deliver to Purchaser copies of any non-confidential information in Seller's possession reasonably requested by Purchaser with respect to Purchaser's application for such approvals, consents and waivers; provided, however, that Seller shall have no obligation to obtain, and Purchaser shall be responsible to obtain, all alcohol-related approvals, registrations, licenses, permits, authorizations and bonds (collectively, "Alcohol Licenses") from the Alcohol and Tobacco Tax and Trade Bureau ("TTB"), the California Department of Alcoholic Beverage Control ("ABC"), and other governmental agencies required for operation of the Real Property.  As soon as practical after the date hereof, Purchaser and Seller shall cooperate with Purchaser in its application for an original "Duplicate 02" license relating to the SCV Tasting Room and obtaining its TTB permit at Purchaser's sole cost and expense, and Purchaser will provide Seller with reasonable documentation to demonstrate that Purchaser has submitted applications with respect thereto within five Business Days following the Effective Date.  Purchaser shall use commercially reasonable efforts to obtain such Alcohol Licenses.  Seller agrees to leave in place and shall not cancel its existing Alcohol Licenses during the duration of the post-Closing transitional services agreement entered into by the Parties, in substantially the form attached hereto as Exhibit H ("TSA").  Subject to the terms and conditions of the TSA, Seller shall surrender licenses, permits and authorizations that relate exclusively to the Brands as may be reasonably required for Purchaser to obtain all approvals, consents and waivers required or desired to be obtained by Purchaser under the terms of this Agreement, including approvals for transfer or issuance of all Alcohol Licenses.  If necessary, Seller shall, at Purchaser's sole cost and expense, continue to submit reports as required by 27 CFR Part 24 based on information and records provided by Purchaser until Purchaser is able to obtain the necessary TTB Alcohol Licenses to operate the Purchased Assets for the duration of the TSA.  The obligations of Seller under this Section shall survive the Closing.

### III.     CONSIDERATION

3.1     Consideration.  The aggregate consideration for the Purchased Assets will be: (a) Fifteen Million Dollars ($15,000,000.00) in cash (the "Bid Purchase Price"); plus (b) the assumption of the Assumed Liabilities; provided, however, the Bid Purchase Price shall be adjusted pursuant to Section 3.3 and Section 3.4 below (as adjusted, the "Purchase Price").  At

15

the Closing, Purchaser shall pay to Seller, in immediately available funds to the account or accounts designated by Seller, an amount equal to the Bid Purchase Price less the Deposit Amount less the Pre-Closing Inventory Adjustment, if any (the "Cash Amount").

3.2     Purchase Price Deposit; Escrow Holdback.

(a)     Purchaser has deposited a sum of $1,500,000 (the "Deposit Amount") into an escrow account maintained by Epiq Corporate Restructuring, LLC ("Escrow Agent"), which will be held in such escrow account and will be either delivered to Purchaser or paid to Seller as follows: (a) if the Closing occurs, $750,000 of the Deposit Amount will be released to Seller and the remaining $750,000 will be held by Escrow Agent as security for Seller's obligation to reimburse Purchaser for any Post-Closing Inventory Adjustment set forth in Section 3.4 below (such remaining amount, the "Escrow Holdback Amount"), (b) if this Agreement is terminated by Seller pursuant to Section 4.4(d) or Section 4.4(e), then the Deposit Amount will promptly be released to Seller (and such Deposit Amount will be deemed fully earned by Seller as compensation and consideration for entering into this Agreement), or (c) if this Agreement is terminated for any reason other than by Seller pursuant to Section 4.4(d) or Section 4.4(e), then the Deposit Amount will promptly be released to Purchaser.  Seller and Purchaser agree to execute joint written instructions and deliver them to the Escrow Agent to cause the Escrow Agent to release the Deposit Amount in accordance with this Section 3.2.

(b)     The Escrow Holdback Amount shall be held in escrow subject to the terms and conditions set forth in an Escrow Agreement in a form approved and executed by the Parties. Any amount of the Escrow Holdback Amount remaining following the determination of and payment to Purchaser of the Post-Closing Inventory Adjustment, if any shall be paid to Seller within five (5) Business Days following such determination and payment.

3.3     Calculation of Pre-Closing Inventory Adjustment. Seller has delivered to Purchaser a complete list of all Inventory as of June 30, 2024 as Schedule 2.1(b)(ii), which includes the most current and accurate listing of wine Inventory ("Wine Inventory") listed by Brand and gallonage of bulk wine and number of cased goods on hand which Schedule reflects the value at cost (accounted for in accordance with Seller's normal and historical procedures) of the Wine Inventory as of June 30, 2024 ("Submission Date Wine Inventory"), and which Schedule also indicates the address where bulk wine is currently located.  Three (3) Business Days prior to the Closing Date or the most recent practicable Business Day prior to such date, Seller shall deliver to Purchaser a statement prepared by Seller setting forth Seller's Wine Inventory listed by Brand and gallonage of bulk wine and number of cased goods on hand valued at cost (accounted for in accordance with Seller's normal and historical procedures) ("Closing Wine Inventory") expected as of the Closing Date.  In the event the Closing Wine Inventory is less than the Submission Date Wine Inventory, the difference between the Closing Wine Inventory and the Submission Date Wine Inventory ("Closing Wine Inventory Adjustment") shall be deducted dollar-for-dollar from the Bid Purchase Price; it being understood that the value of any portion of the Wine Inventory that is (a) contaminated, defective or adulterated within the meaning of the California Food and Agriculture Code and the Federal Pure Food and Drug Act, (b) a white varietal wine with a vintage of 2021 or prior or (c) holiday-labeled Wine Inventory (such Wine Inventory described in subsections (a), (b) and (c) is collectively referred to as "Substandard Wine Inventory") shall be excluded from the Closing Wine Inventory when

16

calculating the Closing Wine Inventory Adjustment paid at Closing. Seller covenants and agrees that to the extent it sells any Substandard Wine Inventory after the Effective Date and prior to the Closing Date, it shall either (i) sell such Substandard Wine Inventory as bulk wine or (ii) sell such Substandard Wine Inventory as "shiners" by removing the labels and any reference to the Brands on the glass, corks, foil caps, and packaging.

3.4    Calculation of Post-Closing Inventory Adjustment.

(a)    After the Closing, if Purchaser does not agree with the Closing Wine Inventory provided by Seller, Purchaser shall deliver to Seller a notice of its disapproval (the "Disapproval Notice") within five (5) Business Days after the Closing Date along with a statement prepared by Purchaser calculating the difference between the Closing Wine Inventory and the actual Inventory count on hand as of the Closing ("Actual Closing Date Inventory"). In the event the Disapproval Notice is not delivered within the foregoing disapproval period, Purchaser shall have been deemed to have approved Closing Wine Inventory provided by Seller as set forth in Section 3.3 above.

(b)    Following receipt of the Actual Closing Date Inventory, Seller shall be permitted to review the Actual Closing Date Inventory and the working papers relating to the Actual Closing Date Inventory and, within ten (10) Business Days after the date of such receipt (the "Notice Period"), may deliver to Purchaser a certificate setting forth any objections to the Actual Closing Date Inventory (a "Notice of Disagreement"). In the event Seller does not so object within the Notice Period, the Actual Closing Date Inventory shall become final and binding upon Purchaser and Seller for purposes of this Agreement upon expiration of the Notice Period.

(c)    In the event any objections raised in the Notice of Disagreement are not resolved by the Parties within five (5) Business Days after Seller's receipt of a Notice of Disagreement, then Purchaser and Seller shall submit in writing such unresolved objections to a mutually agreeable third-party accounting firm of national reputation and as to which neither party has a material relationship (the "Accounting Firm"), and the Accounting Firm shall make the final determination of the disputed items. The Actual Closing Date Inventory (as the same may be adjusted) shall become final and binding upon Purchaser and Seller on the date the disputed matters are finally resolved in writing by the Accounting Firm. The cost of the fees and expenses of the Accounting Firm shall be borne equally by Purchaser and Seller.

(d)    In the event the Actual Closing Date Inventory is determined or deemed to be less than the Closing Wine Inventory, the amount of such difference shall be paid to Purchaser from the Escrow Holdback Amount; provided, Purchaser's recovery shall be limited to the Escrow Holdback Amount (and, to the extent such difference is less than the Escrow Holdback Amount, the remainder of the Escrow Holdback Amount will be released to Seller in accordance with Section 3.2(b)).

(e)    Any term or provision hereof to the contrary notwithstanding, at all times following the Closing, a Party shall afford the other Party and such Party's accountants and representatives, and, if applicable, the Accounting Firm, reasonable access during normal business hours to such books, records and other information (including working papers) as any

17

of the foregoing may reasonably request to prepare for or review the Closing Wine Inventory, the Actual Closing Date Inventory or any matters submitted to the Accounting Firm.  The fees and expenses of Seller's accountants and other advisers of Seller shall be paid by Seller.  The fees and expenses of Purchaser's accountants and other advisers of Purchaser shall be paid by Purchaser.

## IV.    CLOSING AND TERMINATION

4.1    <u>Closing Date</u>.  Subject to the satisfaction of the conditions set forth in <u>Sections 9.1</u>, <u>9.2</u> and <u>9.3</u> (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in <u>Article II</u> (the "<u>Closing</u>") will take place remotely by exchange of documentation and signatures at 10:00 a.m. (Pacific time) on the date that is three (3) Business Days following the satisfaction or waiver of the conditions set forth in <u>Sections 9.1</u>, <u>9.2</u> and <u>9.3</u> (other than conditions that by their nature are to be first satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place and time as the Parties may designate in writing.  The date on which the Closing is held is referred to in this Agreement as the "<u>Closing Date</u>."

4.2    <u>Deliveries by Seller</u>.

(a)    At the Closing, Seller shall deliver (subject to the physical delivery provisions of <u>Section 8.10</u>) the Purchased Assets or cause the Real Property and the Purchased Assets to be delivered to Purchaser.

(b)    At Closing, Seller shall deliver the Sale Order.

(c)    At the Closing, Seller shall also deliver or cause to be delivered to Purchaser any and all other such documents necessary to consummate this Agreement and the Transactions contemplated herein, including but not limited to the following:

(i)    a Grant Deed in the form attached hereto as <u>Exhibit B</u>, duly executed by Seller or its applicable Affiliates, reasonably acceptable to the Title Company, and customarily used in Sonoma County, California;

(ii)    a Bill of Sale in the form attached hereto as <u>Exhibit C</u>, duly executed by Seller or its applicable Affiliates;

(iii)    an Assignment and Assumption Agreement in the form attached hereto as <u>Exhibit D</u> (the "<u>General Assignment</u>"), duly executed by Seller or its applicable Affiliates;

(iv)    an Assignment of Intellectual Property in the form attached hereto as <u>Exhibit E</u> (the "<u>Assignment of IP</u>") and Trademark Assignment in the form attached hereto as <u>Exhibit F</u> (the "<u>Trademark Assignment</u>"), in each case, duly executed by Seller or its applicable Affiliates;

(v)    Mailing Lists: A flash drive containing Seller's Mailing Lists;

18

(vi)    a Certificate of Non-Foreign Status in the form attached hereto as Exhibit G, duly executed by Seller or its applicable Affiliates;

(vii)    the TSA, duly executed by Seller or its applicable Affiliates;

(viii)    customary title affidavits and/or certificates, to the extent reasonably requested by the Title Company in order to enable the Purchaser to acquire the Title Policy;

(ix)    such other documents as are reasonably necessary and customary to consummate the sale of the Real Property to the Purchaser; and

(x)    evidence that Seller has renewed the registration of the trademark Sonoma Coast Vineyards with the United States Patent and Trademark Office.

4.3    <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser will deliver to Seller:

(a)    Cash Amount;

(b)    the General Assignment, duly executed by Purchaser;

(c)    the Assignment of Contracts, duly executed by Purchaser;

(d)    the Assignment of IP and Trademark Assignment, in each case, duly executed by Purchaser;

(e)    the TSA, duly executed by Purchaser; and

(f)    Escrow Agreement, duly executed by Purchaser.

4.4    <u>Termination of Agreement</u>.  This Agreement may be terminated prior to the Closing as follows:

(a)    by Purchaser or Seller, if the Closing has not occurred by 5:00 p.m. Pacific time on November 1, 2024 (the "<u>Termination Date</u>"), which date may be extended pursuant to Sections 4.4(c) and 4.4(d); provided, however, that if the Closing has not occurred on or before the Termination Date due to a breach by (i) Purchaser of any representations, warranties, covenants or agreements contained in this Agreement that has resulted in any of the conditions set forth in Section 9.2 or Section 9.3 not being satisfied by the Termination Date, then Purchaser may not terminate this Agreement pursuant to this Section 4.4(a) or (ii) Seller of any representations, warranties, covenants or agreements contained in this Agreement that has resulted in any of the conditions set forth in Section 9.1 or Section 9.3 not being satisfied by the Termination Date, then Seller may not terminate this Agreement pursuant to this Section 4.4(a);

(b)    by mutual written consent of Seller and Purchaser;

(c)    by Purchaser, if Seller breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a

19

condition set forth in Sections 9.1 or 9.3 and such breach has not been cured within ten (10) Business Days after the giving of written notice by Purchaser to Seller of such breach; provided that Purchaser is not then in breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in Article IX; provided, further, that in the event that Purchaser provides such written notice to Seller within ten (10) Business Days of the Termination Date, then the Termination Date will be extended until the end of the ten (10) Business Day cure period set forth in this Section 4.4(c).

(d)     by Seller, if Purchaser breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a condition set forth in Sections 9.2 or 9.3 and such breach has not been cured within ten (10) Business Days after the giving of written notice by Seller to Purchaser of such breach; provided further that Seller is not then in breach of any representation, warranty, covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in Article IX, provided further, that in the event that Seller provides such written notice to Purchaser within ten (10) Business Days of the Termination Date, then the Termination Date will be extended until the end of the ten (10) Business Day cure period set forth in this Section 4.4(d);

(e)     by Seller, if all of the conditions set forth in Sections 9.1, 9.2 and 9.3 have been satisfied or waived by the applicable Party (in each case, other than those conditions that by their nature are first satisfied at the Closing), Seller has given written notice to Purchaser that they are prepared to consummate the Closing and Purchaser fails to consummate the Closing within two (2) Business Days after the date that the Closing should have occurred pursuant to Section 4.1.

(f)     by Seller or Purchaser, if there is in effect a final non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions; it being agreed that the Parties will promptly appeal and use reasonable best efforts to seek to overturn any adverse determination which is not non-appealable and pursue such appeal with reasonable diligence unless and until this Agreement is terminated pursuant to this Section 4.4.

(g)     automatically, upon the consummation of an Alternative Transaction.

4.5     Procedure Upon Termination.  In the event of termination pursuant to Section 4.4 (other than Section 4.4(g), under which termination will take place automatically), the terminating Party will give written notice thereof to the other Party or Parties, and this Agreement will terminate as described in Section 4.6, and the purchase of the Purchased Assets and assumption of the Assumed Liabilities hereunder will be abandoned, without further action by Purchaser or Seller.

4.6     Effect of Termination.   In the event that this Agreement is terminated as provided herein, then each of the Parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination and there will be no Liability or obligation on Purchaser, Seller or any of their respective Representatives, except as specifically set forth in this Section 4.6; provided, however, that the provisions of Section 3.2, this Section 4.6, Section 7.3, Article XI and, to the extent necessary to effectuate the foregoing enumerated provisions,

20

Article I, will survive any such termination and will be enforceable hereunder; provided, further, that nothing in this Section 4.6 will be deemed to release any Party from Liability for any breach of this Agreement prior to termination and nothing in this Section 4.6 will be deemed to interfere with Sellers' rights to retain the Deposit Amount to the extent provided in Section 3.2.

## V.    REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the letter from Seller, dated the Effective Date, addressed to Purchaser (the "Company Disclosure Letter") or in the Company SEC Documents related to the Purchased Assets with such description being reasonably apparent (other than any forward-looking disclosures set forth in any risk factor section, any disclosure in any section relating to forward-looking statements and any other similar disclosures included therein, in each case, to the extent such disclosures are primarily predictive or forward-looking in nature and do not consist of statements of present fact) filed prior to the date of this Agreement, Seller hereby represents and warrants to Purchaser that:

5.1    Organization and Good Standing.  Seller is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and, subject to any limitations that may be imposed on Seller as a result of filing a petition for relief under the Bankruptcy Code, has the requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchased Assets.  Seller is not in violation of its organizational or governing documents.

5.2    Authorization of Agreement.  Subject to entry of the Sale Order, as applicable, Seller has all necessary power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder.  The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the Transactions have been duly authorized by all requisite corporate or similar action on the part of Seller.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly and validly executed and delivered, by Seller and (assuming the due authorization, execution and delivery by the other Parties and the entry of the Sale Order) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes legal, valid and binding obligations of Seller enforceable against Seller in accordance with its respective terms, subject to equitable principles of general applicability (whether considered in a proceeding at law or in equity).

5.3    Governmental Consents.  Except as set forth on Schedule 5.3 and except to the extent not required if the Sale Order is entered, and subject to Purchaser obtaining the Alcohol Licenses, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Seller in connection with the execution and delivery of this Agreement or any other agreement, document or

21

instrument contemplated hereby or thereby to which Seller is a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the Transactions or the taking by Seller of any other action contemplated hereby or thereby (with or without notice or lapse of time, or both), except for the entry of the Sale Order.

5.4     Title to Purchased Assets.  At the Closing, Purchaser will be vested with good and marketable title to the Purchased Assets, or in the case of leased assets, good and marketable leasehold interest in, such Purchased Assets, free and clear of all Liens (other than Permitted Exceptions and Transferred Exceptions) and Excluded Liabilities, to the fullest extent permissible under Law, including Section 363(f) of the Bankruptcy Code.

5.5     SEC Documents.  Except (x) that which would not reasonably be expected to have or has not had, individually or in the aggregate, a Material Adverse Effect and (y) as set forth on Schedule 5.5, (a) Seller has filed with or furnished to the SEC all forms, reports, schedules, statements and other documents required to be filed or furnished by it since January 1, 2022, under the Exchange Act or the Securities Act (collectively, the "Company SEC Documents") and (b) as of its respective date of filing, or, if amended or superseded by a subsequent filing made prior to the date of this Agreement, as of the date of the last such amending or superseding filing, each Company SEC Document (i) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated in such Company SEC Document or necessary in order to make the statements in such Company SEC Document, in light of the circumstances under which they were made, not misleading and (ii) complied in all material respects with the applicable requirements of the Exchange Act and the Securities Act, as the case may be, and the applicable rules and regulations of the SEC under the Exchange Act and the Securities Act, as the case may be.

5.6     Litigation.  Except (x) for any Actions or Orders that would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Brands and (y) as set forth on Schedule 5.6, there are no Actions or Orders pending or, to the Knowledge of Seller, threatened against Seller that involves or relates to the Brands, any of the Transactions, or affects any of the Purchased Assets.

5.7     Compliance with Laws.  Seller is and, since January 1, 2020, has been, in all material respects, in compliance with all Laws and Orders applicable to the Brands.  Seller holds all material governmental licenses, authorizations, permits, consents and approvals necessary for the operation of the Business relating to the Brands as presently conducted, taken as a whole (the "Company Permits").  Seller is in material compliance with the terms of the Company Permits.

5.8     Intellectual Property.

(a)     Schedule 5.8 contains a list of all domestic and foreign patents, patent applications, registered trademarks, trademark applications, service marks, service mark applications, registered copyrights, copyright applications and domain names included in the Purchased Intellectual Property.  All of the Purchased Intellectual Property is owned solely by Seller and free and clear of all Liens except Permitted Exceptions.  Each registration listed on Schedule 5.8 (excluding applications that have not been issued or granted by the relevant

22

Governmental Body) is valid, in full force and effect and enforceable.  Except as otherwise set forth in <u>Schedule 5.8</u>, no item listed on <u>Schedule 5.8</u> has expired, been canceled or abandoned.

(b)　　The Purchased Intellectual Property constitutes all of the Intellectual Property owned by Seller that is necessary for the conduct of the Business relating to the Brands as presently conducted.  The conduct of the Business as currently conducted or conducted since January 1, 2020 does not infringe or violate any patent, trademark, trade name, copyright, or other Intellectual Property rights of any Person, or constitute a misappropriation of any confidential information or any other Intellectual Property right of any Person.  There are no pending or to the Knowledge of Seller, threatened claims, and Sellers have not received, since January 1, 2020, any written notice of any actual or threatened Legal Proceedings alleging any of the foregoing except for those that have since been resolved.  To the Knowledge of Seller, there is no infringement, misappropriation or violation being made by any other Person of any Purchased Intellectual Property.

(c)　　To Seller's Knowledge there has been no disclosures of any material trade secrets, confidential information, or other proprietary information included in the Purchased Intellectual Property to any third party that have not been authorized by Seller.

5.9　　<u>Customers and Mailing Lists</u>.  All customer lists, email lists, mailing lists, wine club lists and any other information or lists of customers or persons visiting SCV's tasting room or attending events relating to the Brands, in any format that is related to the Brands, in the possession of Seller relating to the Brands, which shall be delivered to Purchaser at the Closing (collectively, "<u>Mailing Lists</u>"), are true, complete and accurate copies of all of the mailing, email, and customer lists owned, held or used by Seller in connection with the Brands. Purchaser shall have exclusive ownership and the exclusive right to use the Mailing Lists.

5.10　　<u>Financial Advisors, Finders, Brokers</u>.  Except (x) with respect to GLC Advisors & Co., LLC and (y) as set forth on <u>Schedule 5.10</u>, Seller have not incurred any Liability for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement or Transactions for which Purchaser is or will become liable.

5.11　　<u>Real Property</u>.

(a)　　<u>Water</u>.  The quality and quantity of water available to the Real Property is sufficient for the operation of SCV Tasting Room as it is currently conducted as of the date of this Agreement and as of the Closing.  Seller has not released or modified any of the Water Rights or supplies for any of the Real Property, and such Water Rights and supplies are sufficient for the operation of the SVC Tasting Room as it is currently conducted as of date of this Agreement and as of the Closing.  To Seller's Knowledge, there are no water sharing agreements or water disputes affecting the Real Property that would not otherwise be disclosed on a title commitment search or lien search on the Real Property.

(b)　　<u>Utilities</u>.  The Real Property is supplied with utilities and other services in such amounts as have been reasonably necessary for their present use in the operation of the Real Property and the SVC Tasting Room in all material respects, including gas, electricity, irrigation, drainage facilities, telephone, sanitary and storm sewer service.

(c)    Improvements.  The Improvements are in good operating condition and repair (subject to normal wear and tear consistent with the age and assets of the properties).  To Seller's Knowledge, there are no structural or other material physical defects or deficiencies in the condition of any of the Improvements, including all heating, ventilation, air conditioning, plumbing, electrical, and mechanical equipment.  The Improvements are in compliance in all material respects with all applicable governmental requirements.

(d)    Entitlements.  The Real Property in all material respects is licensed, permitted and authorized to carry on the SCV Tasting Room as it is presently conducted under all applicable federal, state and local statutes, Orders, approvals, zoning or land use requirements, rules and regulations and no portion of the Real Property or the current use thereof constitutes a non-conforming use (except for Permitted Exceptions or as would otherwise be disclosed on a standard building and zoning report).  Except for Permitted Exceptions, Seller has not received any written notice regarding the Real Property's failure to comply with or violation of any applicable Law, rule, regulation, ordinance or government directive from any administrative or governmental authority or any restrictive easements or covenants affecting the Real Property.  Except for Permitted Exceptions, Seller has not received any written notice, nor to Seller's Knowledge, has there been any, condemnation action, litigation or environmental, zoning, moratorium, or other land use proceedings, either instituted or planned to be instituted, which would affect the use or occupancy of the Real Property, nor has Seller received written notice of any special assessment proceedings affecting the Real Property.

(e)    No Tenancies, Occupations or Encroachments.  There are no leases, subleases, or licenses affecting the Real Property or Persons (other than Seller) in possession of any part thereof.  No portion of the Improvements has been built or installed on any neighboring property and no portion of any Improvements on any neighboring property has been built or installed on the Real Property, in each case, except as would not reasonably be expected to have a material adverse effect on the Improvements or the Real Property.

(f)    No Agreements.  Except for any Assumed Contracts, there are no contracts, leases, storage, service, supply, maintenance, management agreements or other Contracts affecting the Real Property that will not be terminated at or prior to the Closing.

5.12    Tangible Personal Property. Each item of the Tangible Personal Property is in a condition suitable for the uses for which they are intended in all material respects, normal wear and tear excepted and there are no, to Seller's Knowledge, material defects to any of the Tangible Personal Property.

5.13    Inventory.  Schedule 2.1(b)(ii) contains a true, correct and complete list of all Inventory of Seller as June 30, 2024, including information, in each case to the extent such information is available, regarding such Inventory's vintage, vineyard block, varietal and the name and address of the warehouse and tank in which such Inventory is located.  Seller is the true, lawful and exclusive owner of the Inventory and has all necessary power and authority to transfer title of the Inventory to Purchaser, free and clear of all Liens other than Permitted Liens and Liens that will be removed on or before the Closing Date.  The Inventory has been produced, packaged and labeled, including as to vintage, appellation, and varietal, in accordance with all Laws in all material respects.  The Inventory consists only of items of quality commercially

24

usable and salable in the Ordinary Course of Business, is within its shelf life, is not materially obsolete or damaged, and, to the extent applicable, consists of packaging and product that is merchantable and free of material defects.  None of such Inventory has been consigned from or to others.

5.14    <u>Permits and Licenses</u>.  <u>Schedule 5.14</u> sets forth a full and complete list of all alcohol-related approvals, registrations, licenses, permits, authorizations and bonds that exclusively relate to the Brands (collectively, "<u>Permits</u>").  All such Permits are valid and existing under Law and in full force in all material respects.  Seller has received no written notice of any pending proceeding, and there is no pending or, to Seller's Knowledge, threatened action by any governmental authority that may reasonably be expected to result in the revocation, cancellation, suspension, termination, or adverse modification of any of said Permits.  Seller has, since January 1, 2020, complied with all Permits and is not in conflict with, or in default or violation of, any Permits, in each case, in all material respects.

5.15    <u>Environmental Matters</u>.  Seller is in compliance in all material respects with all applicable Environmental and Safety Laws, except where a failure to be in compliance would not cause a Seller Material Adverse Change.  Seller has not used, stored, generated, manufactured, transported, treated, recycled, disposed of, released, discharged, dumped or otherwise handled Hazardous Materials on the Real Property or any other location, and to Seller's Knowledge, no other party has used, stored, generated, manufactured, transported, treated, recycled, disposed of, released, discharged, dumped or otherwise handled Hazardous Materials on the Real Property, in each case in a condition that requires remediation under applicable Environmental and Safety Laws.  Seller has not received any unresolved written notice of any alleged or actual noncompliance of the Real Property by it or of its past or present operations with Environmental and Safety Law.  No written notice regarding any pending administrative Action has been received or, to Seller's Knowledge, is anticipated or threatened relating to Seller's use of Hazardous Materials or a violation of any Environmental and Safety Laws by Seller on the Real Property owned or leased by it.  To Seller's Knowledge, there has not been in the past during the period Seller has owned such property, and there is not now, any contamination, disposal, spilling, dumping, incineration, release, discharge, storage, treatment or handling of Hazardous Materials on, under or migrating to or from the Real Property (including soils, soil vapors and surface and ground waters) caused by Seller or any other Person that could result in any material Liability of or affecting Seller or any Purchased Asset under Environmental and Safety Laws.  Seller has not installed or operated any underground storage tank for the storage of Hazardous Materials under the Real Property and to Seller's Knowledge, there is no underground storage tank used for the storage of Hazardous Materials under the Real Property, in each case in a condition that violates applicable Environmental and Safety Laws.

5.16    <u>No Notice</u>.  Seller has not received any written notice of any matter that directly relates to (a) any change contemplated in any governmental regulations applicable specifically to the Real Property or Purchased Assets, which change is not part of the public record, (b) any judicial or administrative action with respect to a violation of governmental regulations by Seller pertaining to the Real Property or Purchased Assets, (c) any action or claim by adjacent landowners against Seller with respect to the Real Property or Purchased Assets, or (d) any conditions upon the Real Property or Purchased Assets which would prevent, impede, limit, or

25

impair the use of the Real Property as of the date of this Agreement and as of the Closing, Purchased Assets, or operation of the Business relating to the Brands.

5.17    <u>Distributors and Suppliers.</u>  Seller has not participated in any activities of the type commercially referred to as "trade loading" or "channel stuffing" or any other activity that reasonably could be expected to result in a material increase, temporary or otherwise, in the demand for products of the Brands within twelve (12) months prior to the Closing, including sales of such products: (a) with payment terms materially longer than terms customarily offered by Seller for such products in the Ordinary Course of Business; (b) at a greater discount from listed prices than customarily offered by Seller for such products in the Ordinary course of Business, other than pursuant to a promotion of a nature previously used in Seller's Ordinary Course of Business for such products; or (c) in a quantity greater than the reasonable resale requirement of any particular customer or distributor.

5.18    <u>Taxes</u>.  Except as would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchased Assets or the Business:

(a)    Seller has filed  (or had filed on its behalf) all material Tax Returns that it was required to file in respect of the Purchased Assets and all such Tax Returns were correct and complete in all material respects.  Other than as excused or prohibited from being paid as a result of the Bankruptcy Code or the Bankruptcy Court, with respect to the Purchased Assets, Seller has paid (or had paid on its behalf) (i) all material Taxes that are shown to be due by Seller on any such Tax Returns or pursuant to any written assessment received by Seller from any Tax Authority for any period preceding the Closing Date, and (ii) all other material Taxes due on or before the Closing Date (whether or not shown on a Tax Return).

(b)    There are no pending, proposed in writing or threatened in writing Actions with respect to any material Taxes payable by or asserted against Seller related to the Purchased Assets.

(c)    There are no Liens with respect to Taxes (other than Permitted Exceptions, Liens that will be released by the Sale Order, and Liens for Taxes not yet due and payable or Taxes that are being diligently contested and for which adequate reserves have been set aside in accordance with GAAP) upon the Purchased Assets.

(d)    Seller is not a party to any Tax indemnity, Tax allocation or Tax sharing agreement, other than any such agreement entered into in the Ordinary Course of Business the principal purpose of which is not related to Tax, that could result in a Lien upon the Purchased Assets.

(e)    There are no requests for rulings pending between Seller and any Tax Authority in respect of any Tax that could result in a Lien upon the Purchased Assets.

5.19    <u>Data Privacy</u>.

(a)    To Seller's Knowledge, Seller has complied with all Privacy Requirements and all internal or publicly posted policies, notices, and statements concerning the collection, use, processing, storage, transfer, and security of Personal Information in the conduct

26

of the Business.  Without limiting the generality of the foregoing, Seller complies with all Privacy Requirements in all jurisdictions where Seller sells and markets its wine (including through its online allocation, order and sale process for its yearly wine releases).

(b)    Seller has not: received any written notice of any Action by any Governmental Body or other Person concerning Seller's collection, use, processing, storage, transfer, or protection of Personal Information or actual, alleged, or suspected violation of any Privacy Requirement, in each case in connection with the conduct of the Business, and there are no facts or circumstances that could reasonably be expected to give rise to any such Action.

5.20    No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this Article V, Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller, the Purchased Assets, the Assumed Liabilities or the Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller, or any of Seller's or their Affiliates' respective Representatives.  Except for the representations and warranties contained in this Article V (the Company Disclosure Letter), Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any Representative of Seller or any of its Affiliates).  Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Purchased Assets or the use thereof.  The disclosure of any matter or item in any Schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter could result in a Material Adverse Effect.

## VI.    REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as set forth in the letter from Purchaser, dated as of the Effective Date, addressed to Seller (the "Purchaser Disclosure Letter"), Purchaser hereby represents and warrants to Seller that:

6.1    Organization and Good Standing.  Purchaser is a corporation organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Purchaser to consummate the Transactions or to otherwise timely perform its obligations under this Agreement.  Purchaser is not in violation of its organizational or governing documents.

6.2    Authorization of Agreement.  Purchaser has all necessary corporate power and authority to execute and deliver this Agreement and each other agreement, document or

27

instrument contemplated hereby or thereby to which Purchaser is a party and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party and the consummation of the Transactions have been duly authorized by all requisite corporate or similar action on the part of Purchaser.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly and validly executed and delivered, by Purchaser and (assuming the due authorization, execution and delivery by the other Parties and the entry of the Sale Order) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party constitutes legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its respective terms, subject to equitable principles of general applicability (whether considered in a proceeding at law or in equity).

6.3    Consents and Approvals; No Violations.

(a)    The execution, delivery and performance of this Agreement by Purchaser and the consummation Purchaser of the Transactions do not and will not (i) conflict with or violate the certificate of incorporation or bylaws (or similar organizational documents) Purchaser, (ii) assuming that all consents, approvals and authorizations contemplated by clauses (i) and (ii) of subsection (b) of this Section have been obtained, and all filings described in such clauses have been made, conflict with or violate any Law or Order applicable Purchaser or by which Purchaser or any of its respective properties are bound, or (iii) result in any breach or violation of or constitute a default (or an event which with notice or lapse of time or both would become a default) or result in the loss of a benefit under, or give rise to any right of termination, cancellation, amendment or acceleration of, any Contracts to which Purchaser is a party or by which Purchaser or any of its respective properties are bound, except, in the case of clauses (ii) and (iii), for any such conflict, violation, breach, default, acceleration, loss, right or other occurrence which would not have or reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Transactions or to otherwise timely perform its obligations under this Agreement.

(b)    The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the Transactions do not and will not require any consent, approval, authorization or permit of, action by, filing with or notification to, any Governmental Body, except for (i) the applicable requirements, if any, of the Exchange Act and state securities, takeover and "blue sky" Laws, and, (ii)  any such consent, approval, authorization, permit, action, filing or notification the failure of which to make or obtain would not have or reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Transactions or to otherwise timely perform its obligations under this Agreement.

6.4    Financial Capability.  Purchaser has sufficient funds available to it in cash to pay or cause to be paid the Purchase Price and the fees and expenses required to be paid by Purchaser in connection with the Transactions, and to effect the Transactions.  Upon the consummation of the Transactions, (a) Purchaser will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) Purchaser will not be left with unreasonably small capital, (c) Purchaser will not have

28

incurred debts beyond its ability to pay such debts as they mature, and (d) the capital of Purchaser will not be impaired.

6.5     Condition of the Purchased Assets.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Article V (as modified by the Company Disclosure Letter or any Company SEC Documents), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis.  Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Purchased Assets and, in making the determination to proceed with the Transactions, Purchaser has relied on the results of its own independent investigation and the representations and warranties of Seller in Article V.

6.6     Exclusivity of Representations and Warranties.  Purchaser acknowledges that except for the representations and warranties made by Seller in Article V, neither Seller, any of their respective Affiliates, nor any Representatives of any of the foregoing, make (and neither Purchaser or any other Person has relied upon) any representations or warranties on behalf of Seller.  Purchaser further agrees that neither Seller nor any other Person will have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser in certain "data rooms" or management presentations in expectation of the Transactions.  For the avoidance of doubt, Purchaser acknowledges that none of Seller, any of their respective Affiliates, nor any Representatives of any of the foregoing, make any express or implied representation or warranty with respect to "Confidential Information" as defined in the Confidentiality Agreement, other than to the extent the representations and warranties made by Seller in this Agreement expressly speak to matters that constitute "Confidential Information."  Purchaser acknowledges and agrees that it (a) has had an opportunity to discuss the business of Seller with the management of Seller, (b) has had sufficient access to (i) the books and records of Seller and (ii) the electronic data room maintained by Seller for purposes of the Transactions, (c) has been afforded the opportunity to ask questions of and receive answers from officers and other key employees of Seller and (d) has conducted its own independent investigation of Seller, its respective businesses and the Transactions, and has not relied on any representation, warranty or other statement by any Person on behalf of Seller, other than the representations and warranties of Seller expressly contained in Article V, and that all other representations and warranties are specifically disclaimed.  In connection with any investigation by Purchaser of Seller, Purchaser has received or may receive from Seller or its other Representatives on behalf of Seller certain projections, forward-looking statements and other forecasts and certain business plan information in written or verbal communications.  Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Purchaser is familiar with such uncertainties, that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to Purchaser (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that Purchaser will have no claim against Seller or any other Person with respect thereto.  Accordingly, Purchaser acknowledges that neither Seller nor any other Person on behalf of the Seller make (and neither Purchaser or any other Person has

29

relied upon) any representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

## VII.    BANKRUPTCY COURT MATTERS

7.1    <u>Submission for Bankruptcy Court Approval</u>.  As promptly as practicable after the execution of this Agreement, Seller will file with the Bankruptcy Court a supplemental motion seeking (a) entry of the Bidding Procedures Order and authorizing the observance and performance of the Bidding Procedures Order by Seller and Purchaser and approval of the Bid Protections and (b) the Sale Order, including the approval of this Agreement and the sale of the Purchased Assets to Purchaser on the terms and conditions hereof if determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order.  Such motion must be reasonably acceptable to Purchaser.

7.2    <u>Bankruptcy Process</u>.

(a)    Seller and Purchaser acknowledge and agree that this Agreement, the sale of the Purchased Assets and the Transactions are subject to higher or otherwise better bids (in accordance with the Bidding Procedures Order) and Bankruptcy Court approval (each, a "<u>Competing Bid</u>"), as determined in Seller's sole and exclusive discretion.  Purchaser and Seller acknowledge that Seller must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best offer for the Purchased Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about Seller's business to prospective bidders, entertaining higher or otherwise better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an auction (the "<u>Auction</u>").  Purchaser agrees and acknowledges that Seller and their Affiliates will be permitted, and will be permitted to cause their Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Purchaser and its Affiliates, agents and Representatives).  In addition, the Seller shall have the responsibility and obligation to respond to any inquiries or offers for a Competing Bid and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, including supplying information relating to the Seller or the Purchased Assets to prospective purchasers.

(b)    The bidding procedures to be employed with respect to this Agreement and any Auction will be those reflected in the Bidding Procedures Order, which must be in form reasonably acceptable to Purchaser.  Purchaser agrees to be bound by and accept the terms and conditions of the Bidding Procedures Order as entered by the Bankruptcy Court to the extent such Order is substantially in a form reasonably acceptable to Purchaser.

(c)    Purchaser will provide adequate evidence and assurance under the Bankruptcy Code of the future performance by Purchaser of each Purchased Contract.  Purchaser will, and will cause its Affiliates to, reasonably promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of

adequate assurance of future performance under the Purchased Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Representatives available to testify before the Bankruptcy Court.  Subject to the other terms and conditions of this Agreement, Purchaser will, from and after the Closing Date, (i) assume all Liabilities of Seller under the Purchased Contracts and (ii) satisfy and perform all of the Liabilities related to each of the Purchased Contracts when the same are due thereunder.

(d)     Purchaser and Seller agree to use commercially reasonable efforts to cause the Bankruptcy Court to enter the Sale Order in substantially the form attached hereto as Exhibit A with such changes or modifications as may be requested by Purchaser or Seller that are consented to in writing by the other Party, with such consent not to be unreasonably withheld, conditioned or delayed, if either (i) no other Qualified Bid is timely submitted in accordance with the Bidding Procedures Order or (ii) one or more Qualified Bids is timely submitted and the sale of the Purchased Assets to Purchaser on the terms and conditions hereof (as may be modified at the Auction) are determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order.

(e)     Seller covenants and agrees that if the Sale Order is entered, the terms of any plan submitted by Seller to the Bankruptcy Court for confirmation will not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of Purchaser hereunder, or in any way prevent or interfere with the consummation or performance of the Transactions including any transaction that is contemplated by or approved pursuant to the Sale Order.

(f)     If the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement are appealed or petition for certiorari or motion for rehearing or reargument is filed with respect thereto, Seller agrees to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion and Purchaser agrees to cooperate in such efforts and each Party agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal; provided, that the absence of an appeal of the Sale Order will not be a condition to any Party's obligation to consummate the Transactions at the Closing.

(g)     For the avoidance of doubt, nothing in this Agreement will restrict Seller or its Affiliates from selling, disposing of or otherwise transferring any Excluded Assets or from settling, delegating or otherwise transferring any Excluded Liabilities, or from entering into discussions or agreements with respect to the foregoing.

7.3     Approval of Break-Up Fee and Expense Reimbursement.  In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation hereof and the identification and quantification of assets of Seller, Seller shall pay Purchaser, in accordance with the terms hereof and the Bidding Procedures Order, a break-up fee in an amount equal to (a) $450,000 (the "Break-Up Fee") plus (b) the amount of the reasonable, out-of-pocket and documented expenses of Purchaser incurred in connection with the negotiation hereof up to an aggregate amount of $250,000 (such expense reimbursement, together with the Break-Up Fee, the "Termination Payment" or the "Bid Protections").  Subject to the entry of the Bidding Procedures Order, the Termination Payment shall be paid on the third

31

(3rd) Business Day following the date of consummation of an Alternative Transaction if no material breach by Purchaser of this Agreement has occurred; provided, that, for the avoidance of doubt, the Parties acknowledge and agree that the Termination Payment will be paid to Purchaser in the event that the Alternative Transaction is consummated after this Agreement is terminated pursuant to Section 4.4(a) to the extent that Purchaser has not materially breached the terms of this Agreement.  In accordance with Section 7.1, Seller shall file with and seek the entry by the Bankruptcy Court of the Bidding Procedures Order approving the payment of the Termination Payment, pursuant to, and subject to the limitations set forth in, this Agreement. This provision shall survive the termination of this Agreement.

7.4    Back-Up Bidder.   Subject to Section 4.4 hereof, Seller and Purchaser agree that, in the event that Purchaser is not the winning bidder at the Auction and in accordance with the Bidding Procedures Order, if and only if (a) Purchaser submits the second highest or second best bid at the Auction and is named the "Back-Up Bidder" at the Auction, in each case, as determined by Seller, (b) Purchaser has not terminated this Agreement, including, pursuant to Section 4.4(a), and (c) Seller gives notice to Purchaser that Seller (i) failed to consummate the sale with the winning bidder, and (ii) has terminated the definitive agreement with the winning bidder, Purchaser shall promptly consummate the Transactions upon the terms and conditions as set forth herein, including payment of the Purchase Price, as applicable, in accordance with Article III, as the same may be increased by Purchaser at the Auction.

## VIII.  COVENANTS

8.1    Access to Information.   From the Effective Date through the Closing Date, Purchaser will be entitled, through its Representatives, to make such investigation of the Purchased Assets and the Assumed Liabilities as it reasonably requests for purposes of furthering the consummation of the Transactions; except that, without Seller's prior written consent (which consent may not be unreasonably withheld, conditioned or delayed), (a) Purchaser and its Representatives will not have the right to perform any investigative procedures that involve physical disturbance or damage to the properties of Seller or its Affiliates, and (b) any such investigation will not include any sampling of environmental media, including soil, land, soil gas, surface water, groundwater, stream sediments, indoor air, ambient air or building materials. Any such investigation and examination will be conducted upon reasonable advance notice and under reasonable circumstances, will occur only during normal business hours and will be subject to restrictions under applicable Law.  Seller will direct its respective Representatives to cooperate with Purchaser and Purchaser's Representatives in connection with such investigation and examination, and Purchaser and its Representatives will cooperate with Seller and its Representatives.  Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would require Seller to disclose information that would cause material competitive harm to Seller or would violate attorney-client privilege or other confidentiality obligations of Seller.  No investigation by Purchaser will affect or be deemed to modify any of the representations, warranties, covenants or agreements of Seller contained in this Agreement.

8.2    Actions Pending the Closing.   Except (a) as required by applicable Law or by Order of the Bankruptcy Court, (b) as otherwise expressly contemplated by this Agreement, or (c) with the prior written consent of Purchaser, during the period from the Effective Date to and

through the Closing Date, Seller will (taking into account the commencement of the Bankruptcy Cases, the anticipated liquidation and shut-down of operations of Seller other than the Purchased Assets and other changes, facts and circumstances that customarily result from the events leading up to and following the commencement of bankruptcy proceedings, and Seller's commercially reasonable responses to and actions in light of Changes related to the COVID-19 pandemic): (i) maintain the Purchased Assets in their current condition, ordinary wear and tear excepted (and excluding sales of inventory in the Ordinary Course of Business); (ii) not materially amend, modify, terminate, let lapse (other than the expiration of a Contract pursuant to its terms) or waive any rights under, or create any Lien with respect to, any of the Purchased Contracts; (iii) use commercially reasonable efforts to defend and protect the Purchased Assets from deterioration; (iv) materially comply with applicable Laws with respect to the Purchased Assets; (v) not sell bulk wine that constitutes Wine Inventory to any third party (which shall not prohibit the bottling of bulk wine and the sale of such finished or cased goods) other than bulk wine comprised of Substandard Wine Inventory pursuant to Section 3.3; (vi) move any Inventory from their location as of the date hereof (other than sales of Inventory in the Ordinary Course of Business), or (vii) not enter into any agreement or commitment to take any action prohibited by this <u>Section 8.2</u>.

8.3    <u>Consents</u>.  Seller and Purchaser will use their commercially reasonable efforts to obtain at the earliest practicable date all consents and approvals contemplated by this Agreement, including the consents and approvals referred to in <u>Section 5.3</u> and the Necessary Consents; provided, <u>however</u>, that none of Seller or Purchaser (other than with respect to Assumed Cure Costs) will be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any Actions to obtain any such consent or approval.  For the avoidance of doubt, the Parties acknowledge and agree that obtaining any such authorizations, consents and approvals, giving such notices and making such filings will not be a condition to Closing.

8.4    <u>Reasonable Best Efforts; Consents to Assignment</u>.

(a)    Upon the terms and subject to the conditions of this Agreement, each of the Parties will use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the Transactions as promptly as practicable, including the prompt preparation and filing of all forms, registrations and notices required to be filed to consummate the Transactions and the taking of such commercially reasonable actions as are necessary to obtain any requisite approvals, consents, Orders, exemptions or waivers by any Governmental Body or any other Person.

(b)    Each Party will promptly inform the others of any communication from any Governmental Body (other than the Bankruptcy Court or the Office of the United States Trustee) regarding any of the Transactions and promptly provide the others with copies of all related correspondence or filings.

8.5    <u>Publicity</u>.  With the exception of press releases issued by Seller and Purchaser on the Effective Date and the Closing Date in forms mutually agreeable to Seller and Purchaser, Purchaser and Seller will not issue any press release or public announcement concerning this

33

Agreement or the Transactions without obtaining the prior written approval of the other Parties, which approval may not be unreasonably withheld, conditioned or delayed, except that such consent will not be required if disclosure is otherwise required by applicable Law or by the Bankruptcy Court; provided, however, that Purchaser or Seller, as applicable, will use its or their commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Parties with respect to the text of any such required disclosure.

8.6    Confidentiality.  Purchaser acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under Section 8.1, and is subject to the terms of the confidentiality agreement dated July 8, 2024, between Seller and Purchaser (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference.  Purchaser acknowledges and understands that this Agreement and related documents may be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders or contract counterparties and that, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.

8.7    Access Agreements.  Prior to the Closing, Seller and Purchaser will negotiate mutually acceptable terms of an agreement providing Seller with access, for a period of at least 12 months following the Closing Date, to Purchaser's personnel, including any transferred employees, information technology systems, including email, third party service providers and books and records, and use of office space and office support for employees of Seller, as is reasonably necessary or appropriate in connection with the administration of the Bankruptcy Cases and to permit Seller to wind-down and liquidate the Seller's Bankruptcy Estates following the Closing.

8.8    Employee Matters. Purchaser may, but shall not be required to, extend employment offers to any Business Employees it so chooses in its sole and absolute discretion, with such offers to be effective as of the Closing Date. At the Closing Date, Seller shall terminate those Business Employees who accept an offer of employment with Purchaser.  Seller shall be responsible for payment of all compensation and other amounts, including any severance, payable to current or former employees or other service providers of Seller relating to the Brands who are not offered employment with Purchaser or who do not accept offers of employment with Purchaser, incurred by Seller on or prior to the Closing.  With respect to any employee or consultant of Seller not hired or otherwise engaged by Purchaser, Seller shall be liable for any obligation, Liability or cost associated with his/her termination of employment or service by Seller.  Seller shall give all notices and other information required to be given to the employees of Seller and any applicable government authority under National Labor Relations Act, COBRA or any other applicable Law in connection with the Transactions provided for in this Agreement.  Seller shall be responsible for any and all Liability under the Worker Adjustment and Retraining Notification Act, or under any state Law concerning layoffs or the closing or relocation of worksites or the like, which arises out of or results from any Business Employee's termination of employment by Seller.  This Section 8.8 is solely for the purpose of defining the obligations between Purchaser and Seller concerning the employees of Seller and shall in no way be construed as creating any employment Contract or other Contract between

34

Purchaser or Seller and any employee, or as granting any third-party beneficiary status to any employee.

8.9    Inventory. The Parties acknowledge and agree that Purchaser will be responsible for acquiring possession of the Inventory and that Purchaser will use its reasonable best efforts to acquire such possession of the Inventory as soon as reasonably practicable after the Closing and in no event later than four weeks after the Closing Date.  Purchaser will be responsible for all fees and expenses incurred in connection with acquiring and maintaining possession of the Inventory, including labor, transportation and storage after acquisition.  Seller and its Affiliates will, or will cause the applicable purchaser of the applicable location (each, an "Other Purchaser"), if applicable, to, maintain storage of the Inventory for a period of up to four weeks after the Closing Date at no cost to Purchaser.  After such four-week period, Purchaser will pay Seller or the applicable Other Purchaser a storage fee equal to market rates (as determined by Seller in its sole discretion) (provided, that, neither Seller nor any Other Purchaser will have any obligation to maintain storage of such Inventory after the date that is four weeks following the Closing Date).  Purchaser agrees to indemnify and hold harmless Seller or the applicable Other Purchaser, as applicable, and their respective Affiliates and Representatives for any losses or damages incurred by them in connection with storing of, or the removal of, the Inventory following the Closing. Each applicable Other Purchaser and each of its applicable Affiliates and Representatives, and each of Seller's applicable Affiliates and Representatives, is an express third-party beneficiary for purposes of this Section 8.9.

8.10    Diagram of Premises; Type 02 License.  Prior to the Closing, Seller will use reasonable best efforts to provide Purchaser with copies of the diagrams of the Real Property provided to ABC in connection with its duplicate Type 02 license.  If these are not available, Seller shall inform Purchaser promptly, and then shall permit Purchaser's Representatives to enter the Real Property for the purpose of measuring the SCV Tasting Room premises and making the appropriate diagrams.  Seller shall provide for submission with Purchaser's duplicate Type 02 License application, a California ABC Form 231 License Action Form in order to cancel its existing duplicate Type 2 license.

## IX.    CONDITIONS TO CLOSING

9.1    Conditions Precedent to Obligations of Purchaser.  The obligation of Purchaser to consummate the Transactions is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    each of the representations and warranties of Seller contained in this Agreement (disregarding all "materiality" or "Material Adverse Effect" qualifications set forth therein) shall be true and correct as of the Closing, as if made on the Closing Date (except for any such representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such specific date), except where the failure of the representations and warranties to be true and correct, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect, and Purchaser shall have received a certificate signed by an authorized officer of Seller on behalf of Seller, dated the Closing Date, to the foregoing effect;

(b)    Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to or on the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller on behalf of Seller, dated the Closing Date, to the forgoing effect;

(c)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2;

(d)    (i) the Title Company shall have irrevocably and unconditionally committed to, and shall stand ready to, issue the Title Policy; and (ii) Seller shall deliver or cause to be delivered to the Title Company the release of any and all Liens (other than Permitted Liens), on the Real Property from the holders of such Liens reasonably necessary to obtain the Title Policy; provided, however, that any such recurring Liens on the Property, such as real estate taxes and assessments, need not be retired but shall be paid current by Seller or Purchaser as of Closing in accordance with Section 10.2; and

(e)    The Sale Order shall have been entered and it shall expressly provide that the transfer of the Purchased Asset to the Purchaser at Closing shall be free and clear of all Liens (other than Permitted Exceptions and Transferred Exceptions).

9.2    Conditions Precedent to Obligations of Seller. The obligations of Seller to consummate the Transactions are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)    each of the representations and warranties of Purchaser contained in this Agreement (disregarding all "materiality" or "material adverse effect" qualifications set forth therein) shall be true and correct as of the Closing, as if made on the Closing Date (except for any such representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such specific date), except where the failure of the representations and warranties to be true and correct, individually or in the aggregate, has not had and would not reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Transactions or to otherwise timely perform its obligations under this Agreement, and Seller shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect;

(b)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by Purchaser prior to or on the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect; and

(c)    Purchaser shall have delivered to Seller all of the items set forth in Section 4.3.

9.3    Conditions Precedent to Obligations of Purchaser and Seller. The respective obligations of Purchaser and Seller to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be

NAI-1540838973v12

waived by Seller and Purchaser, jointly, in whole or in part to the extent permitted by applicable Law):

    (a)    there shall not be in effect any Order by a Governmental Body restraining, enjoining or otherwise prohibiting the consummation of the Transactions; and

    (b)    the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be subject to a stay or have been vacated or revoked.

    9.4    <u>Frustration of Closing Conditions</u>.  No Party may rely on the failure of any condition set forth in <u>Sections 9.1</u>, <u>9.2</u> or <u>9.3</u>, as the case may be, if such failure was caused by such Party's breach of any provision of this Agreement.

## X.    TAXES AND PRORATIONS

    10.1    <u>Transfer Taxes</u>.  All documentary, stamp, transfer, motor vehicle registration, sales, use, value added, excise and other similar non-income Taxes and all filing and recording fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the Transactions (collectively, "<u>Transfer Taxes</u>") will be borne by Seller, regardless of the Party on whom Liability is imposed under the provisions of the Laws relating to such Transfer Taxes.  Seller and Purchaser will consult and cooperate in timely preparing and making all filings, Tax Returns, reports and forms as may be required to comply with the provisions of the Laws relating to such Transfer Taxes and will cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for or exemptions from such Transfer Taxes, including preparing exemption certificates and other instruments as are applicable to claim available exemptions from the payment of Transfer Taxes under applicable Law and executing and delivering such affidavits and forms as are reasonably requested by the other Party.

    10.2    <u>Prorations and other Costs</u>.

    (a)    Purchaser shall pay the premium for an owner's Title Policy, if any, one-half (1/2) of all escrow fees, costs and expenses.  Seller shall pay for one-half (1/2) of all escrow fees, costs and expenses.

    (b)    Title Company shall prorate (on the basis of a 365-day year) real and personal property taxes and other similar and appropriate on-going expenses related to the Purchased Assets, as of the Closing Date, and such prorations shall be set forth on a Closing Statement and agreed to prior to the Closing.  Seller shall be liable for the proportionate amount of such taxes and expenses attributable to the period through and including the Closing Date, and Purchaser shall be liable for the proportionate amount of such taxes and expenses attributable to the period after the Closing Date.

    (c)    Any monthly or recurring expenses that accrue with respect to the Purchased Assets, including utility expenses, shall be prorated between Purchaser and Seller as of the Closing Date on the basis of a 365-day year.  Electricity, water, sewer, gas, electric, telephone and other utility charges shall be prorated to the Closing Date and, if prepaid by Seller,

shall be paid by Purchaser, or if payable subsequent to the Closing Date, shall be charged to Seller.

10.3    Purchase Price Allocation.

(a)    As promptly as practicable after the Closing Date, but no later than 30 days thereafter, Purchaser will prepare and deliver to Seller, an allocation schedule setting forth the amounts to be allocated among Seller and among the Purchased Assets of Seller, pursuant to (and to the extent necessary to comply with) Section 1060 of the Code and the applicable regulations promulgated thereunder (or, if applicable, any similar provision under state, local or foreign Law or regulation) (the "Proposed Allocation Statement").  Seller will have Twenty (20) Business Days following delivery of the Proposed Allocation Statement during which to notify Purchaser in writing (an "Allocation Notice of Objection") of any objections to the Proposed Allocation Statement, setting forth in reasonable detail the basis of their objections.  If Seller fails to deliver an Allocation Notice of Objection in accordance with this Section 10.3(a), the Proposed Allocation Statement will be conclusive and binding on all Parties and will become the "Final Allocation Statement."  If Seller submits an Allocation Notice of Objection, then for ten (10) Business Days after the date Purchaser receives the Allocation Notice of Objection, Purchaser and Seller will use their commercially reasonable efforts to agree on the allocations.  Failing such agreement within ten (10) Business Days of such notice, the unresolved allocations will be submitted to an independent, internationally-recognized accounting firm mutually agreeable to Purchaser and Seller, which firm will be instructed to determine its best estimate of the allocation schedule based on its determination of the unresolved allocations and provide a written description of the basis for its determination within forty-five (45) Business Days after submission, such written determination to be final, binding and conclusive.  The fees and expenses of such accounting firm will be apportioned among Seller and Purchaser equally.  For the avoidance of doubt, in administering any Legal Proceeding, the Bankruptcy Court will not be required to apply the Final Allocation Statement in determining the manner in which the Purchase Price should be allocated as between Seller and their respective estates.

(b)    Seller and Purchaser and their respective Affiliates will report, act, and file Tax Returns (including, but not limited to IRS Form 8594) in all respects and for all purposes consistent with the Final Allocation Statement, and will not take any position (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Final Allocation Statement, in each case, except to the extent otherwise required by a "determination" within the meaning of Section 1313 of the Code.

10.4    Cooperation and Audits.  Purchaser and Seller will cooperate fully with each other regarding Tax matters to the extent commercially reasonable and will make available to the other as reasonably requested all information, records and documents relating to Taxes governed by this Agreement until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes.

## XI.    GENERAL GOVERNING PROVISIONS

11.1    No Survival of Representations and Warranties.  The Parties agree that the representations and warranties contained in this Agreement will not survive the Closing

38

hereunder, and none of the Parties will have any Liability to each other after the Closing for any breach thereof. The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing will survive the Closing hereunder until the expiration of the applicable statute of limitations or for such shorter period explicitly specified therein, and each Party will be liable to the other after the Closing for any breach thereof.

11.2    <u>Damage or Destruction; Taking</u>.

(a)    <u>Damage or Destruction</u>. If prior to the Closing, the Purchased Assets, or any part thereof, is damaged, and such damage shall cost in excess of Three Hundred Thousand Dollars ($300,000.00) to repair, Purchaser has the right, exercisable by giving written notice to Seller within ten (10) days after receiving written notice of such damage or destruction (but in any event no later than one (1) Business Day prior to the Closing), either (A) to terminate this Agreement, in which case the entirety of the monies and any documents in escrow shall be returned to the Party depositing the same, and neither Party shall have any further rights or obligations under this Agreement, except for those obligations that are to survive the termination of this Agreement, as expressly set forth in this Agreement, or (B) to accept the Purchased Assets in its then condition and to proceed with the Closing, and receive an assignment of all of Seller's right to any insurance proceeds payable by reason of such damage or destruction and a credit against the Purchase Price for any applicable deductible. In the event any damage occurs costing less than Three Hundred Thousand Dollars ($300,000.00) to repair, if the Closing occurs, Purchaser shall receive an assignment of any insurance proceeds payable by reason of such damage or destruction, and a credit against the Purchase Price for any applicable deductible. A failure by Purchaser to notify Seller in writing within such ten (10) day period will be deemed an election to proceed under clause (A) above. If Purchaser elects (or is deemed to elect) to proceed under clause (B) above, Seller shall not compromise, settle, or adjust any claims to such proceeds without Purchaser's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed.

(b)    <u>Taking</u>. If prior to the Closing, all or any portion of the Real Property is taken or threatened to be taken by any governmental body or public authority, Purchaser has the right, exercisable by giving written notice to Seller within ten (10) days after receiving written notice of such taking (but in any event no later than one (1) Business Day prior to the Closing), either (A) to terminate this Agreement, in which case the entirety of the monies and any documents in escrow shall be returned to the Party depositing the same, and neither Party shall have any further rights or obligations under this Agreement, except for those obligations that are to survive the termination of this Agreement, as expressly set forth elsewhere in this Agreement, or (B) to accept the Real Property in its then condition and to proceed with the Closing, without any abatement or reduction in the Purchase Price, and receive an assignment of all of Seller's rights to any condemnation award payable by reason of such taking. A failure by Purchaser to notify Seller in writing within such ten (10) day period will be deemed an election to proceed under clause (A) above. If Purchaser elects (or is deemed to elect) to proceed under clause (B) above, Seller shall not compromise, settle or adjust any claims to such award without Purchaser's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. As used in this <u>Section 11.2(b)</u>, "Taking" means any transfer of the Property or any portion thereof to a governmental entity or other party with appropriate authority, by exercise of the power of eminent domain.

39

11.3    <u>Expenses</u>.  Except as otherwise expressly provided in this Agreement, whether or not the Transactions are consummated, each of Seller, on the one hand, and Purchaser, on the other hand, will bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Transactions and all Actions incident thereto.

11.4    <u>Injunctive Relief</u>.

(a)    The Parties agree that irreparable damages would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce specifically the terms and provisions of this Agreement, including without limitation specific performance of such covenants, promises or agreements or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this <u>Section 11.4</u> will be in addition to any other rights which a Party may have at Law or in equity pursuant to this Agreement.

(b)    The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Purchaser or Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of Purchaser or Seller, as applicable, under this Agreement all in accordance with the terms of this <u>Section 11.4</u>.

11.5    <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(a)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Actions related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in <u>Section 11.9</u>; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases have been closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action in the United States District Court for the District of Delaware) and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the Parties hereby consents to process being served by any other Party in any Legal Proceeding by delivery of a copy thereof in accordance with the provisions of Section 11.9; provided, however, that such service will not be effective until the actual receipt thereof by the Party being served.

11.6    <u>Waiver of Right to Trial by Jury</u>.  Each Party to this Agreement waives any right to trial by jury in any Legal Proceeding regarding this Agreement or any provision hereof.

11.7    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement represents the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, will be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

11.8    <u>Governing Law</u>.  This Agreement will be governed by and construed in accordance with federal bankruptcy Law, to the extent applicable, other federal law, where applicable, and, where state Law is implicated, the Laws of the State of California applicable to contracts made and performed in such State.

11.9    <u>Notices</u>.  All notices and other communications under this Agreement will be in writing and will be deemed given (a) when delivered personally by hand, (b) when sent by email (with written confirmation of transmission), or (c) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and email addresses (or to such other address or email address as a Party may have specified by notice given to the other Party pursuant to this provision):

> If to Seller, to:
> Vintage Wine Estates, Inc.
> 205 Concourse Blvd.
>
> Santa Rosa, California 95403
> Attention: Amir Sadr
> Email: asadr@vintagewineestates.com
> Attention: Kristina Johnston
> Email: kjohnston@vintagewineestates.com

NAI-1540838973v12

With copies (which will not constitute notice) to:

Jones Day
901 Lakeside Avenue
Cleveland, Ohio 44114
Attention: Heather Lennox
Email: hlennox@jonesday.com
Attention: George Hunter
Email: ghunter@jonesday.com

If to Purchaser, to:

1701 Vintage Center Circle
Las Vegas, NV 89134
Attention: General Counsel
Email: mgravelle@fnf.com

With copies (which will not constitute notice) to:

Carle, Mackie, Power & Ross LLP
100 B Street, Suite 400
Santa Rosa, CA 95401
Attention: Phillip Kalsched
Email: pkalsched@cmprlaw.com; and lbalok@cmprlaw.com

11.10    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

11.11    Assignment.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement (other than as set forth in Section 8.9 and provided that any Person that is not a Party will be a third-party beneficiary for purposes of Section 11.12).  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of Law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents will be void; provided, however, that (a) Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more Affiliates and (b) Seller may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities (including any liquidating trust) pursuant to a Chapter 11 plan confirmed by the Bankruptcy Court, in the case of each clause (a) and (b) without any other Party's consent.  No assignment of any obligations hereunder will relieve the

42

Parties of any such obligations.  Upon any such permitted assignment, the references in this Agreement to Seller or Purchaser will also apply to any such assignee unless the context otherwise requires.

11.12   Non-Recourse.  No past, present or future director, officer, employee, incorporator, member, partner, equityholder, manager, agent, attorney, Representative or Affiliate of the Parties or any of their Affiliates will have any Liability for any obligations or Liabilities of Seller or Purchaser, as applicable, under this Agreement or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the Transactions contemplated hereby and thereby.  Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as Parties or thereto, and then only with respect to the specific obligations set forth herein or therein.  Other than the Parties, no other Person will have any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or Liabilities of any Party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any Legal Proceeding based on, in respect of, or by reason of, Transactions (including the breach, termination or failure to consummate such Transactions), in each case whether based on contract, tort, fraud, strict liability, other Laws or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a Party or another Person or otherwise.  In no event will any Person be liable to another Person for any remote, speculative or punitive damages with respect to the Transactions.

11.13   Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

11.14   Restrictive Covenants.  Upon and after the Closing Date until the earlier of (i) the effective date of a plan of reorganization with respect to the Bankruptcy Cases, (ii) the dismissal of the Bankruptcy Cases, and (iii) six months after the Closing Date, Seller shall not, and shall cause its Affiliates not to:

(a)    conduct business under, or otherwise use, directly or indirectly, any name that consists of any word included in the name of any Brand or any synonyms therefor, or any word or words in combination therewith;

(b)    refer to themselves as the makers, creators, founders or originators of any of the Brands in any commercial context;

(c)    publicly disparage, criticize, defame or slander the Brands, Purchaser or Purchaser's current or future Affiliates; or

(d)    cause or attempt to cause any client, customer, distributor or supplier of the Brands to terminate or materially reduce its business with Purchaser or any current or future Affiliate thereof regarding the Brands.

[*Signature page follows*]

NAI-1540838973v12

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the Effective Date.

PURCHASER:

FOLEY FAMILY WINES, INC.

By: _____
       *Shawn Schiffer*
       4D72EBE9239B423...
       Name:  Shawn Schiffer
       Title:  President

[Signature Page to Asset Purchase Agreement]

COMPANY:

VINTAGE WINE ESTATES, INC.

By: _____
    Name: Kristina Johnston
    Title: Authorized Person

[Signature Page to Asset Purchase Agreement]